IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| **CARLOS AYESTAS,** | § | |
| | § | |
| Petitioner, | § | |
| | § | |
| | § | |
| -VS- | § | No. 4:08-mc-00480 |
| | § | |
| | § | **DEATH PENALTY CASE** |
| | § | |
| **NATHANIEL QUARTERMAN**, Director, | § | |
| Texas Department of Criminal Justice, | § | |
| Institutional Division, | § | |
| | § | |
| Respondent. | § | |
| | § | |

## PETITION FOR A WRIT OF HABEAS CORPUS

TO THE HONORABLE UNITED STATES DISTRICT COURT JUDGE:

Petitioner, Carlos Ayestas, also known as Dennis Zelaya Corea, is currently

confined on death row at the Polunsky Unit in Livingston, Texas. Through undersigned

counsel and pursuant to the Constitution of the United States and 28 U.S.C. § 2254, Mr.

Ayestas petitions this Court to issue a Writ of Habeas Corpus and to order his release

from confinement on the grounds that his custody violates the Constitution and laws of

the United States.

## JURISDICTION

This court has jurisdiction pursuant to 28 U.S.C. § 2241(d) because Mr. Ayestas

was convicted in the 230th Judicial District Court in Harris County, Texas. Subject

matter jurisdiction is conferred by 28 U.S.C. § 2254.

## PRIOR PROCEEDINGS

Mr. Ayestas was convicted and sentenced to death in the 230th District Court of Harris County, Texas. His conviction and sentence were affirmed on November 4, 1998. *Ayestas v. State*, No. AP-72,928 (Tex. Crim. App. 1998) (unpublished). No petition for writ of certiorari was filed. Mr. Ayestas pursued state post-conviction relief. The 230th District Court of Harris County, Texas, signed the State's proposed findings of fact and conclusions of law without alteration and transferred the case to the Texas Court of Criminal Appeals ("CCA"). The CCA denied Mr. Ayestas's claims for relief on September 10, 2008. *Ex parte Ayestas*, No. WR-75-4409-A (Tex. Crim. App. 2008) (unpublished).

## STATEMENT OF FACTS

Carlos Ayestas was indicted for the murder of Santiaga Paneque in the course of either robbery or burglary. R.R. XIX 771. On September 5. 1995, Elim David Paneque left his mother's house to go to work. R.R. XX 79. Shortly after noon that day Elim returned home for lunch, only to find the house had been "ransacked" and his mother had been killed. R.R. XX 87-112.

Anna McDougall lived across the street from Santiaga Paneque. One day in late August of 1995, she drove to an apartment in Imperial Valley to pick up a man named "Carlos" to take him back to her house to show him a car that she had for sale. R.R. XX 119. Another man accompanied "Carlos." R.R. XX 120. While the men examined the car, McDougall went inside her house to get a drink of water and was gone for about

---

[1] R.R. hereinafter refers to the Reporter's Record, the record on direct appeal. R.O.A. refers to the Record On Appeal, the record of pleadings created as part of the direct appeal. C.R. refers to the Clerk's Record, the record in habeas corpus.

fifteen minutes. R.R. XX 120-121. When she came back outside, the men were emerging from Santiaga's house across the street. R.R. XX-121-122, 134. Ms. McDougall asked "Carlos" if he knew Paneque; he said he did not and that she had called them over to her house to look at a some furniture she had for sale. R. XX 123. Four days after Paneque was murdered, Ms. McDougall picked Carlos Ayestas out of a photo-spread and positively identified him as "Carlos." R.R. XX 128-129, 153-154. Out of another photo-spread she identified Federico Zaldivar as the man who had accompanied "Carlos." R.R. XX 130, 153-154.

On September 20, 1995, Henry Nuila was visiting his sister and her family at their home in Kenner, Louisiana. R.R. XIX 158. At that time Mr. Ayestas and two other men were staying there. R.R. XIX 158-159. Mr. Ayestas was introduced to Nuila as "Dennis," and Nuila identified him in court, and identified a rose tattoo on his right upper arm. R.R. XIX 160-162, 182-183. Mr. Ayestas is from Honduras, and Nuila, who is bilingual, conversed with him in Spanish. R.R. XIX 163.

Nuila first testified that Mr. Ayestas told him that "they had murdered a female" in Houston. R.R. XIX 164. After the prosecutor handed him a copy of the statement he had given to Kenner police the next day, Nuila revised his testimony to say that Mr. Ayestas told him the "he" killed a female. R.R. XIX 166, 187. Mr. Ayestas told Nuila that his companions had "told someone" and that they were talking too much. R.R. XIX 164. Mr. Ayestas then told Nuila that he wanted Nuila's help in killing his two companions, and threatened to kill Nuila if he refused. R.R. XIX 168. After Mr. Ayestas fell asleep Nuila alerted the Kenner police, and the three were arrested as they slept in a

- 3 -

back room of the house. R.R. XIX 174-179. Mr. Ayestas's two companions were never identified before the jury.

At the time of her initial autopsy report, on September 6, 1995, the medical examiner determined that the deceased was killed by asphyxiation due to ligature strangulation. R.R. XX 170, 188. In June of 1997, however, at the request of the District Attorney's office, the medical examiner re-examined her data and amended the cause of death to show asphyxiation due to strangulation, which could include ligature strangulation, but would also encompass the possibility of manual strangulation, or a combination of ligature and manual strangulation. R.R. XX 189, 194-195, 198. After reviewing the data, the medical examiner decided that "there was definitely a manual or hand component to the strangulation." R.R. XX 199.

Police were able to lift eighteen identifiable, comparable fingerprints from various locations in the deceased's home. R.R. XIX 146. In a report dated September 19, 1995, police identified two of Mr. Ayestas's thumbprints from the roll of duct tape that had been found on the counter of the master bathroom. R.R. XX 230-34. Nearly two years later, on June 12, 1997, a fingerprint and a palm print taken from the strip of duct tape used to bind the deceased's ankles were also identified as belonging to Mr. Ayestas. R.R. XX-230-233, 251-252. The fingerprint examiner testified he had examined both of these latter prints before June of 1997, and he simply "missed" the identification on that earlier occasion. R.R. XX-252-253.

The evidence presented at the guilt/innocence phase of trial was thus wholly circumstantial. There were no eye-witnesses, no accomplice testimony, no direct confession or statement introduced against Mr. Ayestas.

- 4 -

At the punishment phase of trial the State introduced pen packets from California to show that Mr. Ayestas was prosecuted in 1990 for two instances of possession of narcotics with the intent to sell, one for heroin and one for cocaine. He was placed on probation for those offenses. In 1991 he was again prosecuted for burglary, convicted, his probations revoked, and he was sentenced to two years for the burglary, and three years each for the narcotics possession, all sentences to run concurrently. R.R. XXI 93-95, XXIII (State's Exs. 125, 126). The State admitted a judgment of conviction for misdemeanor theft in Harris County in July of 1995, R.R. XXIII (State's Exs. 123A, 129), and additional evidence of Mr. Ayestas's arrest in Kenner, Louisiana, including the fact that the "machine gun" Nuila saw in Mr. Ayestas's possession was a Tech DC-9, and that there were, at the time of the arrest, thirteen live rounds in a clip of thirty. R.R. XXI 179-180.

In addition, one Candelario Martinez testified that three days after Paneque was murdered, he drove a friend named Jose to a motel on 1-45 so that Jose could recover some money that was owed him. R.R. XXI 101. Jose went into a motel room to collect the money, and Martinez waited in his truck. R.XXI 101-102. A man then approached Martinez and pulled out an "Uzi." R.R. XXI 102. Martinez was forced into the motel room and made to lie on the floor. R.R. XXI 104. Another man in the motel room was already holding a knife to Jose's throat. R.R. XXI 104. There were three assailants in all, and Martinez identified the man with the gun as Mr. Ayestas. R.R. XXI 104, 136-39.

Elim David Paneque was recalled at the mitigation phase of trial to testify to the impact his mother's death has had on his life. R.R. XXI 182-86. He told the jury that he could not sleep at night or trust people, and that he is always looking over his shoulder on

- 5 -

the street. *Id.* He was in therapy for six months after her death, and has had to return to therapy since. His mother was very close to him. He was only twenty-five when she was killed, and he felt cheated of the chance to know her as an adult. He testified to feeling "an emptiness inside of me which no one and I think nothing can ever fill." Two days after his mother's death, David received notice of his acceptance for American citizenship, something his mother wanted very much for him. Because of her death she never got to see him sworn in. R.R. XXI 186.

In contrast, the defense did not investigate a mitigation case. Therefore they only presented three letters from a Ms. Mae J. Martin, addressed to the Parole Board, which stated that Mr. Ayestas was enrolled in her class in English as a second language while awaiting trial for this offense. In all three letters, dated December 1, 1996, April 21, 1997, and June 10, 1997, she characterized him as a "serious and attentive" student who was "progressing well." R.R. XXI 190-191; XXIII (Defense Exhibits 1, 2, and 3).

After resting its case, the defense then asked to re-open the punishment evidence and attempted to offer two official documents from Honduras, one apparently intended to show that Mr. Ayestas had no criminal history there, the other a work permit. R.R. XXI 193-194, XXIII (Defense Exs. 5, 6). However, the name on the documents was "Denys Humberto Zelaya Corea," and because Mr. Ayestas's counsel failed to investigate the case they were not prepared to show that this was the same person as Mr. Ayestas without putting him on the witness stand. R.R. XXI 194-196. Apparently the documents had just been given to counsel that very day, having been sent by Mr. Ayestas's parents from Honduras. R.R. XXI 198-99. Trial counsel then requested that Mr. Ayestas be allowed to testify for the limited purpose of establishing that the documents referred to

- 6 -

him, without being subject to general cross-examination; the trial court denied this

request. R.R. XXI 195. Trial counsel then withdrew this proffer of evidence. R.R. XXI

197-98. The jury reached a punishment verdict in less than twenty-five minutes,

answering the special issues in such a way that the death penalty was imposed. C.R. 311

("State's final arguments . . . concluded at 1:50. At 2:15, the Jury was seated in open

court and assessed punishment at Death.").

## CLAIMS FOR RELIEF

### I.     MR. AYESTAS WAS DENIED HIS SIXTH AND FOURTEENTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL AT THE MITIGATION PHASE WHEN HIS TRIAL COUNSEL'S PERFORMANCE FELL BELOW THE STANDARD OF PRACTICE IN CAPITAL CASES.

Mr. Ayestas's trial counsel utterly failed to provide a constitutionally adequate

defense at the punishment phase of his capital trial by failing to investigate and present

compelling mitigating evidence that would have borne on the future dangerousness and

mitigation special issues. *Wiggins v. Smith*, 539 U.S. 510, 523 (2003) ("[W]e focus on

whether the investigation supporting counsel's decision not to introduce mitigating

evidence of Wiggins' background was itself reasonable."); *Williams v. Taylor*, 529 U.S.

362, 415 (2000) (O'Connor, J., concurring) (noting counsel's duty to conduct the

"requisite, diligent" investigation into his client's background). Trial counsel here

investigated, discovered, and presented virtually no evidence – evidence which was

available and abundant – to persuade the jury that aspects of Mr. Ayestas's character and

background warranted imposition of a life sentence. They failed to produce available

evidence to show Mr. Ayestas's abundant good character traits, including his kindness

and reputation for helping the less fortunate; his lack of criminal history in Honduras; the

fact that one of his co-defendants in this case, Frederico Zaldivar, followed him to Honduras from the United States and was a "bad influence" according to Mr. Ayestas's family; and that Mr. Ayestas suffers from schizophrenia and/or psychosis and alcoholism and drug use.

Instead, trial counsel presented only a trio of identical letters, addressed to the Parole Board, from a teacher who instructed Mr. Ayestas in English as a foreign language in the Harris County Jail while he awaited trial on the instant case. These letters merely stated that that Mr. Ayestas was a serious and conscientious student. This presentation, ineffectual as it was, was sufficient to allow the victim's son to make a highly damaging victim impact statement. *See Mosley v. State*, No. 72,281, slip op. at 88-89 (Tex. Crim. App. July 1, 1998) (capital defendant can avoid victim impact testimony by either waiving reliance on, or presenting no evidence relevant to, the mitigation special issue).

The Sixth Amendment guarantees an accused "the guiding hand of counsel at every stage of the proceedings against him." *Gideon v. Wainwright*, 372 U.S. 335, 342 (1963) (*quoting Powell v. Alabama*, 287 U.S. 45, 68-69 (1932)). A defendant is denied effective assistance when trial counsel performs deficiently, *i.e.*, his performance falls below professional norms, and when that deficient performance is prejudicial. *Strickland v. Washington*, 466 U.S. 668, 688 (1984). To establish prejudice, a "defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. If "there is a reasonable probability that at least one juror would have struck a different balance," the petitioner has established prejudice. *Wiggins v. Smith*, 539 U.S. 510, 537 (2003).

- 8 -

In *Wiggins v. Smith*, the Supreme Court pointed to the American Bar

Association's *Guidelines for the Appointment and Performance of Defense Counsel in*

*Death Penalty Cases* as a guide to what constitutes defense counsel's obligations. 539

U.S. 510, 522 (2003). The Guidelines begin with a description of the *minimum*

components to an adequate defense team in a death penalty case. In Guideline 4.1,

entitled "The Defense Team and Supporting Services," the Guidelines specify:

> The defense team should consist of no fewer than two attorneys qualified in accordance with Guideline 5.1, an investigator, and a mitigation specialist.
>
> The defense team should contain at least one member qualified by training and experience to screen individuals for the presence of mental or psychological disorders or impairments.

GUIDELINES FOR THE APPOINTMENT AND PERFORMANCE OF DEFENSE

COUNSEL IN DEATH PENALTY CASES (2003), GUIDELINE 4.1.A.1-A.2 (available

at http://law.hofstra.edu/pdf/Academics/Journals/LawReview/lrv_issues_v36n03_CC1a-

Guidelines.pdf). *See also GUIDELINE 10.4.C.2.a-c* ("The Defense Team") *and*

*Commentary* at 1003 (this team "is the minimum")).

> As the *Commentary* to *Guideline 4.1* explains:

> The defense [in a death penalty case] must both subject the prosecution's evidence to searching scrutiny and build an affirmative case of its own. Yet investigating a homicide is uniquely complex and often involves evidence of many different types. Analyzing and interpreting such evidence is impossible without consulting experts – whether pathologists, serologists, microanalysts, DNA analysts, ballistics specialists, translators, or others.

GUIDELINES at 955.

> Regarding the punishment phase, the *Guidelines* state:

> **[T]he defendant's psychological and social history and his emotional and mental health** are often of vital importance to the jury's decision at the punishment phase. Creating a competent and reliable mental health evaluation consistent with prevailing standards of practice is a time-

- 9 -

consuming and expensive process. **Counsel must compile extensive historical data**, as well as obtaining a thorough physical and neurological examination. Diagnostic studies, neuropsychological testing, appropriate brain scans, blood test or genetic studies, and consultation with additional mental health specialists may also be necessary.

Counsel's own observations of the client's mental status, while necessary, can hardly be expected to be sufficient to detect the array of conditions (*e.g.*, post-traumatic stress disorder, fetal alcohol syndrome, pesticide poisoning, lead poisoning, schizophrenia, mental retardation) that could be of critical importance. Accordingly, Subsection A(2) mandates that at least one member of the defense team (whether one of the four individuals constituting the smallest allowable team or an additional team member) be a person qualified by experience and training to screen for mental or psychological disorders or defects and recommend such further investigation of the subject as may seem appropriate.

GUIDELINES at 956-57 (emphasis added).

The *Commentary* also explains why "the use of mitigation specialists has become

part of the existing standard of care in capital cases." GUIDELINES at 960.

A mitigation specialist is also an indispensable member of the defense team throughout all capital proceedings. Mitigation specialists possess clinical and information-gathering skills and training that most lawyers simply do not have. They have the time and the ability to elicit sensitive, embarrassing and often humiliating evidence (*e.g.*, family sexual abuse) that the defendant may have never disclosed. They have the clinical skills to recognize such things as congenital, mental or neurological conditions, to understand how these conditions may have affected the defendant's development and behavior, and to identify the most appropriate experts to examine the defendant or testify on his behalf.

Perhaps most critically, having a qualified mitigation specialist assigned to every capital case as an integral part of the defense team insures that the presentation to be made at the penalty phase is integrated into the overall preparation of the case **rather than being hurriedly thrown together by defense counsel still in shock at the guilty verdict**. The mitigation specialist compiles a comprehensive and well-documented psycho-social history of the client based on an exhaustive investigation; analyzes the significance of the information in terms of impact on development, including effect on personality and behavior; finds mitigating themes in the client's life history; identifies the need for expert assistance; assists in locating appropriate experts; **provides social history information to experts to enable them to conduct competent and reliable evaluations;**

- 10 -

and works with the defense team and experts to develop a comprehensive and cohesive case in mitigation.

GUIDELINES at 959-60 (emphasis added).

Regarding investigation, the *Guidelines* mandate:

A.  Counsel at every stage have an obligation to conduct thorough and independent investigations relating to the issues of both guilt and penalty.

    1.  The investigation regarding guilt should be conducted regardless of any admission or statement by the client concerning the facts of the alleged crime, or overwhelming evidence of guilt, or any statement by the client that evidence bearing upon guilt is not to be collected or presented.

    2.  The investigation regarding penalty should be conducted **regardless of any statement by the client that evidence bearing upon penalty is not to be collected or presented.**

GUIDELINE 10.7 ("Investigation") (emphasis added).

The *Commentary* elaborates:

Counsel's duty to investigate and present mitigating evidence is now well established. The duty to investigate exists regardless of the expressed desires of a client. **Nor may counsel sit idly by, thinking that investigation would be futile.**

Because the sentencer in a capital case must consider in mitigation anything in the life of the defendant which might militate against the appropriateness of the death penalty for the defendant, penalty phase **preparation requires extensive and generally unparalleled investigation into personal and family history.** In the case of the client, this begins with the moment of conception. Counsel needs to explore:

(1) Medical history (including hospitalizations, mental and physical illness or injury, **alcohol and drug use,** pre-natal and birth trauma, malnutrition, developmental delays, and neurological damage);

(2) **Family and social history** (including physical, sexual or emotional abuse; family history of mental illness, cognitive impairments, substance abuse, or domestic violence; poverty,

- 11 -

familial instability, neighborhood environment and peer influence); other traumatic events such as exposure to criminal violence, the loss of a loved one or a natural disaster; experiences of racism or other social or ethnic bias; **cultural or religious influences**; failures of government or social intervention (*e.g.*, failure to intervene or provide necessary services, placement in poor quality foster care or juvenile detention facilities);

(3) **Educational history** (including achievement, performance, behavior, and activities), special educational need (including cognitive limitations and learning disabilities) and opportunity or lack thereof, and activities;

(4) Military service (including length and type of service, conduct, special training, combat exposure, health and mental health services);

(5) **Employment and training history** (including skills and performance, and barriers to employability);

(6) **Prior juvenile and adult correctional experience** (including conduct while under supervision, in institutions of education or training, and regarding clinical services);

\* \* \*

It is necessary to **locate and interview the client's family members** (who may suffer form some of the same impairments as the client), and virtually **everyone else who knew the client and his family**, including neighbors, teachers, clergy, case workers, doctors, correctional, probation or parole officers, and others. … Records should be required concerning not only the client, but also his parents, grandparents, siblings and children.

GUIDELINES at 1021-23, 1024 (internal punctuation omitted, emphasis added). *See also* GUIDELINE 10.11 *generally and* F ("The Defense Case Concerning Penalty").

The *Guidelines'* mandate echoes some of Texas' standards for capital defense counsel. An attorney appointed to a death penalty case must:

(A)   be a member of the State Bar of Texas;

(B)   exhibit proficiency and commitment to providing quality representation to defendants in death penalty cases;

(C)   have at least five years of experience in criminal litigation;

(D)   have tried to a verdict as lead defense counsel a significant number of felony cases, including homicide trials and other trials for offense punishable as second or first degree felonies or capital felonies;

(E) have trial experience in:

> (i) the use of and challenges to **mental health** or forensic **expert witnesses**; and

> (ii) **investigating and presenting mitigating evidence** at the penalty phase of a death penalty trial; and

(F) have participated in continuing legal education courses or other training relating to criminal defense in death penalty cases.

TEX. CODE CRIM. PROC. art. 26.052 (d)(2) (emphasis added).

The 2003 ABA Guidelines relied upon by the Supreme Court in *Wiggins* and

*Rompilla* updated and expanded upon the 1989 ABA Guidelines, which provide ample

support for Mr. Ayestas's claim of ineffective assistance:

> The ABA Guidelines provide that investigations into mitigating evidence "should comprise efforts to discover **all reasonably available** mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor." ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases 11.4.1(C), p. 93 (1989). Despite these well-defined norms, however, counsel abandoned their investigation of petitioner's background after having acquired only rudimentary knowledge of his history from a narrow set of sources. *Cf. id.,* 11.8.6, p. 133 (noting that among the topics counsel should consider presenting are **medical history**, educational history, employment and training history, **family and social history**, prior adult and juvenile **correctional experience**, and religious and **cultural influences** (emphasis added)); 1 ABA Standards for Criminal Justice 4-4.1, commentary, p. 4-55 (2d ed.1982) ("The lawyer also has a substantial and important role to perform in raising mitigating factors both to the prosecutor initially and to the court at sentencing .... Investigation is essential to fulfillment of these functions").

*Wiggins*, 539 U.S. 524-25 (2003). *See also Rompilla v. Beard*, 545 U.S. 374, 387 (2005).

Courts have not hesitated to impose the 2003 Guidelines as standards for evaluating claims of ineffective assistance for trials that predated the updated guidelines. *Walbey v. Quarterman*, 309 Fed. Appx. 795 (5th Cir., Jan. 19, 2009) (granting punishment phase relief in 1993 case based on ABA Guidelines); *Anderson v. Sirmons*, 476 F.3d 1131 (10th Cir. 2007) (relying on 2003 Guidelines to reverse death sentence imposed in 1996); *Dickerson v. Bagley*, 453 F.3d 690 (6th Cir. 2006) (granting punishment phase relief in 1985 case based on 2003 Guidelines).

At the penalty phase of Mr. Ayestas's trial, powerful evidence was put before the jury by the the State. In contrast, the jury was given no evidence which might counter this powerful evidence (aside from the three identical, one-paragraph letters addressed to the Parole Board). In failing to produce substantial evidence from which the jury might have answered either of the special issues at the punishment phase in such a way that a life sentence would have been imposed, trial counsel afforded less than reasonably effective assistance, depriving him of a fair punishment hearing.

For example, trial counsel failed to investigate Mr. Ayestas's family history and to secure the attendance of Mr. Ayestas's family members and others in Honduras who were available to testify on his behalf. In state habeas, counsel discovered a plethora of mitigating evidence which should have gone before the jury. At least three members of

Applicant's family would have been more than willing to testify at the punishment phase of his trial, had they been given sufficient advance notice by Applicant's attorneys to allow them to obtain visas and travel to Houston in time. Unfortunately, Applicant's trial counsel did not notify his family that Applicant was even facing prosecution until it was too late.

C.R. 28 (Application for Writ of Habeas Corpus). *See also id.* 91-110 (Affidavits of Zoyla Corea, Mr. Ayestas's mother, and Xiomara and Blanca Zelaya, his sisters). His

family members would have testified in detail about Mr. Ayestas's upbringing in Honduras and his good character and reputation for kindness. *See id.*

Habeas counsel discovered that Mr. Ayestas was born on July 2, 1969, in a public hospital in Tegucigalpa, which is the capitol city of Honduras. *Id.* He was an active child. *Id.* His parents had no marital problems, and always lived together while he and his siblings were growing up. *Id.* For the first twelve years of his life, the family lived in Tegucigalpa. *Id.* There his parents ran a small business, and the family lived in the same building. *Id.* Both his parents were always present, and shared the responsibility of raising the children. *Id.* His mother cooked for the family all the time. *Id.* Mr. Ayestas grew up in a stable, middle class background. *Id.* He was raised in a supportive home environment. *Id.* His father had been married once before, but the children of his father's first marriage had a good relationship with Mr. Ayestas and his siblings, which is unusual in Honduras. *Id.* Mr. Ayestas has one older sister who is now a legal assistant in Honduras. *Id.* One of his younger sisters is currently studying to be a doctor. *Id.*

Young Mr. Ayestas always got along well with his siblings; he never fought with them, or even raised his voice. *Id.* He was a well-mannered son who always obeyed his parents and never talked back to them. *Id.* Mr. Ayestas's parents never let the children play outside of their own house and yard. *Id.* In Honduras children stay close to home, and friends come over to the house to play. *Id.* Corporal punishment was not common in the household. *Id.* On occasions Mr. Ayestas's father would strike him to discipline him, but not with violence. *Id.* The usual form of punishment was simply to talk to the children, and sometimes to deprive them of television privileges. *Id.* There was no physical or sexual abuse of the children. *Id.*

- 15 -

When Mr. Ayestas was about twelve years old, the family moved to San Pedro Sula, where his parents started another small business. *Id.* Mr. Ayestas went to a private high school in San Pedro Sula, and studied accounting. *Id.* He always received above average grades, had no discernable learning disorders, and was never held back in school. *Id.* Mr. Ayestas grew up in the Catholic Church. *Id.* He went to mass every week, and was sincere and devout in his beliefs. *Id.*

Mr. Ayestas never broke the law or got into any kind of trouble whatsoever while growing up in Honduras. *Id.* He first left home when he was eighteen. *Id.* He told the family he was going to Guatemala. *Id.* But after he left they found a note in his room saying he had gone to the U.S. instead. *Id.* The family was very surprised and upset. *Id.* The first time he came to the U.S., Mr. Ayestas stayed only a few months and then returned to Honduras. *Id.* He gave no indication of any intent to go back to the U.S. after that, and he worked in the family business for a while. *Id.* But then he decided to go back to the U.S. *Id.* He traveled back and forth between Honduras and the U.S. about three times. *Id.* Each time he returned to Honduras, the family always expected that he would remain. *Id.* When he would come back from the U.S. he always lived at home. *Id.*

The last time Mr. Ayestas returned to Honduras, in 1994 after he was incarcerated in California, he told the family that if someone came looking for him, to say he was not there. *Id.* He seemed to be avoiding somebody. *Id.* Frederico Zaldivar then began to come by the house, asking where he could find Mr. Ayestas. *Id.* The family refused to tell him, and begged him to leave Mr. Ayestas alone. *Id.* They regarded Zaldivar as a bad influence on Mr. Ayestas. *Id.*

- 16 -

Moreover, trial counsel would have discovered similar documentation of Mr. Ayestas's clean record in Honduras, had said counsel performed even a minimal investigation and timely contacted their client's family. See C.R. 111-132 (Writ Ex. H, Documentary Evidence from Honduras). Thus the witnesses' testimony that Mr. Ayestas was a model citizen in Honduras who did well in school and never got into any trouble while growing up would have been corroborated by documentary evidence.

Mr. Ayestas's capital trial counsel did not even begin to try to contact his family in Honduras until May 29, 1997, almost two years after the offense, and barely a month before the trial was set to commence on July 7, 1997. *Id.*

On May 29, 1997 trial counsel's investigator drafted a letter addressed to "La Familia Zelaya" in San Pedro Sula, Honduras. C.R. 134. In this letter the investigator attempts to inform Mr. Ayestas's family for the first time that Mr. Ayestas is awaiting trial. Obviously, this is not the sort of contact with the defendant's family members that is called for by professional norms.

Once the family "received the letter," they contacted trial counsel "immediately, and communicated with her by telephone every day after that." C.R. 109 (Affidavit of Blanca Corea, Mr. Ayestas's sister). However, trial counsel then failed even to obtain visas for members of her client's family, or to obtain a continuance to allow for their appearance:

> [Trial counsel] wanted at least to have Xiomara and [Zoyla, Mr. Ayestas's mother] come to Houston to testify at the punishment phase of Dennis's trial. It was our understanding that [counsel] was going to fax us a letter to take to the U.S. Embassy in Tegucigalpa, explaining the urgency of the situation and the need to grant us visas to allow us to travel to Houston for the trial. However, we never received such a fax.
>
> On July 7, 1997, we went to the U.S. Embassy to try to obtain visas without a letter from [trial counsel], but were denied visas. We were told that a letter was required from [her] explaining the situation and the need

- 17 -

> for our presence in Houston. The family later got approval for visas, but not until July 31, 1997, by which time the trial was long over.

C.R. 93 (Affidavit of Zoyla Corea, Mr. Ayestas's mother).

It was not a product of trial strategy that trial counsel failed to interview and obtain the presence of members of Mr. Ayestas's family to establish his good character traits. Counsel did try to contact the family, but only so late that it was impossible to actually secure their presence for trial. Counsel may not forego investigation into the client's life history for any reason. *Wiggins v. Smith*, 539 U.S. 510 (2003). See also GUIDELINE 10.7 ("The investigation regarding penalty should be conducted regardless of any statement by the client that evidence bearing upon penalty is not be collected or presented.").

In addition, bringing these witnesses to testify would have allowed trial counsel to introduce further documentary evidence of his good character and history. Counsel had in their possession documents from Honduras which showed that Dennis Humberto Zelaya Corea, that is, Mr. Ayestas, had no criminal history in Honduras. Petitioner was christened "Dennis Humberto Zelaya." *Id.* "Carlos Manuel Ayestas" is an alias for Dennis Humberto Zelaya. *Id.* Had his family members been present to testify at the punishment phase of his trial, they could have established that the "Denys Humberto Zelaya Corea" whom Honduran records showed to have no criminal background or history growing up in Honduras, R.R. XXI at 193-199, XXIII (Defense Ex. 5), was in fact the same "Dennis Humberto Zelaya" who was on trial under the name of "Carlos Manuel Ayestas." C.R. 2 at 28 (Application for Writ of Habeas Corpus). For example, a criminal record card for Denys Corea showing no offenses had a fingerprint on its reverse side. If his sisters were able to testify, in addition to giving their mitigating testimony,

- 18 -

they would also have been able to attest that Denys Zelaya Corea was in fact Carlos Ayestas. C.R. 91-110. Instead, the trial court refused to admit the clear criminal history check of Mr. Zelaya Corea, who was in fact the defendant on trial. R.R. XXIII (Def. Proposed Ex. 6).

Trial counsel's failure to secure family members to testify at the punishment phase of trial prejudiced Mr. Ayestas by depriving him of persuasive evidence relevant both to the first special issue regarding his future dangerousness and the mitigation issue. Trial counsel simply offered three brief, repetitive letters from a teacher of English as a foreign language in the Harris County Jail, letters which were addressed to the Parole Board, and literally nothing else. Introduction of this evidence must surely have left an impression with the jury that Mr. Ayestas was a very dangerous character indeed, with no redeeming qualities whatsoever, if these paltry letters -- not even live testimony -- was the absolute best that his defense team could come up with to present to them at that critical juncture of the trial. Trial counsel did not even mention the mitigation special issue during their final argument at the punishment phase of trial. Thus, the jury was deprived of "important information to know." C.R. 146 (Exhibit M, Affidavit of Juror Charles Pence Burke). This may explain why the jury's sentencing deliberations lasted less than *twenty-five minutes*. *See* C.R. 311 ("State's final arguments . . . concluded at 1:50. At 2:15, the Jury was seated in open court and assessed punishment at Death.").

If counsel had been able to produce testimony from the family, along with official corroborating documentation attesting to their client's long history of studiousness and good citizenship in Honduras, they might well have been able to convince the jury that Mr. Ayestas was not an incorrigibly dangerous man after all, and that his life might be

- 19 -

worth sparing. *Id.* Instead, what trial counsel did present was just enough mitigation evidence arguably to justify the State in presenting the devastating victim impact testimony from the deceased's son. *See Mosley v. State*, No. 72,281, slip op. at 88-89 (Tex. Crim. App. July 1, 1998) (capital defendant can avoid victim impact testimony by either waiving reliance on, or presenting no evidence relevant to, the mitigation special issue).

But for trial counsel's ineffectiveness at the punishment phase, there is a reasonable possibility that the jury would have answered one or more of the special issues in such a way that the trial court would have been obliged to sentence Mr. Ayestas to life in prison rather than death. Had they produced any member of Mr. Ayestas's family, they could have presented substantial evidence to show his good character traits, his positive upbringing, his good scholastic record, and the lack of any juvenile or criminal record while growing up. None of Mr. Ayestas's California convictions were for violent offenses, and this character evidence could have gone a long way to convince the jury either that the deceased's death was an anomaly, and that Mr. Ayestas would not likely pose a continuing threat to society, or that he was deserving of a life sentence notwithstanding any conclusion that he would be a future danger. Instead, trial counsel presented just enough paltry punishment evidence arguably to justify presentation of Elim Paneque's devastating victim impact testimony. Given the fact that trial counsel acquiesced in the selection of a death-prone jury, it is no surprise that the jury assessed a death sentence in record time.

Because they failed to investigate and secure testimony from the family, who were all readily available had counsel acted in a timely manner, counsel provided

representation that fell below what the profession regards as reasonably acceptable under

the circumstances. This failure undermines confidence in the verdicts of guilt and death

in light of the available mitigating evidence.

In addition, Mr. Ayestas suffers from psychosis and schizophrenia, alcoholism,

and possibly drug abuse, conditions of which the jury certainly should have been

informed. Ex. A, TDCJ Medical Records, Master Problem List.[2] Texas Department of

Criminal Justice physicians noted his psychiatric and drug abuse problems in September

2000:

> Patient . . . reports his problem to be that a man in a cell below him (does
> not know if it is the inmate) can read his mind, knows what he is saying in
> private and what he is writing. He announces this info. To everyone on
> the pod. He believes this may be connected witchcraft. Patient is a
> Christian. He reports 14 year history of alcohol abuse and recreational
> usage of cocaine for a year.

*Id.*, Clinic Notes, Sept. 22, 2000. Accord TDCJ Medical Records, Clinic Notes, Oct. 3,

2000; *Id.*, TDCJ Medical Records, Clinic Notes, Oct. 10, 2000 ("MSE reveals he is

consistent [regarding] his complaint of people reading his mind and following his thought

. . . ."). Mr. Ayestas was prescribed Stelazine (trifluoperazine), an anti-psychotic drug,

and Cogentin (benztropine), which minimizes the side effects of Stelazine. *Id.*,

Individual Treatment Plan, Oct. 10, 2000. This treatment was effective. *Id.*, Clinic

Notes, Nov. 7, 2000.

Despite his distaste for the anti-psychotic medication, Mr. Ayestas was put back

on the psychotropic treatment, at least twice, after insisting that he did not need it.

Within four months of his being prescribed the Stelazine and Cogentin for his psychiatric

---

[2] Mr. Ayestas has reams of medical records, which mostly consist of mental health
records. *See* TDCJ Medical Records, Regular Course of Business Affidavit of Devoriah
Nauls ("640 [pages] of records"). Undersigned counsel appends only a representative
selection of these records.

problem, Mr. Ayestas decided he did not want to continue with the treatment and informed prison medical personnel that he had already stopped taking his medication. *Id.*, Clinic Notes, Jan. 9, 2001. Six months later he again complained of "voices, suspiciousness." *Id.*, Clinic Notes, July 31, 2001. At this time he was assessed as "Par. Schizo," DSM code "295.30 (check mark)" – in other words Schizophrenic, Paranoid Type. *Id. See* Diagnostic and Statistical Manual I at 806, App. F, Diagnoses and Codes (1994). He was again prescribed Stelazine and Cogentin. *Id.*, Clinic Notes, July 31, 2001.

Two months later, the diagnosis for this "chronic" psychiatric condition was changed to "Psychosis [with auditory] hallucinations." *Id.*, Individual Treatment Plan, Nov. 29, 2001; *id.*, Individual Treatment Plan, Sept. 26, 2001. Two weeks later the assessment was again changed to Paranoid Schizophrenia. *Id.*, Oct. 15, 2001 ("(A) ITP Dx Code 295.30"). The diagnosis has alternated between Psychosis and Schizophrenia, two related disorders, over time. *See id., passim.* His most recent obtained records list the disorder as schizophrenia. *Id.*, Correctional Managed Care Outpatient Mental Health Services, July 3, 2009.

Soon thereafter Mr. Ayestas again reported "he no longer needs his meds and wishes the meds to be discontinued." *Id.*, Clinic Notes, Dec. 26, 2001. His diagnosis of psychosis was unchanged. *Id.* And again, in less than three months his hallucinations returned – "Everyone knows what he is thinking. . . . Everyone in F pod is talking about Patient's thoughts and laughing at Patient" – and Mr. Ayestas again "requested his meds be returned." *Id.*, Clinic Notes, Feb. 13, 2002.

Mr. Ayestas's psychiatric disorder is indeed "chronic" and persists to this day. See Ex. A, TDCJ Medical Records ("DATE: 07/06/2009 . . . Procedures Ordered: schizophrenia, undifferentiated type, mh death row patient."). His trial counsel's failure to investigate and present this evidence fell below professional norms. ABA Guidelines at 956-57 (The trial team must have a member who is able to "screen for mental or psychological disorders or defects and recommend such further investigation of the subject as may seem appropriate.").

In addition to Mr. Ayestas's social history and psychiatric disorders, the jury should have been presented with evidence that Mr. Ayestas was a long-time alcoholic and drug user. See Ex. A, TDCJ Medical Records, Clinic Notes, Sept. 22, 2000 (alcoholic for 14 years before arrest on the instant charge); *id.*, Medical History, Sept. 17, 1997 (check mark beside alcohol abuse). This is classic mitigating evidence which should have been available for the jury's consideration.

In addition, appointed counsel has discovered further mitigating information. For example, according to his sisters, at one point in Honduras Mr. Ayestas struck a pedestrian while riding his motorcycle. Rather than leave the pedestrian injured on the side of the road, he took the man to the hospital, paid for his medical bills, and continued to pay him even after the accident. Young Mr. Ayestas asked his father to pay for the school tuition of a less fortunate friend. He was very family-oriented – while in America, he would always call or write his family, and when he would return home to Honduras, he would visit as many family members as he could. Indeed, there are at the very least twelve witnesses in Honduras, including Mr. Ayestas's friends, family, and professionals in education, medicine, and religion who have insight into his life and character.

- 23 -

However, counsel has not been able to conduct a full or meaningful investigation because a military coup in Honduras has made any investigation there impossible. As soon as counsel can recruit a "culturally competent" investigator willing to go to Honduras, counsel will supplement this petition with any relevant new information as soon as is practicable. GUIDELINE 5.1. *See* Fed. R. Civ. P. 15(a).

Such further investigation is imperative in light of the fact that no investigator or other legal representative has ever met any of the critical witnesses in Honduras face-to-face. Face-to-face conversations are absolutely necessary to conducting a meaningful mitigation investigation:

> Team members must conduct in-person, face to face, one-on-one interviews with the client and client's family members and any other witnesses who are familiar with the client's life. Multiple interviews will be necessary to establish trust, elicit sensitive information and conduct a thorough and reliable life-history investigation. Team members must endeavor to establish the rapport with the client and witnesses that will be necessary to provide the client with a defense in accordance with constitutional guarantees relevant to a capital sentencing proceeding.

GUIDELINE 10.11 (c) (emphasis added). See also GUIDELINE 5.1 (Counsel must investigate "multi-generational family history, genetic disorders and vulnerabilities, as well as multi-generational patterns of behavior . . . ethnic, racial, cultural and community influences; socio-economic, historical, and political factors.").

Even on the available evidence, the AEDPA, specifically § 2254(d), erects no barrier to this Court's granting relief on this claim and returning the case for a new sentencing proceeding. In denying relief, the trial court and Court of Criminal Appeals accepted the Respondent's proposed findings of fact and conclusions of law in a decision that "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" and which was

- 24 -

"based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding" under those cases. 28 U.S.C. §2254(d).

For example, in the Findings of Fact section of the habeas decision entitled "ATTENDANCE OF APPLICANT'S FAMILY AT TRIAL," the habeas court ruled that "information now asserted in the habeas affidavits of the applicant's family," information which would have been the subject of live testimony at trial, "that the applicant had a normal childhood and family, had no major injuries, illnesses, or problems with the law in Honduras, and made average grade[s], is not significantlty different than the evidence counsel presented at trial through the letters" addressed to the Parole Board from a English teacher at the jail. C.R. 654 (Findings of Fact and Conclusions of Law).

This inexplicable finding is contrary to the decision in *Wiggins*, which does make clear a distinction between reliance on scant documentary evidence and investigation of social history and presentation of live testimony of the defendant's family members and other character witnesses. *Wiggins v. Smith*, 539 U.S. 510, 516 (2003) ("At no point did [trial counsel] proffer any evidence of petitioner's life history or family background. . . . Relying on state social services, medical, and school records, as well as interviews with petitioner and numerous family members, [post-conviction mitigation specialist] chronicled petitioner's bleak life history"). The habeas decision was thus also "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *Id.*

The state habeas court's Conclusions of Law are likewise contrary to Supreme Court precedent and also include unreasonable findings of fact, to wit:

> Trial counsel cannot be considered ineffective based on the applicant's
> family not attending the applicant's trial, in light of the applicant's
> number, initial assertions that he did not want his family contacted and in
> light of trial counsel's extensive efforts to attempt to secure the presence
> of the applicant's family from Honduras after the Applicant changed his
> mind.

FF & CL at 22, WR 665. First, counsel has a duty to investigate and present a capital

client's mitigating social history, regardless of that client's instructions. *See*

GUIDELINE 10.7 ("The duty to investigate exists regardless of the expressed desires of a

client."). Second, counsel did not undertake "extensive" efforts after obtaining

permission from her client. Rather, she waited so long – two years after the offense and

within two months before the trial – to contact Mr. Ayestas's family and according to her

made only the pro forma effort of sending a faxed letter (which was never received).

Furthermore, the state habeas court made no fact finding or legal conclusion

regarding counsel's failure to obtain expert testimony to the effect that Mr. Ayestas's

fingerprints matched those on the certificate of clean Honduran criminal history for

Carlos Humberto Zelaya Corea which was in their possession. If trial counsel had

obtained such testimony, there would have been no dilemma over whether to call Mr.

Ayestas to the stand to testify for a limited purpose, which request was denied, and in

addition counsel would have been able to introduce the clean criminal history in

mitigation. Even this documentary evidence would have greatly added to the mitigation

before the jury, in light of the paltry submission of three one-paragraph letters from the

prison English teacher.

This unpresented mitigating evidence, the failure to investigate and present which

evidence fell below professional norms, undermines confidence in the outcome of the

mitigation phase of Mr. Ayestas's trial.

II.    **MR. AYESTAS WAS DENIED HIS SIXTH AND FOURTEENTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL AT THE GUILT-INNOCENCE PHASE WHEN HIS TRIAL COUNSEL'S PERFORMANCE FELL BELOW THE STANDARD OF PRACTICE.**

In addition to her complete failure to investigate and present mitigating evidence at the mitigation phase of Mr. Ayestas's trial, counsel's performance fell below the standard of practice at the guilt-innocence phase in several ways. First, counsel failed to object to an unconstitutional jury charge which allowed a "patchwork" verdict by which there was no valid, unanimous verdict of guilt as to whether Mr. Ayestas committed the crime of robbery or burglary, which crime served to elevate the murder to capital murder and make him eligible for death.

Second, trial counsel failed to object to the discriminatory strike of a juror on the basis of race. This juror should have been considered an excellent potential juror from the perspective of the prosecutor, given his pro-law enforcement answers, military background, and confidence in the legal system. His answers were very similar to those given by a non-black venireman who did serve on the jury.

Third, counsel allowed the trial court to perform an incomplete voir dire of jurors regarding any conscientious scruples they may have had regarding the death penalty, and acquiesced in dismissing these jurors without putting the State to its burden of proof under the jury death-qualification cases.

Fourth, counsel failed to object to and correct for the jury the prosecutor's statement that, although he did request that the medical examiner who performed the autopsy of the deceased consider the possibility of death by strangulation, he would not ask her to "change the cause of death for me." R.R. XX at 305-306. In doing so the prosecutor essentially testified that he would not, and by implication, did not in this case,

ask the medical examiner to falsify evidence at his request. Because the jury had no legitimate testimony to this effect before it, trial counsel should have objected that the State was testifying and arguing facts outside the record.

Finally, trial counsel rendered ineffective assistance of counsel in failing to object that the arresting and detaining authorities failed to inform him timely of his right to contact the Honduran Consulate, and counsel also failed to provide such notice herself. These failures prevented Mr. Ayestas from investigating and presenting mitigating evidence in this case, to his prejudice.

## A.    Non-unanimous, "Patchwork" Verdict

"[I]t is an assumption of our system of criminal justice so rooted in the traditions and conscience of our people as to be ranked as fundamental that no person may be punished criminally save upon proof of some specific illegal conduct." *Schad v. Arizona*, 501 U.S. 624, 633 (1991) (internal citation omitted). Thus, a defendant has a Sixth Amendment right to "jury consensus as to [his] course of action" which qualifies him for the death penalty. *Id.* at 634, *citing United States v. Gipson*, 553 F.2d 453, 456-59 (5th Cir. 1977). *See also State v. Burke*, 653 N.E.2d 242, 248 (1995) ("[T]he court erred in not instructing the jurors that they must be unanimous in agreeing on which of the alternative [aggravating circumstances the defendant] was guilty of."). By including a more specific description of the offense in the indictment, the State undertakes the burden of proving the specific allegations to obtain a conviction. *Bohnet v. State*, 938 S.W.2d 532, 535 (Tex.App.—Austin 1997). These specific allegations become "facts required to establish the charged offense." *Wray v. State*, 711 S.W.2d 631, 633 (Tex. Crim. App. 1986); *Windham v. State*, 638 S.W.2d 486, 487-88 (Tex. Crim. App. 1982).

Here, the jury was not required to render a unanimous verdict beyond a reasonable doubt as to whether Ayestas committed murder in the course of robbery or burglary. Record on Appeal, 247-49 (allowing jurors to choose between felony murder by robbery or by burglary). Six jurors could find Mr. Ayestas guilty of robbery and six jurors could find him guilty of burglary. The State charged, and the jury chose between, two different crimes: specifically that "Carlos Manuel Ayestas . . . did . . . while in the course of committing and attempting to commit . . . ROBBERY . . . intentionally cause the death" or that he "did . . . while in the course of committing and attempting to commit . . . BURGLARY . . . intentionally cause the death." Ex. B (Indictment).

Although each juror found Mr. Ayestas guilty of *some* type of felony murder, or of assisting or promoting one of his co-defendants to commit that act, it is unclear what crime he actually committed according to the verdict because the judge never instructed the jury that it must agree unanimously on Mr. Ayestas's alleged course of action. *See Paredes v. Quarterman*, 574 F.3d 281 (5th Cir. July 6, 2009). Thus there is no indication that the jury actually convicted him of capital murder, especially since the verdict form was general, not specific. This "patchwork" verdict lessened the State's burden of proof as to guilt beyond a reasonable doubt and violated Mr. Ayestas's rights to due process and jury consensus on an alleged course of action, and his counsel's failure to prevent the flawed charge likewise violated these rights and his right to counsel. *United States v. Correa-Ventura*, 6 F.3d 1070, 1080 n. 16 (5th Cir. 1993). He should be re-tried under a legal charge.

**B.    Incomplete Juror Death Qualification, Death-prone Jury**

In selecting the jury that ultimately sat in this case, the trial court gave general admonishments to three panels consisting of sixty veniremembers each. During each of the three general admonishments, the trial court inquired of the panel who among the veniremembers had conscientious objections to the death penalty such that they "could not consider that as a punishment in any case ever, no matter what the evidence was." R.R. V 30, XI 119-120, XV 41-42. This was the sum total of the questioning on the subject of moral or conscientious scruples against the death penalty, from any source. A total of fourteen prospective jurors told the court they could not consider the death penalty under any circumstances. *See* R.R. V 30-31 (Jurors ## 25, 27, 32, and 53); XI 120-121 (Jurors ## 78, 84, 87, and 95); XV 42 (Jurors ## 127, 129. 131, 132, 151 & 169). Every single one of these prospective jurors was excused from jury service by agreement of the parties, without any further inquiry whatsoever. R.R. V 52-53; XI 132, XV 50. The subject of whether conscientious scruples might impair a prospective juror's ability to answer special issues at the punishment phase of trial conscientiously and without conscious distortion or bias did not come up a single time with any veniremember during the course of the entire individual juror voir dire.

Counsel's failure to object fell below professional norms. Under clear Texas law, firmly in place as of the time of Mr. Ayestas's voir dire in 1997, none of the fourteen prospective jurors whom trial counsel thus agreed to let go had shown himself to be challengeable for cause. Under *Witherspoon v. Illinois*, 391 U.S. 510 1968, the prosecution may not challenge a prospective juror for cause solely on account of his conscientious scruples against the death penalty. This is meant to ensure that no death sentences will be assessed by juries necessarily predisposed to favor capital punishment.

*Adams v. Texas*, 448 U.S. 38 (1980). Under this rule, no defendant may be executed on the basis of findings of fact made by a jury from which a veniremember has been excluded who regards jury service more circumspectly because death is a possible outcome. Of course, the State can successfully challenge a death-scrupled prospective juror for cause. The prosecution may exclude a prospective juror, consistent with the Sixth Amendment, whose views about capital punishment would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Adams*, 448 U.S. at 45. See also *Wainwright v. Witt*, 469 U.S. 412 (1985).

It does violate the Sixth Amendment, however, for the trial court to grant a State's challenge for cause against a prospective juror with conscientious scruples against the death penalty "on any broader basis than [his] inability to follow the law or abide by [his] oath." *Adams v. Texas*, 448 U.S. at 48. Moreover, under Texas law the proponent of a challenge for cause predicated on a bias against the law has the burden to establish that the prospective juror's aversion is so pronounced that he will be substantially impaired in his ability to follow the law as delivered by the trial court. *Clark v. State*, 929 S.W.2d 5, 8 (Tex. Crim. App. 1996); *Riley v. State*, 889 S.W.2d 290 (Tex. Crim. App. 1994).

To show a prospective juror's bias will prevent him from following some phase of the law the proponent of the challenge is entitled to rely on, the proponent must first explain to the juror what the law requires. *Chambers v. State*, 903 S.W.2d 21, 29 (Tex. Crim. App. 1995); *Cuevas v. State*, 742 S.W.2d 331, 343 n. 12 (Tex. Crim. App. 1987); *Trevino v. State*, 815 S.W.2d 592, 614 (Tex. Crim. App. 1991).

In this case, the trial court did not undertake such an inquiry into the jurors' abilities to follow the law and their oath. Instead, every veniremember who showed any hesitation whatsoever to impose a death penalty was summarily excused from service, without any explanation at all of what the law expected of him, much less any inquiry whether he could abide by those expectations, notwithstanding his scruples. None of these prospective jurors ever evinced an inability to follow the law or abide by his oath.

It is true that, in response to the trial court's general queries, these prospective jurors indicated that they could "not consider" the death penalty as an appropriate punishment, "no matter what the evidence was." R.R. V 30. But such a response does not alone demonstrate an inability to abide by the particular statutory scheme under Article 37.071 of the Texas Code of Criminal Procedure and honestly answer the special issues. *Hernandez v. State*, 757 S.W.2d 744, 752 (Tex. Crim. App. 1988). Indeed, neither trial judges nor prosecutors ought to conduct their voir dire "in such a way as to suggest to the juror that his statutory function will be to decide whether a man lives or dies." *Id*. What the prosecutor must do to satisfy his burden is explain to the prospective juror what his statutory function is under Article 37.071, and then ask him directly whether his views on the death penalty will likely cause him to distort *one of his answers* to assure imposition of a life sentence. *Clark v. State*, 929 S.W.2d 5, 8-9 (Tex. Crim. App. 1996); *Ex parte Williams*, 748 S.W.2d 461, at 463, n. 2 (Tex. Crim. App. 1988).

Here, neither the trial court, the prosecutor, nor even the defense lawyers made any such searching examination of any of the fourteen prospective jurors before they were so summarily excused in this cause. This is not simply a case of failing to object to the erroneous granting of a challenge for cause under circumstances in which the State

- 32 -

failed to sustain its burden of proof, or failing to attempt to rehabilitate a prospective

juror for whom the State has, if only marginally, satisfied its burden. Here, Mr. Ayestas's

own trial counsel were active participants in the selection of a jury that was predisposed

to assess the death penalty. In agreeing to let every single one of these veniremembers go

without putting the State to its burden of proof to show they were truly challengeable for

cause, trial counsel positively contributed to the selection of a jury that was so death-

prone it took less than a half an hour to return a sentence of death. In doing so, counsel

rendered less than objectively reasonable assistance of counsel which undermines

confidence in the verdicts of guilt and death.

## C.     Failure To Object To The State's Racially Discriminatory Use Of A Peremptory Challenge of Potential Juror On The Basis Of Race

"Consider[ing] all relevant circumstances," the State in this case excluded an

African American juror – a member of a protected class – from serving on Mr. Ayestas's

jury solely on the basis of race. *Batson v. Kentucky,* 476 U.S. 79, 96 (1986). Willie

Pinchback, who by all accounts seemed an excellent juror from the perspective of a

rational prosecutor, was treated differently from another prospective juror, Davidl Paez,

for no reason save his race. *Miller-El v. Dretke,* 545 U.S. at 241, 253 (2005) (*Miller-El*

*II*) (when the court considers a *Batson* claim, disparate treatment of members of a

protected class is an essential inquiry). "If a prosecutor's proffered reason for striking a

black panelist applies just as well to an otherwise-similar nonblack who is permitted to

serve, that is evidence tending to prove purposeful discrimination." *Miller-El II,* 545

U.S. at 241. *See also Ex Parte Williams,* No. 354897-A (Tex. Crim. App. 2009)

("*Miller-El II* requires the court to factor in evidence of unequal treatment of black venire

members when a Batson challenge arises.").

At trial, the State accepted venireman David Paez, R.R. VII 103, yet struck venireman Willie Pinchback. XVII 25. Defense counsel did not object to the strike of Mr. Pinchback despite the State's having no reason to exclude him, especially in light of their acceptance of Mr. Paez, aside from Mr. Pinchback's race.

Mr. Pinchback and Mr. Paez held very similar views in many respects. Both were members of the military and had served tours in war zones. R.R. VII 103 (Mr. Pinchback served two tours in Vietnam); R.R. XI 36 (Mr. Paez served in Desert Storm).

In other respects, Mr. Pinchback would have been an even better juror for the prosecution. Mr. Paez described himself as "liberal." R.R. XI 37. He rated himself as a "five" on a "scale of 1 to 10, 1 being strongly opposed and 10 being strongly in favor" of the death penalty – "right in the middle" and "open minded" on the issue. *Id.* 38, 40. On the other hand, Mr. Pinchback, "believe[d] in the testament, an eye for an eye. . . . Put them to sleep so . . . society in general can live in peace." R.R. VII 124. Although Mr. Pinchback's son had been arrested and sent to Harris County boot camp, and Mr. Pinchback had a problem with how his son described the manner in which the arrest was conducted, he "[knew] he was wrong. He had to pay his debt. And I pushed for him to go to boot camp. He didn't want to go. He wanted to fight it. I overruled him on that and they sent him on to boot camp." *Id.* at 105. Even given his son's description of the arrest, Mr. Pinchback had no "hard feeling toward the State of Texas." *Id.* at 107. "If bad happens, you find some good and some bad. You have to work with the flow." *Id.*

On the other hand, Mr. Pinchback had little sympathy for offenders: "As a kid growing up they had an old saying on the block: If you couldn't do the time, you don't do the crime. . . . This is what I try to teach all of my kids. . . . You have to pay the price."

-34-

*Id.* 107-8. As for Mr. Pinchback's cousin who was serving time in the penitentiary, "He never figured out right from wrong." Id. 108.

Both jurors attested that they could follow the law and their oath, consider all the evidence, hold the State to its burden, and consider mitigating evidence. There is no reason Mr. Pinchback should have been struck by the State except for his race. The failure to object to the exclusion of this juror fell below the standard of performance, and Mr. Pinchback's exclusion violated Mr. Ayestas's constitutional rights. *Miller-El v. Dretke*, 545 U.S. 231, 238 (2005) ("Nor is the harm confined to minorities. When the government's choice of jurors is tainted with racial bias, that overt wrong casts doubt over the obligation of the parties, the jury, and indeed the court to adhere to the law throughout the trial. [T]he very integrity of the courts is jeopardized when a prosecutor's discrimination "invites cynicism respecting the jury's neutrality [and] undermines public confidence in adjudication.").

## D. Failure To Object To The State's Testifying During Closing Argument and Vouching For Her Witness

In this case the prosecutor essentially testified that he would not, and by implication, did not in this case, ask the medical examiner to falsify evidence at his request. The jury had no legitimate testimony to this effect before it. Trial counsel should have objected that the State was testifying, and arguing facts outside the record.

Dr. Marilyn Murr admitted during her testimony that, in response to a request from the prosecutor to re-examine the autopsy of Paneque shortly before Mr. Ayestas's trial commenced, she changed her conclusion about the cause of death. RR. XX 189-90. Then, during his final argument at the guilt phase of trial, the prosecutor commented:

Dr. Murr, [defense counsel] suggests – [defense counsel] suggests there is something kind of nebulous about her changing her opinion. I don't think

- 35 -

there is any question in any mind in this jury box here she wouldn't change the cause of death for me. I wouldn't ask it and God knows she's not about to do something like that.

R.R. XX 305-306. Thus, the prosecutor essentially testified that he would not, and by implication, did not in this case, ask the medical examiner to falsify evidence at his request. The jury had no legitimate testimony to this effect before it.

Proper jury argument falls within one of four categories: summation of the evidence, reasonable deduction from the evidence, answer to argument of opposing counsel, and pleas for law enforcement. *See McKay v. State*, 707 S.W.2d 23, 36 (Tex. Crim. App. 1985); *Alejandro v. State*, 493 S.W.2d 230,231 (Tex. Crim. App. 1973). A jury argument that injects new and harmful facts into evidence is reversible error. *Id.* Unsworn testimony during jury argument is objectionable on just this ground, for "it is well established that a prosecutor should not inject, by argument, unsworn and inadmissible testimony about a material fact adverse to the defendant which is not in evidence." *Smith v. State*, 446 S.W.2d 317, 318-319 (Tex. Cr. App. 1969). The Court of Criminal Appeals has not hesitated to reverse convictions on this basis. *See, e.g., Good v. State*, 723 S.W.2d 734 (Tex. Crim. App. 1986); *Everett v. State*. 707 S.W.2d 638 (Tex. Crim. App. 1986). Therefore, an objection to this unsworn testimony would have been successful.

In particular, the CCA has been sensitive to prosecutors using final argument to personally vouch for the credibility of State's witnesses. *See Gardner v. State*, 730 S.W.2d 675, 698 (Tex. Crim. App. 1987); *Menefee v. State*, 614 S.W.2d 167 (Tex. Crim. App. 1981). The CCA has also refused to tolerate a prosecutor's assurances during his summation of his own personal integrity in bringing evidence before a jury. *Clayton v. State*, 502 S.W.2d 755 (Tex. Crim. App. 1973).

For the prosecutor to assure the jury in this case that he would not personally ask

his expert witness to falsify evidence, and that she would not, in any event, agree to do it,

was both an impermissible injection of prosecutorial opinion into the case and an

improper voucher for the credibility of a key witness for the State. It was objectionable

on both counts. There is no conceivable reason for Mr. Ayestas's trial counsel not to

object. In failing to do so, they rendered assistance falling below acceptable professional

norms.

### E.     Failure to Inform Mr. Ayestas of His Rights Under The Vienna Convention And/Or To Object To Lack Of Consular Notice Under The Vienna Convention

Trial counsel were apparently unaware of the rights conferred upon their client, a

Honduran national, by the Vienna Convention on Consular Relations. Counsel's

disregard of an area of the law vital to his client's interests is inexcusable. As the United

States Court of Appeals for the Fourth Circuit has observed, "The Vienna Convention . . .

has been in effect since 1969, and a reasonably diligent search by counsel would have

revealed the existence and applicability if any of the Vienna Convention. Treaties are

one of the first sources that would be consulted by a reasonably diligent counsel

representing a foreign national. Counsel in other cases apparently had and have had no

difficulty whatsoever learning of the Convention." *Murphy v. Netherland*, 116 F.3d 97,

100 (4th Cir. 1997).

Under "prevailing professional norms," then, surely an attorney functioning

within objectively reasonable parameters of effectiveness would know, if he were

representing a foreign national, to look to the Vienna Convention for any possible basis

to help his client. In the instant case, that basis was clear, and counsel apparently failed

to recognize it as a basis for arguing that his death sentence was unconstitutional. In that regard, also, counsel rendered less than objectively reasonable assistance of counsel.

This failure prejudiced Mr. Ayestas. Had he been aware of resources counsel could have used to get his family to Texas, which resources were certainly available, such as assistance getting travel visas, his family would have testified to substantial mitigating evidence relevant to both the future danger and mitigation special issues. In addition counsel hereby incorporates the prejudice arguments in Claim V as applicable to this related claim of ineffective assistance of counsel.

The state habeas findings do not preclude relief on this claim. In fact, the habeas decision never finds or concludes that counsel fulfilled her duties of consular notification, and the Court of Criminal Appeals specifically rejected the trial court's finding that she did so by contacting the Honduran Consulate.

## III. THE TRIAL COURT ERRED IN ACCEPTING THE JURY'S VERDICT AS TO WHETHER MR. AYESTAS WOULD CONSTITUTE A CONTINUING THREAT TO SOCIETY BECAUSE THERE WAS LEGALLY INSUFFICIENT EVIDENCE TO SUPPORT SUCH A VERDICT

In reviewing an insufficiency of evidence claim, a federal court on habeas review must consider whether, "after viewing the evidence in the light most favorable to the prosecution, any rational finder of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Dupuy v. Cain*, 201 F.3d 582, 589 (5th Cir. 2000). *Accord Williamson v. State*, 958 S.W.2d 186, 190-1 (Tex. Crim. App. 1997). Although Texas state courts recognize a "factual insufficiency" of the evidence claim, only a "legal insufficiency" of the evidence

- 38 -

claim may be raised in federal court. *Pemberton v. Collins*, 991 F.2d 1218, 1224 (5th

Cir. 1993).

The Texas Legislature has not defined the term "continuing threat to society," nor

has the Court of Criminal Appeals (CCA). *Burks v. State*, 876 S.W.2d 846, 859 (Tex.

Crim. App. 1994). The CCA has, however, provided several non-exclusive factors which

the jury is permitted to consider in determining future dangerousness and which a

reviewing court will find "helpful":

- the circumstances of the capital offense, including defendant's state of mind and whether he was acting alone or with other parties;
- the calculated nature of the defendant's acts;
- forethought and deliberateness exhibited by the crime's execution;
- the existence of any prior criminal record and the severity of the crimes;
- the defendant's age and personal circumstances at the time of the offense;
- whether the defendant was acting under the duress or domination of another at the time of the offense;
- psychiatric evidence; and
- character evidence.

*Williamson*, 958 S.W.2d at 191. In this case, these factors indicate that Mr. Ayestas will

not be a continuing threat to society.

Here, the circumstances of the offense do not indicate that Mr. Ayestas is the

worst of the worst offenders, nor the most dangerous. He acted in concert with his co-

defendants in robbing or burglarizing the deceased, not alone. There was no evidence

presented that Mr. Ayestas was even the person who caused the deceased's death, as

opposed to his two co-defendants – who both accepted plea deals which Mr. Ayestas

refused. Forethought and deliberateness have also not been shown, especially in light of

the fact that the deceased was tied up before she was strangled, which circumstance

suggests an accidental or non-deliberate killing. These acts were not "calculated."

- 39 -

Furthermore, Mr. Ayestas's prior criminal record consists of petty theft and drug possession, not severe crimes.

The latter four *Williamson* factors were not before the jury as a result of trial counsel's ineffectiveness. However, post-conviction investigation into the case has revealed that Mr. Ayestas had a plethora of good character evidence relating to his personal circumstances that the jury never heard because of trial counsel's ineffectiveness, as discussed in Claim I herein. The jury never heard these substantial mitigating facts. In addition, the jury did not hear any psychiatric evidence because none was collected and presented. *Id.*

Mr. Ayestas satisfies the Williamson factors relating to future dangerousness, especially in light of the evidence which the jury did not hear. However, even if the Court finds that the Williamson factors cut against him, and/or that this new mitigation evidence would have had no bearing on the future dangerousness special issue, Mr. Ayestas's death sentence is nevertheless unconstitutionally unreliable because it is based upon inherently unreliable predictions of future dangerousness.

Texas is virtually alone among death penalty jurisdictions in relying exclusively on the aggravating factor of predicting future dangerousness in order to arrive at a sentencing determination.[3] However, it has now been more than two decades since the United States Supreme Court has assessed the constitutionality of this aggravating factor. *See Barefoot v. Estelle,* 463 U.S. 880 (1983). New facts, as well as new legal doctrine pertaining to the admissibility of so-called "junk science," *see, e.g., Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579 (1993), warrant a reassessment of the general

---

[3] The other jurisdiction that does so is Oregon.

permissibility of the use of future dangerousness predictions as an aggravating factor in capital sentencing decisions.

In *Barefoot* itself, where the Supreme Court addressed the reliability of psychiatric predictions of future dangerousness, Justice Blackmun presciently foresaw a case like the present one – he argued that relying on a prediction of future dangerousness as the sole aggravator "create[s] an intolerable danger that death sentences will be imposed erroneously." *Barefoot v. Estelle,* 463 U.S. 880, 924 (1983) (Blackmun, J., dissenting). This very case is the one Justice Blackmun feared.

When the Supreme Court upheld the constitutionality of the Texas capital sentencing regime in *Jurek*, it looked to procedures relating to predictions of future dangerousness in non-capital contexts. *See Jurek v. Texas*, 428 U.S. 262, 275-76 (1976) (plurality opinion). However, in non-capital dangerousness assessments, protective mechanisms serve to defend against false determinations of dangerousness and to account for the possibility of future changes in behavior. Because death is different, and because death row inmates retain life interests throughout their detention on death row, *see Ohio Adult Parole Authority v. Woodard*, 523 U.S. 272, 288 (1998) (O'Connor, J., concurring) *and id.* at 291 (Stevens, J., dissenting), such mechanisms are *a fortiori* required in the capital context.

Where, in a variety of non-capital contexts, the judicial system does employ predictions of future dangerousness, these predictions are reassessed over time to insure that they remain valid. First, for example, in involuntary civil commitment proceedings, a judicial body must determine that there is a likelihood that an individual will pose a

future danger.[4] What constitutes the requisite "danger" for commitment varies from state

to state, but one feature predominates: statutes providing for involuntary commitment

invariably contain provisions for continuing judicial review *after*

confinement begins.[5]

Second, in the case of sexually violent predator acts (SVPAs), civil confinements

follow a prediction of future dangerousness. *See, e.g.,* TEX. HEALTH & SAFETY

CODE § 841.001 (2007). However, the Texas SVPA expressly allows for modification

at any time after a rehearing, and the statute entitles any individual determined to be a

"sexually violent predator" to a biennial examination to review that person's status.[6]

Third, in the non-capital criminal context, parole hearings recognize that changed

circumstances can warrant a modification of punishment. Indeed, the explicit purpose of

parole hearings is to determine whether a person who has been institutionalized poses a

*continuing threat to society.*[7]

The confinement-modification and rehearing provisions in Texas' civil

confinement laws, as well as non-capital criminal contexts, demonstrate a concern for,

and awareness of, the potential for false predictions and the ability of individuals to

change over time.

---

[4] *See* Joanmarie Ilaria Davoli, *Psychiatric Evidence on Trial*, 56 SMU L. REV. 2191, 2203-05 (2003). There are, invariably, civil commitment statutes that allow for indefinite confinement, but those are narrow statutory-based exceptions to the requisite review of civil confinement. *Id.* at 2203 n.68.

[5] *See, e.g.,* OKLA. STAT. tit. 43A, § 5-420 (2002). Oklahoma requires a judicial review of an involuntarily committed person's status every three months, allows the committee or an attorney for the committee to request review, and requires that the Department of Mental Health and Substance Abuse Services take action based upon the review.

[6] TEX. HEALTH & SAFETY CODE §§ 841.082(e), 841.102 (2007).

[7] TEX. ADMIN. CODE § 145.3(1)(B) (2007).

It is now well understood that predictions of future dangerousness are wrong

nearly all of the time.[8] At the time the Supreme Court embraced these predictions in

*Barefoot*, the Court believed that they might prove unsound in one out of every three

cases.[9] In point of fact, in Texas at any rate, these predictions are wrong somewhere

---

[8] *See* Samuel J. Levine, *Playing God: An Essay on Law, Philosophy and American Capital Punishment*, 31 N.M. L. REV. 277 (2001) (citing to Stephen P. Garvey, *"As the Gentle Rain from Heaven": Mercy in Capital Sentencing*, 81 CORNELL L. REV. 989, 1031 (1996) ("Unfortunately, our power to predict future dangerousness seems on a par with our power to predict next month's weather. Study after study shows that long- term predictions of future dangerousness are more often wrong than right."); William J. Bowers & Benjamin D. Steiner, *Death by Default: An Empirical Demonstration of False and Forced Choices in Capital Sentencing*, 77 TEX. L. REV. 605, 667 (1999) ("Judging a person's likely future dangerousness is far from foolproof; indeed, those who have examined such assessments find that they are often unreliable because they are subject especially to 'false positives' or predictions of dangerousness that do not materialize.") (internal citations omitted); Steven G. Gey, *Justice Scalia's Death Penalty*, 20 FLA. ST. L. REV. 67, 118 (1992) (observing that "[n]o jury has the power to ascertain with 100 percent certainty the future actions of the defendant" and referring to "the dubious scientific or predictive value of future dangerousness evidence"); Lynne N. Henderson, *The Wrongs of Victim's Rights*, 37 STAN. L. REV. 937, 973 n.183 (1985) ("Despite the Supreme Court's recent acceptance of the notion that psychiatrists can predict future dangerousness for the purposes of imposing the death penalty, the ability of *anyone* to predict future dangerousness with much accuracy is questionable.") (emphasis added); Jeffrey L. Kirchmeier, *Aggravating and Mitigating Factors: The Paradox of Today's Arbitrary and Mandatory Capital Punishment Scheme*, 6 WM. & MARY BILL RTS. J. 345, 370-72 (1998) ("The use of the 'future danger' aggravating factor as a tool for determining who receives the death penalty is highly suspect."); Douglas Mossman, *The Psychiatrist and Execution Competency: Fording Murky Ethical Waters*, 43 CASE W. RES. L. REV. 1, 3-4 (1992) (observing that the Court's approach "has been roundly criticized in both medical and legal literature"); Irene Merker Rosenberg, Yale L. Rosenberg & Bentzion S. Turin, *Return of the Stubborn and Rebellious Son: An Independent Sequel on the Prediction of Future Criminality*, 37 BRANDEIS L.J. 511, 519-21 (1998-99) (observing that "[a]lthough measures for predicting and preventing future crime are very much in vogue, a substantial body of literature suggests that prophecy of this sort is a very speculative business" and criticizing the Supreme Court for "a lack of appreciation of the inherent difficulty of the task and the consequences of using inadequate methodologies to identify the dangerous predator")).

[9] *Barefoot v. Estelle*, 463 U.S. 880, 899 n.7 (1983).

between 95 and 99 percent of the time.[10] They are, in short, inherently unreliable. A death sentence that rests on such an assessment violates the reliability requirement of the Eighth Amendment.

## IV.   MR. AYESTAS WAS DENIED DUE PROCESS WHERE NO JURY CONSENSUS AS TO AN ALLEGED COURSE OF ACTION WAS REQUIRED

As discussed in the section relating to trial counsel's ineffectiveness, although each juror found Mr. Ayestas guilty of *some* type of felony murder, what crime he actually committed can not be known on this charge and verdict because the judge never instructed the jury that is must agree unanimously on Mr. Ayestas's alleged course of action. *Paredes v. Quarterman*, 574 F.3d 281 (5th Cir. July 6, 2009). Thus there is no indication that the jury actually convicted him of capital murder, especially since the verdict form was general, not specific. This "patchwork" verdict lessened the State's burden of proof as to guilt beyond a reasonable doubt and violated Mr. Ayestas's rights to due process and jury consensus on an alleged course of action. *United States v. Correa-Ventura*, 6 F.3d 1070, 1080 n. 16 (5th Cir. 1993). He should be re-tried under a legal charge.

## V.   MR. AYESTAS'S RIGHTS TO DUE PROCESS, TO BE FREE FROM CRUEL AND UNUSUAL PUNISHMENT, AND TO COMPULSORY PROCESS WERE VIOLATED WHEN HE WAS NOT INFORMED OF HIS RIGHT TO CONTACT THE HONDURAN CONSUL, SUCH THAT HE WAS PREVENTED FROM PRESENTING CRUCIAL MITIGATING EVIDENCE AT THE PUNISHMENT PHASE.

Mr. Ayestas is a Honduran national. Article 36 of the Vienna Convention on Consular Relations, to which both the United States and Honduras are signatories, guarantees that a consular officer of a signatory state shall have the right to visit one of its

---

[10]  See Jessica L. Roberts, Futures Past: Institutionalizing The Re-Examination of Future Dangerousness in Texas Prior to Execution, 11 TEX. J. C.L. & C.R. 101, 121 (2005).

citizens who has been detained in another signatory state, in order "to converse and correspond with him and to arrange for his legal representation." Vienna Convention on Consular Relations, April 24, 1963, Art. 36, 21 U.S.T. 77, 596 U.N.T.S. 261, T.I.A.S. No. 6820 (hereinafter "Vienna Convention").

In addition, the United States and Honduras have also entered into the Bilateral Treaty of Friendship, Commerce and Consular Rights with Honduras, 45 Stat 2618, 1928 WL 26688 (U.S. Treaty) which, unlike the treaties at issue in *Medellin v. Texas*, is self-executing and confers individual rights. Under the Supremacy Clause, then, U.S. Const. art. II, § 2, cl. 2, the treaty obligations undertaken by the United States in the Treaty of Friendship with Honduras are binding upon and enforceable on domestic courts. Among those treaty obligations is the obligation to afford Honduran nationals in this country "that degree of protection that is required by international law." This obligation incorporates the protection of the Vienna Convention, which includes the interpretation of Section 36 of the Vienna Convention which was issued by the International Court of Justice in *Case Concerning Avena and Other Mexican Nationals (Mex. v. U.S.)*, 2004 I.C.J. No. 128 (Judgment of Mar. 31).

Such consular aid cannot be forced upon a foreign national who is detained in the United States. This is because by the terms of Article 36, a detained foreign national must request consular assistance. Of course, in order for a detained foreign national to exercise his option of consular aid, he must be informed of it. Accordingly, Article 36 expressly provides that the detaining state "shall inform the person concerned without delay of his rights" to the assistance of his consul in responding to the fact of his detention. Id. Moreover, the "laws and regulations" of the detaining state must be

- 45 -

sufficient to "enable full effect to be given to the purposes for which the rights accorded under this Article are intended." *Id.*

At no time following his arrest did police inform Mr. Ayestas of his right to consular assistance as guaranteed by Article 36 of the Vienna Convention. CR 85 (Affidavit of Dennis Humberto Zelaya, a/k/a Carlos Manuel Ayestas.) He was never instructed of his option to contact the Honduran Consulate in Houston to help him in making decisions about how to respond to his detention. *Id.*

Had the Honduran Consulate been contacted by Mr. Ayestas, it could have made a difference in the outcome of the trial in at least two ways that significantly impact the assessment of the ultimate penalty of death against Mr. Ayestas. First, in view of the mass of evidence the State had marshaled against him at the guilt phase of trial, the Honduran Consulate could have counseled Mr. Ayestas to accept the State's pre-trial offer of a life sentence in exchange for a plea of guilty to the charges against him. Second, and most critically, if Mr. Ayestas had nevertheless persisted in pleading not guilty, the Honduran Consulate could have taken steps to facilitate the production of mitigating evidence that might have caused the jury to answer one or more of the special issues in such a way that a life sentence would be imposed. Without the intervention of the Consulate, no such evidence was introduced at the punishment phase of trial. Given that practically no evidence was presented at all at the punishment phase of Mr. Ayestas's trial to avoid the death penalty, the absence of involvement of the Honduran Consulate caused a punishment verdict that was not within Eighth Amendment tolerances for reliability.

The failure to inform Mr. Ayestas of his right to consular assistance also deprived him of his rights under the Due Process Clause of the Fourteenth Amendment and the Compulsory Process Clause of the Sixth Amendment to present a complete defense to the State's assertions at the punishment phase of trial that he would be a future threat to society, and that he produced insufficient evidence to warrant a sentence of less than death. The Eighth Amendment assures capital defendants the right to present for jury consideration all relevant evidence which militates against a sentence of death, including evidence which tends to suggest that they will not be dangerous in the future. *Skipper v. South Carolina*, 476 U.S. 1 (1986). Under settled precedent, a capital defendant's good character is always a relevant mitigating factor, not just when it bears on the degree of his fault for the charged offense. Skipper, 476 U.S. at 4.

Moreover, "[a] meaningful opportunity to present a complete defense" is a fundamental right secured both by the Due Process Clause of the Fourteenth Amendment and by the Compulsory Process Clause of the Sixth. *Crane v. Kentucky*, 476 U.S. 683, 690 (1986), *quoting California v. Trombetta*, 467 U.S. 479, 485 (1984). The latter includes not only the right to government assistance in securing the attendance of defense witnesses, as its plain language suggests, but also the broader "right to put before the jury evidence that might influence" the outcome. *Pennsylvania v, Ritchie*, 480 U.S. 39, 56 (1987). "The right to offer testimony is thus grounded in the Sixth Amendment even though it is not expressly described in so many words." *Taylor v. Illinois*, 484 U.S. 400, 409 (1988). Due process also guarantees that in a capital case no person may be sentenced to death on the basis of information that he did not have an opportunity to deny or explain. *Gardner v. Florida*, 430 U.S. 349 (1977). In particular, when imposition of

- 47 -

the death penalty is made to depend in whole or part upon a probability that the defendant will be a continuing threat to society, it is manifestly unfair to exclude evidence proffered by the defense which is relevant to the issue. *Simmons v. South Carolina*, 512 U.S. 154 (1994). Therefore, if the State is to impose the death penalty, the Constitution requires greater than ordinary reliability in the proceedings. *Beck v. Alabama*, 447 U.S. 625 (1980).

By neglecting to inform him of his consular rights under the Vienna Convention, both his lawyers and the arresting and detaining authorities deprived Mr. Ayestas of the ability to present to the jury a complete picture of himself at the punishment phase of trial because he was born and grew up in Honduras, most of the evidence pertaining to his character and background will naturally emanate from there. Had he been informed of his consular rights, Mr. Ayestas would have invoked them.

Involving the Honduran Consulate at an early stage of the proceedings against Mr. Ayestas might have made all the difference. The most basic function of a foreign consulate is to protect its citizens in the receiving state, and the most important protection the consulate can provide when one of its citizens is prosecuted for capital murder in this country is to locate and facilitate the production of evidence of that citizen's background and character from the sending country in an effort to help him avoid the death penalty. *See Uribe, V.*, Consuls at Work: Universal Instruments of Human Rights and Consular Protection in the Context of Criminal Justice, 19 Hou. L.. Int'l L. 375. at 386-387, 416 (1997). But the consulate must be able to communicate immediately with a detained citizen, "because the fulfillment of all other consular protective duties depends" on prompt notification of the detention and communication with the detainee. *Id*. at 387.

- 48 -

Had they been notified of Mr. Ayestas's predicament shortly after his arrest and detention, the Honduran Consulate could have facilitated his legal representation in a number of significant ways. They could have alerted his family many months before the scheduled trial and helped local counsel ascertain exactly what they could contribute in the way of testimony about Mr. Ayestas's character and background in Honduras. They could then have paved the way for the family members to travel to Houston to testify at trial, by helping them timely to secure visas, and they could have helped in the process of gathering and authenticating the documentation from Honduras that would be critical to corroborate the family members' testimony. In the absence of such consular assistance, Mr. Ayestas's trial counsel were either unable, or else simply unwilling, to investigate and produce this critical background information themselves.

Because Mr. Ayestas was unable to obtain consular assistance, he was prevented from introducing critical evidence bearing on his future dangerousness and the question whether other evidence might warrant imposition of a life sentence. The jury heard nothing about his good upbringing in a middle class environment in Honduras. They heard nothing about his good conduct both at home and at school, his better than average academic achievement before leaving home, nor his lack of any criminal record whatsoever growing up. They heard nothing about the apparent bad influence that Federico Zaldivar later exerted upon Mr. Ayestas's character. They saw nothing of how much his family and friends in Honduras love him. In short, the jurors were privy to none of the evidence that might have caused them, or even just a single one of them, to have a reasonable doubt that Carlos Ayestas would constitute a continuing threat to society. They were informed of no mitigating circumstances that might have been

- 49 -

sufficient to warrant imposition of a life sentence. It is no wonder that the jury returned such a swift punishment verdict.

Failing to inform Mr. Ayestas of his consular rights thus deprived him of any meaningful chance to present a defense at the punishment phase of trial. It prevented him from answering the State's evidence of future dangerousness, or meeting his own burden of production of evidence to show why he does not deserve to die. For these reasons Mr. Ayestas suffered a violation of his rights under the Due Process Clause of the Fourteenth Amendment and the Compulsory Process Clause of the Sixth Amendment. And because he was disabled from defending himself at the punishment phase of trial, the jury's swift verdict imposing death cannot be regarded as reliable within the tolerances of the Eighth Amendment. His death sentence should be set aside, and the cause remanded for a new punishment hearing.

## VI. THE TRIAL COURT ERRED IN DENYING MR. AYESTAS'S PRE-TRIAL MOTION TO HOLD ARTICLE 37.071(2)(E) OF THE TEXAS CODE OF CRIMINAL PROCEDURE UNCONSTITUTIONAL BECAUSE THAT PROVISION IMPERMISSIBLY SHIFTS THE BURDEN OF PROOF TO A DEFENDANT

Before trial Mr. Ayestas's lawyers urged that the statutory provision requiring the jury to answer whether "there is a *sufficient* mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than death be imposed" impermissibly shifted the burden to Mr. Ayestas to prove up mitigation. R.O.A. 1 at 98-99. This motion was denied. R.O.A. 1 at 101.

If a capital jury in Texas finds that a defendant will probably present a continuing threat to society (*i.e.*, they exhibit future dangerousness), and that the defendant intended

to kill or anticipated a killing, then, and only then, may the jury address the mitigation
"special issue":

> Whether, taking into consideration all of the evidence, including the
> circumstances of the offense, the defendant's character and background,
> and the personal moral culpability of the defendant, there is a **sufficient**
> mitigating circumstance or circumstances **to warrant that** a sentence of
> life imprisonment without parole **rather than** a death sentence be
> imposed.

Tex. Code Crim. Proced. Art. 37.071(2)(b), (e). By phrasing this issue in terms of

"sufficient" mitigation "to warrant that" life "rather than" death, the statute improperly

imposes a presumptive and default sentence of death, which the defendant must then

overcome by presenting "sufficient" evidence as to why he should not be killed. *See*

*Woodson v. North Carolina,* 428 U.S. 280 (1976) (mandatory death sentences verboten).

Furthermore, where, as here, a foreign-born defendant – whose family and

acquaintances reside in another country and whose case trial counsel does not investigate

mitigating evidence – does not have the means or ability to produce "sufficient"

mitigating evidence, the shift in the burden of proof injects intolerable arbitrariness into

the capital punishment system. This problem is exacerbated by the absence of any

standard that might allow the jury to meaningfully assess what mitigating circumstances

are to be considered "sufficient." There are insufficient "standards provided to guide the

jury in the exercise of its power to select those [death-eligible] murderers who will

receive death sentences." *Roberts v. Louisiana*, 428 U.S. 325, 335 (1976).

Thus the language of the mitigating special issue in Texas, facially and as applied

here, is imposed in a wanton and freakish manner in violation of the defendant's rights to

due process and to be free from cruel and unusual punishment:

> This conclusion rests squarely on the predicate that the penalty of death is
> qualitatively different from a sentence of imprisonment, however long.
> Death, in its finality, differs more from life imprisonment than a 100-year

prison term differs from one of only a year or two. Because of that qualitative difference, there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case.

*Woodson*, 428 U.S. at 305 (1976). Mr. Ayestas must be resentenced under a

constitutional sentencing regime.

## VII. THE TRIAL COURT ERRED IN DENYING MR. AYESTAS'S MOTION TO HOLD TEXAS CODE OF CRIMINAL PROCEDURE ARTICLE 37.071(2)(E) UNCONSTITUTIONAL FOR ITS FAILURE TO ALLOW CONSIDERATION OF MITIGATING EVIDENCE BY LIMITING CONSIDERATION OF EVIDENCE IN MITIGATION TO EVIDENCE WHICH REDUCES MORAL BLAMEWORTHINESS

The charge followed by the jury at sentencing in this case limited its consideration

of mitigating evidence to evidence which reduces moral blameworthiness, in violation of

long lines of Supreme Court precedent.

Following their finding of guilt of capital murder, the jury in Mr. Ayestas's trial

heard penalty phase evidence and then were asked to answer the special issues dictated

by Tex. Code Crim. Proc. Art. 37.071. The charge instructed the jury that:

In answering Special Issue No. 3 you shall consider mitigating evidence to be evidence that a juror might regard as reducing the defendant's moral blameworthiness, including evidence of the defendant's background, character, record, emotional instability, intelligence, or the circumstances of the offense that mitigates against the imposition of the death penalty.

C.R. 262. Thus, if the jury thought that Mr. Ayestas's "background, character, record,

emotional instability, intelligence, or the circumstances of the offense" just so happened

to also coincidentally reduce his moral blameworthiness, then that evidence would

"mitigate[] against the imposition of the death penalty."

The special issue question itself built on this verbiage:

Do you find from the evidence, taking into consideration all of the evidence, including the circumstances of the offense, the Defendant's character and background, and the personal moral culpability of the

> Defendant, . . . that there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed?

C.R. 267. Transposing the definition of "mitigating evidence" provided to the jury into

the special issue question, as the jury did, it is clear that the special issue question

precludes any consideration of mitigating evidence that does not reduce moral

blameworthiness:

> Do you find from the evidence, taking into consideration all of the evidence, including the circumstances of the offense, the Defendant's character and background, and the personal moral culpability of the Defendant, . . . that there is a sufficient *evidence that a juror might regard as reducing the defendant's moral blameworthiness* including evidence of the defendant's background, character, record, emotional instability, intelligence, or the circumstances of the offense to warrant that a sentence of life imprisonment rather than a death sentence be imposed?

C.R. 262, 267. Clearly, even though the jury was instructed to consider a wide range of

evidence, the only evidence that had any relevance to the actual decision to execute Mr.

Ayestas continued to consist only of evidence "that . . . reduc[es] the defendant's moral

blameworthiness." This definition restricted consideration of mitigation to evidence that

was related to the crime. *See Rhoades v. State*, 934 S.W.2d 113, 126 (Tex. Crim. App.

1996) ("photographs of appellant which depict a cheerful early childhood are irrelevant to

appellant's moral blameworthiness for the commission of a violent double-murder

because such evidence has no relationship to appellant's conduct in those murders.").

This special issue, with its nexus requirement, restricted the jury's assessment to whether

there was sufficient evidence related to the killing which happened to reduce Mr.

Ayestas's moral blameworthiness.

As a vehicle for considering mitigating evidence, the special issue as rendered to

Mr. Ayestas's jury is impermissibly narrow because it requires any mitigating evidence

- 53 -

to have a sufficient "nexus" to the offense to reduce the defendant's moral

blameworthiness. This nexus requirement was a feature of the jurisprudence of the Court

of Criminal Appeals and the Fifth Circuit for over a decade, including at the time of Mr.

Ayestas's trial. The Fifth Circuit summarized the analysis of what evidence was relevant

to show reduced moral culpability:

> In order to present relevant evidence that one is less culpable for his crime,
> the evidence must show (1) a "uniquely severe permanent handicap[] with
> which the defendant was burdened through no fault of his own", *Graham
> v. Collins*, 950 F.2d 1009, 1029 (5th Cir. 1992) (en banc), and (2) that the
> criminal act was attributable to this severe permanent condition. *Madden*,
> 18 F.3d at 307.

*Davis v. Scott*, 51 F.3d 457, 461 (5th Cir. 1995). The Court also made it absolutely clear

that there had to be positive evidence establishing that the offending conduct was related

to or attributable to the mitigating evidence. *Davis v. Scott*, 51 F.3d 457, 461 (5th Cir.

1995) (offense not shown to be attributable to evidence of paranoid schizophrenia,

violent sexual proclivities and abusive childhood.); *Barnard v. Collins*, 958 F.2d 634,

638 (5th Cir. 1992) (Abused childhood could rise to the level of a *Penry* claim if the

traumatic events caused psychological effects to which the criminal conduct was

attributable.); *Madden v. Collins*, 18 F.3d 304, 308 (5th Cir. 1994) ("[The] disorder is

not linked causally to the criminal act. [The petitioner] fails to produce substantial

evidence that his childhood abuse . . . had such a psychological effect on him that it led to

the criminal act.").

Both the threshold requrement and the nexus test have now been "unequivocally

rejected." *Smith v. Texas*, 543 U.S. 37 (2004). The history of the interpretation of the

Texas death penalty statute has resulted in the clearly established proposition that a jury

must be given a free rein when considering mitigating evidence. *Tennard v. Dretke*, 542

U.S. 274, 287 (2004) (rejecting nexus requirement, jury must be able to give effect to any evidence that it might find warrants a sentence less than death); *Smith v. Texas*, 543 U.S. 37, 45 (2004) (nexus requirement was never countenanced by the Court and is specifically rejected).

The risk of the undefined term "moral blameworthiness" is therefore clear: a jury that thinks that only evidence that reduces responsibility for the offense can be mitigating is unable to give other non-offense-related mitigating evidence its proper effect. The trial court could and should have given an instruction to clarify for the jury the role it was constitutionally required to perform. To require that mitigating evidence have a relationship to the murder for which a defendant stands to be sentenced, rather than have a relationship to the defendant himself, is to exclude much of what is recognized as mitigating across the country, including evidence that simply aims to humanize a defendant. The responsibility of defense counsel to humanize a defendant in a capital penalty phase has long been recognized. *Strickland v. Washington*, 466 U.S. 668 (1984) (Marshall, J.) ("Experienced members of the death-penalty bar have long recognized the crucial importance of adducing evidence at a sentencing proceeding that establishes the defendant's social and familial connections.").

The mitigation special issue does not provide a vehicle to give full consideration and full effect to mitigating circumstances other than those that reduce a defendant's moral blameworthiness. As a result of the unconstitutional limitation placed upon the use to which the sentencing jury could put evidence of mitigation, the jury was unable to give effect to the one piece of evidence his lawyers put on in mitigation – letters from a prison English teacher which attested that Mr. Ayestas was learning English and progressing

- 55 -

well. R.R. Vol. XXI at 190, shown at R.R. Vol. XXIII, Defendant's Exhibits 1-3. This

mitigating evidence, of course, has no relation to the alleged crime.

## VIII. THE TRIAL COURT'S INSTRUCTION, THAT TEN JURORS MUST AGREE ON THE PRESENCE OF SUFFICIENT MITIGATING CIRCUMSTANCES IN ORDER THAT THE DEFENDANT RECEIVE A LIFE SENTENCE RATHER THAN DEATH, UNCONSTITUTIONALLY MISLED AND COERCED THE JURY

The Texas death penalty statute specifically proscribes informing the jury of the

"effect of a failure to agree" on the so-called "special issues." Tex. Code Crim. Proced.

Art. 37.071(2)(a)(1). In relevant part, the jury must decide

> Whether, taking into consideration all of the evidence . . . there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment without parole rather than a death sentence be imposed.

Tex. Code Crim. Proced. Art. 37.071(e)(1). Although a single juror may believe that the

answer to this question is "no," in which case the court is required to impose a penalty of

life imprisonment, Art. 37.071(g), the jury is instructed that ten of twelve jurors must

decide that the mitigating evidence warrants a life sentence. This untruthful instruction

not only misleads the jurors, it coerces jurors who find the mitigating evidence sufficient

to bend to the will of the majority if there are not nine like-minded jurors at the start of

deliberations.

It is well established that "where discretion is afforded a sentencing body on a

matter so grave as the determination of whether a human life should be taken or spared,

that discretion must be suitably directed and limited so as to minimize the risk of wholly

arbitrary and capricious actions." *Gregg v Georgia*, 428 U S 153, 189 (1976). Thus, the

death penalty should not be imposed under any sentencing procedures which would

create a substantial risk that the death penalty might be inflicted in an arbitrary and

capricious manner, including sentencing procedures which mislead the jury about its role as sentencer. *Caldwell v. Mississippi*, 472 U.S. 320 (1985); *Gardner v. Florida*, 430 U.S. 286 (1977).

In order to preserve this well-established rule providing that the death penalty may not be arbitrarily or capriciously administered, the United States Supreme Court has made clear that jury instructions must not introduce "a level of uncertainty and unreliability into the fact finding process that cannot be tolerated in a capital case," *Beck v Alabama*, 447 U.S. 625, 643 (1980). Therefore the sentencing jury must informed of the relevant state sentencing law. *Simmons v. South Carolina*, 512 U.S. 154, 163-71 (1994). *See also Caldwell*, 472 U.S. 320 at 336.

The charge must provide the necessary state law so that each and every juror will be allowed to consider, and know that they will be allowed to consider, and decide, whether the evidence does not require a death sentence. As in the case of *Andres v. United States*, 333 U.S. 740 (1948), under the Texas regime of misleading capital sentencing juries, "the jury might reasonably conclude that" the punishment must be death. *Id*. at 752. "In death cases doubts such as those presented here should be resolved in favor of the accused." *Id*. The New Jersey Supreme Court so held in 1987:

> The entire system of capital punishment depends on the belief that a jury representing the conscience of the community will responsibly exercise its guided discretion in deciding who shall live and who shall die. To hide from the jury the full range of its sentencing options, thus permitting its decision to be based on uninformed and possibly inaccurate speculation, is to mock the goals of rationality and consistency required by modern death penalty jurisprudence.

*State v. Ramseur*, 524 A.2d 188, 284 (N.J. 1987).

Furthermore, it is also well established that "jurors may not be coerced into surrendering views conscientiously held." *Jenkins v. United States*, 380 U.S. 445 (1965).

In other words, a judgment must be reversed when a jury charge "had [a] coercive

effect." *Id.* The interplay between, on the one hand, requiring the jury to be ignorant of

its role, and on the other coercion of jurors in the minority, was noted by the Louisiana

Supreme Court in 1980:

> In the present case the jurors were not fully informed of the consequences
> of their votes and the penalties which could result in each eventuality.
> They were not told that, by their failure to decide unanimously, they
> would in fact decide that the court must impose a sentence of life
> imprisonment without benefit of probation, parole or suspension of
> sentence. Instead, the members of the sentencing body were left free to
> speculate as to what the outcome would be in the event there was not
> unanimity. Under these circumstances, individual jurors could rationally
> surmise that in the event of disagreement a new sentencing hearing, and
> perhaps a new trial, before another jury would be required.
>
> Such a false impression reasonably may have swayed a juror to join the
> majority, rather than hold to his honest convictions, in order to avoid
> forcing the parties, witnesses and court officials to undergo additional
> proceedings. Consequently, by allowing the jurors to remain ignorant of
> the true consequence of their failure to decide unanimously upon a
> recommendation, the trial court failed to suitably direct and limit the jury's
> discretion so as to minimize the risk of arbitrary and capricious action.
> The death penalty was imposed under sentencing procedures that created a
> substantial risk that it would be inflicted in an arbitrary and capricious
> manner.
>
> The penalty of death is qualitatively different from a sentence of
> imprisonment. Death, in its finality, differs more from life imprisonment
> than a 100-year prison term differs from one of only a year or two.
> Because of that qualitative difference, there is a corresponding difference
> in the need for reliability in the determination that death is the appropriate
> punishment in a specific case. *Lockett v. Ohio*, 438 U.S. 586, 98 S. Ct.
> 2954, 57 L. Ed. 2d 973 (1978); *Gardner v. Florida*, 430 U.S. 349, 362, 97
> S. Ct. 1197, 51 L. Ed. 2d 393 (1977) (White, J., concurring); *Woodson v.
> North Carolina*, 428 U.S. 280, 96 S. Ct. 2978, 49 L. Ed. 2d 944 (1976).
>
> The effect of the error here involved must be held to have been prejudicial.
> If only one of the twelve jurors was swayed by the failure to inform him
> fully of the consequence of his sentence recommendation, then, in the
> absence of that error, the death penalty would not have been imposed.

*State v. Williams*, 392 So.2d 619, 631 (La. 1980). *See also Bradfield v. United States*,

272 U.S. 448 (1926) (divided jury must not be coerced into rendering unanimous

verdict). The mitigation instructions in this case coerced the jury into surrendering views

conscientiously held by misleading jurors of their role as sentencer. A new sentencing proceeding is required in which the jurors are actually informed of their role as the conscience of the community.

## PRAYER

WHEREFORE, Petitioner Carlos Ayestas prays that this Court issue a Writ of Habeas Corpus, order Respondent to show cause why Mr. Ayestas should not be granted a new trial, conduct an evidentiary hearing to determine the facts, and order the State to produce all documents necessary to determine this cause. With respect to any unexhausted claims, Mr. Ayestas requests that the Court hold this matter in abeyance, and allow him to present any such claims to the state courts for full litigation, fact finding, and final determination so that the claims he wishes to assert in order to challenge his conviction and sentence be given a full and fair hearing. Mr. Ayestas further prays that after determining the facts, the Court grant all relief to which he is entitled and order that he be discharged from further confinement pursuant to the illegal judgment and sentence in this case and that the sentence of death be vacated and set aside.

Respectfully submitted,

/s/

David R. Dow
Texas Defender Service
412 Main St. # 1150
Houston, Texas  77002
Phone: (713) 222-7788
Fax: (713) 222-0260
Texas State Bar No. 06064900

*Counsel for Petitioner*

- 59 -

## CERTIFICATE OF SERVICE

I do hereby certify that a true and correct copy of the above and foregoing has

been delivered to the Post-Conviction Litigation Division of the Office of the Texas

Attorney General, attention Jeremy Greenwell by email at the address

jeremy.greenwell@oag.state.tx.us, as previously agreed.

/s/_____
Matthew L. Byrne

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| **CARLOS AYESTAS,** | § | |
| | § | |
| Petitioner, | § | |
| | § | |
| | § | |
| -VS- | § | No. 4:08-mc-00480 |
| | § | |
| | § | **DEATH PENALTY CASE** |
| | § | |
| **NATHANIEL QUARTERMAN**, Director, | § | |
| Texas Department of Criminal Justice, | § | |
| Institutional Division, | § | |
| | § | |
| Respondent. | § | |
| | § | |

## VERIFICATION

I, Matthew L. Byrne, declare under penalty of perjury that the foregoing Petition for Writ of Habeas Corpus filed pursuant to 28 U.S.C. §2254 is true and correct.

Executed on September 10, 2009.

/s/_____
David R. Dow