IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION


CARLOS AYESTAS,                  §
                                 §
            Petitioner,          §
                                 §
v.                               §
                                 §    CIVIL ACTION NO. H-09-2999
RICK THALER, Director,           §
Texas Department of Criminal     §
Justice-Correctional             §
Institutions Division,           §
                                 §
            Respondent.          §


## MEMORANDUM OPINION AND ORDER

Petitioner Carlos Ayestas has filed a petition for a writ of habeas corpus under 28 U.S.C. § 2254 challenging his state court conviction and death sentence for capital murder.  Respondent Rick Thaler has filed a motion for summary judgment.  Having carefully considered the petition, the summary judgment motion, the state court record, the parties' submissions, and the applicable law, the court will grant respondent's motion for summary judgment and will deny Ayestas's petition for a writ of habeas corpus, entering final judgment by separate order.  The reasons for these rulings are set out in detail below.

## I.  **Background**[1]

Ayestas was convicted of capital murder for murdering Santiaga Paneque during the course of committing or attempting to commit robbery or burglary. About two weeks before the murder, Ayestas and a friend went to look at a car offered for sale by Anna McDougal, who lived across the street from Paneque. McDougal went inside her house for about 15 minutes while the men inspected the car. When she came back outside, McDougal saw the two men leaving Paneque's house. When she asked what they were doing, the men told McDougal that Paneque called them over to look at some furniture she was trying to sell.

Paneque's son, Elin, left the house at about 8:30 a.m. on September 5, 1995. He returned home for lunch at 12:23 p.m.[2] and rang the doorbell, but there was no response. He put his key in the doorknob, but noticed that the door was unlocked. Upon entering, he saw that the room was ransacked and items were missing. The rest of the house was in much the same condition. Elin went to the house of a neighbor, Maria Diaz, and called 911. Upon returning to his house, he found his mother's body on the floor of the master

---

[1] This statement of facts is adapted from the Texas Court of Criminal Appeals ("TCCA") opinion affirming Ayestas's conviction and sentence. *See Ayestas v. State*, No. 72,928 (Tex. Crim. App. Nov. 4, 1998). Where this opinion diverges from, or expands upon, the TCCA's discussion of the facts, the difference will be noted by a specific citation to the record.

[2]     He stated that he specifically noted the time.

bathroom. She had silver duct tape on her ankles. Elin returned to Diaz's house and asked her to go make sure that his mother was dead. Diaz entered the Paneque house and called Ms. Paneque's name. She found Ms. Paneque lying face down on the floor. Her face was a dark color and she was not breathing.

Detective Mark Reynolds of the Harris County Sheriff's Department testified that the house was ransacked but bore no signs of forced entry. Paneque's body was face down in a pool of blood and vomit. Her wrists were bound with the cord from an alarm clock and then wrapped in silver duct tape. She also had duct tape over her eyes and around her neck. Reynolds also testified that it was apparent that Paneque was beaten. Her face was swollen and covered with cuts and bruises. Reynolds showed neighbors photographs of two suspects and McDougal identified them as the same two men who were in Paneque's house about two weeks before the murder. One of the suspects was Petitioner and the other was Frederico Zaldivar.

An autopsy conducted by Dr. Marilyn Murr, an assistant medical examiner for Harris County, revealed that Paneque suffered multiple blows while she was still alive, resulting in numerous bruises and lacerations. She had fractured bones in her right elbow and neck, and bruises on each side of her pelvic area, just above the hips. An internal examination revealed extensive hemorrhaging in the neck and head. She had another fracture, caused by a "significant amount of force," in the roof of the orbit containing her right eye. Dr.

-3-

Murr determined that none of these injuries was substantial enough to kill Paneque. The cause of death was asphyxiation due to continual pressure applied to her neck for three to six minutes. Dr. Murr testified that her initial report indicated asphyxiation by ligature strangulation, but she reexamined the evidence shortly before trial at the request of the prosecutor. She then changed her conclusion to "asphyxiation due to strangulation," which allowed for the possibility that a hand or hands might have caused the asphyxia.

Police recovered fingerprints from the crime scene. Two prints recovered from the tape around Paneque's ankles, and two recovered from the roll of tape, matched Ayestas. On cross examination, the defense brought out that the two prints on the tape around Paneque's ankles were only discovered shortly before trial, approximately 20 months after the murder, based on a reexamination undertaken at the prosecutor's request.

Henry Nuila testified that he met Ayestas in mid-September 1995 at Ayestas's sister's house in Kenner, Louisiana. On September 20, an intoxicated Ayestas told Nuila that he was involved in the murder of a woman in Houston. Ayestas asked Nuila for help in killing the other two participants in the murder because "they had spoken too much." Ayestas told Nuila that, if he declined, Ayestas would kill him. Ayestas brandished a gun. Nuila kept Ayestas talking until Ayestas passed out. Nuila then called the police. They arrested Ayestas, still in possession of the gun. Based on this evidence,

-4-

the jury found Ayestas guilty of capital murder for murdering Paneque during the commission or attempted commission of a burglary, robbery, or both.

During the penalty phase, the State presented evidence that Ayestas served time in prison in California and Texas for possession, and purchase for sale, of narcotics, burglary, and misdemeanor theft.  He was also the subject of a California warrant for illegal transportation of aliens. Candelario Martinez testified that three days after the murder, Ayestas approached him outside a motel where he was waiting for a friend.   After a brief conversation, Ayestas pulled a gun on Martinez and ordered him into one of the rooms.  Martinez's friend was also in the room.  Ayestas ordered Martinez onto the floor and threatened to kill him.  Ayestas and two others took Martinez's personal belongings and forced him into the bathroom, where they again told him that they would kill him.  Martinez begged for his life as the three discussed who would kill him.  Ayestas finally said that he would let Martinez live, but threatened to kill his family if Martinez told the police.  Ayestas and his accomplices left in Martinez's truck.

Based on this evidence, along with the evidence of the brutality of Paneque's murder, the jury found that there is a likelihood that Ayestas would commit future acts of criminal violence posing a continuing threat to society, that Ayestas actually caused Paneque's death or intended to kill her or

-5-

anticipated that a human life would be taken, and that the mitigating evidence did not warrant a sentence of life imprisonment. Accordingly, the trial court sentenced Ayestas to death.

The TCCA affirmed Ayestas's conviction and sentence, *Ayestas v. State*, No. 72,928 (Tex. Crim. App. Nov. 4, 1998), and denied his application for habeas corpus relief, *Ex parte Ayestas*, No. WR-69,674-01 (Tex. Crim. App. Sept. 10, 2008). Ayestas filed a petition for a writ of habeas corpus in this Court on September 11, 2009. Thaler moved for summary judgment on April 9, 2010, and Ayestas responded to that motion on October 26, 2010.

## II.  The Applicable Legal Standards

### A.  The Antiterrorism and Effective Death Penalty Act

This federal petition for habeas relief is governed by the applicable provisions of the Antiterrorism and Effective Death Penalty Act ("AEDPA"). *See Lindh v. Murphy*, 521 U.S. 320, 335-36 (1997). Under the AEDPA federal habeas relief based upon claims that were adjudicated on the merits by the state courts cannot be granted unless the state court's decision (1) "was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States" or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); *Kitchens v. Johnson*, 190 F.3d 698, 700 (5th Cir. 1999). For questions of law or mixed questions of law and fact adjudicated

-6-

on the merits in state court, this court may grant relief under 28 U.S.C. § 2254(d)(1) only if the state court decision "was contrary to, or involved an unreasonable application of, clearly established [Supreme Court precedent]."  *See Martin v. Cain*, 246 F.3d 471, 475 (5th Cir.), *cert. denied*, 534 U.S. 885 (2001). Under the "contrary to" clause, this court may afford habeas relief only if "'the state court arrives at a conclusion opposite to that reached by . . . [the Supreme Court] on a question of law or if the state court decides a case differently than . . . [the Supreme Court] has on a set of materially indistinguishable facts.'" *Dowthitt v. Johnson*, 230 F.3d 733, 740-41 (5th Cir. 2000), *cert. denied*, 532 U.S. 915 (2001) (quoting *Williams v. Taylor*, 529 U.S. 362, 406 (2000)).

The "unreasonable application" standard permits federal habeas relief only if a state court decision "identifies the correct governing legal rule from [the Supreme Court] cases but unreasonably applies it to the facts of the particular state prisoner's case" or "if the state court either unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Williams*, 529 U.S. at 406. "In applying this standard, we must decide (1) what was the decision of the state courts with regard to the questions before us and (2) whether there is any established federal law, as explicated by

the Supreme Court, with which the state court decision conflicts." *Hoover v. Johnson*, 193 F.3d 366, 368 (5th Cir. 1999). A federal court's "focus on the 'unreasonable application' test under Section 2254(d) should be on the ultimate legal conclusion that the state court reached and not on whether the state court considered and discussed every angle of the evidence." *Neal v. Puckett*, 239 F.3d 683, 696 (5th Cir. 2001), *aff'd*, 286 F.3d 230 (5th Cir. 2002) (en banc), *cert. denied sub nom. Neal v. Epps*, 537 U.S. 1104 (2003). The sole inquiry for a federal court under the 'unreasonable application' prong becomes "whether the state court's determination is 'at least minimally consistent with the facts and circumstances of the case.'" *Id.* (quoting *Hennon v. Cooper*, 109 F.3d 330, 335 (7th Cir. 1997)); *see also Gardner v. Johnson*, 247 F.3d 551, 560 (5th Cir. 2001) ("Even though we cannot reverse a decision merely because we would reach a different outcome, we must reverse when we conclude that the state court decision applies the correct legal rule to a given set of facts in a manner that is so patently incorrect as to be 'unreasonable.'").

The AEDPA precludes federal habeas relief on factual issues unless the state court's adjudication of the merits was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *See* 28 U.S.C. § 2254(d)(2); *Hill v. Johnson*, 210 F.3d 481, 485 (5th Cir. 2000), *cert. denied*, 532 U.S. 1039 (2001). The state court's factual determinations are presumed correct unless rebutted by "clear and

convincing evidence." 28 U.S.C. § 2254(e)(1); *see also Jackson v. Anderson*, 112 F.3d 823, 824-25 (5th Cir. 1997), *cert. denied*, 522 U.S. 1119 (1998).

## B.   The Standard for Summary Judgment in Habeas Corpus Cases

"As a general principle, Rule 56 of the Federal Rules of Civil Procedure, relating to summary judgment, applies with equal force in the context of habeas corpus cases." *Clark v. Johnson*, 202 F.3d 760, 764 (5th Cir.), *cert. denied*, 531 U.S. 831 (2000). In ordinary civil cases a district court considering a motion for summary judgment is required to construe the facts in the case in the light most favorable to the nonmoving party. *See Anderson v. Liberty Lobby*, 477 U.S. 242, 255 (1986). Where, however, a state prisoner's factual allegations have been resolved against him by express or implicit findings of the state courts, and the prisoner fails to demonstrate by clear and convincing evidence that the presumption of correctness established by 28 U.S.C. § 2254(e)(1) should not apply, it is inappropriate for the facts of a case to be resolved in the petitioner's favor. *See Marshall v. Lonberger*, 459 U.S. 422, 432 (1983); *Sumner v. Mata*, 449 U.S. 539, 547 (1981). In reviewing factual determinations of the Texas state courts, this court is bound by such findings unless an exception to 28 U.S.C. § 2254 is shown.

## III.  **Analysis**

### A.  **Ineffective Assistance of Counsel**

In his first two claims for relief, Ayestas contends that his counsel rendered ineffective assistance.  First, he alleges that counsel was ineffective during the penalty phase by failing to investigate and present mitigating evidence.  Specifically, he contends that counsel failed to develop evidence of: (a) his good character traits; (b) his kindness and reputation for helping those less fortunate; and (c) his lack of criminal history in his native Honduras; that (d) his co-defendant, Francisco Zaldivar, was a bad influence on him; and (e) he suffers from mental illness, alcoholism, and drug addiction.  Second, he alleges that counsel was ineffective at the guilt/innocence phase by failing to: (a) object to a jury charge; (b) object to an allegedly racially discriminatory jury strike; (c) perform a complete *voir dire* regarding jurors' conscientious scruples against the death penalty; (d) object to a statement by the prosecutor; and (e) object to the failure of the police to inform Ayestas of his right to contact the Honduran consulate.

To prevail on a claim for ineffective assistance of counsel, Petitioner

> must show that . . . counsel made errors so
> serious that counsel was not functioning as the
> "counsel" guaranteed by the Sixth Amendment.
> Second, the [petitioner] must show that the
> deficient performance prejudiced the defense.
> This requires showing that counsel's errors

-10-

> were so serious as to deprive the defendant of
> a fair trial, a trial whose result is reliable.

*Strickland v. Washington*, 466 U.S. 668, 687 (1984).  In order to prevail on the first prong of the *Strickland* test, Petitioner must demonstrate that counsel's representation fell below an objective standard of reasonableness.  *Id.* at 687-88.  Reasonableness is measured against prevailing professional norms, and must be viewed under the totality of the circumstances.  *Id.* at 688.  Review of counsel's performance is deferential.  *Id.* at 689.

### 1.    Procedural Default

Ayestas did not present sub-claims 1 (b) and (e), and 2 (a) and (b) to the TCCA.  The AEDPA requires that a prisoner exhaust his available State remedies before raising a claim in a federal habeas petition.

> An application for a writ of habeas corpus on
> behalf of a person in custody pursuant to the
> judgment of a state court shall not be granted
> unless it appears that (A) the applicant has
> exhausted the remedies available in the courts
> of the State; or (B)(i) there is an absence of
> available State corrective process; or (ii)
> circumstances exist that render such process
> ineffective to protect the rights of the
> applicant.

28 U.S.C. § 2254(b)(1).  As the Fifth Circuit explained in a pre-AEDPA case, "federal courts must respect the autonomy of state courts by requiring that petitioners advance in state court all grounds for relief, as well as factual allegations supporting those grounds.   "[A]bsent special circumstances, a federal habeas

-11-

petitioner must exhaust his state remedies by pressing his claims in state court before he may seek federal habeas relief." *Orman v. Cain*, 228 F.3d 616, 619-20 (5th Cir. 2000). This rule extends to the evidence establishing the factual allegations themselves. *Knox v. Butler*, 884 F.2d 849, 852 n.7 (5th Cir. 1989) (citing 28 U.S.C. § 2254(b)); *see also Jones v. Jones*, 163 F.3d 285, 298 (5th Cir. 1998) (noting that "[s]ubsection (b)(1) [of AEDPA] is substantially identical to pre-AEDPA § 2254(b)").

A petitioner fulfills the exhaustion requirement, however, if "all crucial factual allegations were before the state courts at the time they ruled on the merits" of the habeas petition. *Dowthitt v. Johnson*, 230 F.3d 733, 746 (5th Cir. 2000). This court may also consider evidence presented for the first time in federal habeas proceedings if the evidence supplements, as opposed to fundamentally altering, claims presented to the state court. *Morris v. Dretke*, 379 F.3d 199, 204-05 (5th Cir. 2004); *Dowthitt*, 230 F.3d at 746. If the petitioner presents material evidentiary support for the first time in federal court, then he has not exhausted his state remedies. *Morris*, 379 F.3d at 204-05.

Ayestas's evidence of his kindness and reputation for helping others merely supplements his exhausted claim that he has good character traits. Therefore, subclaim 1(b) is properly before this Court. Ayestas's evidence of his alleged mental illness and substance abuse, however, raises a new, unexhausted, claim, as do his claims that counsel failed to object to the jury charge and the

-12-

alleged racially discriminatory jury strike.

Ordinarily, a federal habeas petition that contains unexhausted claims is dismissed without prejudice, allowing the petitioner to return to the state forum to present his unexhausted claims. *Rose v. Lundy*, 455 U.S. 509 (1982). Such a result in this case, however, would be futile because Petitioner's unexhausted claims would be procedurally barred as an abuse of the writ under Texas law. On habeas review, a federal court may not consider a state inmate's claim if the state court based its rejection of that claim on an independent and adequate state ground. *Martin v. Maxey*, 98 F.3d 844, 847 (5th Cir. 1996). A procedural bar for federal habeas review also occurs if the court to which a petitioner must present his claims to satisfy the exhaustion requirement would now find the unexhausted claims procedurally barred. *Coleman v. Thompson*, 501 U.S. 722, 735 n.1 (1991).

The Texas abuse of the writ statute, TEX. CODE CRIM. PROC. ANN. art. 11.071, § 5(a), provides, in relevant part, that the TCCA may not consider a subsequent habeas application unless a petitioner can show either that the claim could not have been timely raised in state court or that the claim raises a compelling federal claim:

> (a) If a subsequent application for a writ of habeas corpus is filed after filing an initial application, a court may not consider the merits of or grant relief based on the subsequent application unless the application contains sufficient specific facts establishing that:
>
>     (1) the current claims and issues have not

> been and could not have been presented
> previously in a timely initial application
> or in a previously considered application
> filed under this article . . . because the
> factual or legal basis for the claim was
> unavailable on the date the applicant
> filed the previous application;
>
> (2) by a preponderance of the evidence,
> but for a violation of the United States
> Constitution no rational juror could have
> found the applicant guilty beyond a
> reasonable doubt; or
>
> (3) by clear and convincing evidence, but
> for a violation of the United States
> Constitution no rational juror would have
> answered in the state's favor one or more
> of the special issues that were submitted
> to the jury in the applicant's
> trial . . . .

TEX. CODE CRIM. PROC. ANN. art. 11.071. The TCCA has held that, to avoid dismissal under § 5(a), a petitioner must satisfy *both* the state procedural requirement of § 5(a)(1) *and* the federal constitutional merits requirements of § 5(a)(2) or 5(a)(3). *Ex parte Campbell*, 226 S.W.3d 418, 421 (Tex. Crim. App. 2007) ("We have interpreted [§ 5(a)] to mean that . . . 1) the factual or legal basis for an applicant's current claims must have been unavailable as to all of his previous applications; and 2) the specific facts alleged, if established, would constitute a constitutional violation that would likely require relief from either the conviction or sentence.").

Petitioner argues that because the TCCA's standard boilerplate dismissal under § 5(a) does not specify whether dismissal was

-14-

premised on a failure to satisfy state procedural law or on the merits, federal courts must presume that unexhausted claims are not necessarily procedurally defaulted.  In support, he cites *Ruiz v. Quarterman*, 504 F.3d 523 (5th Cir. 2007), in which the Fifth Circuit concluded that no adequate and independent state procedural basis for dismissal could be discerned from the TCCA's "boilerplate" dismissal under § 5(a).  *Ruiz*, however, is distinguishable.  There, it was plain that an assessment of the merits played a significant role in the dismissal.  One TCCA panelist filed a concurring opinion concluding that Ruiz did not allege a meritorious Sixth Amendment claim.  Two other panelists filed a dissent from the dismissal, urging the merits of the Sixth Amendment claim.  *Id.* at 528.

The facts of this case are much more like those in *Hughes v. Quarterman*, 530 F.3d 336 (5th Cir. 2008), *cert. denied*, 129 S.Ct. 2378 (2009).  In that case the Fifth Circuit concluded that an adequate and independent state procedural basis for dismissal was evident because it was plain that the factual and legal bases for the petitioner's claims were available well before he filed his subsequent habeas application, and because there was "nothing in [the TCCA's] perfunctory dismissal of the claims that suggest[ed] that it actually considered or ruled on the merits."  *Id.* at 342. Petitioner does not contend that the factual or legal bases for these claims were unavailable when he filed his initial habeas petition.  Because the claims were available, it is clear that the

-15-

TCCA would dismiss any successive application under the independent and adequate state procedural bar of § 5(a)(1). That bar precludes this Court from reviewing Petitioner's claim absent a showing of cause for the default and actual prejudice attributable to the default, or that this Court's refusal to review the claim will result in a fundamental miscarriage of justice. *Coleman*, 501 U.S. at 750.

"Cause" for a procedural default requires a showing that some objective factor external to the defense impeded counsel's efforts to comply with the state procedural rule, or a showing of a prior determination of ineffective assistance of counsel. *Murray v. Carrier*, 477 U.S. 478, 488 (1986); *Amadeo v. Zant*, 486 U.S. 214, 222 (1988). Petitioner makes no such showing.

A "miscarriage of justice" means actual innocence, either of the crime for which he was convicted or of the death penalty. *Sawyer v. Whitley*, 505 U.S. 333, 335 (1992). "Actual innocence of the death penalty" means that, but for a constitutional error, he would not have been legally eligible for a sentence of death. *Id.* Ayestas makes no showing that he is actually innocent of capital murder, or that he is legally ineligible for a death sentence. Therefore, his unexhausted claims are procedurally defaulted.

## 2. Failure to Investigate/Penalty Phase

Ayestas contends that several of his family members would have come to the United States from Honduras to testify if asked. He

-16-

claims that they would have testified about his upbringing and good character and reputation for kindness. Citing affidavits submitted by family members, Ayestas contends that they would have testified that he grew up in a stable, middle class environment, and had a good relationship with his siblings and step siblings. Ayestas states that it is unusual in Honduras for step siblings to have a good relationship. Ayestas was a well-behaved child. Ayestas states that the family moved when Ayestas was 12 years old. He continued to do well in school and was a devout Catholic. He was never in trouble with the law as a child. He left home when he was 18. He told his family that he was going to Guatemala, but left a note in his room saying that he went to the United States instead. He returned to Honduras several times, always staying with his parents when he did.

Ayestas states that the last time he returned to Honduras was 1994, after his incarceration in California. He told his family that if someone came looking for him, they were to say he was not home. Frederico Zaldivar, Ayestas's co-defendant in this case, began to come to the house looking for Ayestas. The family refused to tell Zaldivar where Ayestas was and asked him to leave Ayestas alone. They regarded Zaldivar as a bad influence. Ayestas also contends that counsel would, with minimal investigation, have found evidence that he had no criminal record in Honduras.

The state habeas court found, based on a credible affidavit by

-17-

trial counsel, that counsel, among other things, interviewed witnesses, talked to Ayestas's family, employed an investigator, reviewed juror questionnaires, spoke to Ayestas about his background and life, and attempted to secure the presence of Ayestas's family at trial.  3 SH. at 647.[3]  Regarding the attendance of the Ayestas family at trial, the state court found that Ayestas repeatedly told counsel that he did not want his family to attend the trial and did not agree to have his family contacted until after jury selection was complete.  The court also found that counsel made every effort to contact the family after Ayestas permitted her to do so.  S.H. at 651.  The court further found that the defense investigator sent a letter to the family in Honduras on May 29, 1997, six weeks before the penalty phase began.  Counsel sent a second letter on June 10, 1997, stating that Ayestas finally agreed to let counsel contact his family.  Counsel sent a third letter on July 2, 1997, and faxed a letter to the United States embassy in Honduras to expedite the family's travel to the United States.  Counsel informed the embassy of the need for the family's presence at trial, arranged a July 3, 1997, meeting for the family at the embassy, and included a copy of the June 10, 1997, letter.  The court also found that counsel communicated with the Ayestas family by phone beginning on June 3, 1997.  She spoke with Ayestas's mother, explained the situation, and requested the family's presence at trial.  Ayestas's mother said she

---

[3]     "SH" refers to the transcript of Ayestas's state habeas corpus proceeding.

-18-

would call back.  Counsel heard from the family on June 25, when Ayestas's sister, Somara Zalaya, informed counsel that the family would have difficulty leaving Honduras for the trial.  Among the reasons stated were their father's illness and economic reasons. Counsel called the family again on June 26 and 27, and July 2. Ayestas's mother appeared unconcerned and gave evasive responses. Counsel's assistants also noted the mother's apparent lack of concern.  The Court further found that counsel informed the Honduran consulate of Ayestas's arrest, indictment, and upcoming trial on June 9, 1997.  SH. at 651-653.  The court found that counsel was not ineffective based on the failure of petitioner's family to attend trial "in light of the [petitioner's] numerous, initial assertions that he did not want his family contacted and in light of trial counsel's extensive efforts to attempt to secure the presence of [petitioner's] family from Honduras after [he] changed his mind." SH. at 665.

During the penalty phase, counsel presented letters from an instructor in the Houston Community College system who taught Ayestas in an English as a second language program at Harris County Jail.  She stated that Ayestas was a serious and attentive student, had no other problems with the law, and had no history of violent crime.  SH. at 653.

Based on this evidence, the Court found that counsel made diligent efforts to secure the family's presence at trial.  The

-19-

Court also found that the evidence the family would have offered regarding Ayestas's childhood and background was not significantly different from the evidence in the instructor's letters. SH. at 654.

Counsel has a duty to investigate possible mitigating evidence. *Wiggins v. Smith*, 539 U.S. 510 (2003). The record establishes, however, that counsel did attempt to investigate and develop evidence concerning Ayestas's background and childhood.

First, Ayestas instructed counsel not to call his family. Neither the Supreme Court nor the Fifth Circuit has ever held that a lawyer provides ineffective assistance by complying with the client's clear and unambiguous instructions to not present evidence. In fact, the Fifth Circuit has held on several occasions that a defendant cannot instruct his counsel not to present evidence at trial and then later claim that his lawyer performed deficiently by following those instructions. In *Autry v. McKaskle*, 727 F.2d 358 (5th Cir. 1984), the defendant prevented his attorney from presenting any mitigating evidence during the punishment phase of his capital trial. The Fifth Circuit rejected Autry's claim that counsel was ineffective for heeding his instructions: "If Autry knowingly made the choices, [his lawyer] was ethically bound to follow Autry's wishes." *Id.* at 362;[4] *see also Nixon v. Epps*, 405

---

[4]The *Autry* court also rejected the defendant's claim that counsel was required to request a competency hearing before agreeing to comply with the client's decisions. *Id.*

-20-

F.3d 318, 325-26 (5th Cir. 2005) (finding that counsel was not ineffective for failing to present additional mitigating evidence over client's objection: "A defendant cannot block his counsel from attempting one line of defense at trial, and then on appeal assert that counsel was ineffective for failing to introduce evidence supporting that defense."); *Roberts v. Dretke*, 356 F.3d 632, 638 (5th Cir. 2004) (noting that defendant may not obstruct attorney's efforts, then claim ineffective assistance of counsel); *Dowthitt v. Johnson*, 230 F.3d 733, 748 (5th Cir. 2000) (finding that counsel was not ineffective for failing to call family members during punishment phase where defendant stated that he did not want family members to testify).[5] Second, the state court's finding that counsel acted promptly and reasonably to secure the family's presence once Ayestas relented is amply supported by the record. Therefore, Ayestas fails to demonstrate deficient performance.

## 3. Guilt/Innocence Phase

As noted above, Ayestas's claims that counsel was ineffective for failing to object to the jury charge and to an allegedly racially discriminatory jury strike are unexhausted and procedurally

___

[5]*Cf. Schriro v. Landrigan*, 550 U.S. 465, 475-77 (2007) (stating that, if defendant instructed counsel not to present mitigating evidence, "counsel's failure to investigate further could not have been prejudicial under *Strickland*"); *Amos v. Scott*, 61 F.3d 333, 348-49 (5th Cir. 1995) (denying ineffective assistance claim for want of prejudice where defendant "strongly opposed" presenting any witnesses during punishment phase of trial).

defaulted.

### a.    Failure to Perform Complete *Voir Dire*

In his first non-defaulted claim of ineffective assistance of counsel during the guilt/innocence phase, Ayestas contends that his counsel was ineffective for failing to effectively *voir dire* potential jurors who expressed opposition to the death penalty and in failing to object to the dismissal of these potential jurors. In *Witherspoon v. Illinois*, 391 U.S. 510 (1968), the Supreme Court noted that "[a] man who opposes the death penalty, no less than one who favors it, can make the discretionary judgment entrusted to him by the State and can thus obey the oath he takes as a juror.  But a jury from which all such men have been excluded cannot perform the task demanded of it." *Id.* at 519.  Accordingly, the Court held that

> a sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction.

*Id.* at 522.  In *Adams v. Texas*, 448 U.S. 38, 45 (1980), the Court clarified that *Witherspoon* established "the general proposition that a juror may not be challenged for cause based on his views about capital punishment unless those views would prevent or substantially impair the performance of his duties as a juror . . . ."

In this case, 14 venire members were dismissed, without objection, after expressing opposition to the death penalty.  Before dismissing them, however, the trial court spoke individually to each

-22-

venire member in an effort to determine if the juror could set aside
personal feelings and consider the death penalty.  For example, the
court stated to one such group of prospective jurors:

> [M]y question specifically is going to be to
> you this:  is what you're saying that no matter
> what the facts of the case, under no situation
> ever could you ever consider death as a
> possible punishment?

11 Tr. at 120.  In response to this question, some jurors asserted
that they could not, under any circumstances, vote to impose the
death penalty.  Others stated that they could in an appropriate
case.  *Id.* at 120-22.  The jurors who were eventually dismissed
stated that they could never impose a death sentence.  Clearly, a
juror who could never consider a death sentence holds "views [that]
would prevent or substantially impair the performance of his duties
as a juror . . . ."  *Adams*, 448 U.S. at 45.  Because the jurors in
question stated that they could never vote to impose a death
sentence, any failure by Ayestas' counsel to attempt to rehabilitate
them and any objection to their dismissal would have been futile.
Counsel was therefore not deficient in this regard.

### b.    Failure To Object To Closing Argument

Harris County Assistant Medical examiner Dr. Marilyn Murr
initially concluded that the cause of death was ligature
strangulation.  She later changed the cause of death to asphyxiation
due to strangulation after the prosecutor pointed out certain
inconsistencies.

In closing argument, defense counsel stated:

-23-

And then we go to the doctor's testimony, Dr.
Murr.  Nobody tells me what to do.  I believe
her.  On September 6th, she gave one opinion.
On June 2nd, she gave another opinion from the
same material that she looked at the first time
they did this autopsy.  The same material that
was reviewed by another doctor . . . and had
the same opinion she had.  And yet we come back
on June 2nd and we look at that same data and we
reach a different conclusion.  Or maybe not a
different conclusion, but a further conclusion.

What's so important about that?  The importance
in that is that a ligature strangulation might
be interpreted by 12 citizens of this county as
being an act clearly dangerous to human life as
opposed to the intentional killing of a human
being, whereas manual strangulation, choking
somebody to death, is clearly an act of intent.
That is the difference between the two.

I don't know what you make about her changing
her mind.  All I know is here it is a month
before trial and we come up with a completely
different opinion from the same data with no
formal second opinion.  And when questioned
about, well, don't you think it would be good
to get another opinion, particularly when
you're changing your mind?  I don't need one.
Well, wasn't that the policy before?  Yeah, it
was the policy.  Aren't two heads better than
one?  Of course they are.  Depends on the head.

Well, Dr. Bellas' 17 years, that's a pretty
good head to me.  He's her boss.  Don't you
think particularly if you're changing your
mind, that would be the best time, the time you
really need somebody else to step in and say,
hey, take a look at this?  What do you think?
Didn't happen, folks.  What does it mean to
you?

20 Tr. at 290-91.  In response, the prosecutor argued:

[Counsel] suggests there is something kind of
nebulous about her changing her opinion.  I
don't think there is any question in any mind
in this jury box she wouldn't change the cause

-24-

of death for me.  I wouldn't ask it and God
knows she's not about to do something like
that.

20 Tr. at 305-06.  Ayestas argues that counsel was ineffective for
failing to object to this statement because it amounted to the
prosecutor testifying and commenting on facts outside the record.

Under Texas law, a prosecutor may present argument to the jury
on four types of issues:  (1) summation of the evidence; (2)
reasonable deductions from the evidence; (3) responses to opposing
counsel's argument; and (4) pleas for law enforcement.  *Moody v.
State*, 827 S.W.2d 875, 894 (Tex.Crim.App.), *cert. denied sub nom.
Moody v Texas*, 506 U.S. 839 (1992).  The state habeas court found
that the prosecutor's comments were a permissible response to
defense counsel's argument.  SH at 660, 667.  This conclusion is
reasonable and is entitled to deference under the AEDPA.

### c.   Failure To Object To Vienna Convention Violation

The Vienna Convention is a 79-article, multilateral treaty
negotiated in 1963 and ratified by the United States in 1969.  Per
Article 36, the treaty requires an arresting government to notify
a foreign national of his right to contact his consul. *United States
v. Jimenez-Nava*, 243 F.3d 192, 195 (5th Cir. 2001).  Ayestas claims
that the arresting authorities never informed him of his right to
contact his consulate, and that counsel was ineffective for failing
to raise this issue.

Assuming that counsel was deficient for failing to raise an
objection, Ayestas nonetheless fails to demonstrate any prejudice.

-25-

Ayestas contends that the consulate might have helped him procure evidence and witnesses, including his family's presence at trial. As discussed above, however, trial counsel did seek consular assistance in obtaining evidence and witnesses once Ayestas removed his prohibition on counsel contacting his family.   The record establishes that Ayestas himself delayed counsel's work in seeking this evidence.  Once counsel could contact Ayestas's family members, they did not cooperate.   Ayestas thus fails to demonstrate any prejudice flowing from counsel's alleged ineffectiveness.

## B.   Future Dangerousness

Ayestas raises two claims concerning the future dangerousness special issue.   First, he contends that the evidence was insufficient to support the jury's finding that he poses a future danger to society.  Second, he contends that predictions of future dangerousness are so inherently unreliable that the special issue is unconstitutional.  Because Ayestas never raised the second claim in state court, it is unexhausted and procedurally defaulted.

Ayestas did raise a claim in state court that the evidence was insufficient to support the jury's finding, but he based his argument on state law; he did not cite any provision of the United States Constitution or other federal law, cited no federal case law, and did not otherwise alert the Texas Court of Criminal Appeal to the federal constitutional nature of the claim.   See Appellant's Brief at Pgs. 33-36.  The Supreme Court has stated that, not only must a petitioner present the state court with his claim, he must

-26-

also alert the state court of the constitutional nature of the claims. *See Duncan v. Henry*, 513 U.S. 364, 366 (1995) ("If state courts are to be given the opportunity to correct alleged violations of prisoners' federal rights, they must surely be alerted to the fact that the prisoners are asserting claims under the United States Constitution."). Because Ayestas did not alert the state court to the federal nature of his claim, this claim is also unexhausted and procedurally defaulted. Moreover, even if Ayestas has preserved this claim, it would not entitle him to habeas relief because the conclusion of the Texas Court of Criminal Appeals that the evidence was sufficient to support the jury's finding of future dangerousness was not contrary to and did not involve an unreasonable application of federal law.

## C. Jury Unanimity

Ayestas was charged with capital murder for murdering Paneque in the course of committing or attempting to commit robbery, burglary, or both. Ayestas contends that the trial court violated his right to due process by not requiring jury unanimity on which underlying crime he committed. Ayestas never presented this claim to the Texas state courts, however, and it is therefore unexhausted and procedurally defaulted.

## D. Vienna Convention

Ayestas next claims that his conviction is unconstitutional because the arresting authorities violated his rights under the Vienna Convention by failing to notify him of his right to contact

his consulate. Ayestas presented this claim in his state habeas petition. The TCCA found that the claim was procedurally defaulted because Ayestas did not raise an objection at trial based on the alleged violation of his Vienna Convention rights. SH at 667. Because this finding of default is based on an independent and adequate state ground, *i.e.*, Texas's contemporaneous objection rule, this Court cannot review Ayestas's Vienna Convention claim. *See*, *e.g.*, *Coleman v. Thompson*, 501 U.S. 722, 731-32(1991).

## E. Burden Of Proof In Mitigation Special Issue

Ayestas next argues that the mitigation special issue unconstitutionally places the burden on the defendant to prove that there are mitigating circumstances sufficient to warrant imposition of a life sentence rather than a death sentence. This claim has no merit.

The Supreme Court has recognized a distinction

> between facts in aggravation of punishment and facts in mitigation. . . . If facts found by a jury support a guilty verdict of murder, the judge is authorized by that jury verdict to sentence the defendant to the maximum sentence provided by the murder statute. If the defendant can escape the statutory maximum by showing, for example, that he is a war veteran, then a judge that finds the fact of veteran status is neither exposing the defendant to a deprivation of liberty greater than that authorized by the verdict according to statute, nor is the judge imposing upon the defendant a greater stigma than that accompanying the jury verdict alone. Core concerns animating the jury and burden-of-proof requirements are thus absent from such a scheme.

-28-

*Apprendi v. New Jersey*, 530 U.S. 466, 491 n.16 (2000). The Supreme Court has thus drawn a critical distinction between aggravating and mitigating circumstances in sentencing proceedings. To the extent that some aggravating circumstance is required before the court may exceed an otherwise-prescribed sentencing range, the State must prove those aggravating circumstances beyond a reasonable doubt. Under the Texas capital sentencing statute the statutory maximum sentence in the absence of proof of aggravating circumstances is life imprisonment. A court cannot sentence a defendant to death unless the State proves beyond a reasonable doubt that there is a probability that the defendant will commit future acts of violence constituting a continuing threat to society, and that he acted with the requisite mental state. Once the State has proven these two factors, the defendant may be sentenced to death. The sentencing scheme, however, gives a defendant another opportunity to show that death should not be imposed, even though the State has met its burden of proof. The mitigation special issue is, in this sense, analogous to an affirmative defense. *Apprendi* does not prohibit placing the burden of proof on this special issue on the defendant. The mitigation special issue does not address a factor necessary to increase the maximum sentence; rather, it addresses factors that allow the jury to impose a sentence *less than* the statutory maximum. Ayestas is not entitled to relief on this claim.

-29-

**F.    Consideration Of Evidence In Connection With Mitigation Special Issue**

Ayestas next argues that the mitigation special issue unconstitutionally limits the evidence the jury can consider. Ayestas contends that, by limiting the jury to consideration of evidence that in some way reduces Ayestas's blameworthiness, the special issue only allows the jury to consider evidence with some nexus to the crime.  This, he argues, did not allow the jury to give full consideration to his evidence, specifically the letters from his prison English teacher stating that Ayestas was learning English and was a good student.   The record does not support Ayestas's claim.

In *Lockett v. Ohio*, 438 U.S. 586, 608 (1978), a plurality of the Supreme Court held "that the Eighth and Fourteenth Amendments require that the sentencer . . . not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record . . . as a basis for a sentence less than death."  438 U.S. at 604 (emphasis in original).   This holding is based on the plurality's conclusion that death "is so profoundly different from all other penalties" as to render "an individualized decision . . . essential in capital cases."  *Id.* at 605.   In *Penry v. Johnson*, 532 U.S. 782 (2001), the Supreme Court clarified that a capital sentencing jury must "be able to consider and *give effect to* a defendant's mitigating evidence in imposing sentence."  *Id.* at 797 (internal quotation marks, citation and brackets omitted).   In

-30-

Penry's trial, the jury was told to determine whether the evidence supported a finding on any of three statutory special issues. It was then told that it must consider mitigating evidence and, if it concluded that the weight of the mitigating evidence dictated in favor of a life sentence, it should answer "no" to one of the special issues. *Id.* at 789-90.

The Supreme Court found that there were two plausible interpretations of the instructions given to Penry's jury. First, it could be understood as instructing the jurors to weigh the mitigating evidence in determining its answer to each special issue. *Id.* at 798. The Court held, however, that none of the special issues were broad enough for the jury to give mitigating effect to the evidence of Penry's retardation and the abuse he suffered as a child. *Id.* For example, the jury could fully credit the mitigating evidence, believe it required a sentence less than death, but find that Penry's retardation actually made him *more dangerous* in the future, thereby compelling a positive answer to the future dangerousness special issue. The Court found that a second plausible interpretation was that the jury could simply nullify, *i.e.*, give a negative answer to a special issue which it actually found was supported by the evidence. *Id.* The Court found that this interpretation made the jury instructions "internally contradictory, and placed law-abiding jurors in an impossible situation." *Id.* The Court therefore concluded that the instructions injected an element

of capriciousness into the sentencing decision. *Id*. at 800.

In contrast, Ayestas's jury was instructed:

> Do you find from the evidence, taking into consideration all the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, Carlos Manuel Ayestas, that there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed?

SH at 778. Petitioner's jury received a separate special issue that specifically allowed it to return a life sentence if it found that the mitigating evidence so dictated. The jury thus had *two* opportunities to act on the mitigating evidence of Petitioner's character, as reflected in the letters from his teacher: First, as a factor weighing against an affirmative finding on the future dangerousness special issue; and second, as free standing mitigating evidence to be weighed in its own right in determining sentence. There was no express or implied requirement of a nexus between the mitigating evidence and the crime. *Cf. Tennard v. Dretke*, 542 U.S. 274, 285 (2004). Nothing in the instructions given to the jury precluded the jurors from giving full weight to any of the mitigating evidence. The instructions were proper and did not violate Petitioner's rights under the United States Constitution.

## G. Failure To Inform The Jury Of The Effect Of A Single "No" Vote

In his final claim for relief, Ayestas argues that the Texas capital sentencing scheme is unconstitutional because it fails to

inform the jurors of the effect of a single "no" vote on a special issue No. 3, the mitigation issue. Although Respondent argues that Ayestas did not present this claim to the Texas state courts, it appears that he did present it as his tenth point of error on direct appeal.

Petitioner argues that Texas Code of Criminal Procedure art. 37.071, which requires a jury instruction informing the jury that it must have at least 10 "yes" votes to answer the mitigation special issue "yes" violates the Eighth Amendment. Petitioner argues that this misleads the individual jurors into thinking that they cannot return a life sentence unless at least ten jurors agree on an answer to the special issue.

In *Mills v. Maryland*, 486 U.S. 367 (1988), and *McKoy v. North Carolina*, 494 U.S. 433 (1990), the Supreme Court held that capital sentencing schemes requiring the jury to unanimously find the existence of any mitigating factor before giving that factor any weight violated the Eighth Amendment. The Court held that each juror must be free to give any mitigating evidence any weight that juror deems appropriate in weighing mitigating against aggravating evidence. The Texas statute complies with that requirement. *See McKoy*, 494 U.S. at 442-43.

While the trial court in this case informed the jury that it could not affirmatively find that the mitigating evidence was sufficient to warrant a life sentence unless at least 10 jurors agreed, it never instructed the jury that any particular number of

-33-

jurors had to agree that any particular piece of evidence was mitigating. In other words, even if only one juror felt that a specific piece of evidence was mitigating, that juror could give the evidence any weight he deemed appropriate. The instruction only stated that at least 10 jurors, individually weighing mitigating evidence, had to agree that there was sufficient mitigating evidence to impose a life sentence. This instruction does not suffer from the constitutional flaw underlying *Mills* and *McKoy*.

To the extent that Ayestas argues that the jury was misled as to the effect of a single "no" vote, the Supreme Court has held that there is no constitutional requirement of an instruction on the effect of a deadlock. *See Jones v. United States*, 527 U.S. 373, 381-82 (1999).

## IV.   Certificate of Appealability

Although Ayestas has not requested a certificate of appealability ("COA"), the court may nevertheless determine whether he is entitled to this relief in light of the court's rulings. *See Alexander v. Johnson*, 211 F.3d 895, 898 (5th Cir. 2000) ("It is perfectly lawful for district court's [sic] to deny a COA *sua sponte*. The statute does not require that a petitioner move for a COA; it merely states that an appeal may not be taken without a certificate of appealability having been issued."). A petitioner may obtain a COA either from the district court or an appellate court, but an appellate court will not consider a petitioner's request for a COA until the district court has denied such a

-34-

request. *See Whitehead v. Johnson*, 157 F.3d 384, 388 (5th Cir. 1988); *see also Hill v. Johnson*, 114 F.3d 78, 82 (5th Cir. 1997) ("[T]he district court should continue to review COA requests before the court of appeals does").

A COA may issue only if the petitioner has made a "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2); *see also United States v. Kimler*, 150 F.3d 429, 431 (5th Cir. 1998). A petitioner "makes a substantial showing when he demonstrates that his application involves issues that are debatable among jurists of reason, that another court could resolve the issues differently, or that the issues are suitable enough to deserve encouragement to proceed further." *Hernandez v. Johnson*, 213 F.3d 243, 248 (5th Cir.), *cert. denied*, 531 U.S. 966 (2000). The Supreme Court has stated that

> Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong. The issue becomes somewhat more complicated where . . . the district court dismisses the petition based on procedural grounds. We hold as follows: When the district court denies a habeas petition on procedural grounds without reaching the prisoner's underlying constitutional claim, a COA should issue when the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling.

*Slack v. McDaniel*, 529 U.S. 473, 484 (2000). "[T]he determination of whether a COA should issue must be made by viewing the petitioner's arguments through the lens of the deferential scheme laid out in 28 U.S.C. § 2254(d)." *Barrientes v. Johnson*, 221 F.3d 741, 772 (5th Cir. 2000), *cert. dismissed*, 531 U.S. 1134 (2001).

The court has carefully considered each of Ayestas's claims and concludes that each of the claims is foreclosed by clear, binding precedent. The court concludes that under such precedents Ayestas has failed to make a "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). The court therefore concludes that Ayestas is not entitled to a certificate of appealability on his claims.

## V. **Petitioner's Motion to Expand Record**

Petitioner has filed a motion to expand the record to add two affidavits in support of his claim that trial counsel rendered ineffective assistance. (Docket Entry No. 16) The Court has concluded that the Texas courts reasonably found that counsel did not render deficient performance. Because the affidavits do nothing to change that conclusion, the affidavits are unnecessary to the resolution of this case. Accordingly, Petitioner's Motion To Expand Record will be denied.

## VI.  Motion for the Appointment of an Investigator

On January 25, 2011, Ayestas filed a motion for funding to hire an investigator to develop further evidence about his background in support of his *Wiggins* claim.  Federal law provides that "[u]pon a finding that investigative, expert, or other services are reasonably necessary for the representation of the defendant, whether in connection with issues relating to guilt or the sentence, the court may authorize the defendant's attorneys to obtain such services on behalf of the defendant[.]"  18 U.S.C.A. § 3599(f).  Neither the Supreme Court nor the Fifth Circuit has defined the phrase "reasonably necessary" beyond the statute's plain language.  The Fifth Circuit, however, requires a petitioner to show "that he ha[s] a substantial need" for investigative or expert assistance.  *Clark v. Johnson*, 202 F.3d 760, 768 (5th Cir.), *cert. denied*, 531 U.S. 831 (2000); *see also Fuller v. Johnson*, 114 F.3d 491, 502 (5th Cir.), *cert. denied*, 522 U.S. 963 (1997) ("In light of the statutory language, we first note that Fuller did not show a substantial need for expert assistance.").  The Fifth Circuit upholds the denial of funding "when a petitioner has (a) failed to supplement his funding request with a viable constitutional claim that is not procedurally barred, or (b) when the sought-after assistance would only support a meritless claim, or (c) when the sought after assistance would only supplement prior evidence."  *Smith v. Dretke*, 422 F.3d 269, 288 (5th Cir. 2005); *see also Woodward v. Epps*, 580 F.3d 318, 334 (5th Cir. 2009), *cert. denied*, 130 S.Ct. 2093 (2010).

-37-

Title 28, section 2254(d)(2) of the United States Code prohibits a federal court from granting habeas corpus relief

> with respect to any claim that was adjudicated on the merits in State court . . . unless the adjudication of the claim . . . resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

As discussed above, the Texas courts' conclusion that counsel did not render deficient performance was reasonable. Moreover, the evidence Ayestas now seeks would merely supplement the evidence he presented to the state habeas court. Because Ayestas is not entitled to relief on this claim, investigative services are not reasonably necessary. Accordingly, Ayestas's motion (Docket Entry No. 18) will be denied.

## VII.  Conclusion and Order

For the foregoing reasons, it is **ORDERED** as follows:

1. Respondent Rick Thaler's Motion for Summary Judgment (Document No. 11) is **GRANTED**;

2. Petitioner Carlos Ayestas's Petition for a Writ of Habeas Corpus (Document No. 1) is in all respects **DENIED** and Ayestas's Petition is **DISMISSED WITH PREJUDICE**; and

3. No Certificate of Appealability shall issue in this case.

4.    Petitioner's Motion to Expand Record (Docket Entry No. 16) is **DENIED.**

5.    Petitioner's Motion for the Appointment of an Investigator (Docket Entry No. 18) is **DENIED.**

**SIGNED** at Houston, Texas, on this the 26th day of January, 2011.

_____
                              SIM LAKE
                   UNITED STATES DISTRICT JUDGE