**IN THE**
**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS,**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **CARLOS MANUEL AYESTAS,** | § | |
| **a/k/a Dennis Humberto Zelaya Corea,** | § | |
| | § | |
| **Petitioner,** | § | |
| | § | **USDC No. 4:09-cv-2999** |
| **v.** | § | |
| | § | **Capital Case** |
| **WILLIAM STEPHENS, Director,** | § | |
| **Texas Department of Criminal Justice,** | § | |
| **Correctional Institutions Division,** | § | |
| | § | |
| **Respondent.** | § | |

**PETITIONER'S MOTION TO STAY AND HOLD IN ABEYANCE THE PROCEEDINGS UNDER *RHINES V. WEBER* TO ALLOW PETITIONER TO EXHAUST THE NEW CLAIMS**

NOW COMES, Petitioner, Dennis Humberto Zelaya Corea ("Mr. Zelaya"), under the name Carlos Manuel Ayestas, and files this motion to stay and hold these proceedings in abeyance to allow Petitioner to exhaust new claims that his prosecution and sentence of death violated the Equal Protection and Due Process clauses of the Fourteenth Amendment and the Cruel And Unusual Punishment clause to the Eighth Amendment to the United States Constitution.

On December 22, 2014, Mr. Zelaya's counsel reviewed portions of the State's file at the Office of the District Attorney in Houston and discovered a Capital Murder Summary memorandum, prepared by the prosecution, indicating that Mr. Zelaya's national origin was a motivating factor behind the State's decision to seek the death penalty. When Mr. Zelaya discovered this memorandum, Mr. Zelaya was before this court on a motion pursuant to Rule 59(e) of the Federal Rules of Civil Procedure ("FRCP") to alter or amend this court's judgment

entered on November 18, 2014, wherein it denied habeas relief. *See Petitioner's Motion to Alter or Amend Judgment* (Doc. No. 53) [hereinafter *First Rule 59 Motion*]. That motion remains pending before this court. On January 9, 2015, Mr. Zelaya moved this Court under FRCP 15(a) for leave to amend his original petition for a writ of habeas corpus to add claims based on the newly-discovered prosecution memorandum that his state conviction and sentence violated the Equal Protection and Due Process clauses of the Fourteenth Amendment and the Cruel and Unusual Punishment clause of the Eighth Amendment. *See Motion for Leave to Amend Original Petition for Writ of Habeas Corpus* (Doc. No. 54) [hereinafter *Rule 15 Motion*]. On January 14, 2015, Mr. Zelaya filed a supplemental motion under FRCP 59 to urge the Court to take one of three options under FRCP 59 to set aside the judgment and, thus, allow him to amend the pleadings under FRCP 15(a). *See Supplement to Petitioner's Rule 59 Motion to Alter or Amend the Judgment Urging the Court to Grant Leave to Amend Original Petition for Writ of Habeas Corpus* (Doc. No. 55) [hereinafter *Supplemental Rule 59 Motion*].

Justice requires that the constitutional issues implicated by the prosecution's announcement that Mr. Zelaya's status as a foreign national was a motivating factor behind the prosecutorial decision to seek the death penalty be litigated. As such, Mr. Zelaya has asked this Court to either: 1) Grant Mr. Zelaya's First Rule 59 Motion on the grounds stated in that motion, while also granting Mr. Zelaya's Rule 15 Motion to amend the original petition for writ of habeas corpus to allow for litigation of these important constitutional issues; 2) Invoke Rule 59(d) and, after giving notice and opportunity to be heard, grant Mr. Zelaya's First Rule 59(e) motion on the basis of the constitutional issues raised by the newly discovered prosecution memorandum, and further grant Mr. Zelaya's Rule 15 Motion to amend the petition; or 3) Grant

the Supplemental Rule 59 Motion, and further grant Mr. Zelaya's Rule 15 Motion to amend the petition.

In addition to granting Mr. Zelaya's Rule 15 Motion for leave to amend his original petition through a Rule 59 gateway, Mr. Zelaya requests that once amendment is permitted, this Court stay the present litigation and hold these proceedings in abeyance to allow Mr. Zelaya the opportunity to exhaust his Equal Protection and Eighth Amendment claims in state court. *See Rhines v. Webber*, 544 U.S. 269 (2005).

A. Once Mr. Zelaya is permitted to amend his original petition for writ of habeas corpus, he will be required to exhaust the claims in state court utilizing the procedure set out in *Rhines*.

Mr. Zelaya's Equal Protection and Eighth Amendment claims rely upon newly available evidence that just recently came to light. As such, these claims have not yet been presented in state court and are thus unexhausted. Exhaustion doctrine provides state courts with an opportunity to correct federal constitutional errors that mar state convictions before those claims are presented to and decided by federal courts. *See Rose v. Lundy*, 455 U.S. 509, 518 (1982). In accordance with this principle, Congress has prohibited federal courts from granting habeas relief when the petitioner "has the right under the law of the State to raise, by any available procedure, the question presented." 28 U.S.C. § 2254(c). *See also* 28 U.S.C. § 2254(b) (prohibiting the district court from granting relief unless "the applicant has exhausted the remedies available in the courts of the State").

Before passage of the Anti-Terrorism and Effective Death Penalty Act (AEDPA), federal courts were required to dismiss "mixed" habeas petitions that contained unexhausted claims. *Rose v. Lundy*, 455 U.S. at 518. Petitioners faced with the dismissal of their petitions routinely returned to state court to exhaust their claims before returning to federal court. AEDPA,

however, "dramatically altered the landscape for federal habeas corpus petitions," and imposed a one-year statute of limitations for the filing of federal habeas petitions. *Rhines v. Weber*, 544 U.S. at 274. *See generally* 28 U.S.C. § 2244(d). Because the pendency of a federal petition did not toll the statute of limitations, *see Duncan v. Walker*, 533 U.S. 167, 181 (2001), the total exhaustion requirement threatened to combine with the limitations bar to render untimely procedurally sound claims that had been presented alongside an unexhausted claim. Specifically, when all claims in the mixed petition were dismissed without prejudice, even exhausted claims that had been pending in federal court for over a year would be untimely under § 2244(d)—at least without equitable tolling. To avoid this unexpected interaction between *Lundy*'s mixed-petition rule and AEDPA's new statute of limitations, the Supreme Court unanimously adopted a stay-and-abeyance procedure in *Rhines*. 544 U.S. at 269. The Court held that district courts should stay federal proceedings (1) when the district court determines there was good cause for the petitioner's failure to exhaust his claims first in state court; and (2) the claims presented are not "plainly meritless." 544 U.S. at 277. The Fifth Circuit has held that the Supreme Court did not intend the phrase "good cause" in *Rhines* in the "technical sense," but "rather intended the district court [to] find 'good cause' in the equitable sense." *Ruiz v. Quarterman*, 504 F.3d 523, 529 n.17 (5th Cir. 2007).

B. Mr. Zelaya has presented "good cause" for not presenting these claims previously in state court.

At no point during the pendency of Mr. Zelaya's trial, appeal, or habeas proceedings did the State make counsel aware of this memorandum, or communicate to Mr. Zelaya that the impermissible factor of Mr. Zelaya's national origin guided prosecutors as they decided whether to prosecute for capital murder and seek the death penalty. And until the moment when he discovered this long-hidden internal memorandum, Mr. Zelaya had no reason to believe that such

a memorandum existed or that his prosecutors in his case were motivated by his national origin. At any rate, the State never made any prior defense team aware of its potential malfeasance in considering Mr. Zelaya's national origin in its charging decision and the decision whether to seek death. As a result, Mr. Zelaya plainly can demonstrate good cause for not pursuing these claims earlier, and the fact that he has brought them to this Court's attention as soon as he became aware of the evidence demonstrates that he is not asserting the claims merely for purposes of delay or based upon abusive litigation tactics.

C. Because there is a significant probability that the state court will entertain Mr. Zelaya's new claims upon return to that court, they are not plainly meritless.

In this case, the State of Texas has provided a procedural mechanism to allow consideration of a subsequent petition for writ of habeas corpus when the claims raised are based upon newly available evidence. Section 5 of Article 11.071, provides:

> (a) If a subsequent application for a writ of habeas corpus is filed after filing an initial application, a court may not consider the merits of or grant relief based on the subsequent application unless the application contains sufficient specific facts establishing that:
>
> > (1) the current claims and issues have not been and could not have been presented previously in a timely initial application or in a previously considered application filed under this article or Article 11.07 because the factual or legal basis for the claim was unavailable on the date the applicant filed the previous application . . . .

TEX. CODE CRIM. P., art. 11.071, §5(a). *See also Ex parte Chavez*, 371 S.W.3d 200, 210 (Tex.Crim.App. 2012) (In a subsequent habeas petition, the court considered due process claims based on newly discovered evidence of false testimony); *Ex parte Staley*, 160 S.W.3d 56, 63 (Tex.Crim.App. 2005) (capital prisoner may raise newly available *Atkins* claim in subsequent petition). For previously unavailable claims under § 5(a)(1), such as Mr. Zelaya's Equal Protection and Eighth Amendment claims, the application must demonstrate that the factual basis

was unavailable at the time any prior application was filed and that the "specific facts alleged, if established, would constitute a constitutional violation that would likely require relief from either the conviction or sentence." *Ex parte Campbell*, 226 S.W.3d 418, 422 (Tex.Crim.App. 2007).

Factual unavailability is defined by the statute: "For purposes of Subsection (a)(1), a factual basis of a claim is unavailable on or before a date described by Subsection (a)(1) if the factual basis was not ascertainable through the exercise of reasonable diligence on or before that date." TEX. CODE CRIM. P., art. 11.071, § 5(e). *See also Ex parte Miles*, 359 S.W.3d 647, 664 (Tex.Crim.App. 2012); *Ex parte Lemke*, 13 S.W.3d 791, 794 (Tex.Crim.App. 2000). As discussed, Mr. Zelaya had no knowledge of this evidence, whereas the State did have such knowledge, and the State withheld the evidence from Mr. Zelaya until only recently. Mr. Zelaya could not have possibly raised this claim in his original state application for writ of habeas corpus. This is paradigmatic newly available evidence under § 5(a)(1), and it is clear that Mr. Zelaya can satisfy this prong for a subsequent writ.

Moreover, neither *Rhines* nor § 5(a) require, at this juncture, Mr. Zelaya to carry his ultimate burden to prove his constitutional claims. To raise a claim under § 5(a)(1), an applicant is only required to plead a *prima facie* case with respect to the underlying claims. *Ex parte Blue*, 230 S.W.3d at 162; *Ex parte Brooks*, 219 S.W.3d at 400; *Ex parte Briseno*, 135 S.W.3d 1, 3 (Tex.Crim.App. 2004). Thus, an applicant does not have to prove actual entitlement to relief:

> It would be anomalous to require that the applicant to actually *convince* us . . . at this stage. Indeed, if we were to require that the subsequent application actually *convince* us . . . , there would be no need to return the application to the convicting court for further proceedings.

*Ex parte Blue*, 230 S.W.3d at 163 (emphasis in original). Thus, "an applicant is *not* required to set out within his writ application the detailed facts and record evidence which would [actually] *prove* [his claims]." *Ex parte Rivera*, No. WR-27,065-02, 2003 WL 21752841, at *2

(Tex.Crim.App., Jul. 25, 2003) (emphasis added). *See also Ex parte Williams*, No. WR-43,907-02, 2003 WL 1787634, at *1 (Tex.Crim.App., Feb. 26, 2003) (noting that an "applicant need not include every jot and tittle of evidence which would prove [his claim]"). Likewise, in order to obtain a *Rhines* stay, he need only demonstrate that his claim is not "plainly meritless." *See Rhines v. Weber*, 544 U.S. at 269.

The Equal Protection Clause requires similar treatment of all persons similarly situated. *See City of Cleburne v. Cleburne Living Center, Inc.*, 473 U.S. 432, 439 (1985). A party who wishes to make out an equal protection claim must prove the existence of purposeful discrimination motivating the alleged state action. *See Washington v. Davis*, 426 U.S. 229, 246-50 (1976); *Bryan v. City of Madison, Miss.*, 213 F.3d 267, 277 (5th Cir. 2000) ("[T]o successfully bring a selective prosecution or enforcement claim, a plaintiff must prove that the government official's acts were motivated by improper considerations, such as race, religion, or the desire to prevent the exercise of a constitutional right.").

Prosecutorial discretion is broad, but it is restrained by the Constitution. *See, e.g.*, *United States v. Batchelder*, 442 U.S. 114, 125 (1979) ("Selectivity in the enforcement of criminal laws is . . . subject to constitutional constraints."). A prosecution based on national origin is presumed to be arbitrary, *see, e.g.*, *United States v. Cammisano*, 546 F.2d 238 (8th Cir. 1976), and a classification based on national origin, like one based on race, is subject to the strictest, "most exacting scrutiny." *Clark v. Jeter*, 486 U.S. 456, 461 (1988). Selective prosecution on the basis of improper considerations such as race, ethnicity, or national origin violates Equal Protection guarantees. *Oyler v. Boles*, 368 U.S. 448, 456 (1962) (holding that a decision about whether or not to prosecute, and to what extent, may not be "deliberately based upon an unjustifiable

standard such as race, religion, or other arbitrary classification."); *see also McCleskey v. Kemp*, 481 U.S. 279, 310 n.30 (1987).

A court's consideration of an Equal Protection-based claim of selective prosecution necessarily begins with a presumption of good faith and constitutional compliance by the prosecutors, and this presumption applies absent clear evidence to the contrary. *United States v. Armstrong*, 517 U.S. 456, 464-66 (1996); *see also United States v. Ramirez*, 765 F.2d 438, 440 (5th Cir. 1985) ("Conclusional allegations of impermissible motive are not sufficient" to demonstrate the government acted in bad faith.). Ordinarily, a claimant must show both (1) that there was a "discriminatory purpose"—that the prosecutorial decision-making was motivated by improper considerations such as race, religion, national origin, or another arbitrary classification, *see, e.g.*, *Beeler v. Rounsavall*, 328 F.3d 813, 816 (5th Cir. 2003)—and (2) that it had a "discriminatory effect" in that similarly situated individuals who belonged to another class were not prosecuted. *See United States v. Armstrong*, 517 U.S. at 465, 469 n.3 (holding that where there is no admission of discriminatory intent, the threshold showing required of a petitioner before he or she was entitled to discovery under the Federal Rules of Criminal Procedure consisted of evidence of discriminatory purpose and effect).

In the "exceedingly rare" case where a prosecutor admits that ethnicity or nationality factored into prosecutorial decision-making, *see United States v. Tuitt*, 68 F. Supp. 2d 4, 10 (D. Mass. 1999), at least one Circuit has held that it is unnecessary for a petitioner to establish second element relating to discriminatory effect. *See United States v. Al Jibori*, 90 F.3d 22, 26 (2d Cir. 1996) ("We believe this case demonstrates why admissions should sometimes justify further inquiry."). In *Al Jibori*, the defendant-appellant raised a claim of selective prosecution based on national origin, but failed to offer any "credible evidence that the government had

declined to prosecute similarly situated suspects from parts of the world other than the Middle East." *Id.* at 25. The government, however, introduced into evidence an affidavit of an Assistant U.S. Attorney explaining that the defendant was prosecuted for presenting a false passport at least in part because of his Iraqi national origin. Even in the absence of some evidence of discriminatory effect, this affidavit was enough to cause the U.S. Court of Appeals for the Second Circuit to remand the defendant's case for further inquiry into his selective prosecution claim. *Id*. at 25-27.

As stated, at this stage, Mr. Zelaya is only required to demonstrate that his claim is not "plainly meritless." *See Rhines v. Weber*, 544 U.S. at 269. Mr. Zelaya's recent discovery of the Capital Murder Summary (attached as Exhibit A to the *Rule 15 Motion*), prepared by the prosecution team, indicated that his status as a foreign national played a role in the State's decision to seek death. In fact, Mr. Zelaya's national origin is cited as one of only two aggravating factors militating in favor a death penalty prosecution. The Capital Murder Summary was prepared by the assigned court chief, Kelly Siegler, and was dated September 19, 1995. After listing the some of the circumstances of the crime and the pending investigation, Siegler then listed the circumstance of Mr. Zelaya's alienage as an aggravating factor weighing in favor of the death penalty. The indictment recommendation by Siegler—as well as by the division chief, Casey O'Brien, the bureau chief, Keno Henderson, and the district attorney, John B. Holmes, Jr.—indicated that the case would be charged as a capital murder. Additionally, the district attorney, in a handwritten recommendation at the end of the report, approved seeking the death penalty on Mr. Zelaya.

The Capital Murder Summary provides the kind of direct evidence of discriminatory purpose rarely seen in cases raising equal protection violations. *Cf. United States v. Tuitt*, 68 F.

Supp. 2d at 10. It is an internal Harris County District Attorney memorandum that provides a unique window into the factors that high-level supervisorial prosecutors believed to be relevant to a decision on whether to pursue the imposition of the death penalty.

Moreover, that there is a line drawn through the recommendation to seek the death penalty against Mr. Zelaya because of his alienage does not mitigate the import of the admission it contains: national origin was an explicit decisional factor in the exercise of prosecutorial discretion. Since it is presently unknown who made the mark, when that person made it, what that person intended, how many phases of prosecution review the Capital Murder Summary passed without the mark, and whether Mr. Zelaya's national origin nevertheless continued to be a factor when the district attorney ultimately authorized seeking the death penalty, the mark should not excuse the shocking reliance on unconstitutional factors to guide prosecutorial discretion. Siegler's impermissible exercise of prosecutorial discretion is not speculative; her words speak for themselves. On the other hand, any suggestion that the discriminatory purpose inherent in this memo is cured by a mark through the sentence citing Mr. Zelaya's national origin would be based on pure speculation, since nothing is known about the origin of that mark or its intended effect.

Just as in *Al Jibori*, where the prosecution acknowledged that the defendant's Iraqi origin was a factor that motivated the prosecution, here, Siegler, a supervisor in the District Attorney's office, asserted that Mr. Zelaya should face the death penalty because he was not a citizen of the United States. This is an explicit, unabashed acknowledgment of impermissible, discriminatory purpose. Where such a discriminatory purpose is directly acknowledged, as here, Mr. Zelaya is not required to plead evidence of discriminatory effect, much less prove such effect, and under both *Rhines* and Article 11.071, § 5(a)(1) of the Texas Rules of Criminal Procedure, he has at

least made out a *prima facie* case of a constitutional violation. *See, e.g., United States v. Al Jibori*, 90 F.3d at 26.[1]

Finally, where, as here, a constitutionally impermissible and irrelevant factor such as "national origin" is cited as an aggravating factor militating in favor of an enhanced penalty, the Eighth Amendment's bar against cruel and unusual punishments is violated. *See, e.g., Zant v. Stephens*, 462 U.S. 862, 885 (1983).

* * * *

Mr. Zelaya discovered the Capital Murder Summary on December 22, 2014, while reviewing the files of the Harris County District Attorney relating to his prosecution. The Summary demonstrates that Mr. Zelaya has potentially meritorious claims under the Eighth and Fourteenth Amendments to the United States Constitution, and he has not engaged in abusive litigation or intentional delay. *See Rhines v. Weber*, 544 U.S. at 270. As such, Mr. Zelaya asks this court to stay and hold in abeyance the proceedings to allow him to litigate these issues of constitutional importance in state court.

**Conclusion and Prayer for Relief**

WHEREFORE, PREMISES CONSIDERED, Petitioner, Dennis Humberto Zelaya Corea, under the name Carlos Manuel Ayestas, respectfully requests that this Court permit him to alter or amend the judgment under Rule 59; that the Court grant Mr. Zelaya leave to amend his original petition for writ of habeas corpus; that the Court stay and hold this matter in abeyance while he exhausts Texas remedies on the newly-discovered claims; and that the Court grant him any and all other relief to which he may be entitled.

---

[1] Conversely, the fact that Mr. Zelaya's alienage was cited by prosecutor supervisors as an aggravating factor militating in favor of a death penalty prosecution necessarily means that for those homicide suspects who were citizens of the United States had the benefit—solely as a result of their own citizenship—of one less aggravating factor tilting the scale of prosecutorial discretion towards the death penalty. Thus, the prosecution's Capital Murder Summary explicitly identifies the class of similarly situated defendants.

Respectfully submitted,

PAUL E. MANSUR
Senior Staff Attorney
Texas Defender Service
P.O. Box 1300
Denver City, Texas 79323
(806) 215-1025
(806) 592-9136 (facsimile)
pmansur@texasdefender.org
Member of the Bar of this Court

BENJAMIN B. WOLFF
Texas Bar No. 24091608
Staff Attorney
Texas Defender Service
510 South Congress, Suite 304
Austin, Texas 78704
(Tel) 512-320-8300
(Fax) 512-447-2153
bwolff@texasdefender.org
Member of the Bar of this Court

/s/ Paul E. Mansur
Attorneys for Petitioner

***Certificate of Conference***

I certify that on January 14, 2015, I discussed the merits of this motion with counsel for Respondent, Jeremy Greenwell, and he informed me that Respondent will be opposed to the requested relief.

/s/ Paul E. Mansur

***Certificate of Service***

I certify that on January 14, 2015, I served by ECF a true and correct copy of this motion upon opposing counsel at the following address:

Greg Abbott
attn: Jeremy Greenwell
Texas Attorney General
Postconviction Litigation Division
P.O. Box 12548
Austin, Texas 78711-2548.

/s/ Paul E. Mansur