United States Courts
Southern District of Texas
FILED
August 23, 2019
David J. Bradley, Clerk of Court

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit
**FILED**
July 31, 2019
Lyle W. Cayce
Clerk

No. 15-70015

4:09-CV-2999

CARLOS MANUEL AYESTAS, also known as Dennis Zelaya Corea,

    Petitioner - Appellant

v.

LORIE DAVIS, DIRECTOR, TEXAS DEPARTMENT OF CRIMINAL JUSTICE, CORRECTIONAL INSTITUTIONS DIVISION,

    Respondent - Appellee

---

Appeal from the United States District Court
for the Southern District of Texas

---

ON REMAND FROM THE SUPREME COURT OF THE UNITED STATES

Before SMITH, SOUTHWICK, and HO, Circuit Judges.

LESLIE H. SOUTHWICK, Circuit Judge:

    Carlos Manuel Ayestas is a prisoner on death row in Texas. We previously affirmed the district court's denial of his request under 18 U.S.C. § 3599(f) for investigatory funding because he had not shown a "substantial need" that made the funds "reasonably necessary" to the representation. The Supreme Court held the statute does not require a showing of "substantial need" and remanded with instructions to consider only whether funding is "reasonably necessary."

No. 15-70015

We conclude that investigatory funding is not reasonably necessary because nothing would establish the ineffectiveness of state-habeas counsel, a gateway requirement for him to overcome the procedural default of his claim that his trial counsel was ineffective for failing to present certain mitigating evidence of substance abuse and mental illness. AFFIRMED.

FACTUAL AND PROCEDURAL BACKGROUND

In 1997, Carlos Manuel Ayestas was convicted of murdering Santiaga Paneque, a 67-year-old Houston woman, after he and two accomplices broke into her home one morning. Paneque's son discovered her body when he returned home for lunch. He testified at sentencing that it had been important to his mother that he become a United States citizen, and that he had wanted her at his naturalization ceremony, which occurred two days after her death. The Texas Court of Criminal Appeals affirmed Ayestas's conviction and death sentence in 1998; that court denied his application for a writ of habeas corpus in 2008.

We have previously described in detail Ayestas's federal-habeas proceedings. *Ayestas v. Stephens*, 817 F.3d 888, 892-94 (5th Cir. 2016), *vacated sub nom. Ayestas v. Davis*, 138 S. Ct. 1080 (2018). We explain here some recent developments. In 2014, the district court denied Ayestas's federal habeas application as well as his *ex parte* motion for additional investigatory funding pursuant to 18 U.S.C. § 3599(f). With respect to the Section 3599(f) motion, the district court recited then-controlling precedent that Ayestas was required to show a "substantial need" for investigative assistance, as well as the statutory requirement that the assistance be "reasonably necessary" to the representation. *See Brown v. Stephens*, 762 F.3d 454, 459 (5th Cir. 2014); § 3599(f).

2

No. 15-70015

The district court then denied multiple post-judgment motions, including some based on a newly discovered "Capital Murder Summary memorandum, prepared by the prosecution, stating that Ayestas's lack of citizenship was an 'aggravating circumstance[].'" *Ayestas*, 817 F.3d at 894. On appeal, we affirmed the denial of Ayestas's motions for investigatory funding, to stay proceedings to allow exhaustion of new claims in state court, and to supplement his habeas application with new evidence. *Id.* at 892. We also denied Ayestas's request for a certificate of appealability to appeal the denial of his habeas application. *Id.*

The Supreme Court granted certiorari on the denial of investigatory funding under Section 3599(f), then vacated and remanded for further proceedings. *Ayestas*, 138 S. Ct. 1080. The Court rejected that an applicant must show a "substantial need" or present "a viable constitutional claim that is not procedurally barred." *Id.* at 1093 (citation omitted). Instead, funding may be reasonably necessary when it "stands a credible chance of enabling a habeas petitioner to overcome the obstacle of procedural default." *Id.* at 1094. The Court instructed that "the 'reasonably necessary' standard thus requires courts to consider the potential merit of the claims that the applicant wants to pursue, the likelihood that the services will generate useful and admissible evidence, and the prospect that the applicant will be able to clear any procedural hurdles standing in the way." *Id.*

Ayestas contends that investigatory funding is reasonably necessary to develop claims that his trial counsel was ineffective for failing to present mitigating evidence of his substance abuse and mental illness at sentencing. *See Wiggins v. Smith*, 539 U.S. 510 (2003). A prison psychologist first diagnosed Ayestas as schizophrenic in 2003 when his state-habeas application was still pending.

3

No. 15-70015

DISCUSSION

We review the district court's denial of a Section 3599(f) motion for an abuse of discretion. *Hill v. Johnson*, 210 F.3d 481, 487 (5th Cir. 2000). "A district court abuses its discretion if it bases its decision on an erroneous view of the law or on a clearly erroneous assessment of the evidence." *Perez v. Stephens*, 745 F.3d 174, 177 (5th Cir. 2014) (citation omitted). When reviewing for abuse of discretion, the "underlying conclusions of law are reviewed *de novo* and conclusions of fact are reviewed for clear error." *Aguilar-Ayala v. Ruiz*, 973 F.2d 411, 416 (5th Cir. 1992) (citation omitted).

Since the Supreme Court's *Ayestas* decision, we have remanded some Section 3599(f) denials for reconsideration by the district court. *E.g., Sorto v. Davis*, 716 F. App'x 366 (5th Cir. 2018). Remand is not required "if the judgment is sustainable for any reason." *Af-Cap, Inc. v. Republic of Congo*, 462 F.3d 417, 425 (5th Cir. 2006). For that reason, other panels have affirmed pre-*Ayestas* denials where "the reasons the district court gave for its ruling remain sound." *Jones v. Davis*, 927 F.3d 365, 374 (5th Cir. 2019) (citation omitted).

*I. Section 3599(f) Motion for Investigatory Funding*

The district court denied the Section 3599(f) motion for these reasons: Ayestas "fail[ed] to demonstrate that [1] trial counsel was deficient, [2] that there [was] a reasonable probability that his claimed evidence of substance abuse would have changed the outcome of either his trial or his state habeas corpus proceeding, or [3] that his state habeas counsel was ineffective."

Whether the district court's reliance on the first two reasons abused its discretion under the standard described in the Supreme Court's *Ayestas* decision are close questions because of the district court's emphasis on *existing* as opposed to *potential* evidence. The district court's third reason for denying

4

No. 15-70015

funding was that state-habeas counsel was not ineffective. Ayestas must establish that his state-habeas counsel was ineffective to overcome the procedural default of claims based on failures to present mitigating evidence of substance abuse and mental illness. *See Trevino v. Thaler*, 569 U.S. 413 (2013). If the district court's assessment of effectiveness is valid, then the district court did not abuse its discretion by denying funding regardless of any potential error in the other stated reasons.

We previously concluded that Ayestas's state-habeas counsel was not constitutionally ineffective. *Ayestas*, 817 F.3d at 898. Nonetheless, the Supreme Court has informed us to consider "the prospect that the applicant will be able to clear any procedural hurdles standing in the way." *Ayestas*, 138 S. Ct. at 1094. This means assessing whether the investigation "stands a credible chance of enabling a habeas petitioner to overcome the obstacle of procedural default." *Id.* If no credible chance exists, then the investigation is not reasonably necessary regardless of the *Wiggins* claims' viability or the likelihood of uncovering admissible evidence. That is because "it would not be reasonable — in fact, it would be quite unreasonable — to think that services are necessary to the applicant's representation if, realistically speaking, they stand little hope of helping him win relief." *Id.*

## A. *State-Habeas Counsel's Effectiveness*

The question then is whether state-habeas counsel's decision not to bring these specific claims fell outside of "prevailing professional norms" given any signs that mental illness and substance abuse went uninvestigated by trial counsel and in light of the post-conviction claims that were advanced instead. *See Strickland v. Washington*, 466 U.S. 668 (1984).

5

No. 15-70015

### i. *Prevailing Professional Norms*

Capital defense practices have changed significantly over the past 30 years.[1] The Supreme Court, though, has made clear that counsel's performance is to be evaluated based on "the professional norms prevailing when the representation took place." *Bobby v. Van Hook*, 558 U.S. 4, 7 (2009).

Scrutiny of mitigation investigations did not take shape until well after Ayestas's state-habeas application was filed in 1998. At that time, the ABA guidelines spoke only briefly to the duties for post-conviction counsel. ABA GUIDELINES FOR THE APPOINTMENT AND PERFORMANCE OF COUNSEL IN DEATH PENALTY CASES 11.9.3, p. 126 (1989).[2] Ayestas's current request for funding closely tracks supplementary ABA guidelines, but their "probative value . . . is diminished by the fact that they were adopted" a decade after the state-habeas application was filed. *Druery v. Thaler*, 647 F.3d 535, 541 n.2 (5th Cir. 2011); *see* ABA SUPPLEMENTARY GUIDELINES FOR THE MITIGATION FUNCTION OF DEFENSE TEAMS IN DEATH PENALTY CASES (2008).

---

[1] *See* Russell Stetler & W. Bradley Wendel, *The ABA Guidelines and the Norms of Capital Defense Representation*, 41 HOFSTRA L. REV. 635, 695 (2013) ("Counsel's duty to conduct thorough mitigation investigation in death penalty cases must be understood in terms of the evolving standards of the specialized capital defense bar — a bar that has been increasingly successful in avoiding death sentences.").

[2] GUIDELINE 11.9.3 DUTIES OF POSTCONVICTION COUNSEL
 A. Postconviction counsel should be familiar with all state and federal postconviction remedies available to the client.
 B. Postconviction counsel should interview the client, and previous counsel if possible, about the case. Counsel should consider conducting a full investigation of the case, relating to both the guilt/innocence and sentencing phases. Postconviction counsel should obtain and review a complete record of all court proceedings relevant to the case. With the consent of the client, postconviction counsel should obtain and review all prior counsel's files.
 C. Postconviction counsel should seek to present to the appropriate court or courts all arguably meritorious issues, including challenges to overly restrictive rules governing postconviction proceedings.

No. 15-70015

Ayestas's state-habeas attorney in 1998 would not have found much in the case law for claims based upon mitigating evidence of substance abuse and mental illness. In 1998, the most relevant authority was likely *Strickland* itself, which held that "[t]rial counsel could reasonably surmise from his conversations with [his client] that character and psychological evidence would be of little help." *Strickland*, 466 U.S. at 699.

No authority cited now by Ayestas that addresses mitigating evidence even existed when his state-habeas application was filed in December 1998. *See Wiggins v. Smith*, 539 U.S. 510 (2003); *Rompilla v. Beard*, 545 U.S. 374, 393 (2005); *Porter v. McCollum*, 558 U.S. 30, 39 (2009).

"Starting with *Williams v. Taylor* in 2000, and then continuing with *Wiggins v. Smith* in 2003, and *Rompilla v. Beard* in 2005, the Court launched a series of decisions emphasizing the importance of thorough mitigation investigation in capital defense cases." Emily Hughes, *Mitigating Death*, 18 CORNELL J.L. & PUB. POL'Y 337, 352 (2009) (citations omitted). In fact, the 2000 decision in *Williams* was "the first time [the Supreme Court] overturned a death sentence under the *Strickland* standard." Stephen F. Smith, *The Supreme Court and the Politics of Death*, 94 VA. L. REV. 283, 353 (2008) (citation omitted). Importantly, none of these cases established *retroactive* constitutional rules.

In 1998, then, there was little to indicate to state-habeas counsel that the failure to develop substance abuse and mental illness evidence was an egregious omission, particularly when compared to the failure to secure testimony from his family. Ayestas's counsel pursued that evidence. In fact, just a year before the state-habeas application was filed, we explicitly characterized an ineffective assistance claim "for failing to present mitigating lay testimony from family or friends" as a "stronger argument" than a claim

7

No. 15-70015

premised on "failing to locate an expert who would conclude that [the defendant] was retarded or suffered from mental illness." *Williams v. Cain*, 125 F.3d 269, 278 (5th Cir. 1997). The "double-edged" nature of substance abuse and mental illness evidence and the state of the law before 2000 would have likely made those claims seem unlikely to succeed. *See, e.g., Boyle v. Johnson*, 93 F.3d 180, 187-88 (5th Cir. 1996); Jonathan P. Tomes, *Damned If You Do, Damned If You Don't: The Use of Mitigation Experts in Death Penalty Litigation*, 24 AM. J. CRIM. L. 359, 360-61 (1997).

In one representative case, the petitioner had argued his counsel "failed to present significant mitigating evidence that was either known to his counsel or should have been known to his counsel" including "evidence of his mental illness, violent family background, economic deprivation, voluntary intoxication, drug and alcohol addictions, and testimony as to his many positive traits." *Boyle*, 93 F.3d at 187. We held he "failed to establish that his counsel was deficient at trial" given trial counsel's testimony in state-habeas proceedings that this "would have been aggravating," and because "all the evidence that [the applicant] maintain[ed] should have been presented at the punishment phase of his capital murder trial had a double-edged quality." *Id.* at 187-88.

We acknowledge that evaluating performance against prevailing professional norms is complicated when standard practices raise constitutional concerns. As one Fifth Circuit judge observed, "[i]n Texas, the most active state in the carrying out of death sentences, we have often failed to live up to our ideal of justice. The failure of lawyers, judges, prosecutors, and defense counsel to perform as professionals is now well-documented." Patrick E. Higginbotham, *A Reflection on Furman*, 34 AM. J. CRIM. L. 199, 204 (2007).

8

No. 15-70015

In this instance, though, the record shows that state-habeas counsel provided aggressive, competent, and professional representation.

*ii.   Analysis*

Ayestas's state-habeas counsel, J. Gary Hart, has never been publicly disciplined for any reason. In December 1998, eleven months after being appointed, Ayestas's state-habeas counsel filed a 70-page application for relief raising several constitutional claims:

> <u>Claims 1–10</u>. That ten distinct actions or omissions by Ayestas's trial counsel, including the failure to present mitigating evidence, each denied Ayestas effective assistance in violation of the Sixth Amendment;
>
> <u>Claims 11–13</u>. That the failure to inform Ayestas of his right, under an international treaty, to consult with the Honduran Consul prevented him from presenting mitigating evidence in violation the Eighth Amendment, the Fourteenth Amendment, and the Sixth Amendment's compulsory process clause;
>
> <u>Claims 14–15</u>. That the state knowingly presented false testimony from a witness at the guilt phase of the trial in violation of the Fourteenth Amendment, and at the punishment phase in violation of the Eighth Amendment;
>
> <u>Claim 16</u>. That the state suppressed impeachment evidence in violation of the Fourteenth Amendment due process clause.

Hart did not merely repeat claims raised in the direct appeal. In fact, there is virtually no overlap between them. Hart's independent efforts are also represented in the extra-record evidence that he developed and attached to the initial state-habeas application, which included affidavits from a forensic pathologist, Ayestas himself, three of Ayestas's family members, and one of the jurors that sentenced Ayestas to death, as well as documents from the Honduran government and a letter from an independent fingerprint examiner.

9

No. 15-70015

In summary, state-habeas counsel raised ten ineffective assistance of trial counsel ("IATC") claims, including multiple claims premised on a failure to present certain mitigating evidence. Specifically, state-habeas counsel argued that Ayestas was prejudiced by the failure to present mitigating testimony from family members that he had no criminal record in Honduras and that he had lived a normal life. In other words, this claim was the *opposite* of what would likely be shown by evidence of mental illness and substance abuse, which as mentioned already had little support in the case law at the time.

The omission of these claims was not because state-habeas counsel was unaware of the mental illness and substance abuse. State-habeas counsel had access to the psychological and disciplinary records subpoenaed by trial counsel's investigator. That trial investigator provided Ayestas with a questionnaire, and state-habeas counsel had Ayestas's responses where he identified a history of head traumas and "admitted to drinking alcohol since he was 16 years old and to doing cocaine at least once a week, which became more frequent as he slipped into the grips of addiction."

Despite the relative novelty of mitigation specialists,[3] state-habeas counsel hired one shortly after being appointed. That specialist advised:

> It is clear the defendant had a history of substance abuse. What we know from reviewing the trial evidence is that Ayestas probably abused heroine and/or cocaine while in California: that he had

---

[3] Judge Berrigan, who "as a lawyer, handled the penalty phase of a number of capital cases in the 1980s and early 1990s on a pro bono basis" has written that she "had never heard of a mitigation specialist." Helen G. Berrigan, *The Indispensable Role of the Mitigation Specialist in A Capital Case: A View from the Federal Bench*, 36 HOFSTRA L. REV. 819, 819 n.a1 (2008). "She did her own investigation and . . . [f]or witnesses, she generally had only family members and a psychologist." *Id. See also Murphy v. Davis*, 737 F. App'x 693, 705 (5th Cir. 2018) ("Before *Wiggins*, counsel said lawyers still had to conduct a mitigation investigation, but it was not incumbent upon lawyers to retain a mitigation expert.").

No. 15-70015

what appeared to be a drug-related run-in with alleged victim Martinez in Houston days after this murder, and that he had gotten so drunk he "passed out" on the day of his arrest. Would there have been a defense to his conduct due to some sort of addiction? We should look at substance abuse as mitigation.

Hart commented in his handwritten notes: "Ayestas's drinking and/or drug consumption as a possible mitigating fact. How could this have been developed at trial?"

Prior to filing the initial state-habeas application, Hart requested investigatory funding based on his mitigation specialist's recommendations that he estimated would cost $15,000.[4] However, recognizing an existing "policy to authorize no more than $2,500.00 for investigative expenses to begin with," Hart requested only that amount. The state court granted only $1,500. State-habeas counsel managed to obtain only an additional $1,000 in investigatory funding before he filed the initial application, after which further requests were denied. *See* TEX. CODE CRIM. PROC. ANN. art. 11.071 § 3(b) (requiring prepayment requests to be filed no later than 30 days before filing of initial application).

"Although courts may not indulge '*post hoc* rationalization' for counsel's decisionmaking that contradicts the available evidence of counsel's actions, neither may they insist counsel confirm every aspect of the strategic basis for his or her actions." *Harrington v. Richter*, 562 U.S. 86, 109 (2011) (citation omitted). We are constrained to interpret the omission of a mitigation claim based on substance abuse as a strategic decision given the evidence in the record that state-habeas counsel contemplated the possibility but decided

---

[4] The Texas Court of Criminal Appeals capped fees for habeas counsel at $15,000 until 2000, when it was raised to $25,000. *See Shamburger v. Cockrell*, 34 F. App'x 962, at *3 n.9 (5th Cir. 2002).

11

No. 15-70015

against it. *See Hopkins v. Cockrell*, 325 F.3d 579, 586 (5th Cir. 2003) ("As for the alcohol and drug abuse, this Court has repeatedly denied claims of ineffective assistance of counsel for failure to present 'double edged' evidence where counsel has made an informed decision not to present it."). We therefore "conclude that counsel's decisions" about the substance abuse "were objectively reasonable based on the double-edged nature of the evidence involved." *Kitchens v. Johnson*, 190 F.3d 698, 703 (5th Cir. 1999).

With respect to Ayestas's mental illness, neither trial counsel nor state-habeas counsel could have been expected to explore it given that there was no evidence he was schizophrenic until 2000, two years after his state-habeas application was filed.

State-habeas counsel had access to prison medical records. They document that Ayestas was examined on September 22, 2000, at which time he complained of delusions that inmates could read his mind. The handwritten notes also indicate that Ayesteas "report[ed] no psy problems until 2 months ago." In other words, there is evidence that he did not begin exhibiting any symptoms of schizophrenia until July 2000. That is consistent with the absence of any evidence of Ayestas's mental illness prior to that point and with the multiple indicators of it afterwards.

In October 2000, Hart accompanied the Honduran Consul General and the Honduran Ambassador to the United States on a visit to Ayestas in prison. After meeting with Ayestas, Ambassador Hugo Pino told Hart he believed that Ayestas was delusional. In May 2003, in the wake of the Supreme Court's decision in *Atkins v. Virginia*, 536 U.S. 304 (2002), Hart arranged for a psychologist to evaluate Ayestas's intellectual status. The psychologist concluded that there was no evidence of mental retardation but did express concerns about his mental state and delusional thinking.

12

No. 15-70015

While this evaluation concluded there was not a viable *Atkins* claim, state-habeas counsel nonetheless leveraged it to support the IATC claim premised on the failure to present evidence Ayestas was only guilty of lesser included felony murder. State-habeas counsel used the psychologist's finding that Ayestas was not intellectually disabled to support his argument that trial counsel should have called Ayestas to testify. State-habeas counsel filed the psychologist's letter in the habeas proceedings but redacted the discussion of Ayestas's delusional thinking. Delusional thinking, of course, was arguably inconsistent with state-habeas counsel's attempt to portray Ayestas as a viable witness who should have been called at trial. Ayestas was formally diagnosed with schizophrenia in October 2003.

State-habeas counsel cannot have been ineffective for failing to investigate mental illness because the record establishes that there "was nothing to *factually* put counsel on notice of any reasonable likelihood that any such condition existed" at trial or when the state-habeas application was filed. *West v. Johnson*, 92 F.3d 1385, 1409 n.46 (5th Cir. 1996). This is not a *Wiggins* fact-pattern. Counsel's failure to present evidence of mental illness "did not result from pure inattention, and this is not a case like *Porter*, where counsel wholly ignored multiple avenues of investigation," nor is it like *Rompilla* where there was "a readily available file that the prosecution tipped-off to defense counsel." *Charles v. Stephens*, 736 F.3d 380, 391 (5th Cir. 2013). Nothing counsel "uncovered prior to trial had led them to any family history of mental illness." *Smith v. Davis*, 927 F.3d 313, 337 (5th Cir. 2019).

At the same time, state-habeas counsel's awareness and active redaction of this "double-edged" evidence after it emerged further constrains us to interpret the omission of a claim premised on the failure to present evidence of mental illness as a strategic decision because "not to present evidence of [his]

13

No. 15-70015

volatile mental state, especially given counsel's decision to emphasize [his] non-violent history, was clearly reasonable." *Nobles v. Johnson*, 127 F.3d 409, 422 (5th Cir. 1997).

To repeat, when Hart filed the initial habeas application none of these major mitigation decisions existed. Even thereafter, Texas's limitations on subsequent applications would have prevented Hart from adding additional mitigation claims premised on mitigating evidence of substance abuse and mental illness. TEX. CODE CRIM. PROC. ANN. art. 11.071 § 5. The earliest cite to *Wiggins* by a Texas court considering a habeas application apparently was in 2005, and the court rejected the claim as procedurally barred:

> The decisions of the Supreme Court of the United States in *Wiggins v. Smith*, 123 S. Ct. 2527 (2003), and *Rompilla v. Beard*, 125 S. Ct. 2456 (2005), were subsequent to and unavailable at the time of the initial application in this cause. However, neither decision creates a new legal basis for a review of the factual allegations which were presented and reviewed on applicant's initial writ application.

*Ex parte Ramirez*, No. WR-52,775-02, 2005 WL 2659443, at *1 (Tex. Crim. App. Oct. 18, 2005) (unpublished).

Deciding whether to respond to a new trend and pivot to a *Wiggins*-centric strategy or to stay the course was surely its own strategic decision. Avoiding claims likely to be barred as successive was more than reasonable. "Experienced advocates since time beyond memory have emphasized the importance of winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at most on a few key issues." *Jones v. Barnes*, 463 U.S. 745, 751-52 (1983).

While Hart failed to anticipate the arrival of *Wiggins* claims, the record does demonstrate his own innovative efforts. State-habeas counsel argued that the failure to inform Ayestas of his right under the Vienna Convention on

14

No. 15-70015

Consular Relations ("VCCR") to consult with the Honduran Consul prevented him from presenting mitigating evidence in violation of the Eighth, Fourteenth, and Sixth Amendments. Texas rightly describes these as "cutting edge" claims that would not be rejected by the Supreme Court until 2008. *See Medellin v. Texas*, 552 U.S. 491 (2008).

A 1998 issue of the journal published by the National Association of Criminal Defense Lawyers makes the sophistication of this effort by state-habeas counsel obvious:

> The use of state post-conviction proceedings for VCCR violations is even more in its infancy than the use of federal *habeas* proceedings since, until recently, the treaty violations were not discovered until the cases had progressed into federal court. Although unsuccessful because the Ohio court found its state habeas proceedings limited to "constitutional" issues, which excluded a treaty issue, *State v. Loza* represents the first reported case where the VCCR issue was raised in state *habeas*. Despite the scarcity of reported cases, a state post-conviction proceeding is the most promising forum for litigating a violation of the VCCR post-trial, since in that context it is much less likely that procedural barriers will foreclose efforts to raise the treaty violation.
>
> In addition, state *habeas* proceedings provide an opportunity to make a record on the effect of the treaty violation. Lawyers who represent defendants in state *habeas* proceedings should develop evidence through declarations, documents, and live testimony that establishes what actions the consulate would have taken and what prejudice the defendant suffered as a result of the failure to notify.

John Cary Sims & Linda E. Carter, *Representing Foreign Nationals: Emerging Importance of the Vienna Convention on Consular Relations As A Defense Tool*, THE CHAMPION, Sept./Oct. 1998, at 28, 56.

Ayestas wants us to find his state-habeas counsel was ineffective, or potentially ineffective, for not undertaking an investigation that Ayestas himself described as "unusual" because it would "touch[] two central American

15

No. 15-70015

countries and three States," require interviewing dozens of witnesses, "involve[] extraordinarily complex investigatory tasks to piece together the manifestations of [petitioner's] mental illness in the years leading up to the commission of this crime," include attempts at "identifying percipient witnesses, probing their memories for clues whether [Ayestas] manifested signs of mental illness and the nature of his ability to function," and "encompass complex cultural issues that must be addressed and accounted for."

This would go well beyond the prevailing professional norms for post-conviction capital representations in 1998, and state-habeas counsel was not ineffective for not conducting such an investigation given the limited time and resources available. "*Strickland* does not require counsel to investigate every conceivable line of mitigating evidence." *Wiggins*, 539 U.S. at 533.

It is not disputed that Ayestas had a history of substance abuse nor that Ayestas was diagnosed with a mental illness after conviction. Ayestas, though, has not explained how state-habeas counsel was ineffective, or even how his proposed investigation might uncover evidence that differs not only in degree but in kind from the facts known to state-habeas counsel. Investigations are not reasonably necessary "when the sought-after assistance would only supplement prior evidence." *Smith v. Dretke*, 422 F.3d 269, 288 (5th Cir. 2005).

Given the evidence that state-habeas counsel was not deficient, joined with the unlikelihood of locating new information suggesting otherwise, funding for investigatory services cannot be reasonably necessary.

AFFIRMED.