### IN THE UNITED STATES DISTRICT COURT
### FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| CARLOS MANUEL AYESTAS, a/k/a<br>Dennis Humberto Zelaya Corea | § | |
| | § | |
| | § | |
| Petitioner, | § | |
| | § | |
| v. | § | USDC No. 4:09-cv-2999 |
| | § | |
| BOBBY LUMPKIN, Director, Texas | § | |
| Department of Criminal Justice, | § | |
| Correctional Institutions Division | § | Capital Case |
| | § | |
| Respondent. | § | |
| | § | |
| | § | |
| | § | |
| | § | |
| | § | |
| | § | |
| | § | |

## MOTION FOR RELIEF FROM JUDGMENT PURSUANT TO RULE 60(b)(6) OF THE FEDERAL RULES OF CIVIL PROCEDURE

## TABLE OF CONTENTS

**Page**

INTRODUCTION ..................................................................................................1

BACKGROUND ..................................................................................................2

    I.    FACTUAL BACKGROUND ...................................................................2

        A.    Ms. Siegler's Record Of Misconduct .........................................2

        B.    The Siegler Memorandum ..........................................................3

        C.    Mr. Zelaya's Conviction And Sentencing ..................................5

    II.    SUBSEQUENT PROCEDURAL HISTORY .........................................5

        A.    State Post-Conviction Proceedings—Initial Proceedings ...........5

        B.    Initial Federal Post-Conviction Proceedings ..............................6

        C.    Federal Post-Conviction Proceedings—On Remand ................7

        D.    Post-Judgment Motions ...............................................................7

ARGUMENT ....................................................................................................10

    I.    RELIEF UNDER FEDERAL RULE OF CIVIL PROCEDURE 60(B)(6) IS APPROPRIATE IN EXTRAORDINARY CIRCUMSTANCES ...................10

    II.    THERE ARE EXTRAORDINARY CIRCUMSTANCES IN THIS CASE ........11

        A.    The Director Has Since Conceded That The Information Was Not In Fact Available To Trial Counsel .........................................11

        B.    *Banister* Voided The Fifth Circuit Rule That District Courts May Treat Claims Made In Rule 59(e) Postures As Successive Petitions .......13

        C.    The District Attorney Injected Impermissible Factors Into The Decision To Seek Death ...........................................................15

    III.    MR. ZELAYA HAS BEEN UNIMPEACHABLY DILIGENT IN SEEKING RELIEF ON THIS CLAIM .............................................................21

CONCLUSION .................................................................................................22

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ayestas v. Davis*,
138 S. Ct. 1080 (2018) ................................................................................5, 9

*Ayestas v. Davis*,
933 F.3d 384 (5th Cir. 2019) ..............................................................................9

*Ayestas v. State*,
No. AP-72,928 (Tex. Crim. App. Nov. 4, 1998) ...............................................5

*Ayestas v. Stephens*,
817 F.3d 888 (5th Cir. 2016) ..............................................................................8

*Ayestas v. Stephens*,
826 F.3d 214 (5th Cir. 2016) ..............................................................................9

*Ayestas v. Thaler*,
569 U.S. 1015 (2013) ..........................................................................................7

*Banister v. Davis*,
140 S. Ct. 1698 (2020) ..................................................................................1, 14

*Batson v. Kentucky*,
476 U.S. 79 (1986) .............................................................................................17

*Beatty v. Davis*,
755 F. App'x 343 (5th Cir. 2018) .....................................................................16

*Buck v. Davis*,
137 S. Ct. 759 (2017) ..................................................................................passim

*Cantu v. Thaler*,
632 F.3d 157 (5th Cir. 2011) ..............................................................................6

*Crutsinger v. Davis*,
936 F.3d 265 (5th Cir. 2019) ............................................................................21

*Davis v. Ayala*,
135 S.Ct. 2187 (2015) .......................................................................................18

*Davis v. Kelley*,
855 F.3d 833 (8th Cir. 2017) ............................................................................16

*Diaz v. Stephens*,
731 F.3d 370 (5th Cir. 2013) ............................................................................15

*Ex parte Ayestas*,
No. WR-69672-01, 2008 WL 4151814 (Tex. Crim. App. Sept. 10, 2008)................5

*Ex parte Soffar*,
143 S.W.3d 804 (Tex. Crim. App. 2004) ........................................................21

*Gonzalez v. Crosby*,
545 U.S. 524 (2005) .....................................................................................20, 21

# TABLE OF AUTHORITIES
### (continued)

Page(s)

*Graham v. Richardson,*
   403 U.S. 365 (1971) ............................................................................................... 18

*Haynes v. Davis,*
   733 F. App'x 766 (5th Cir. 2018) ....................................................................... 10

*Hesling, v. CSX Transp., Inc.,*
   396 F.3d 632 (5th Cir. 2005) ............................................................................... 16

*Hickman v. Taylor,*
   329 U.S. 495 (1947) ............................................................................................... 12

*Ibarra v. Thaler,*
   687 F.3d 222 (5th Cir. 2012) ................................................................................. 6

*In re Franklin,*
   832 F. App'x 340 (5th Cir. 2020) ....................................................................... 14

*Lambrix v. Sec'y, Fla. Dep't of Corr.,*
   851 F.3d 1158 (11th Cir. 2017) ........................................................................... 16

*Liljeberg v. Health Services Acquisition Corp.,*
   486 U.S. 847 (1988) ...................................................................................11, 16, 18

*Martinez v. Ryan,*
   132 S. Ct. 1309 (2012) ........................................................................................... 6

*Miller v. Mays,*
   879 F.3d 691 (6th Cir. 2018) ............................................................................... 16

*Nat'l Union Fire Ins. Co. of Pittsburgh v. Valdez,*
   863 S.W.2d 458 (Tex. 1993) ............................................................................... 12

*Ott v. State,*
   627 S.W.2d 218 (Tex. App. 1981), *pet. for discretionary review refused* (1982) ................... 12

*Polites v. United States,*
   364 U.S. 426 (1960) ............................................................................................... 14

*Prible v. Davis,*
   No. H-09-CV-1896, 2020 WL 2563544 (S.D. Tex. May 20, 2020) ........................... 3

*Raby v. Davis,*
   907 F.3d 880 (5th Cir. 2018) .........................................................................11, 16

*Rose v. Mitchell,*
   443 U.S. 545 (1979) .........................................................................................17, 18

*Seven Elves, Inc. v. Eskenazi,*
   635 F.2d 396 (5th Cir. 1981) .........................................................................10, 16

*Siripongs v. Calderon,*
   167 F.3d 1225 (9th Cir. 1999) ............................................................................. 12

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Snyder v. Louisiana*,
  552 U.S. 472 (2008) ...................................................................................................17

*State v. Kelly*,
  No. 99-CP-42-1174 (S.C. Ct. C.P. Oct. 6, 2003) .....................................................20

*Trevino v. Thaler*,
  133 S. Ct. 1911 (2013) ................................................................................................7

*Trevino v. Thaler*,
  569 U.S. 413 (2013) .....................................................................................................7

*Trimble v. Gordon*,
  430 U.S. 762 (1977) ...................................................................................................18

*Webb v. Davis*,
  940 F.3d 892 (5th Cir. 2019) ........................................................................................8

*Wiggins v. Smith*,
  539 U.S. 510 (2003) .....................................................................................................6

**Statutes**

28 U.S.C. § 2244(b) ..............................................................................................16, 18

Tex. Gov't Code § 552.111 .........................................................................................15

**Other Authorities**

"Findings of Fact and Conclusions of Law," *Ex Parte David Mark Temple*, 178th District Court,
  No. 1008673-A (July 8, 2015)......................................................................................3

11 WRIGHT AND MILLER'S FED. PRAC. & PROC. CIV. § 2864 (3d ed.) .........................17

7 MOORE'S FEDERAL PRACTICE P 60.19 .......................................................................13

**Rules**

Fed. R. Civ. P. 26 ........................................................................................................15

Fed. R. Civ. P. 60(b) ...................................................................................................13

Tex. R. Civ. P. 192.5(b)(1) ..........................................................................................15

## INTRODUCTION

Federal Rule of Civil Procedure 60(b)(6) authorizes this Court to reopen a case under extraordinary circumstances.  Extraordinary circumstances are present here.  After Mr. Zelaya[1] filed his federal habeas petition, the State accidentally disclosed a privileged document—an internal charging memorandum in which the prosecutor recommended that the State seek the death penalty because Mr. Zelaya was a noncitizen.  In conjunction with a motion under Rule 59(e), Mr. Zelaya immediately moved to add an invidious discrimination claim.  The Director opposed, suggesting that the document had been available to trial counsel.  The Court denied the opportunity to amend on that basis.  But the Director's representation was not true.  During subsequent certiorari proceedings the Director conceded that the document would ***not*** have been available to trial counsel, because it was privileged work product.  That concession destroys the factual basis for this Court's prior ruling, and this Court should reopen the litigation in order to consider the invidious discrimination that the State has concealed for decades.

The Director's tardy concession should be enough, but there are three other circumstances that make this case extraordinary.  First, the Supreme Court has overruled the jurisdictional rule this Court invoked to dispose of the claim at issue, holding that arguments presented in an FRCP 59(e) posture are not to be analyzed as successive petitions under 28 U.S.C. § 2244(b)(2).  *See Banister v. Davis*, 140 S. Ct. 1698, 1702 (2020).  Second, the claim at issue involves serious allegations of intentional discrimination, which FRCP 60(b)(6) carves out for especially forgiving treatment.  *See Buck v. Davis*, 137 S. Ct. 759, 777, (2017).  Finally, the offending prosecutorial behavior is a stain on the criminal justice system. Mr. Zelaya raised the intentional discrimination

---

[1] At the time of Mr. Zelaya's arrest and the drafting of the Siegler Memorandum, Mr. Zelaya also went by Carlos Ayestas; thus, the name "Carlos Ayestas" or "Ayestas," which appears throughout the Siegler Memorandum and the procedural history of this case, refers to Mr. Zelaya.

he discovered at the earliest possible opportunity.  The constitutional violation that underpinned his death sentence remains entirely unreviewed on the merits, and federal courts have thus far deprived Mr. Zelaya of *the opportunity* to establish that procedural default does not preclude relief. It would be a miscarriage of justice to allow Texas to execute Mr. Zelaya because it succeeded in concealing its own unconstitutional conduct until he could no longer challenge it.

## **BACKGROUND**

### I.    **FACTUAL BACKGROUND**

On September 5, 1995, Santiaga Paneque was found murdered in her home.  Soon thereafter, Federico Zaldivar, Roberto Meza, and Mr. Zelaya were identified as persons of interest in connection with her death.  On September 19, 1995, before Mr. Zelaya had been arrested in connection with the murder, Assistant District Attorney Kelly Siegler wrote an internal memorandum for the Harris County District Attorney's Office ("HCDA"), entitled "Capital Murder Summary" (the "Siegler Memorandum").  The Siegler Memorandum expressly listed Mr. Zelaya's noncitizenship as one of only two reasons for seeking the death penalty.  Exhibit 1. ROA.1140-42.

### A.    **Ms. Siegler's Record Of Misconduct**

At the time that Ms. Siegler drafted the Siegler Memorandum, and for the duration of Mr. Zelaya's prosecution, she was the "Court Chief" at the HCDA.  Upon information and belief, as part of her role of Court Chief, Mr. Siegler prepared these "capital murder summaries" for Harris County homicides that might be eligible for capital prosecutions.  These memoranda contained factual summaries of the alleged crime, along with any perceived aggravating or mitigating circumstances.  These summaries provided the Court Chief's recommendation on whether to seek the death penalty to other senior decision-makers at the HCDA.

Although Ms. Siegler no longer occupies a position with the HCDA, her 21-year record as a prosecutor there has been the subject of increasing scrutiny.  Recent court decisions have revealed her jarring record of misconduct as a line prosecutor and as the HCDA Court Chief.  Less than a year ago, a federal court in the Southern District of Texas granted relief on six separate claims that Ms. Siegler hid exculpatory evidence from the defense, falsely reported the availability of material secreted in her private work product file, provided undisclosed favors to prison informants in exchange for fabricated false confessions, used prison informants to illegally interrogate the defendant while he was in custody, and was not truthful in her sworn testimony.  *See Prible v. Davis*, No. H-09-CV-1896, 2020 WL 2563544 (S.D. Tex. May 20, 2020).  In addition to its other critiques of Ms. Siegler's indifference to the interests of justice, the federal court found that "Siegler's testimony was not credible on both minor and major points."  2020 WL 2563544, at *19.  Most pertinently, the Court found that Ms. Siegler's testimony that critical documents "were in the open file" that was shared with defense counsel was false because those critical documents "were in her work product file and were not disclosed to defense counsel."  *Id.*  In a different case in which Ms. Siegler served as the lead counsel, the court ordered a new trial after finding 36 instances of prosecutorial misconduct by the HCDA.  *See* "Findings of Fact and Conclusions of Law," *Ex Parte David Mark Temple*, 178th District Court, No. 1008673-A (July 8, 2015). (These findings post-date this Court's order denying leave to amend.)

**B.**     **The Siegler Memorandum**

The Siegler Memorandum identified two "aggravating factors" for seeking the death penalty.  One of those factors simply stated "THE DEFENDANT IS NOT A CITIZEN."  Ex. A at 3:



A. THE VICTIM IS A HELPLESS 67 YEAR OLD WOMAN KILLED IN HER HOME.

B. ~~THE DEFENDANT IS NOT A CITIZEN.~~

The Siegler Memorandum's recommendations were later adopted by Division Chief Casey O'Brien, Bureau Chief Keno Henderson, and District Attorney John B. Holmes, Jr., who subsequently sought the death penalty against Mr. Zelaya.[2]

Before Mr. Zelaya's trial began, he filed two separate *Brady* demands, both of which were granted.  On February 16, 1996, Mr. Zelaya filed the first such motion, a motion for discovery requesting, inter alia, "[a]ny and all favorable evidence which is in the possession, custody or control of the State, of investigating body of the State of Texas, or Houston Police Department or any of their agencies . . .".  C.39.[3]  On May 23, 1997, Mr. Zelaya filed a separate discovery motion seeking production of "[a]ny and all evidence reflecting on the issue of punishment."  C.64.  On June 3, 1997, the trial court granted both motions. C.46; C.66.  The HCDA did not disclose the Siegler Memorandum in response to the discovery motions and the trial court's orders, because the HCDA considered the Siegler Memorandum to be privileged work product.

---

[2] At some point before the Siegler Memorandum was inadvertently disclosed by the HCDA to Mr. Zelaya's counsel—nearly 20 years after it was drafted—someone crossed out the sentence that identified Mr. Zelaya's alienage as a factor for seeking the death penalty.  The HCDA has not made any representations regarding 1) who was responsible for crossing out the sentence citing Mr. Zelaya's citizenship status as a reason to seek death; 2) when that sentence was crossed out; and 3) why it was crossed out.

[3] In this Motion, the Reporter's Record of the trial shall be referred as "R." preceded by the volume number and followed by the page number.  The Clerk's Record shall be referred to as "C." followed by the page number.  The state habeas record shall be referred to as "SHR." followed by the page number.  The federal record on appeal shall be referred to as the "ROA." followed by the page number.  The Siegler Memorandum (September 19, 1995) is part of the record on appeal, but is also attached as Exhibit 1 for this Court's convenience.

Unfortunately, the Siegler Memorandum would remain undisclosed to Mr. Zelaya for nearly two decades; only becoming available to Mr. Zelaya because the HCDA accidentally over-disclosed information from its file at the end of 2014.

### C. Mr. Zelaya's Conviction And Sentencing

On July 9, 1997, Mr. Zelaya was convicted of capital murder. The next day, he was sentenced to death. 21R.R.238-42. The Texas Court of Criminal Appeals ("CCA") affirmed the conviction and sentence on November 4, 1998. Opinion, *Ayestas v. State*, No. AP-72,928 (Tex. Crim. App. Nov. 4, 1998) (not designated for publication).

## II. SUBSEQUENT PROCEDURAL HISTORY

### A. State Post-Conviction Proceedings—Initial Proceedings

On December 9, 1998, during the 90-day window for seeking certiorari review of the CCA order affirming his conviction and sentence, Mr. Zelaya filed his initial state post-conviction application. He raised a number of claims, including an ineffective-assistance-of-trial-counsel ("IATC") claim that trial counsel prejudicially "failed to secure the attendance" of Mr. Zelaya's family members from Honduras. SHR.2-4. During this stage of the post-conviction proceedings, the Siegler Memorandum had not been disclosed to Mr. Zelaya because, as the Director later admitted, the HCDA treated it as privileged work product. Br. in Opp'n ("BIO") at 18 n. 10, *Ayestas v. Davis*, 138 S. Ct. 1080 (2018) (No. 16-6795). Thus, Mr. Zelaya's initial state application did not address any claims related to the Siegler Memorandum. The Texas trial court recommended that all relief sought in the initial state application be denied, and the CCA adopted that recommendation on September 10, 2008. *See Ex parte Ayestas*, No. WR-69672-01, 2008 WL 4151814, at *1 (Tex. Crim. App. Sept. 10, 2008).

### B.      Initial Federal Post-Conviction Proceedings

On September 11, 2009, Mr. Zelaya, represented by new counsel, filed his federal habeas petition, again unable to include any claims associated with the Siegler Memorandum because he did not know, and had no reason to know, that it existed.  ROA.8-68.  In addition to the claim that trial counsel deficiently failed to secure the attendance of his family, Mr. Zelaya's federal habeas petition also included a "*Wiggins* claim" that trial counsel was constitutionally ineffective for failing to reasonably investigate mitigation.  ROA.14-15; *see also Wiggins v. Smith*, 539 U.S. 510 (2003).

On January 26, 2011, the district court rejected Mr. Zelaya's claims, concluding that the unexhausted IATC claims were procedurally defaulted.  ROA.502-07.  On February 22, 2012, Mr. Zelaya appealed the denial of relief to the Fifth Circuit Court of Appeals.  ROA.602.  The Fifth Circuit denied his request for a certificate of appealability, agreeing with the district court's disposition of the IATC claim and noting that "[g]enerally, errors by 'habeas counsel cannot provide cause for a procedural default,'" and therefore that the unexhausted IATC claim was "procedurally barred."  ROA.617 (quoting *Cantu v. Thaler*, 632 F.3d 157, 166 (5th Cir. 2011)).

Shortly thereafter, the Supreme Court of the United States decided *Martinez v. Ryan*, 132 S. Ct. 1309 (2012), holding for the first time that deficient state habeas representation may excuse the procedural default of an IATC claim.  Mr. Zelaya thereafter requested that the Fifth Circuit vacate its judgment and remand his case to the district court to reconsider the IATC claims in light of *Martinez*.  On June 28, 2012, the Fifth Circuit held that *Martinez* did not apply to Texas cases, *see Ibarra v. Thaler*, 687 F.3d 222, 227 (5th Cir. 2012), and the Fifth Circuit denied Mr. Zelaya's motion to vacate and remand.  *Ayestas v. Davis*, No. 11-70004, Order Denying Motion to Vacate Opinion and Judgment, (5th Cir. Jul. 11, 2012).

6

Mr. Zelaya then sought review in the U.S. Supreme Court.  *Ayestas v. Thaler*, petition for cert., No. 12-6656 (filed Oct. 9, 2012).  Following Mr. Zelaya's petition for certiorari, the Supreme Court decided *Trevino v. Thaler*, 133 S. Ct. 1911 (2013), holding that *Martinez* does apply to Texas cases, such as Mr. Zelaya's.  On June 3, 2013, the Supreme Court granted certiorari, vacated the lower federal courts' denial of relief, and remanded the case for further proceedings.  *Ayestas v. Thaler*, 569 U.S. 1015 (2013).  The case then returned to the Fifth Circuit.  After considering supplemental briefing of the parties on January 30, 2014, the Fifth Circuit remanded the case to the district court.

### C.    Federal Post-Conviction Proceedings—On Remand

On remand to the district court, Mr. Zelaya argued that *Martinez* and *Trevino* had dramatically shifted the jurisprudential landscape of the case, and provided a new procedural mechanism to develop and litigate fully the defaulted IATC claims.  ROA.651-659.  On November 18, 2014, the district court entered its Memorandum Opinion and Order denying Mr. Zelaya's' IATC claims.  The district court also denied funding under 18 U.S.C. § 3599(f) for Mr. Zelaya to develop his claims, holding that the requested § 3599(f) services were not "reasonably necessary" because Mr. Zelaya had not demonstrated the ineffectiveness of state habeas counsel.[4]  ROA.952.

### D.    Post-Judgment Motions

On December 16, 2014, 28 days after the district court's judgement denying relief, Mr. Zelaya filed a timely Motion to Alter or Amend the Judgment.  ROA.969.  His federal habeas counsel discovered the Siegler Memorandum on December 22, while reviewing portions of the State's files at the HCDA's office related to a separate issue.  The HCDA officials had inadvertently left the work product, which they usually remove before viewing, in the stored file.

_____

[4] The district court also denied a certificate of appealability as to Mr. Zelaya's *Wiggins* claim. ROA.967.

On January 9, 2015, while his Rule 59(e) motion remained pending, Mr. Zelaya filed a Motion for Leave to Amend Original Petition for Writ of Habeas Corpus, to add the Eighth and Fourteenth Amendment claims arising out of the Siegler Memorandum.  ROA.1132.  On January 14, 2015, Mr. Zelaya made motions necessary to perfect that amendment request as part of the Rule 59(e) proceeding, and to seek an order holding the federal proceeding in abeyance so that he could exhaust. On January 21, 2015, the HCDA filed its opposition to Mr. Zelaya's motions, arguing, inter alia, that the Court was bound to treat the amendment request as a successive petition within the meaning of 28 U.S.C. § 2244(b), and indicating that the Siegler Memorandum could have been available to trial counsel. ROA.1190-1199.  In a pair of orders on February 17 and April 1, 2015, the district court adopted the Director's position and denied all relief on the Siegler Memorandum claims, holding that the attempt to amend during the Rule 59(e) period amounted to a successive petition that it lacked jurisdiction to entertain; the district court did not reach the merits of the claims.  ROA.1219-25.[5]

On March 22, 2016, the Fifth Circuit affirmed the district court's ruling, but on slightly different grounds.  *Ayestas v. Stephens*, 817 F.3d 888 (5th Cir. 2016).  As a result of the State's continued refusal to acknowledge that the Siegler Memorandum was privileged work product that was withheld from trial counsel, the Fifth Circuit held that the Eighth and Fourteenth Amendment

---

[5] This Court briefly referenced the mandate rule in its prior order on the motion to amend. *See* Memorandum Opinion and Order, *Ayestas v. Stephens*, No. 4:09-cv-02999, ECF No. 64, at 3 ("While Ayestas frames his attempt to raise this new claim as merely amending his petition, the new claim is not within the scope of the remand."). The Fifth Circuit did not affirm that holding, and subsequent Fifth Circuit authority indicates that it was likely a mistake in the first instance. *See Webb v. Davis*, 940 F.3d 892, 897 (5th Cir. 2019) (in habeas case, holding that the mandate rule "does not have merit" when appellate order did not "specifically address[]" a claim). Nevertheless, the showing Mr. Zelaya needs to make here remains the same *without regard the correctness of its prior mandate-rule holding*, because its exceptions simply parallel the "extraordinary circumstances" exception for Rule 60(b) inquiries. *See* Webb, 940 F.3d at 897 (explaining that mandate rule is "a discretionary device and not immutable," and that there are "several exceptions to the rule," including "new evidence," an "intervening change in law," and "where the earlier decision was clearly erroneous and would work a manifest injustice" (internal citations and quotations omitted)).

claims were procedurally defaulted. *Id.* It did not, however, affirm this Court's jurisdictional holding. The Fifth Circuit specifically revised its original panel opinion to clarify that the basis of its holding was that the file would have been available to *trial* counsel, not that habeas counsel was insufficiently diligent. *Ayestas v. Stephens*, 826 F.3d 214, 215 (5th Cir. 2016).

On November 7, 2016, Mr. Zelaya filed a petition of writ for certiorari. In its Brief in Opposition before the Supreme Court, the Director finally conceded, for the first time, that the Siegler Memorandum was not, and would not have been, available to trial counsel, as "[t]he fact that [the Siegler Memorandum] is privileged explains why it was not voluntarily turned over to [Mr. Zelaya's] counsel during the criminal trial." BIO at 18 n.10, *Ayestas v. Davis*, 138 S. Ct. 1080 (2018) (No. 16-6795). The Supreme Court did not grant certiorari on the issues arising out of the Siegler Memorandum, but it did grant certiorari and reverse the district court and Fifth Circuit on an issue relevant to Mr. Zelaya's *Wiggins* claim. *Ayestas v. Davis*, 138 S. Ct. 1080, 1098-101 (2018). When the case returned to the Fifth Circuit on the *Wiggins* issues, Mr. Zelaya continued to seek an opportunity to litigate the Siegler Memorandum claims. The Fifth Circuit ultimately refused to grant *Wiggins* relief and, surprisingly, failed to address the claims related to the Siegler Memorandum that Mr. Zelaya presented. *Ayestas v. Davis*, 933 F.3d 384 (5th Cir. 2019). The Supreme Court denied a request for certiorari review on February 24, 2020. *Ayestas v. Davis*, 140 S. Ct. 1107 (2020).

Mr. Zelaya continued to request the opportunity to litigate the constitutional issues implicated in the Siegler Memorandum, seeking authorization from the CCA, on August 25, 2020, to litigate his first subsequent state post-conviction application. On December 9, 2020, the CCA denied Mr. Zelaya's habeas petition in a short decision that did not reach the merits of his claims related to the Siegler Memorandum. *See* Ex. B, Order Dismissing Application for Writ of Habeas

Corpus.  On December 23, 2020, Mr. Zelaya filed a Suggestion for Reconsideration; the CCA

denied Mr. Zelaya's request without written order on January 27, 2021.  *See* Ex. C, Official Notice

from Court of Criminal Appeals of Texas.  This Motion follows, 7 business days later.

## ARGUMENT

## I.   RELIEF UNDER FEDERAL RULE OF CIVIL PROCEDURE 60(B)(6) IS APPROPRIATE IN EXTRAORDINARY CIRCUMSTANCES

This is a motion for post-judgment relief under Federal Rule of Civil Procedure 60(b),

which provides that "On motion and just terms, the court may relieve a party or its legal

representative from a final judgment, order, or proceeding for [any of five specified reasons, as

well as] any (6) other reason that justifies relief." The Supreme Court has held that Rule 60(b)(6)

relief is available in "extraordinary circumstances," and that the exercise of its "wide" discretion

requires a district court to "consider a wide range of factors." *Buck v. Davis*, 137 S. Ct. 759, 778,

(2017).

Federal courts in the Fifth Circuit ordinarily analyze Rule 60(b)(6) motions by reference to

the so-called *Seven Elves* factors, which were initially identified in a prominent federal treatise:

> (1) That final judgments should not lightly be disturbed; (2) that the Rule 60(b) motion is not to be used as a substitute for appeal; (3) that the rule should be liberally construed in order to achieve substantial justice; (4) whether the motion was made within a reasonable time; (5) whether if the judgment was a default or a dismissal in which there was no consideration of the merits the interest in deciding cases on the merits outweighs, in the particular case, the interest in the finality of judgments, and there is merit in the movant's claim or defense; (6) whether if the judgment was rendered after a trial on the merits the movant had a fair opportunity to present his claim or defense; (7) whether there are intervening equities that would make it inequitable to grant relief; and (8) any other factors relevant to the justice of the judgment under attack. These factors are to be considered in the light of the great desirability of preserving the principle of the finality of judgments.

*Seven Elves, Inc. v. Eskenazi*, 635 F.2d 396, 402 (5th Cir. 1981) (quoting 7 MOORE'S FEDERAL

PRACTICE P 60.19, at 237-39)); *see also Haynes v. Davis*, 733 F. App'x 766, 769 (5th Cir. 2018)

("Though we have never explicitly held that the '*Seven Elves factors*' bear on the extraordinary

circumstances analysis under Rule 60(b)(6) specifically, we have used them as a guide in evaluating the strength of a motion brought pursuant to Rule 60(b)(6).").

These factors cut heavily in favor of post-judgment relief here, but there is more. In a case involving discrimination, federal courts must consider risks of "injustice to the parties" and "of undermining the public's confidence in the judicial process." *Buck*, 137 S. Ct. at 778 (quoting *Liljeberg v. Health Services Acquisition Corp.*, 486 U.S. 847, 863-864 (1988)). One of the few things the Supreme Court has ever said about the substance of the Rule 60(b)(6) inquiry centers on the privileged status of discrimination claims, as "[s]ome toxins can be deadly in small doses." *Buck*, 137 S. Ct. at 777; *see also* Raby v. Davis, 907 F.3d 880, 884 (5th Cir. 2018) (distinguishing *Buck* litigation from other Rule 60(b)(6) motions on the ground that the "odious[ness]" of forbidden discrimination produces an institutional stain that requires special attention).

## II.   THERE ARE EXTRAORDINARY CIRCUMSTANCES IN THIS CASE

### A.   The Director Has Since Conceded That The Information Was Not In Fact Available To Trial Counsel

It is undisputed that the factual basis for Mr. Zelaya's motion—undiscoverable work product prepared by Kelly Siegler that was considered to be privileged by the HCDA—was not ascertainable through reasonable diligence at the time that Mr. Zelaya filed his initial application. The Siegler Memorandum was fortuitously discovered nearly two decades after Mr. Zelaya's conviction, only when the HCDA failed to remove the Memorandum in accordance with its long-standing policy of removing privileged work product before sharing the prosecution's file with post-conviction counsel.  While the Director previously allowed this court to believe that the Siegler Memorandum would have been available to trial counsel, *see* ECF No. 60 at 7-8, the Director has now conceded that the Memorandum is privileged work product that would not have

been discoverable by Mr. Zelaya or his counsel.  That concession is consistent with the sworn position it has taken in other litigation, too.

The Siegler Memorandum memorializes the thought process underlying the prosecution's decision to seek the death penalty for Mr. Zelaya, and both the HCDA and the Director therefore considered it to be privileged under the work product doctrine.  *Cf. Nat'l Union Fire Ins. Co. of Pittsburgh v. Valdez*, 863 S.W.2d 458, 460 (Tex. 1993) ("An attorney's litigation file goes to the heart of the privileged work area guaranteed by the work product [doctrine].").  As a result, Mr. Zelaya could not have reasonably ascertained the Memorandum because it was withheld from defense counsel's review as non-discoverable privileged work product.  *See Hickman v. Taylor*, 329 U.S. 495, 510-11 (1947) (defining the scope of work product and explaining why it should remain privileged); *Siripongs v. Calderon*, 167 F.3d 1225, 1227 (9th Cir. 1999) (holding that prosecutors are under no obligation to disclose their theories, thought processes, or even all investigatory work); *see also* Fed. R. Civ. P. 26(b)(3)(B)(stating that the work product doctrine "protect[s] against disclosure of the mental impressions, conclusions, opinions, or legal theories of a party's attorney or other representative concerning the litigation"); Tex. R. Civ. P. 192.5(b)(1) ("[T]he work product of an attorney or an attorney's representative that contains the attorney's or the attorney's representative's mental impressions, opinions, conclusions, or legal theories—is not discoverable."); *Ott v. State*, 627 S.W.2d 218, 225 (Tex. App. 1981), *pet. for discretionary review refused* (1982) (recognizing work-product doctrine in Texas criminal cases); Tex. Gov't Code § 552.111 (exempting interagency memoranda from disclosure under the Texas Public Information Act, where such memoranda would not be available by law to a party in litigation).

As described above, the Director finally conceded that the Siegler Memorandum was unavailable to Mr. Zelaya on the grounds that it is work product: "The fact that [the Siegler

Memorandum] is privileged explains why it was not voluntarily turned over to petitioner's counsel during the criminal trial." BIO at 18 n.10.[6]  Treating capital murder summaries as privileged work product is the longstanding practice of the HCDA which, historically, has objected to disclosure of Capital Murder Summaries to defense counsel on those grounds.  *See* Tr. of October 27, 2015 Proceedings in *Ex parte Balderas*, Trial Court No. 1412826 at 5-6, attached as Ex. D (HCDA "object[ing] to turning over the capital murder summary"); Tr. of May 2, 2018 Proceedings in *Ex parte Balderas*, Trial Court No. 1412826 at 8, attached as Ex. E (HCDA stating that "capital murder summaries in Harris County are work product."). Like the findings concerning Ms. Siegler's misconduct and lack of credibility in *Prible*, this sworn testimony also post-dates this Court's prior judgment.

Therefore, despite Mr. Zelaya's exercise of reasonable diligence, it is undisputed that the Memorandum was not ascertainable by Mr. Zelaya at the time of filing his initial state writ application because the government's policies and practices prevented its disclosure.[7]  The Director's concession entirely subverts the prior factual basis for this Court's decision—that trial counsel could have gotten the Siegler Memorandum.  Such a concession is extraordinary.

## B.    *Banister* Voided The Fifth Circuit Rule That District Courts May Treat Claims Made In Rule 59(e) Postures As Successive Petitions

These circumstances are also extraordinary because they include an intervening change in decisional law.  In the prior round of litigation, Mr. Zelaya moved under Rule 59(e) to amend his habeas petition and add the Siegler Memorandum claim, arguing that it had been previously

---

[6]  Indeed, the Director has never disputed undersigned counsel's belief that the Siegler Memorandum is the only HCDA capital murder summary that has been produced without a court order.

[7]  The Director conceded that the Siegler Memoraandum was work product and therefore unavailable to trial counsel. But the implication of that concession is even broader, as the practice of the HCDA was to withhold work product even after trial concluded—meaning the Memo was not available even to postconviction counsel until its accidental disclosure in late 2014.

unavailable.   At the urging of the Director, this Court held dismissed the claim for want of jurisdiction—reasoning that the Rule 59(e) posture meant that the claim had to be analyzed as a successive federal petition within the meaning of 28 U.S.C. § 2244(b). *See* Memorandum Opinion and Order, *Ayestas v. Stephens*, No. 4:09-cv-02999, Docket No. 64, at 3 ("Rather than seeking to amend his existing petition, Ayestas' supplemental motion actually seeks leave to file a successive petition."); Order, *Ayestas v. Stephens*, No. 4:09-cv-02999, Docket No. 63, at 3 (invoking 28 U.S.C. § 2244(b)(2) to jurisdictionally bar consideration of discrimination claim raised in Rule 59(e) posture); Respondent's Opposition to Petitioner's Motions for Leave To File an Amended Petition and to Stay and Abate, *Ayestas v. Stephens*, No. 4:09-cv-02999, Docket No. 59, at 3-6 (urging this Court to analyze Rule 59(e) motion as a successive petition).

In *Banister v. Davis*, 140 S. Ct. 1698 (2020), the Supreme Court held that such treatment in the Rule 59(e) posture is incorrect: "The question here is whether a motion brought under Federal Rule of Civil Procedure 59(e) to alter or amend a habeas court's judgment qualifies as such a successive petition. We hold it does not. A Rule 59(e) motion is instead part and parcel of the first habeas proceeding." *Id.* at 1702; *see also In re Franklin,* 832 F. App'x 340, 341 (5th Cir. 2020) ("However, the Supreme Court recently held that Rule 59(e) motions do not constitute successive habeas applications and that the rationale of [*Gonzalez v. Crosby*, 545 U.S. 524 (2005)] does not apply to such motions."). An intervening change in law is not only mentioned in *Seven Elves*, but is also a circumstance that the Supreme Court has identified as favoring relief under Rule 60(b). *See Polites v. United States*, 364 U.S. 426, 433 (1960) ("[W]e need not go so far here as to decide that when an appeal has been abandoned or not taken because of a clearly applicable adverse rule of law, relief under Rule 60(b) is inflexibly to be withheld when there has later been a clear and authoritative change in governing law."); *see also* Other Reasons Justifying Relief, 11

WRIGHT AND MILLER'S FED. PRAC. & PROC. CIV. § 2864 (3d ed.) (noting that, and collecting cases in which, courts "have granted relief under clause (6)" when "there is a change in decisional law").

Mr. Zelaya recognizes that, in the Fifth Circuit, an intervening change in law is not *alone* sufficient to reopen a judgment. *See Diaz v. Stephens*, 731 F.3d 370, 375 (5th Cir. 2013) ("[T]his court has held that a change in decisional law after entry of judgment does not constitute exceptional circumstances and *is not alone* grounds for relief from a final judgment under Rule 60(b)(6).") (alterations and internal quotation marks omitted) (emphasis added). Nevertheless, such a change in law weighs substantially in favor of post-judgment relief where, as here, it is coupled with other exceptional circumstances. *Buck* itself awarded Rule 60(b)(6) relief on the ground that decisional law had changed, and because the change unlocked a previously unavailable path to merits review of a discrimination claim. *See Buck*, 137 S. Ct. at 767 (holding that claimant should be entitled to use Rule 60(b)(6) to invoke *Martinez* and unlock previously barred review of claim that defense counsel tainted the trial with discrimination).

In short, *Banister* was an intervening change in decisional law establishing that the claims related to the Siegler Memorandum were not supposed to be analyzed under 28 U.S.C. § 2244(b), and that this court had jurisdiction to entertain them. Because *Banister* combines with the determinative concession that the Siegler Memorandum was not in fact available to reasonably diligent trial counsel, and with the fact that Mr. Zelaya would otherwise be deprived of a forum for litigating this discrimination claim, the circumstances here are extraordinary.

## C.   The District Attorney Injected Impermissible Factors Into The Decision To Seek Death

Rule 60(b)(6) recognizes that although the finality of judgments is of crucial importance, "the justice-function of the courts demands that it must yield, in appropriate circumstances, to the equities of the particular case in order that the judgment might reflect the true merits of the cause."

*Seven Elves, Inc.*, 635 F.2d at 401.   Among the circumstances that weigh heavily in this balancing

of equities are "the risk of injustice to the parties and the risk of undermining the public's

confidence in the judicial process." *Buck v. Davis*, 138 S. Ct. 759, 758. (quoting *Liljeberg v. Health*

*Servs. Acquisition Corp.*, 486 U.S. 847, 863-864 (1988) (internal quotation marks omitted)).  As

the Supreme Court held in *Buck v. Davis*, 137 S. Ct. 759 (2017), the introduction of race into the

capital sentencing calculus gravely threatens injustice to the defendant and undermines public

confidence—and it is consequently of extraordinary importance in the Rule 60(b) calculus.[8]  Here

the State relied on Mr. Zelaya's noncitizenship and, almost certainly, on one or both of its close

cousins, race and national origin.  That reliance, along with the other extraordinary circumstances

detailed herein, compels the exercise of Rule 60(b)'s "'grand reservoir of equitable power to do

justice in a particular case.'" *Williams v. Thaler*, 602 F.3d 291, 311 (5th Cir. 2010) (quoting

*Hesling, v. CSX Transp., Inc.,* 396 F.3d 632, 642 (5th Cir. 2005).

---

[8] Since *Buck*, two Fifth Circuit decisions have emphasized that Rule 60(b)(6) relief requests involving discrimination claims have a special status. *See Raby v. Davis*, 907 F.3d 880, 85 (5th Cir. 2018) ("Raby neither alleges racial discrimination nor demonstrates how his claims give rise to the sort of pernicious injury that affects communities at large[.]") (internal quotation marks omitted);  *Beatty v. Davis*, 755 F. App'x 343, 349–50 (5th Cir. 2018) ("No such concern calling into account the integrity of the initial judicial proceedings in the public's mind is present here[.]"); *see also, Miller v. Mays*, 879 F.3d 691, 702 (6th Cir. 2018) ("Contrary to Miller's argument on appeal, the *Buck* Court did not consider the merits of the ineffective-assistance claim for the purposes of Rule 60(b)(6), nor did it assign greater weight to the change in the law because of the substantiality of that claim [but i]nstead, it was focused on the injection of race into the sentencing determination, the state's actions in similar cases, and notions of finality."); *Davis v. Kelley*, 855 F.3d 833, 835–36 (8th Cir. 2017) ("As the district court pointed out, *Buck* focused on the race-based nature of the case and its far reaching impact on the community by the prospect of a defendant having been sentenced to death because of his race[,]  extraordinary facts [which]have no application to the present case."); *Lambrix v. Sec'y, Fla. Dep't of Corr.*, 851 F.3d 1158, 1172 (11th Cir. 2017) ("Lambrix also fails to demonstrate how his claims . . .give rise to the sort of pernicious injury that affects communities at large, instead of garden-variety ineffective-trial-counsel claims.").

"Discrimination on the basis of race, odious in all aspects, is especially pernicious in the administration of justice." *Rose v. Mitchell*, 443 U.S. 545, 555 (1979).  In  *Buck*, the Supreme Court held that the district court abused its discretion in denying the claimant's Rule 60(b)(6) motion, rejecting the idea that Rule 60(b)(6) could be denied because the discrimination played only a "de minimis" role in the proceeding:

> [T]hat Buck may have been sentenced to death in part because of his race. . . is a disturbing departure from a basic premise of our criminal justice system: Our law punishes people for what they do, not who they are. *Dispensing punishment on the basis of an immutable characteristic* flatly contravenes this guiding principle. This departure from basic principle was exacerbated because it concerned race.

*Buck*, 137 S. Ct. at 778 (emphasis added).

Given that almost all foreign nationals prosecuted in Texas are from Latin America, and are themselves Latino, Ms. Siegler's reference to Mr. Zelaya's noncitizenship strongly suggests that an underlying reason for seeking the death penalty was his race.  If race in fact motivates a state actor's decision, such a decision violates the Equal Protection Clause regardless of whether the actor cited a pretextual reason for the decision.  *See Batson v, Kentucky*, 476 U.S. 79 (1986) (requiring the trial judge to determine the truthfulness of a proffered race-neutral reason for a peremptory challenge); *see also Snyder v. Louisiana*, 552 U.S. 472, 485 (2008) ("In the typical peremptory challenge inquiry, the decisive question will be whether counsel's race-neutral explanation for a peremptory challenge should be believed.").  Mr. Zelaya has been denied the discovery and evidentiary hearing that would help determine whether express discrimination on the basis of alienage was pretext for discrimination on the basis of race.

But Ms. Siegler's reliance on Mr. Zelaya's noncitizenship was impermissible regardless of whether it was a proxy for his national origin/race or not.  Noncitizens, like racial minorities, are a "prime example of a 'discrete and insular' minority for whom [] heightened judicial solicitude is appropriate," and "classifications based on alienage, like those based on nationality or race, are

inherently suspect and subject to" the same judicial scrutiny. *Graham v. Richardson*, 403 U.S. 365, 372 (1971) (citation omitted); *see also Trimble v. Gordon*, 430 U.S. 762, 780 (1977) ("In cases involving alienage, for example, [the Court] has concluded that such classifications are suspect because, though not necessarily involving race or national origin, they are enough like the latter to warrant similar treatment.") (internal quotation marks omitted). Citizenship, like race, is an "immutable characteristic" whose influence on punishment "flatly contravenes" the principal that "[o]ur law punishes people for what they do, not who they are." *Buck*, 137 S.Ct. at 778.

Moreover, "[r]elying on race to impose a criminal sanction 'poisons public confidence' in the judicial process." *Id*. (quoting *Davis v. Ayala*, 135 S.Ct. 2187, 2208 (2015). Consequently, such reliance "injures not just the defendant, but 'the law as an institution, . . . the community at large, and . . . the democratic ideal reflected in the processes of our courts.'" *Id.* (quoting *Rose*, 443 U.S. at 556). The twin evils—one suffered by the defendant and the other by the community— raised by reliance on an accident of birth "are precisely among those [the Supreme Court has] identified as supporting relief under Rule 60(b)(6)." *Buck*, 137 S.Ct. at 778 at (citing *Liljeberg*, 486 U.S., at 864).

In several respects, the risk of injury both to the defendant and to the public is greater in this case than in *Buck*. First, the expert testimony at issue in *Buck*, taken as a whole, weighed against imposition of the death sentence, and it is therefore possible that Buck benefitted from it; the problem was the *risk* that jurors would deem that testimony permission to consider race even while rejecting the conclusions of the expert.[9] Here, Ms. Siegler both cited Mr. Zelaya's

---

[9] The Supreme Court did not require proof that Buck's jury considered his race, but relied on the risk that it did so as sufficient to constitute Sixth Amendment prejudice. Here, we do not know whether the District Attorney would have sought death had Ms. Siegler not considered Mr. Zelaya's noncitizenship, and had she not advocated that status as a reason for the state to kill him. But just as in *Buck*, there is a substantial risk that an impermissible characteristic, either

noncitizenship as a reason to seek death, and concluded that death should be sought; her memo could only have increased the likelihood of a death sentence. Second, Buck's jury was provided with numerous factors to consider in deciding whether to impose the death penalty, including one impermissible factor, but the District Attorney was provided with only two reasons to seek death, one of which was "[d]ispensing punishment on the basis of an immutable characteristic." *Buck*, 137 S.Ct. at 778. Third, at least the consideration of race in *Buck* was open, and therefore open to contest at several procedural junctures. In contrast, Ms. Siegler advocated for the consideration of an impermissible factor in secret, and the State first concealed that she had done so, and then suggested—falsely, as it has now conceded—that Mr. Zelaya could have discovered this constitutional violation if only he had attempted to do so. That false assertion is what deprived Mr. Zelaya of his opportunity to assert his claim the first time he was in federal court, a factor that was not present in *Buck*. And that false assertion is also what has deprived the public of an opportunity to see this injustice redressed and its confidence in the judicial system restored.

One other similarity to *Buck* is important: The claims of both are "extraordinary" in the sense that they are rare. The Supreme Court quoted with approval Buck's assertion that "[i]t stretches credulity to characterize Buck's . . . claim as run-of-the-mill." *Buck*, 137 S. Ct. at 778 (citing Brief for Petitioner 57). But just as the explicit argument that a person's race makes them more dangerous is rare, so too is it rare to find direct evidence of conscious, impermissible discrimination in the decision to seek death. This is not a selective prosecution claim asking a

---

consciously or unconsciously, influenced the District Attorney's decision. That someone at some time crossed out the sentence citing Mr. Zelaya's citizenship might bear on that question if it were known who did so, when, and for what reason, but without information as to actor, timing, and motivation—information Mr. Zelaya has been precluded from exploring—all that is certain is that Ms. Siegler herself considered citizenship and that the District Attorney saw the memo recommending that he seek death.

court to draw inferences from raw statistical disparities or complex data analyses.  Rather, the Siegler Memorandum's explicit reliance on citizenship status is direct evidence of purposeful discrimination.  *Cf. McCleskey*, 481 U.S. at 291-92 & n.8 (holding that a statistical study was insufficient to demonstrate discriminatory intent).  Undersigned counsel is aware of only one other post-*Furman* case in which the defendant presented such evidence.[10]

The "'whole purpose" of  Rule 60(b) 'is to make an exception to finality.'" *Buck*, 137 S.Ct. at 779 (quoting *Gonzalez v. Crosby*, 545 U.S. 524, 529 (2005).  As in *Buck*, "the State's interest in finality deserves little weight . . . [because] the people of Texas lack an interest in enforcing a capital sentence obtained on so flawed a basis."

*    *    *

In sum, there are extraordinary circumstances here.  The district court accepted the Director's suggestion that the Siegler Memorandum would have been available to trial counsel, which the Director now concedes to be untrue; it took the position that arguments made in the Rule 59(e) posture trigger AEDPA's successive petition rules, which contravenes *Banister*; and a refusal to give special consideration to invidious discrimination claims would violate *Buck*.  More generally, permitting Mr. Zelaya to reopen this litigation is necessary to avert a miscarriage of justice.  No court has yet ruled on the merits of this claim.

---

[10] In that case, *State v. Kelly*, the prosecutor admitted in post-conviction proceedings that he felt that "the black community would be upset … if we did not seek the death penalty because there were two black victims in this case." No. 99-CP-42-1174 (S.C. Ct. C.P. Oct. 6, 2003). The court held that the defendant was entitled to relief because the prosecutor's admission that race factored into the decision to seek the death penalty was dispositive, regardless of whether the prosecutor also considered other factors.  *Id.*

### III.     MR. ZELAYA HAS BEEN UNIMPEACHABLY DILIGENT IN SEEKING RELIEF ON THIS CLAIM

In conjunction with an extraordinary circumstances inquiry, the Supreme Court and the Fifth Circuit have also referred to a requirement that the motion have been "made within a reasonable time." *Gonzalez v. Crosby*, 545 U.S. 524, 535 (2005); *see also Crutsinger v. Davis*, 936 F.3d 265, 267 (5th Cir. 2019) (same).  *Banister* was decided in June 1, 2020, as Mr. Zelaya was preparing to file his subsequent state habeas application in the middle of the COVID-19 pandemic. The state post-conviction state proceedings concluded on Wednesday, January 27, 2021, when the CCA denied reconsideration of its order refusing to authorize subsequent state proceedings.  This Motion is being filed on February 5, 2021, meaning that only seven business days have elapsed since state and federal abstention rules permitted him to file the challenge in federal court.[11]  There is no question that the motion was filed "within a reasonable time."

Even before *Banister*, Mr. Zelaya appealed this Court's ruling to the Fifth Circuit, and sought certiorari review from the Supreme Court.  In his Brief in Opposition, the Director expressly stated what it had studiously avoided conceding before this Court: that the Siegler Memorandum was not available to trial counsel.  The Supreme Court granted certiorari on another issue and reversed, and Mr. Zelaya continued to press the Siegler Memorandum claim before the Fifth Circuit, calling attention to the Director's concession.  For whatever reason, the Fifth Circuit simply forgot to resolve the issue when it decided the case on remand, even as it denied relief on the *Wiggins* claim.  The Supreme Court denied the latest certiorari petition on February 24, 2020.

---

[11] Texas has a "two-forum" rule against co-pendency of state and federal post-conviction challenges, so Mr. Zelaya could not file this Motion while his state proceedings were ongoing. *See Ex parte Soffar*, 143 S.W.3d 804, 805 (Tex. Crim. App. 2004) (announcing exception not applicable here and observing that the CCA "dismisse[s] state habeas corpus writ applications when the applicant also has a writ pending in the federal courts that relates to the same conviction or same 'matter'").

At that time, *Banister* had not been decided, and so the decisional ground to pair with the Director's concession was absent.  Moreover, there was no need to ask for an abeyance in order to return to state court, because the federal proceeding had concluded and there was nothing to hold in abeyance so that he could file his subsequent state post-conviction application.  Mr. Zelaya would waive any available claims not included in that subsequent post-conviction application, and so he needed to do some basic investigation to ensure that no meritorious claims were omitted from the forthcoming filing.  As he was preparing to file the subsequent application, the COVID-19 pandemic struck—and all three principal attorneys were at home with children who could no longer attend school.  They were *still* able to complete necessary investigation and file the subsequent state post-conviction application on August 5, 2020.  *Banister* had just been decided on June 1.

The CCA issued an effectively unreasoned order refusing to authorize the claim on December 9, 2020, expressly declaring that it had not reached the merits.  Mr. Zelaya promptly sought reconsideration on December 23, which was denied on January 27, 2021.  This Motion follows 7 business days later.

## CONCLUSION

For the reasons set forth herein, this Court should grant Petitioner's Motion for Relief from Judgment Pursuant to Rule 60(b)6) of the Federal Rules of Civil Procedure or, in the alternative, schedule a hearing on this Motion.

Dated:  February 5, 2021                    Respectfully submitted,

Sheri Lynn Johnson                          Lee B. Kovarsky
*motion to appear pro hac vice forthcoming* Phillips Black, Inc.
Cornell Law School                          727 East Dean Keeton Street
240 Myron Taylor Hall                       Jon 6.222
Ithaca, NY 14853                            Austin, TX 78705
(607) 255-6478                              (434) 466-8257
slj8@cornell.edu                            l.kovarsky@phillipsblack.org

Attorneys for Petitioner

## <u>CERTIFICATE OF CONFERENCE</u>

I certify that on February 5, 2021, I conferred with Gwen Vindell, Assistant Attorney General, Criminal Appeals Division, in the Office of the Texas Attorney General, to inquire about their opposition to this motion.  She indicated that Respondent is opposed to this motion.

_/s/ Lee Kovarsky_

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 5th day of February 2021, I electronically filed the above and foregoing document using the CM/ECF system, which automatically sends notice and a copy of the filing to all counsel of record.

*/s/ Lee Kovarsky*