**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| CARLOS MANUEL AYESTAS, a/k/a Dennis Humberto Zelaya Corea | § § | |
| Petitioner, | | |
| | § | |
| v. | § § | USDC No. 4:09-cv-2999 |
| BOBBY LUMPKIN, Director, Texas Department of Criminal Justice, Correctional Institutions Division | § § § | |
| | § | Capital Case |
| Respondent. | § § § § | |
| | § § § | |

**FIRST AMENDED PETITION FOR A WRIT OF HABEAS CORPUS**

Petitioner, Carlos Manuel Ayestas ("Mr. Ayestas")[1], by and through his undersigned counsel, respectfully files this First Amended Petition for a Writ of Habeas Corpus pursuant to this Court's August 12, 2021 Memorandum Opinion and Order, Dkt. 93, and subsequent scheduling order, Dkt. 96. This Amended Petition is timely filed. *See id*. (directing Petitioner to file by September 28, 2021). This Amended Petition is not intended to supplant or supersede Mr. Ayestas's original Petition for Writ of Habeas Corpus, Dkt. 1, and the original Petition is hereby incorporated by reference.

At this time, Mr. Ayestas has identified two supplemental claims for relief.

---

[1] Petitioner is also known as Dennis Zelaya; because Petitioner's initial Petition for Writ of Habeas Corpus, Dkt. 1, referred to Petitioner as "Mr. Ayestas," this First Amended Petition uses "Mr. Ayestas" throughout.

Claim Number One:  Mr. Ayestas alleges that the State based its decision to capitally charge and seek the death penalty against him on his alienage, race, and/or national origin, in violation of the Equal Protection Clause of the Fourteenth Amendment.

Claim Number Two: Mr. Ayestas alleges that the decision to capitally charge and seek the death penalty against him violated the Cruel and Unusual Punishment clause of the Eighth Amendment, as applied to Texas by the Fourteenth Amendment.

<u>**RELEVANT FACTUAL BACKGROUND**</u>

Mr. Ayestas amends his Petition for a Writ of Habeas Corpus to include the following factual background relevant to the claims contained herein.  Mr. Ayestas incorporates by reference all facts provided in his initial Petition.  Dkt. 1.

**A.  The Siegler Memorandum**

On September 5, 1995, sixty-seven-year-old Santiaga Paneque was found dead.  Soon thereafter, Federico Zaldivar, Roberto Meza, and Mr. Ayestas were identified as persons of interest in connection with her death.   At that time, Johnny Holmes was the Harris County District Attorney, and Kelly Siegler was his Court Chief.  On September 19, 1995, before Mr. Ayestas had been arrested in connection with the murder, Ms. Siegler wrote an internal memorandum for the Harris County District Attorney's Office ("HCDA"), entitled "Capital Murder Summary" (the "Siegler Memorandum").  The Siegler Memorandum is reproduced below, and several aspects of it are particularly important.  Most critically, the Siegler Memorandum recommended that the HCDA capitally charge and seek death against Mr. Ayestas, and cited two facts in support of that recommendation: that Ms. Paneque was a "helpless sixty-seven year old woman" and that "the Defendant is not a citizen."  *See* Dkt. 82-1, at 3.

The memo is typed with several handwritten additions, and if the handwritten notes are credited, the handwriting occurred at more than one time.  At the top of the memo, Mr. Ayestas's

name is circled and the line "THE DEFENDANT IS NOT A CITIZEN" is crossed out.  Although there are initials and dates at other points on the Memo, there are none next to either the circle or strikethrough.



III.   AGGRAVATING CIRCUMSTANCES

A.   THE VICTIM IS A HELPLESS 67 YEAR OLD WOMAN KILLED IN HER HOME.

B.   ~~THE DEFENDANT IS NOT A CITIZEN.~~

Ms. Siegler's recommendation was ultimately approved.  Near the bottom of the memo, under the heading "Indictment Recommendation," are four printed signature lines: one for Kelly Siegler, one for "Division Chief- Casey O' Brien," one for "Bureau Chief - Keno Henderson," and one for Johnny Holmes.  All have the handwritten word "Capital" and the respective initials, but the dates differ; Siegler's line reads "9/19/25," O'Brien and Henderson's lines read "9/21/95," and Holmes' line has no date.

The heading "Recommendation for disposition at trial" also has four signature lines; however, none are signed.  Below that section is a handwritten comment approving a capital prosecution against "killer Ayestas" and life against his two "nonkilling" co-defendants if they testify, followed by the initials "JBH."  No date follows that comment, but at the very bottom of the page, in handwriting that is slanted backwards (unlike the rest of the handwriting on the Memo), is the word "done" and on the line below, "6-5-97."  Whether the strikethrough also occurred at that time is unclear.

V. INDICTMENT RECOMMENDATION

A. COURT CHIEF-KELLY SIEGLER *Capital - 1st* 9/9/95

B. DIVISION CHIEF-CASEY O'BRIEN *Capital O'Brien* 7/4/95

C. BUREAU CHIEF-KENO HENDERSON *Capital K Henderson* 9/21/95

D. DISTRICT ATTORNEY-JOHN B. HOLMES, JR. *Capital JBH*

VI. RECOMMENDATION FOR DISPOSITION AT TRIAL

A. COURT CHIEF-KELLY SIEGLER _____

B. DIVISION CHIEF-CASEY O'BRIEN _____

C. BUREAU CHIEF-KENO HENDERSON _____

D. DISTRICT ATTORNEY-JOHN B. HOLMES, JR _____

*OK to plead non-Killers for Agg. Rob.*
*Life, deadly weapon, See death on Killer*
*Ayestas. 2 pleading D's to testify —*

*JBH*

*done*
*6-5-97*

Unfortunately, the Siegler Memorandum would remain undisclosed to Mr. Ayestas for nearly two decades—only becoming available to Mr. Ayestas because the HCDA accidentally disclosed information from its file at the end of 2014.

**B. Ms. Siegler's Record of Misconduct**

The author of the Siegler Memorandum was no ordinary Assistant District Attorney. At the time that Ms. Siegler drafted the Siegler Memorandum, and for the duration of Mr. Ayestas's prosecution, she was the "Court Chief" at the HCDA. Although Ms. Siegler no longer occupies a position with the HCDA, her 21-year record as a prosecutor in the HCDA has been the subject of increasing scrutiny. Recent court decisions have revealed her jarring record of dishonest

4

prosecutorial misconduct as a line prosecutor and as the HCDA Court Chief.  A year ago, a federal court in the Southern District of Texas granted relief on six separate claims that Ms. Siegler hid exculpatory evidence from the defense, falsely reported the availability of material secreted in her private work product file, provided undisclosed favors to prison informants in exchange for fabricated false confessions, used prison informants to illegally interrogate the defendant while he was in custody, and was not truthful in her sworn testimony.  *See Prible v. Davis*, No. H-09-CV-1896, 2020 WL 2563544 (S.D. Tex. May 20, 2020).  In addition to its other critiques of Ms. Siegler's indifference to the interests of justice, the federal court found that "Siegler's testimony was not credible on both minor and major points."  2020 WL 2563544, at *19.  Most pertinently, the Court found that Ms. Siegler's testimony in which she stated that critical documents "were in the open file" that was shared with defense counsel was false, because those critical documents "were in her work product file and were not disclosed to defense counsel."  *Id.*  In a different case in which Ms. Siegler served as the lead counsel, the court ordered a new trial after finding 36 instances of prosecutorial misconduct by the HCDA.  *See* "Findings of Fact and Conclusions of Law," *Ex Parte David Mark Temple*, 178th District Court, No. 1008673-A (July 8, 2015).  These findings post-date this Court's 2015 order denying leave to amend.

### C.  State Court Proceedings

As the Siegler Memorandum recommended, the HCDA indicted Mr. Ayestas on capital murder charges and sought the death penalty.  Before Mr. Ayestas's trial began, he filed two separate *Brady* demands, both of which were granted.  On February 16, 1996, Mr. Ayestas filed the first such motion, a motion for discovery requesting, inter alia, "[a]ny and all favorable evidence which is in the possession, custody or control of the State, of investigating body of the

State of Texas, or Houston Police Department or any of their agencies . . .".  C.39.[2]  On May 23,

1997, Mr. Ayestas filed a separate discovery motion seeking production of "[a]ny and all evidence

reflecting on the issue of punishment."  C.64.  On June 3, 1997, the trial court granted both motions,

C.46; C.66, but the Siegler Memorandum was not disclosed; on information and belief, the

explanation for withholding the Siegler Memorandum is that the HCDA treats its charging

memoranda as privileged work product.

On July 9, 1997, Mr. Ayestas was convicted of capital murder.  The next day, he was

sentenced to death.  21R.R.238-42.  The Texas Court of Criminal Appeals ("CCA") affirmed the

conviction and sentence on November 4, 1998.  Opinion, *Ayestas v. State*, No. AP-72,928 (Tex.

Crim. App. Nov. 4, 1998) (not designated for publication).  On December 9, 1998, Mr. Ayestas

filed his initial state post-conviction application.  Because state post-conviction counsel was

unaware of the Siegler Memorandum's existence, the initial application contained no claims

relating to it.  On September 10, 2008, the CCA adopted the trial court's recommendation and

denied all relief. *See Ex parte Ayestas*, No. WR-69,674-01, 2008 WL 4151814, at *1 (Tex. Crim.

App. Sept. 10, 2008).

### D.  Federal Habeas Proceedings

#### 1.  The *Wiggins* Claim

Mr. Ayestas filed his initial Petition for a Writ of Habeas Corpus in this Court on September

11, 2009.  Dkt. 1.  At the time that Mr. Ayestas filed his initial federal habeas petition, he was

unable to include any claims associated with the Siegler Memorandum because he did not know,

and had no reason to know, that it existed.  Mr. Ayestas's initial federal habeas petition included

---

[2] In this Amended Petition, the Reporter's Record of the trial shall be referred as "R." preceded by the volume number and followed by the page number.  The Clerk's Record of the trial shall be referred to as "C." followed by the page number.  The state habeas record shall be referred to as "SHR." followed by the page number.

a "*Wiggins* claim" that trial counsel was constitutionally ineffective for failing to reasonably investigate mitigation. *See* Dkt. 1; *see also Wiggins v. Smith*, 539 U.S. 510 (2003). On June 3, 2013, the United States Supreme Court granted certiorari, vacated the lower federal courts' denial of relief, and remanded the case for further proceedings under *Trevino v. Thaler*, 569 U.S. 413 (2013). *Ayestas v. Thaler*, 133 S. Ct. 2764 (2013) (mem.). The Supreme Court granted a later certiorari petition on April 3, 2017, again vacated the Fifth Circuit's judgment, and again reversed the lower federal courts after plenary consideration of a *Wiggins* funding issue. *Ayestas v. Davis*, 138 S. Ct. 1080, 1098-101 (2018). The *Wiggins* litigation concluded in early 2020, after the Fifth Circuit again decided the *Wiggins* issue against Mr. Ayestas and after the Supreme Court denied a request for certiorari review on February 24, 2020. *Ayestas v. Davis*, 140 S. Ct. 1107 (2020).

### 2.   The Siegler Memorandum Claims

During the pendency of post-judgment motions on the *Wiggins* claim that eventually went to the Supreme Court, federal habeas counsel discovered the Siegler Memorandum. On December 22, 2014, then-federal habeas counsel Ben Wolff, in connection with the investigation of a wholly separate issue, was reviewing portions of the HCDA file at the HCDA office when he discovered work product inadvertently left in the reviewable file: the Siegler Memorandum. The HCDA had a long-standing policy of withholding work product from files viewable by post-conviction counsel. *See infra* at 21. On January 9, 2015, while his Rule 59(e) motion remained pending, Mr. Ayestas filed a Motion for Leave to Amend Original Petition for Writ of Habeas Corpus, to add claims arising out of the Siegler Memorandum. Dkt 54. On January 14, 2015, Mr. Ayestas filed motions necessary to perfect that amendment request as part of the Rule 59(e) proceeding, and to seek an order holding the federal proceeding in abeyance so that he could exhaust. Dkt. 55 & 56. On January 21, 2015, the HCDA filed its opposition to Mr. Ayestas's motions, arguing, inter alia,

that the Court was bound to treat the amendment request as a successive petition within the meaning of 28 U.S.C. § 2244(b), and indicating that the Siegler Memorandum was available to trial counsel.  Dkt. 60.

In a pair of orders on February 17, 2015 and April 1, 2015, the district court adopted the Director's position and denied all relief on the Siegler Memorandum claims, holding that the attempt to amend during the Rule 59(e) period amounted to a successive petition that it lacked jurisdiction to entertain; the district court did not reach the merits of the claims.  Dkts. 63 & 64.

On March 22, 2016, the Fifth Circuit affirmed the district court's ruling, but on slightly different grounds.  *See Ayestas v. Stephens*, 817 F.3d 888 (5th Cir. 2016).  As a result of the State's continued refusal to acknowledge that it had treated the Siegler Memorandum as privileged work product that was withheld from trial counsel, the Fifth Circuit refused to permit the amendment necessary to present Mr. Ayestas's Eighth and Fourteenth Amendment claims.  *Id.*  It did not, however, affirm the district court's jurisdictional holding.  The Fifth Circuit specifically revised its original panel opinion to clarify that the basis of its holding was that the file would have been available to *trial* counsel, not that post-conviction counsel was insufficiently diligent.  *Ayestas v. Stephens*, 826 F.3d 214, 215 (5th Cir. 2016).

On November 7, 2016, Mr. Ayestas filed a petition of writ for certiorari, seeking not only a review of the *Wiggins* claim, but also a review of the Fifth Circuit's decision to bar Mr. Ayestas from immediately commencing litigation of the Siegler Memorandum claims.  In its Brief in Opposition ("BIO") before the Supreme Court, the Director finally conceded, for the first time, that the Siegler Memorandum was not, and would not have been, available to trial counsel: "The fact that [the Siegler Memorandum] is privileged explains why it was not voluntarily turned over to [Mr. Ayestas's] counsel during the criminal trial."  BIO at 18 n.10, *Ayestas v. Davis*, 138 S. Ct.

1080 (2018) (No. 16-6795).  The Supreme Court did not grant certiorari on the issues arising out of the Siegler Memorandum, but it did grant certiorari and reverse the district court and Fifth Circuit on an issue relevant to Mr. Ayestas's *Wiggins* claim.  *Ayestas v. Davis*, 138 S. Ct. 1080, 1098-101 (2018).

With the judgment vacated and the case returned to the Fifth Circuit on the *Wiggins* issues, Mr. Ayestas renewed his arguments supporting the Siegler Memorandum claims.  The Fifth Circuit ultimately refused to permit funding to investigate the *Wiggins* claim and simply issued the opinion and order without any reference whatsoever to the Siegler Memorandum claims.  *Ayestas v. Davis*, 933 F.3d 384 (5th Cir. 2019).  The Supreme Court denied a request for certiorari review on February 24, 2020.  *Ayestas v. Davis*, 140 S. Ct. 1107 (2020).

Mr. Ayestas continued to request the opportunity to litigate the constitutional issues implicated in the Siegler Memorandum.  On August 25, 2020, he sought authorization from the CCA to litigate his first subsequent state post-conviction application.  *See* Dkt. 82-2, at 2.  On December 9, 2020, the CCA denied Mr. Ayestas's habeas petition in a short decision that did not reach the merits of his claims related to the Siegler Memorandum.  See Dkt. 82-2, at 2.  On December 23, 2020, Mr. Ayestas filed a Suggestion for Reconsideration, but the CCA denied Mr. Ayestas's request without written order on January 27, 2021.  Dkt. 82-3.

Seven business days later, Mr. Ayestas filed his Motion for Relief from Judgment Pursuant to Rule 60(b)(6) with this Court on February 5, 2021.  Dkt. 82.  Following briefing by the parties, this Court entered an Order on August 12, 2021, granting Mr. Ayestas's Motion for Relief from Judgment Pursuant to Federal Rule of Civil Procedure 60(b)(6).  Dkt. 93.  On August 30, 2021, this Court ordered Mr. Ayestas to file his First Amended Petition no later than September 28, 2021. Dkt. 96.

**CLAIM NUMBER ONE:  THE STATE BASED ITS DECISION TO CAPITALLY CHARGE AND SEEK DEATH AGAINST MR. AYESTAS ON HIS ALIENAGE, RACE, AND/OR NATIONAL/ORIGIN, VIOLATING THE EQUAL PROTECTION CLAUSE OF THE FOURTEENTH AMENDMENT**

Kelly Siegler, then the HCDA Court Chief, wrote the Siegler Memorandum recommending that the District Attorney capitally charge and seek death against Mr. Ayestas. The Siegler Memorandum cited two reasons, one of which was Mr. Ayestas's status as a noncitizen. Because an impermissible decision to prosecute individuals based on alienage, race, or national origin violates the Equal Protection Clause of the Fourteenth Amendment, Mr. Ayestas's resulting conviction and sentence were unconstitutionally obtained.

The fact that alienage discrimination influenced the charging decision is evident from the face of the Siegler Memorandum, which makes clear that this impermissible motivation served as a basis for the HCDA's charging decision.  But the demography of noncitizens in Texas means that alienage might have *also* been a proxy for race and/or national origin.  Discovery may reveal whether additional invidious motives, beyond the impermissible consideration of alienage, influenced the HCDA's charging decision.

### A.  Relevant Law

The Equal Protection Clause of the Fourteenth Amendment requires vigilance against the unjustified use of invidious classifications.  It is well established that racial classification must be subjected to "the most rigid scrutiny."  *Korematsu v. United States*, 323 U.S. 214, 216 (1944). Alienage classifications, however, likewise "are 'suspect' because, though not necessarily involving race or national origin, they are enough like the latter to warrant similar treatment," and the principles first developed with respect to race discrimination apply to citizenship discrimination as well.  *Trimble v. Gordon*, 430 U.S. 762, 780 (1977).

1.  **Equal Protection Constraints on Racial and National Origin Discrimination**

"[A] classification based upon the race of the participants [ ] must be viewed in light of the historical fact that the central purpose of the Fourteenth Amendment was to eliminate racial discrimination emanating from official sources in the States." *McLaughlin v. Florida.*, 379 U.S. 184, 191–92 (1964); *see also Washington v. Davis*, 426 U.S. 229, 239 (1976) ("The central purpose of the Equal Protection Clause of the Fourteenth Amendment is the prevention of official conduct discriminating on the basis of race."). Because racial distinctions are, in almost all circumstances, irrelevant to any constitutionally permissible purpose, *Hirabayashi v. United States*, 320 U.S. 81, 100 (1943), they are subject to strict scrutiny and may be sustained only when they "are narrowly tailored measures that further compelling governmental interests." *Johnson v. California*, 543 U.S. 499, 505 (2005) (citations and quotation marks omitted).

Strict scrutiny applies to all racial classifications, as well as to other invidious distinctions including alienage, and is especially exacting when the state action takes the form of criminal process. "The Fourteenth Amendment is not directed solely against discrimination due to a 'two-class theory,'" but rather encompasses any discrimination against individuals "because of their ancestry or national origin." *Hernandez v. Texas*, 347 U.S. 475, 478 (1954); *see also Hernandez v. New York*, 500 U.S. 352 (1991) (applying prohibition against racially motivated peremptory challenges to the exclusion of Latino jurors); *Castaneda v. Partida*, 430 U.S. 482 (1977) (applying prohibition against racial discrimination in jury venire selection to the exclusion of Mexican Americans). And although "*all* racial classifications [imposed by government] . . . must be analyzed by a reviewing court under strict scrutiny," *Johnson*, 543 U.S. at 505 (citing *Adarand Constructors Inc. v. Peña*, 515 U.S. 200, 227 (1995) (emphasis added in *Johnson*)),

11

"[d]iscrimination on the basis of race, odious in all aspects, is especially pernicious in the administration of justice." *Rose v. Mitchell*, 443 U.S. 545, 555 (1979).

"Proof of racially discriminatory intent or purpose is required to [invoke strict scrutiny under] the Equal Protection Clause." *Arlington Heights v. Metropolitan Housing Development*, 429 U.S. 252, 265 (1977).  Such proof may take many forms.  "[A]n express racial classification [is] immediately suspect." *Johnson*, 543 U.S. at 509 (citing *Shaw v. Reno*, 509 U.S. 630, 642 (1993)).  However, where racial motivation is not express, "[d]etermining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Arlington Heights*, 429 U.S. at 266.

### 2. Equal Protection Constraints on Alienage Discrimination

Equal Protection doctrine constrains not only race and national origin classifications, but also invidious classifications such as those based on alienage.   Because the Fourteenth Amendment's Equal Protection clause protects "persons," it is well established "that an alien is entitled to the shelter of the Equal Protection Clause." *Sugarman v. Dowell*, 413 U.S. 634, 641 (1973) (citing *Graham v. Richardson,* 403 U.S. 365, 371 (1971); *Truax v. Raich*, 239 U.S. 33, 39 (1915); *Wong Wing v. United States,* 163 U.S. 228, 238 (1896); *Yick Wo v. Hopkins*, 118 U.S. 356 (1886)).  Aliens, like racial minorities, are a "prime example of a 'discrete and insular' minority for whom [] heightened judicial solicitude is appropriate," and "classifications based on alienage, like those based on nationality or race, are inherently suspect and subject to" the same judicial scrutiny.  *Graham v. Richardson*, 403 U.S. 365, 372 (1971) (citations omitted); *see also Trimble v. Gordon*, 430 U.S. 762, 780 (1977) ("In cases involving alienage, for example, [the Court] has

concluded that such classifications are 'suspect' because, though not necessarily involving race or national origin, they are enough like the latter to warrant similar treatment.").

### 3.   Application of Equal Protection Constraints to Charging Decisions

A prosecutor's charging decisions are subject to scrutiny under these equal protection principles.  Though prosecutors enjoy broad charging discretion, "[s]electivity in the enforcement of criminal laws is . . . subject to constitutional constraints." *United States v. Batchelder*, 442 U.S. 114, 125 (1979).  Factors such as "race or religion may play no part in [the state's] charging decision." *Bordenkircher v. Hayes*, 434 U.S. 357, 364-65 (1978).  Selectivity in enforcement violates equal protection where "the selection was deliberately based upon an unjustifiable standard such as race, religion, or other arbitrary classification." *Oyler v. Boles*, 368 U.S. 448, 456 (1962); *see also McCleskey v. Kemp*, 481 U.S. 279, 291-292 n.30 (1987) ("It would violate the Equal Protection Clause for a State to base enforcement of its criminal laws on an unjustifiable standard such as race, religion, or other arbitrary classification.") (internal quotation marks omitted).

Prohibitions against alienage discrimination—unlike prohibitions against race and national origin discrimination—are subject to some exceptions, but none apply to state decisions to prosecute.  *Cf. Ambach v. Norwick*, 441 U.S. 68, 74-75 (1979) (that aliens may be denied political rights or excluded from employment involving public policy "is an exception to the general standard applicable to classifications based on alienage"); *Mathews v. Diaz*, 426 U.S. 67, 79-85 (1976) (recognizing that, although Congress "[i]n the exercise of its broad power over immigration . . . [may] make rules that would be unacceptable if applied to citizens," states do not possess this power) (citing *Graham v. Richardson*, 403 U.S. 365 (1971)).  As the Supreme Court has frequently

recognized, classifications based on alienage require strict scrutiny analysis of their constitutionality. *See Toll v. Moreno*, 458 U.S. 1, 9 (1982).

### B. Argument

Ms. Siegler recommended Mr. Ayestas's capital prosecution, in part, because Mr. Ayestas "is not a citizen." That recommendation violates the Equal Protection Clause. In the context of a criminal prosecution, "where the power of the State weighs most heavily upon the individual or the group, [courts] must be especially sensitive to the policies of the Equal Protection Clause which, as reflected in congressional enactments dating from 1870, were intended to [inter alia] . . . subject all persons 'to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, *and to no other*.'" *McLaughlin*, 379 U.S. at 192 (emphasis added). Here, Mr. Ayestas was not subjected to "like punishment," but to additional punishment due to his protected status.

*McCleskey v. Kemp*, 481 U.S. 279 (1987), a case which concerned a Fourteenth Amendment challenge to the application of Georgia's death penalty statute, is instructive. In *McCleskey*, the Court explained that "to prevail under the Equal Protection Clause, [one] must prove that the decisionmakers in his case acted with discriminatory purpose." *Id.* at 292 (emphasis omitted). Such a burden can be met when one offers "evidence *specific to his own case* that would support an inference that racial considerations played a part in his sentence." *Id.* at 292-93 (emphasis added). In Mr. Ayestas's case, the Siegler Memorandum proves that at least one of "the decisionmakers in his case acted with discriminatory" purpose, by offering "evidence specific to his own case that would support an inference that [constitutionally impermissible] considerations played a part in his sentence." *Id.* at 280-81.

Indeed, the Siegler Memorandum is *direct* evidence that alienage was an "aggravating circumstance" that motivated the prosecution to charge capital murder and seek the death penalty for Mr. Ayestas. Judicial vigilance is particularly imperative where prosecutors have acted on

racial motives. *See Flowers v. Mississippi,* 588 U.S.__ (2019), 139 S. Ct. 2228 (reversing conviction where prosecutor himself had a history of engaging in racial discrimination in jury selection); *Foster v. Chatman*, 136 S. Ct. 1737, 1755 (2016) ("The contents of the prosecution's file, however, plainly belie the State's claim that it exercised its strikes in a 'color-blind' manner."). Thus, in the face of explicit prohibited discrimination by decisionmakers, reversal is required.

While it is clear that the Siegler Memorandum reflects alienage discrimination, it also may reflect discrimination of another form. Almost all foreign nationals that Texas prosecutes are Latino and from Latin America,[3] so the expressed reliance on noncitizenship may well have been a proxy for discrimination on the basis of race or national origin. Moreover, Ms. Siegler's willingness to rely on one impermissible factor suggests that she might be willing to rely on others. Any presumption of regularity that might otherwise apply to her decisionmaking is unsustainable in the face of her well-established history of violating *Brady*, breaching duties of candor, and misrepresenting HCDA policy. The evidence here, albeit not an explicit declaration of intent to discriminate on the basis of race or national origin, is sufficient to make out a prima facie case of such impermissible motivation.

Explicit reliance on a protected status in the decision to seek death, as evidenced by the Siegler Memorandum, is exceedingly rare. In fact, Mr. Ayestas is aware of only one other post-*Furman* case in which a defendant was able to provide similarly direct evidence of conscious discrimination. In that case, *State v. Kelly*, the prosecutor admitted in postconviction proceedings that he felt that "the black community would be upset . . . if we did not seek the death penalty because there were two black victims in this case." No. 99-CP-42-1174 (S.C. Ct. C.P. Oct. 6,

---

[3] Mexican nationals account for most of the prisoners with ICE detainers, and El Salvador and Honduras nationals account for the next greatest numbers of offenders with ICE detainers. *Less Than 5 Percent of Texas Prison Inmates are Undocumented, The Texas Tribune,* Feb. 19, 2016, *https://www.texastribune.org/2016/02/19/ice-records-reveal-makeup-undocumented-prison-popu/.*

2003) at 38, attached as Exhibit 1.  The court granted the defendant a new trial, reasoning that the prosecutor's admission that race factored into the decision to seek the death penalty was dispositive, regardless of whether the prosecutor also considered other factors.  *Id.*  Likewise, Ms. Siegler's explicit reliance on alienage—as well as her sharing of that reliance with other members of the prosecution—entitle Mr. Ayestas to relief.

In sum, "[t]he unhappy persistence of both the practice and the lingering effects of racial discrimination against minority groups in this country is an unfortunate reality, and government is not disqualified from acting in response to it."  *Adarand Constructors*, 515 U.S. at 237.  Here, the government saw fit to enhance Mr. Ayestas's punishment because of his race, national origin, and/or alienage.  Such conduct is not narrowly tailored to any compelling state interest. Consequently, it cannot be sustained.

### CLAIM NUMBER TWO:  THE DECISION TO CAPITALLY CHARGE AND SEEK THE DEATH PENALTY AGAINST MR. AYESTAS VIOLATED THE CRUEL AND UNUSUAL PUNISHMENT CLAUSE OF THE EIGHTH AMENDMENT

The HCDA's consideration of race, national origin, and alienage also violated the Eighth Amendment.  U.S. Const. amend. XIII.  To prevail on an Eighth Amendment claim, as opposed to an Equal Protection claim, a claimant need not prove purposeful discrimination.  Instead, a claimant must establish only *a constitutionally impermissible risk* of arbitrariness.  *See Turner v. Murray*, 476 U.S. 28, 35-36 (1986) ("We have struck down capital sentences when we found that the circumstances under which they were imposed created an unacceptable risk that the death penalty [may have been] meted out arbitrarily or capriciously or through whim or mistake.") (citations, quotation marks, and alterations omitted).  The Siegler Memorandum itself establishes such a risk.

### A.  Relevant Law

The Eighth Amendment's prohibition of tainted prosecutions does not require a claimant to introduce evidence that conclusively proves intent to discriminate.  Indeed, when the death penalty is at stake, substantial risk of discrimination is enough.  *See Godfrey v. Georgia*, 446 U.S. 420, 427 (1980) ("[T]he penalty of death may not be imposed under sentencing procedures that create a *substantial risk* that the punishment will be inflicted in an arbitrary and capricious manner.") (emphasis added).  "It would seem to be incontestable that the death penalty inflicted on one defendant is 'unusual' if it discriminates against him by reason of his race, religion, wealth, social position, or class, or if it is imposed under a procedure that gives room for the play of such prejudices."  *Furman v. Georgia*, 408 U.S. 238, 242 (1972) (Douglas, J., concurring).

### B.  Argument

The State may maintain that Mr. Ayestas has not established discriminatory purpose and that his Equal Protection claim therefore fails, but such a contention, even if meritorious (and as discussed above, it is not), cannot defeat Mr. Ayestas' Eighth Amendment claim.  *McCleskey*, 481 U.S. at 279, also addressed an Eighth Amendment challenge to Georgia's death penalty, and its treatment of that challenge supports the conclusion that an Eighth Amendment violation occurred here.  *McCleskey* reasoned that "[a]t most, the [proferred statistical] study indicates a discrepancy that appears to correlate with race."  *Id*. at 312.  But in contrast to the statistical showing of showing of arbitrariness held to be insufficient in *McCleskey*, Mr. Ayestas' claim does not rely upon an "assum[ption] that what is unexplained is invidious."  *Id*. at 313.  Nor does it ask this Court "to accept the likelihood allegedly shown by [a statistical] study as the constitutional measure of an unacceptable risk of racial prejudice influencing capital sentencing decisions."  *Id.* at 309.  Rather, it relies upon invidiousness explicit on the face of the Memo.

Mr. Ayestas has presented direct and *conclusive* evidence that alienage was an "aggravating circumstance" that the prosecution team actively considered in deciding to seek the death penalty. Indeed, the Siegler Memorandum clearly establishes that the prosecution team considered alienage in deciding to prosecute Mr. Ayestas for capital murder and seek death against him. As the Supreme Court has explained, alienage classifications "are 'suspect' because, though not necessarily involving race or national origin, they are enough like the latter to warrant similar treatment," *Trimble*, 430 U.S. at 780, and a state violates the Eighth Amendment when it "attaches the 'aggravating' label to factors that are constitutionally impermissible or totally irrelevant to the sentencing process, such as for example, the race, religion, or political affiliation of the defendant." *Brown v. Sanders*, 546 U.S. 212, 218 (2006). Ms. Siegler's own reliance on a forbidden discriminatory classification, as well as the sharing of her forbidden reasoning with other members of the prosecution, establishes a constitutionally impermissible risk "that the punishment will be inflicted in an arbitrary and capricious manner." *Godfrey*, 446 U.S. at 427.

Finally, because of the close connection between alienage and race and/or national origin in the context of the Texas criminal justice system, there is an unconstitutionally impermissible risk that all three factors motivated Ms. Siegler's recommendation—and thereby influenced the decisions of O'Brien, Henderson, and Holmes. These constitutionally impermissible risks provide multiple reasons to condemn Mr. Ayestas's capital prosecution, but Ms. Siegler's explicit reliance to alienage, standing alone, is sufficient to render it unconstitutional.

## THE LIMITATIONS PERIOD DOES NOT FORECLOSE RELIEF[4]

Any assertion that Mr. Ayestas's claims are foreclosed due to the limitations period are unavailing. Indeed, Mr. Ayestas attempted to amend the initial petition within days of discovering

---

[4] If the Director asserts a statute-of-limitations defense, Mr. Ayestas will respond fully in his Reply. Nevertheless, the Court should understand, even at this juncture, that statute of limitations will not preclude merits consideration.

the Siegler Memorandum, which the state had withheld on the ground that the state believed it to be privileged work product.  Therefore, any delay was not due to Mr. Ayestas's inaction, and he has diligently pursued remedies since he discovered the violation's factual predicate.  This Court may give effect to his diligent pursuit of his claim either by relating this Amendment back to the date he first sought leave—on January 9, 2015—or by equitably tolling the limitations period.

### A.  If the Amendment Does Not Relate Back, Then the One-Year Limitations Period in § 2244(d)(1)(D) Was Exhausted during Federal Litigation

Under 28 U.S.C. § 2244(d)(1)(D), there is a one-year limitations period that runs from "the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence."  The Siegler Memorandum was the "factual predicate" of the claims presented and, as previously explained, it could not have been "discovered through the exercise of due diligence."  *See supra* at 8-11, 21. For that reason, the trigger date for the one-year limitations period is the date on which counsel for Mr. Ayestas discovered the Siegler Memorandum following its inadvertent disclosure by the HCDA: December 22, 2014.

In his Response in Opposition to the Supplemental Motion to Alter Judgment, the Director suggested that the Siegler Memorandum was available to trial counsel. Dkt. 60 at 7 ("[I]t is clear that the factual predicate for the new claims—the 1995 prosecution report—could have been discovered much earlier had Ayestas exercised due diligence.").  It wasn't.  The HCDA treated it as undiscoverable work product prepared by Kelly Siegler.  The Director conceded that it treated the memo as privileged in a footnote of its certiorari briefing before the Supreme Court.  *See* BIO at 18 n.10, *Ayestas v. Davis*, 138 S. Ct. 1080 (2018) (No. 16-6795). ("The fact that [the Siegler Memo] is privileged explains why it was not voluntarily turned over to [Mr. Ayestas'] counsel during the criminal trial.").

The HCDA and the Director considered the Siegler Memorandum to be privileged work product because it memorializes the thought process underlying the state's decision to capitally prosecute and seek death against Mr. Ayestas.  *See Hickman v. Taylor*, 329 U.S. 495, 510-11 (1947) (defining the scope of work product and explaining why it should remain privileged); *see also* Fed. R. Civ. P. 26(b)(3)(B) (stating that the work product doctrine "protect[s] against disclosure of the mental impressions, conclusions, opinions, or legal theories of a party's attorney or other representative concerning the litigation"); Tex. R. Civ. P. 192.5(b)(1) ("[T]he work product of an attorney or an attorney's representative that contains the attorney's or the attorney's representative's mental impressions, opinions, conclusions, or legal theories—is not discoverable."); *Nat'l Union Fire Ins. Co. of Pittsburgh v. Valdez*, 863 S.W.2d 458, 460 (Tex. 1993) ("An attorney's litigation file goes to the heart of the privileged work area guaranteed by the work product [doctrine].").

The work product doctrine works the same way in criminal proceedings as it does in civil ones.  *See Nat'l Union Fire Ins. Co. of Pittsburgh v. Valdez*, 863 S.W.2d 458, 460 (Tex. 1993) ("An attorney's litigation file goes to the heart of the privileged work area guaranteed by the work product [doctrine]."); *Ott v. State*, 627 S.W.2d 218, 225 (Tex. App. 1981), pet. for discretionary review refused (1982) (recognizing work-product doctrine in Texas criminal cases); Tex. Gov't Code § 552.111 (exempting interagency memoranda from disclosure under the Texas Public Information Act, where such memoranda would not be available by law to a party in litigation); *see also Siripongs v. Calderon*, 167 F.3d 1225, 1227 (9th Cir. 1999) (holding that prosecutors are under no obligation to disclose their theories, thought processes, or even all investigatory work). Treating capital murder summaries as privileged work product is the longstanding practice of the HCDA which, historically, has objected to the disclosure of Capital Murder Summaries on those

20

grounds.  *See* Dkt. 82-4, Tr. of October 27, 2015 Proceedings in *Ex parte Balderas*, Trial Court

No. 1412826 at 5-6, (HCDA "object[ing] to turning over the capital murder summary"); Dkt. 82-

5, Tr. of May 2, 2018 Proceedings in *Ex parte Balderas*, Trial Court No. 1412826 at 8 (HCDA

stating that "capital murder summaries in Harris County are work product").

If the Amendment does not relate back to the January 2015 request for leave to file it, then

the limitations period elapsed one year after it started because Mr. Ayestas was barred from

activating the statutory tolling mechanism.  28 U.S.C. § 2244(d)(2) provides: "The time during

which a properly filed application for State post-conviction or other collateral review with respect

to the pertinent judgment or claim is pending shall not be counted toward any period of limitation

under this subsection."  Section 2244(d)(2) does not statutorily toll the limitations period, however,

during the pendency of *federal* post-conviction proceedings. *See Duncan v. Walker*, 533 U.S. 167,

181 (2001).  As a result, and if the Amendment does not relate back to the January 2015 motion

for leave to file it, then the § 2244(d)(1)(D) limitations period expired on December 22, 2015.

### B.  If the Amendment Does Not Relate Back, Then Mr. Ayestas Is Entitled to Equitable Tolling

After discovering the Siegler Memorandum, Mr. Ayestas immediately began trying to

amend his earlier filings, and limitations would be a non-issue had he been afforded his legal right

to amend at the Rule 59 moment.  However, recognizing that external circumstances like the ones

here sometimes preclude timely filing, the Supreme Court has affirmed uniform circuit practice

and recognized that the limitations period can be tolled *equitably*.  *See Holland v. Florida*, 560

U.S. 631, 645 (2010) ("Now, like all 11 Courts of Appeals that have considered the question, we

hold that § 2244(d) is subject to equitable tolling in appropriate cases.").  Under *Holland*, a

claimant is entitled to equitable tolling when he has pursued the claim diligently and when some

"extraordinary circumstance" precluded timely filing.  *See Holland*, 560 U.S. at 649.  In a later

case, the Supreme Court held that a limitations period could be equitably tolled in a case of actual innocence, on the theory that the equitable tolling rules should have the "miscarriage of justice" exception that exists for procedural default.  *See McQuiggin v. Perkins*, 569 U.S. 383, 392-94 (2013).  The defining feature of this tolling inquiry is that it is, as the name indicates, equitable— it is flexible and case-specific, and does not require a court to follow rigid categories defined in prior case law.  As the Supreme Court explained: "In emphasizing the need for flexibility, for avoiding mechanical rules, we have followed a tradition in which courts of equity have sought to relieve hardships which, from time to time, arise from a hard and fast adherence to more absolute legal rules, which, if strictly applied, threaten the evils of archaic rigidity."  *Holland*, 560 U.S. at 650 (internal quotation marks and citations omitted); *see also Palacios v. Stephens*, 723 F.3d 600, 606 (5th Cir. 2013) (emphasizing that equitable tolling doctrine does not use "bright-line rules," that tolling requires "case-by-case" inquiry, and that "specific circumstances" of a case can warrant "special treatment") (internal citations omitted).

### 1.  Mr. Ayestas Is Entitled to Equitable Tolling under *Holland*

*Holland* generally requires that a claimant seeking equitable tolling show both that federal habeas counsel was reasonably diligent and that extraordinary circumstances prevented timely filing.  *See Holland*, 560 U.S. at 649.  Mr. Ayestas clears both bars.

#### a.  Reasonable diligence.

One of the critical inquiries for courts when assessing whether equitable tolling is applicable centers on a petitioner's diligence in asserting the claim after it is discovered—i.e., the diligence of federal post-conviction counsel.  The reasonable-diligence requirement is meant to be surmountable.  *Holland* itself explained that "[t]he diligence required for equitable tolling purposes is reasonable diligence, not maximum feasible diligence[.]"  560 U.S. at 653 (internal citations and

quotation marks omitted); *see also Manning v. Epps*, 688 F.3d 177, 183 (5th Cir. 2012) (emphasizing reasonable-diligence proposition from *Holland*). Like other parts of the equitable tolling inquiry, the reasonable diligence inquiry is "often fact-intensive," requires courts "to avoid 'mechanical rules,'" and instructs them to "draw upon decisions made in other similar cases for guidance." *Palacios*, 723 F.3d at 605 (citing *Holland*).

Mr. Ayestas has *far* exceeded *Holland*'s diligence requirement. He raced to the courthouse to file documents necessary to preserve remedies on the Siegler Memorandum claims—a motion to amend, to supplement his post-judgment motion, and to stay the case so as to permit exhaustion. Dkt. Nos. 54-56. He pressed for his remedies during *two rounds* of appellate litigation. *See supra* at 6-7. In the earliest stages of the COVID pandemic, he returned to state court to seek remedies there. *See* Dkt. 82-2. In Mr. Ayestas's case, courts, including this one, have gone out of their way to note the post-discovery diligence of his federal habeas counsel. On a motion for panel rehearing, the Fifth Circuit reissued its opinion specifically to disclaim any criticism of post-conviction counsel's diligence. *See Ayestas v. Stephens*, 826 F.3d at 215. And in granting the Rule 60(b)(6) relief precipitating this amendment, this Court found the Director's argument that Mr. Ayestas was non-diligent to be "unconvincing." Dkt. 93 at 6. It further explained: "Ayestas has demonstrated his diligence in pursuing this claim. His Rule 60(b) Motion was filed within a reasonable time under both the factual and procedural circumstances giving rise to the motion." Dkt. 93 at 7.

### b. *Extraordinary circumstances*

The other critical inquiry for courts when assessing whether equitable tolling is applicable centers on whether extraordinary circumstances prevented timely filing. "[E]xtraordinary circumstances" equates roughly to "cause" for the purposes of excusing procedural default. *Manning*, 688 F.3d at 184 n.2. The cause for failing to file within the limitations period here was

simply the mistaken application of federal law that *Banister* corrected. *See* Dkt. No. 93 at 5-6 (this Court's order explaining how *Banister v. Davis*, 140 S.Ct. 1698 (2020), precluded timely amendment). The entire limitations period was therefore consumed by the pendency of the initial federal petition, during which time the limitations period is not *statutorily* tolled. *See Duncan*, 533 U.S. at 181. And there is another extraordinary circumstance: the Director repeatedly mislead lower federal courts about the availability of the Siegler Memorandum, negatively affecting their willingness to exercise their discretion in favor of merits review.[5]

### 2. Mr. Ayestas Is Entitled to Equitable Tolling under the Miscarriage-of-Justice Rule

While *Holland* establishes that Mr. Ayestas is entitled to equitable tolling because his habeas counsel was reasonably diligent and extraordinary circumstances prevented timely filing, Mr. Ayestas is also entitled to equitable tolling under the miscarriage-of-justice rule. *See McQuiggin*, 569 U.S. at 392-94 (holding that the miscarriage-of-justice rule for excusing procedural defaults also applies to timeliness defects).

---

[5] The Director repeatedly told this Court that the Siegler Memorandum was available to counsel. *See*, *e.g.*, Dkt. No. 60 at 7 ("[I]t is clear that the factual predicate for the new claims—the 1995 prosecution report—could have been discovered much earlier had Ayestas exercised due diligence."); *id.* ("[T]here is absolutely no indication that the report was not in those very same files prior to his filing his original federal habeas application in September 2009."); Dkt. No. 59 at 3. ("Despite the apparent availability of this document for quite some time, this is the first time Ayestas has attempted to raise such a claim in any court."); *id.* ("Because these new allegations could have been presented in that original petition, any amendment now is actually a second or successive application under 28 U.S.C. §2244(b)(2) and must be dismissed."); *id.* at 5 ("Furthermore, it is clear that the factual predicate for the new claims—the 1995 prosecution report—could have been discovered much earlier had Ayestas exercised due diligence."); *id.* ([T]here is absolutely no indication that the report was not in those very same files prior to his filing his original federal habeas application in September 2009."); *id.* at 5 n.4 ("[T]here is absolutely no evidence to indicate that the report has been concealed for twenty years and was just recently returned to the State's files to be discovered."); *id.* at 6 ("Therefore, he should have raised these claims in his original federal petition because the factual predicate of the claim was available."); id. at 6 ("As shown above, Ayestas' new claims clearly could have been raised in an earlier petition."); *id.* at 9 ("Ayestas still cannot demonstrate any form of diligence because the 'evidence' he uses to support his new claims has always been available."). The Director continued to misrepresent the availability of the Siegler Memorandum before the Fifth Circuit by relentlessly suggesting that the Memorandum would have been available, had trial counsel asked. For example, after being ordered to respond to the rehearing petition, the Director stated: "Furthermore, the panel correctly held that Ayestas' attempt to excuse this lack of diligence by blaming the State and relying on the self-serving assumption that it would have been futile to ask the State to produce work product was unavailing." Resp. to Pet. for Rehearing, *Ayestas v. Stephens*, No. 15-70015 (5th Cir. May 23, 2016).

A refusal to remedy the Siegler Memorandum claims would be a serious miscarriage of justice. The Supreme Court has repeatedly admonished courts about being especially attentive to the noxious taint of unlawful discrimination. *See., e.g.*, *Pena-Rodriguez v. Colorado*, 137 S. Ct. 855, 869 (2017) ("Where a juror makes a clear statement that indicates he or she relied on racial stereotypes or animus to convict a criminal defendant, the Sixth Amendment requires that the no-impeachment rule give way in order to permit the trial court to consider the evidence of the juror's statement and any resulting denial of the jury trial guarantee."); *see also, Buck v. Davis*, 137 S. Ct. 759, 778 (2017) ("[W]hen a jury hears expert testimony that expressly makes a defendant's race directly pertinent on the question of life or death, the impact of that evidence cannot be measured simply by how much air time it received at trial or how many pages it occupies in the record. Some toxins can be deadly in small doses."). This Court has *already* held that, if it were to fail to remediate the constitutional violation alleged here, "then there is a substantial risk of injustice in declining to address the merits of the claim, as well as a substantial risk of undermining public confidence in the judicial process." Dkt. 93 at 8.

## PROCEDURAL DEFAULT DOES NOT FORECLOSE RELIEF[6]

Nor does the CCA's non-merits dismissal preclude merits consideration. Claims are not procedurally defaulted unless the state procedural ground is adequate and independent. *See Coleman v. Thompson*, 501 U.S. 722, 750 (1991); *Matchett v. Dretke*, 380 F.3d 844, 848 (5th Cir. 2004). And even if the state procedural ground was adequate and independent, default may still be excused either by showing cause and prejudice, or by demonstrating a miscarriage of justice. *See Coleman*, 501 U.S. at 750; *Matchett*, 380 F.3d at 848. Procedural default does not bar merits

---

[6] If the Director asserts a procedural-default defense, Mr. Ayestas will respond fully in the Reply. Nevertheless, the Court should understand, even that this juncture, that a default will not preclude merits consideration.

consideration here for two reasons: (1) any procedural default is excused on cause-and-prejudice grounds; and (2) any procedural default is excused on miscarriage-of-justice grounds.

### A. There Is Cause and Prejudice for the Default

First, a claimant can excuse default by showing cause and prejudice. *See Thompson*, 501 U.S. at 750; *Matchett*, 380 F.3d at 848. There is cause if some factor "external" to Mr. Ayestas caused the forfeiture. *See Murray v. Carrier*, 477 U.S. 478, 488 (1986) ("[T]he existence of cause for a procedural default must ordinarily turn on whether the prisoner can show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule."); *Gonzales v. Davis*, 924 F.3d 236, 242 (5th Cir. 2019) (quoting and citing *Carrier*). When the state withholds the factual predicate of a claim, there is textbook cause for excusing default. *See Strickler v. Greene*, 527 U.S. 263, 282-89 (1999); *Rocha v. Thaler*, 619 F.3d 387, 394 (5th Cir.), *clarified on denial of reconsideration*, 626 F.3d 815 (5th Cir. 2010). There is cause here because the failure to obtain the Siegler Memorandum was "external" to Mr. Ayestas. The Siegler Memorandum was not available to reasonably diligent counsel because the HCDA withheld it as work product.

A prejudice showing requires a claimant to show that "the error[ ] . . . worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *United States v. Frady*, 456 U.S. 152, 170 (1982). To the extent that the prejudice requirement simply refers to the substantiality of the underlying claim, Mr. Ayestas incorporates by reference his arguments set forth above; the error asserted here is structural and "infect[ed] his entire trial with" constitutional error. *Id.*; *see also Amadeo v. Zant*, 486 U.S. 214, 228 n.6 (1988) (giving effect to concession that "intentional . . . discrimination in the composition of the master jury lists satisfies the requirement of prejudice"); *Quintero v. Bell*, 368 F.3d 892, 893 (6th Cir. 2004) (presuming prejudice on underlying claim of structural error). The constitutional violation also

had a substantial effect on his conviction or sentence.  Given the taint of discrimination, it is sufficiently likely that, absent the constitutional violation, the HCDA would not have capitally prosecuted or sought death against Mr. Ayestas.

### B.  A Failure to Reach this Claim Would Result in a Miscarriage of Justice

Even in the absence of cause and prejudice, a claimant can secure merits consideration of a constitutional claim by showing that the failure to do so would result in a miscarriage of justice. *See Coleman*, 501 U.S. at 750; *Matchett*, 380 F.3d at 848.  For the same reasons that Mr. Ayestas would satisfy the miscarriage-of-justice exception to the limitations statute, *see supra* at 25*,* he would satisfy the miscarriage-of-justice exception to procedural default.

### <u>PRAYER FOR RELIEF</u>

For all of the above reasons, Mr. Ayestas respectfully asks that the Court:

(1) Issue an order to have him brought before it, to the end that he may be discharged from the unconstitutional confinement and restraint on the bases set forth in this Amended Petition;

(2) Allow Mr. Ayestas to further amend further his Petition after discovery and the investigation based thereupon, and in the event of any other changes in the law or facts relevant to his case;

(3) Allow Mr. Ayestas to further respond to any procedural or affirmative defenses, including assertions of procedural default, and to any other arguments that the Respondent might raise in this action;

(4) Allow Mr. Ayestas to submit further briefing and oral argument related to the precedential and statutory law relevant to his case in light of the record and the allegations raised by his Amended Petition;

(5) Entertain a motion for discovery, pursuant to Rule 6, Rules Governing § 2254 Cases in the United States District Courts;

(6) Entertain a motion to expand the record pursuant to Rule 7, Rules Governing § 2254 Cases in the United States District Courts;

(7) Entertain a motion for evidentiary hearing pursuant to Rule 8, Rules Governing § 2254 Cases in the United States District Courts, and conduct a hearing at an appropriately scheduled time where proof may be offered and argument advanced concerning the allegations set forth in his Amended Petition; and

(8) Grant such other relief as may be necessary and appropriate.

Dated:  September 28, 2021                         Respectfully submitted,

Sheri Lynn Johnson                                 Lee B. Kovarsky
*motion to appear pro hac vice*                    Phillips Black, Inc.
*forthcoming*                                      727 East Dean Keeton Street
Cornell Law School                                 Jon 6.222
240 Myron Taylor Hall                              Austin, TX 78705
Ithaca, NY 14853                                   (434) 466-8257
(607) 255-6478                                     l.kovarsky@phillipsblack.org
slj8@cornell.edu


                                                   Attorneys for Petitioner

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 28th day of September 2021, I electronically filed the above and foregoing document using the CM/ECF system, which automatically sends notice and a copy of the filing to all counsel of record.

*/s/ Lee Kovarsky*