IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| CARLOS MANUEL AYESTAS, | § | |
| Petitioner, | § | |
| | § | |
| v. | § | Civil Action No. 4:09-CV-2999 |
| | § | |
| BOBBY LUMPKIN, Director, | § | (Death Penalty Case) |
| Texas Department of Criminal | § | |
| Justice, Correctional Institutions | § | |
| Division, | § | |
| Respondent. | § | |

**RESPONDENT'S ANSWER AND MOTION FOR
SUMMARY JUDGMENT**

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

JOSH RENO
Deputy Attorney General
For Criminal Justice

EDWARD L. MARSHALL
Chief, Criminal Appeals Division

GWENDOLYN S. VINDELL
Assistant Attorney General
State Bar No. 24088591
Southern ID No. 2202376
   *Counsel of Record*

Post Office Box 12548, Capitol Station
Austin, Texas 78711
Tel.: (512) 936-1400
Fax: (512) 320-8132
Email: *gwendolyn.vindell2@oag.texas.gov*

*Counsel for Respondent*

# TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................... i

INDEX OF AUTHORITIES ................................................................... iii

ANSWER .............................................................................................. 1

JURISDICTION ................................................................................... 2

PETITIONER'S ALLEGATIONS ........................................................ 2

STATEMENT OF THE CASE ............................................................. 3

I.      Facts of Ayestas's Capital Murder ...........................................3

II.     Conviction and Postconviction Proceedings ...........................4

III.    Federal Habeas Litigation Related to the Siegler Memo Claim .............4

ARGUMENT ..................................................................................... 10

I.      Ayestas's Amended Petition Is Successive ........................... 10

II.     Ayestas's Claims Are Time-Barred...................................... 14

      A.     Ayestas's amended petition is untimely because his limitations period expired on September 10, 2009 ..................... 15

      B.     Ayestas does not benefit from a later factual predicate date because both the CCA and the Fifth Circuit have already found him not diligent ................................................................. 16

      C.     Even if a later factual predicate date applied, Ayestas's amended petition is still untimely ............................................... 22

      D.     Ayestas is not entitled to equitable tolling................................. 24

           1.     Ayestas was not diligent..................................................... 24

           2.     Ayestas fails to demonstrate extraordinary circumstances ......................................................................... 30

E.     Ayestas has not demonstrated he is actually innocent of capital murder .................................................................. 33

III.   Ayestas's Claims Are Procedurally Barred ................................ 34

    A.     Ayestas does not prove a miscarriage of justice ........................ 35

    B.     Ayestas does not prove cause and prejudice ........................ 36

       1.     Ayestas fails to establish cause .......................................... 37

       2.     Ayestas fails to demonstrate actual prejudice too ............ 38

IV.   Alternatively, Ayestas's Claims Are Without Merit ............................ 41

    A.     Relevant facts ........................................................................ 41

    B.     Ayestas's Equal Protection claim is *Teague* barred and entirely without merit ................................................................ 46

       1.     Ayestas's Equal Protection claim is *Teague* barred because it is based on his status as an unlawful alien ...... 49

       2.     Even assuming illegal alienage is subject to the same selective-prosecution test as suspect classes, Ayestas fails to show discriminatory effect ........................................ 55

       3.     Ayestas also fails to show any discriminatory purpose related to his citizenship status .......................................... 58

       4.     Ayestas's race-and national origin-discrimination by proxy argument entirely fails to state an Equal Protection claim ................................................................ 60

    C.     Ayestas's Eighth Amendment claim is *Teague* barred and without merit ........................................................................ 65

CONCLUSION ................................................................................ 68

# INDEX OF AUTHORITIES

**Cases**                                                                **Page**

*Ambach v. Norwick*, 441 U.S. 68 (1979) .......... 50

*Balentine v. Thaler*, 626 F.3d 842 (5th Cir. 2010) .......... 35

*Banister v. Davis*, 140 S. Ct. 1698 (2020) .......... 13, 28

*Batson v. Kentucky*, 476 U.S. 79 .......... 38

*Beard v. Kindler*, 558 U.S. 53 (2009) .......... 34

*Bordenkircher v. Hayes*, 434 U.S. 357 (1978) .......... 46, 47

*Bousley v. United States*, 523 U.S. 614 (1998) .......... 33

*Briggs v. Pa. R.R. Co.*, 334 U.S. 304 (1948) .......... 20

*Brown v. Sanders*, 546 U.S. 212 (2006) .......... 65, 66

*Cantu-Tzin v. Johnson*, 162 F.3d 295 (5th Cir. 1998) .......... 29

*Castaneda v. Partida*, 430 U.S. 482 (1977) .......... 57

*Chaidez v. United States*, 568 U.S. 342 (2013) .......... 54

*Coleman v. Johnson*, 184 F.3d 398 (5th Cir. 1999) .......... 24

*Coleman v. Thompson*, 501 U.S. 722 (1991) .......... 34, 35, 36

*CPC Int'l, Inc. v. Northbrook Excess & Surplus Ins. Co.*, 144 F.3d 35 (1st Cir. 1998) .......... 63

*Davis v. United States*, 411 U.S. 233 (1973) .......... 39

*Duncan v. Walker*, 533 U.S. 167 (2001) .......... 15

*Edwards v. Vannoy*, 141 S. Ct. 1547 (2021) .......... 52, 54

*Evans v. Maggio*, 557 F.2d 430 (5th Cir. 1977) .......... 39

*Ex parte Broxton*, 888 S.W.2d 23 (Tex. Crim. App. 1994) .......... 51

iii

*Ex parte Temple*, No. WR-78,545-02, 2016 WL 6903758 (Tex. Crim. App. Nov. 23, 2016) ................................................................................. 61, 62

*Fearance v. Scott*, 56 F.3d 633 (5th Cir. 1995) ................................................. 37

*Felder v. Johnson*, 204 F.3d 168 (5th Cir. 2000) ........................................ 29, 31

*Fierro v. Cockrell*, 294 F.3d 674 (5th Cir. 2002) ........................................ 23, 29

*Fierro v. Johnson*, 197 F.3d 147 (5th Cir. 1999) ............................................. 17

*Fisher v. Johnson*, 174 F.3d 710 (5th Cir. 1999) ............................................ 24

*Fisher v. Kadant, Inc.*, 589 F.3d 505 (1st Cir. 2009) ...................................... 12

*Flores v. Quarterman*, 467 F.3d 484 (5th Cir. 2006) ...................................... 24

*Ford v. Davis*, 910 F.3d 232 (5th Cir. 2018) ............................................. 21, 22

*Furman v. Georgia*, 408 U.S. 238 (1972) ......................................................... 65

*Godfrey v. Georgia*, 446 U.S. 420 (1980) ......................................................... 65

*Godfrey v. Kemp*, 836 F.2d 1557 (11th Cir.) .................................................... 39

*Gonzalez v. Crosby*, 545 U.S. 524 (2005) ................................................... 14, 30

*Goodwin v. Johnson*, 224 F.3d 450 (5th Cir. 2000) ......................................... 20

*Graham v. Richardson*, 403 U.S. 365 (1971) ................................................... 50

*Hardaway v. Davis*, 684 F. App'x 444 (5th Cir. 2017) ..................................... 23

*Hardy v. Quarterman*, 577 F.3d 596 (5th Cir. 2009) .................................. 24, 25

*Harper v. Ercole*, 648 F.3d 132 (2d Cir. 2011) ................................................ 30

*Herrick v. Garvey*, 298 F.3d 1184 (10th Cir. 2002) ......................................... 62

*Hines v. Quillivan*, 982 F.3d 266 (5th Cir. 2020) ............................................ 55

*Holland v. Florida*, 560 U.S. 631 (2010) .................................................... 24, 30

*Huffman v. Wainwright*, 651 F.2d 347 (5th Cir. 1981) ..................................... 39

*Hughes v. Quarterman*, 530 F.3d 336 (5th Cir. 2008) ..................................... 34

iv

*In re Bexar Cty. Criminal Dist. Attorney's Office*, 224 S.W.3d 182 (Tex. 2007) ..................................................................................................... 32

*In re Boshears*, 110 F.3d 1538 (11th Cir. 1997)................................. 19

*In re Davila*, 888 F.3d 179 (5th Cir. 2018) ....................................... 19

*In re Jones*, 998 F.3d 187 (5th Cir. 2021) ........................................ 16

*In re Masterson*, 638 F. App'x 320 (5th Cir. 2016) ........................... 19

*In re Wilson*, 442 F.3d 872 (5th Cir. 2006) ...................................... 27

*In re Young*, 789 F.3d 518 (5th Cir. 2015) ....................................... 19

*Int'l Land Acquisitions, Inc. v. Fausto*, 39 F. App'x 751 (3rd Cir. 2002) ........ 62

*Jackson v. City of Hearne, Tex.*, 959 F.3d 194 (5th Cir. 2021) ........... 47, 55, 56

*Jackson v. Davis*, 933 F.3d 408 (5th Cir. 2019)................................. 24

*Jimenez v. Quarterman*, 555 U.S. 113 (2009)................................... 14

*Johnson v. California*, 543 U.S. 499 (2005)...................................... 53

*Johnson v. Dretke*, 442 F.3d 901 (5th Cir. 2006)............................... 19

*Jones v. Lumpkin*, 22 F.4th 486 (5th Cir. 2022) ............................... 31

*Lambrix v. Singletary*, 520 U.S. 518 (1997) .................................... 54

*Larson v. Valente*, 456 U.S. 228 (1982)........................................... 53

*LeClerc v. Webb*, 419 F.3d 405 (5th Cir. 2005) ................................ 51

*Lott v. Mueller*, 683 F.3d 1230 (9th Cir. 2012) ................................ 30

*Mahone v. Addicks Util. Dist. of Harris Cnty.*, 836 F.2d 921 (5th Cir. 1988) 55

*Marshall v. Lonberger*, 459 U.S. 422 (1983)..................................... 21

*Mathews v. Diaz*, 426 U.S. 67 (1976) ........................................ 50, 52

*Mayle v. Felix*, 545 U.S. 644 (2005)................................................ 15

*McCleskey v. Kemp*, 481 U.S. 279 (1987)...................................*passim*

*McQuiggin v. Perkins*, 569 U.S. 383 (2013).........................................25, 33, 34

*Moore v. Quarterman*, 534 F.3d 454 (5th Cir. 2008).................................37, 40

*Murray v. Carrier*, 477 U.S. 478 (1986).......................................................36, 37

*Nipper v. Snipes*, 7 F.3d 415 (4th Cir. 1993).....................................................63

*Ott v. Johnson*, 192 F.3d 510 (5th Cir. 1999)....................................................25

*Owens v. Boyd*, 235 F.3d 356 (7th Cir. 2000)...................................................19

*Oyler v. Boles*, 368 U.S. 448 (1962).............................................................46, 47

*Pace v. DiGuglielmo*, 544 U.S. 408 (2005)...................................................24, 28

*Palacios v. Stephens*, 723 F.3d 600 (5th Cir. 2013)..........................................28

*Phillips v. United States*, 668 F.3d 433 (7th Cir. 2012)...................................14

*Plyler v. Doe*, 457 U.S. 202 (1982).....................................................................52

*Prible v. Davis*, No. H-09-CV-1896, 2020 WL 2563544 (S.D. Tex. May 20, 2020)...................................................................................................................61

*Pulley v. Harris*, 465 U.S. 37 (1984)..................................................................67

*Rhines v. Weber*, 544 U.S. 269 (2005)........................................................*passim*

*Roberts v. Cockrell*, 319 F.3d 690 (5th Cir. 2003)............................................15

*Samaad v. City of Dallas*, 940 F.2d 925 (5th Cir. 1991)...........................55, 56

*San Martin v. McNeil*, 633 F.3d 1257 (11th Cir. 2011).....................................31

*Sawyer v. Whitley*, 505 U.S. 333 (1992)............................................................35

*Schlup v. Delo*, 513 U.S. 298 (1995).............................................................33, 36

*Schriro v. Summerlin*, 542 U.S. 348 (2004).......................................................52

*Scott v. Johnson*, 227 F.3d 260 (5th Cir. 2000)................................................15

*Smith v. Kemp*, 715 F.2d 1459 (11th Cir.)........................................................39

*Stop the Beach Renourishment, Inc. v. Fla. Dep't of Env't Prot.*, 560 U.S. 702 (2010) ................................................................................................. 55

*Sugarman v. Dowell*, 412 U.S. 634 (1973) ........................................................ 50

*Takahashi v. Fish & Game Comm'n*, 334 U.S. 410 (1948) ............................... 50

*Taylor v. Louisiana*, 419 U.S. 522 (1975) ........................................................ 38

*Taylor v. Charter Med. Corp.*, 162 F.3d 827, (5th Cir. 1998) ................... 63, 64

*Teague v. Lane*, 489 U.S. 288 (1989)............................................... 46, 52, 54, 68

*Toll v. Moreno*, 458 U.S. 1 (1982) ............................................................... 50, 51

*Trimble v. Gordon*, 430 U.S. 762 (1977) .......................................................... 51

*Truax v. Raich*, 239 U.S. 33 (1915) .................................................................. 50

*Turner v. Murray*, 476 U.S. 28 (1986)............................................................. 65

*U.S. Steel, LLC, v. Tieco, Inc.*, 261 F.3d 1275 (11th Cir. 2001)...................... 62

*United States v. Armstrong*, 517 U.S. 456 (1996) .....................................*passim*

*United States v. Frady*, 456 U.S. 152 (1982) ............................................*passim*

*United States v. Lee*, 358 F.3d 315 (5th Cir. 2004) .......................................... 20

*United States v. Locke*, 471 U.S. 84 (1985)...................................................... 30

*United States v. Parham*, 16 F.3d 844 (8th Cir. 1994) ................................... 54

*United States v. Ryan*, 874 F.2d 1052 (5th Cir. 1989) .................................... 67

*United States v. Sine*, 483 F.3d 1021 (9th Cir. 2007)...................................... 62

*United States v. Sparks*, 2 F.3d 574 (5th Cir. 1993) ....................................... 47

*United States v. White*, 928 F.3d 734 (8th Cir. 2019) ..................................... 54

*Vasquez v. Hillery*, 474 U.S. 254 (1986)........................................................... 38

*Wayte v. United States*, 470 U.S. 598 (1985) .............................................*passim*

*Williams v. Whitley*, 994 F.2d 226 (5th Cir. 1993) .......................................... 39

*Wong v. United States*, 163 U.S. 228 (1896) ..................................................... 51

*Woodard v. Thaler*, 702 F.Supp.2d 738 (S.D. Tex. 2010) ................................. 37

*Woodford v. Garceau*, 538 U.S. 202 (2003) ...................................................... 23

*Woodfox v. Cain*, 772 F.3d 358 (5th Cir. 2014) ................................................. 20

*Yick v. Hopkins*, 118 U.S. 356 (1866) ............................................................... 50

## Statutes

28 U.S.C. § 1631 ................................................................................................ 27

28 U.S.C. § 2244(b)(3) ...................................................................................... 14

28 U.S.C. § 2244(b)(3)(A) ............................................................................... 2, 6

28 U.S.C. § 2244(d)(1) ...................................................................................... 14

28 U.S.C. §§ 2244(d)(1)(A) .............................................................................. 14

28 U.S.C. § 2244(d)(1)(D) ...................................................................... 14, 16, 22

28 U.S.C. § 2244(d)(2) ...................................................................................... 15

28 U.S.C. § 2254 .................................................................................................. 2

28 U.S.C. § 2254(e)(1) ........................................................................... 21, 22, 37

Tex. Code Crim. Proc. art. 11.071 § 5(a) ............................................................ 5

## Rules

Fed. R. Civ. P. 10(c) ......................................................................................... 10

Fed. R. Civ. P. 15 ........................................................................................... 5, 10

Fed. R. Civ. P. 59(e) ................................................................................. *passim*

Fed. R. Civ. P. 60(b) ................................................................................. *passim*

Fed. R. Civ. P. 60(b)(6) ...................................................................................... 8

Fed. R. Evid. 201 ............................................................................ 63

Fed. R. Evid. 404(a) ....................................................................... 62

Fed. R. Evid. 801(c) ........................................................................ 62

## Other Authorities

6 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure
     § 1489 (3d ed.)............................................................................. 12, 13

# ANSWER

Petitioner Carlos Manuel Ayestas[1] was properly convicted of and sentenced to death for the brutal murder of sixty-seven-year-old Santiaga Paneque in the course of committing a burglary or robbery. Ayestas has spent twenty-five years unsuccessfully challenging his conviction and sentence in both state and federal court. In fact, this Court has twice entered final judgment denying Ayestas's claims—the first time in 2011 and the second time in 2014 following a limited remand. After the Court's second final judgment, Ayestas filed a post-judgment motion seeking to litigate new claims predicated on a capital murder summary, the so-called "Siegler memo," he discovered in the files of the Harris County District Attorney's Office (Harris County) in December 2014. Ayestas unsuccessfully litigated procedural issues attendant to those claims for several years.

But in January 2021, Ayestas returned once more to federal court. This time, the Court found merit to Ayestas's arguments and ostensibly reopened the proceedings so that Ayestas could file an amended petition twelve years after his initial petition.[2] Ayestas filed that amended petition in September

---

[1]     Ayestas's real name is Dennis Zelaya Corea, but he was charged and convicted under the name Carlos Ayestas.

[2]     As the Director argued in his motion for reconsideration of this Court's order granting Ayestas's motion for relief from judgment, and as explained further below, this Court has not vacated its underlying final judgment. By filing the instant

2021, raising two claims related to the Siegler memo. However, Ayestas fails to demonstrate that he is entitled to relief on his successive, untimely, procedurally barred, and meritless claims. Therefore, the Director respectfully requests that Ayestas's amended petition for a writ of habeas corpus be denied with prejudice and that a certificate of appealability (COA) also be denied.

## JURISDICTION

Ayestas seeks habeas corpus relief in this Court pursuant to 28 U.S.C. § 2254, which provides the Court with jurisdiction over the subject matter and the parties, as Ayestas was convicted within this Court's jurisdiction. This Court, however, does not have subject matter jurisdiction to entertain Ayestas's amended petition because it is successive. 28 U.S.C. § 2244(b)(3)(A).

## PETITIONER'S ALLEGATIONS

The Director understands Ayestas to assert two grounds for relief.[3] First, Ayestas claims that the Equal Protection Clause of the Fourteenth Amendment was violated by the State's decision to seek death against Ayestas based on his alienage, race, and/or national origin. Am. Pet. 10–16. Second,

---

responsive pleading, the Director does not waive his previously raised objections to these proceedings. *See* Resp't's Mot. Recons. 5–9, ECF No. 98.

[3]     Ayestas purports to "incorporate by reference" his original petition. First Am. Pet. for Writ of Habeas Corpus ("Am. Pet.") at 1, ECF No. 101. But the Court has not reopened final judgment with respect to any of Ayestas's underlying claims, to the extent it has reopened final judgment at all. Thus, Ayestas's initial federal habeas petition is not "live" at this juncture in the proceedings.

Ayestas claims that the Eighth Amendment's prohibition on cruel and unusual

punishment was violated by the State's decision to seek death against Ayestas

based on the same classifications. *Id*. at 16–18.

## STATEMENT OF THE CASE

### I.   Facts of Ayestas's Capital Murder

The Fifth Circuit has previously summarized the facts surrounding the

capital murder of Ms. Paneque as follows:

> On September 5, 1995, Carlos Manuel Ayestas and two other
> men[4] entered into the Houston, Texas home of Santiaga Paneque,
> to commit a robbery. Paneque was killed during the robbery. Her
> son later discovered her body lying in a pool of blood on the floor of
> the master bathroom. She had been bound with the cord of a clock
> as well as by duct tape. Duct tape had also been placed over her
> eyes and around her neck. The wounds on her face resulted from a
> severe beating. The autopsy showed that she had numerous
> fractures as well as internal hemorrhaging. These injuries were
> inflicted prior to death. While they were serious, none were fatal.
> Rather, Paneque was killed by strangulation.
>
> The roll of duct tape used to bind Paneque was found at the scene.
> Ayestas's fingerprints were on the roll and also on the pieces of
> tape which were used to bind Paneque's ankles.
>
> A few weeks later, while in Kenner, Louisiana, Ayestas confided to
> another man that he had killed a woman in Houston in the course
> of a robbery earlier that month. Ayestas sought the man's
> assistance in killing his two accomplices because he feared they
> would say too much. If the man did not help, Ayestas said he would
> kill him as well. To make his point, he brandished a machine gun.

---

4    Ayestas's co-defendants were Roberto Didier Meza and Rolando Gutierrez
AKA Federico Zaldivar. *See Ayestas v. State*, No. 72,928, slip op. 1 (Tex. Crim. App.
Nov. 4, 1998) (*Ayestas v. State*) (unpublished); *see also* ECF No. 82-1, at 2.

After Ayestas went to sleep, the man called the police. Ayestas was arrested and in time returned to Texas for prosecution.

*Ayestas v. Thaler*, 462 F. App'x 474, 476 (5th Cir. 2012) (*Ayestas I*) (per curiam) (unpublished).

## II.  Conviction and Postconviction Proceedings

Ayestas was convicted and sentenced to death on July 9, 1997, for Ms. Paneque's murder. Clerk's Record (CR) 272–73. The Texas Court of Criminal Appeals (CCA) affirmed Ayestas's conviction and sentence on direct appeal, *Ayestas v. State*, No. 72,928, slip op. 2 (unpublished), and then later denied him state habeas relief, *Ex parte Ayestas*, No. WR-69,674-01, 2008 WL 4151814, at *1 (Tex. Crim. App. Sept. 10, 2008) (unpublished).

## III.  Federal Habeas Litigation Related to the Siegler Memo Claim

Ayestas filed his initial petition for federal habeas relief in 2009. Fed. Writ Pet., ECF No. 1. This Court initially denied Ayestas federal habeas relief on January 26, 2011, Mem. Op. & Order, ECF No. 19, and entered final judgment on that date, Final J., ECF No. 20. Following a limited remand related to ineffective-assistance-of-trial-counsel (IATC) claims, this Court denied Ayestas relief on the IATC claims and issued final judgment for the second time on November 18, 2014. Final J., ECF No. 52.

On December 16, 2014, Ayestas filed a motion under Federal Rule of Civil Procedure 59(e) related to the denied IATC claims. Pet'r's Mot. Alter or

Am. J., ECF No. 53. While this motion was pending, Ayestas's federal habeas counsel reviewed Harris County's file and discovered the Siegler memo. Pet'r's Mot. Leave Amend Original Pet., ECF No. 54. On January 9, 2015, Ayestas moved to amend his original habeas petition under Federal Rule of Civil Procedure 15 to include Eighth and Fourteenth Amendment claims based on the Siegler memo. *Id.* Yet another five days after that, Ayestas filed a self-styled "supplemental" Rule 59(e) motion that argued for inclusion of these new claims, Supp. Pet'r's Mot. Am. J., ECF No. 55 (Supp. Rule 59(e) Mot.), as well as a motion to stay and hold the petition in abeyance while he exhausted his new claims in state court, Pet'r's Mot. Stay, ECF No. 56.

This Court denied Ayestas's motion to amend his federal habeas petition and motion for a stay under *Rhines v. Weber*, 544 U.S. 269 (2005). Order, ECF No. 63. As to the amendment, the Court held such an amendment would constitute a successive petition, and amendment would thus be futile. *Id.* at 3–4. As to the *Rhines* stay, the Court noted that a stay is inappropriate when a claim is "plainly meritless." *Id.* at 5. Analyzing Ayestas's claim under Texas's abuse-of-the-writ statute, Tex. Code Crim. Proc. art. 11.071 § 5(a), the Court held Ayestas failed to show the Siegler memo could not have been previously discovered, and absent that showing, Texas courts would not consider Ayestas's subsequent application. ECF No. 63, at 5–6.

This Court later denied Ayestas's Rule 59(e) and "supplemental" Rule 59(e) motions, holding that the latter was a second or successive petition because it fell outside the Fifth Circuit's limited remand order. Order 2–3, ECF No. 64. Consequently, the Court concluded it was without jurisdiction to hear Ayestas's new claims unless and until Ayestas obtained authorization from the Fifth Circuit under 28 U.S.C. § 2244(b)(3)(A). *Id*. at 3–4.

On appeal, the Fifth Circuit declined to grant Ayestas a COA on his request for a *Rhines* stay. *Ayestas v. Stephens*, 817 F.3d 888, 898–901 (5th Cir. 2016) (*Ayestas II*), *vacated in part*, 138 S Ct. 1080 (2018). The Fifth Circuit agreed with this Court's conclusion that adding claims unrelated to the subject of the remand would violate the mandate rule. *Id*. at 899. It also agreed that a stay would be futile because Texas courts would not have considered Ayestas's second habeas application. *Id*. at 900–901. In doing so, the Fifth Circuit found Ayestas had not exercised reasonable diligence in attempting to discover the Siegler memo earlier, and this Court therefore did not abuse its discretion in denying Ayestas's motion for a stay and abeyance. *Id*. at 901.

Ayestas moved for panel and en banc rehearing. The Fifth Circuit denied rehearing en banc, and the panel issued a short opinion on rehearing. *Ayestas v. Stephens*, 826 F.3d 214, 214 (5th Cir. 2016) (*Ayestas III*). The Fifth Circuit rejected Ayestas's characterization of their holding under *Rhines* as applying to *federal* habeas counsel's diligence, noting that they had been referring not

"to the diligence of federal habeas counsel in locating the [Siegler] memo," but rather, consistent with *Rhines* and the Texas abuse-of-the-writ statute, to the diligence of trial counsel. *Id*. at 215.

Ayestas then petitioned the Supreme Court for a writ of certiorari. The Supreme Court granted certiorari on an unrelated issue but denied review of the Siegler memo claim. *Ayestas v. Davis*, 137 S. Ct. 1433 (2017). The Supreme Court eventually reversed the Fifth Circuit's opinion on the unrelated issue and remanded the case for proceedings consistent with its opinion. *Ayestas v. Davis*, 138 S. Ct. 1080, 1085 (2018). On remand, the parties submitted supplemental briefing. Ayestas, again raising issues outside the limited scope of a higher court's mandate, continued to litigate issues related to the Siegler memo. The Fifth Circuit did not address Ayestas outside-the-scope-of-the-mandate arguments. *See generally Ayestas v. Davis*, 933 F.3d 384, 387 (5th Cir. 2019) (*Ayestas IV*). The Supreme Court declined certiorari review. *Ayestas v. Davis*, 140 S. Ct. 1107 (2020).

On August 25, 2020—about six months after the Supreme Court denied certiorari review—Ayestas filed a subsequent state habeas application in the CCA, raising his Siegler-memo claims in the state courts for the first time. SHCR-02 at 2;[5] *see Ex parte Ayestas*, No. WR-69,674-02, 2020 WL 7234770, at

---

[5]     "SHCR-01" refers to the documents and pleadings filed in Ayestas's first-in-time state habeas proceeding, or state habeas clerk's record, preceded by volume

\*1 (Tex. Crim. App. Dec. 9, 2020) (unpublished). The CCA dismissed Ayestas's application as an abuse of the writ without considering the merits of the claims. *Ex parte Ayestas*, 2020 WL 7234770, at \*1. Two weeks later, Ayestas filed a suggestion that the CCA reconsider, on its own motion, the dismissal of his application. The CCA denied Ayestas's suggestion for reconsideration on January 27, 2021. Pet'r's Mot. Relief from J., Ex. C, ECF No. 82-3.

Nine days after that, Ayestas filed a motion for relief from judgment under Federal Rule of Civil Procedure 60(b)(6). ECF No. 82. This Court granted Ayestas's motion "[t]o the extent that [it] seeks relief from the denial of his motion *to amend his Rule 59(e) motion*." Mem. Op. & Order 8, ECF No. 93 (emphasis added). Though the Court's order did not explicitly reopen the proceedings—limited as it was to the denial of a "motion to amend" the Rule 59(e) motion—the order seemed to suggest Ayestas would be permitted to pursue further factual development on the Siegler-memo claims. *See id*. To that end, the Court ordered the parties to submit either joint or competing proposed scheduling orders. *Id*. at 8–9. The parties did not agree, so each submitted his own scheduling order. ECF Nos. 94, 95. In an unreasoned order, the Court adopted Ayestas's scheduling approach, directing Ayestas to "file his

number and followed by page numbers. "SHCR-02" refers to the transcript compiled by the state court in Ayestas's subsequent state habeas proceeding, followed by the page number. The latter record will be filed as additional state court records simultaneous to this response.

first amended petition by September 28, 2021[,]" and for the parties to submit a proposed schedule. Order, ECF No. 96.

Given a pronounced dispute over the meaning of the Court's order granting Rule 60(b) relief—specifically whether and when it had reopened judgment—the Director asked the Court to enter a new order that clearly identified the procedural posture and legal standards governing the case and authorizing the filing of a new federal habeas petition years after final judgment had been twice entered. Resp't's Mot. Recons., ECF No. 98. The Director also filed a motion to defer the entry of a scheduling order contingent on resolution of the motion to reconsider. ECF No. 99. Ayestas opposed both of the Director's motions, Pet'r's Opp'n, ECF No. 102, and filed his first amended petition in accordance with the Court's scheduling order, Am. Pet.

The Court denied the Director's motion to reconsider, reasoning that many of the arguments had either been previously rejected or could be raised later. Order, ECF No. 107. Regarding whether judgment had actually been reopened, the Court clarified that its Rule 60(b) order "vacated the court's previous order denying Ayestas's motion to amend and granted him leave to file an amended petition for writ of habeas corpus." *Id*. at 2. The Court did not specify to which "motion to amend" it was referring. The Court also did not state that it had entered an order reopening judgment or cite to any such order. Regardless, the parties submitted a joint proposed order pursuant to the

9

Court's order on November 12, 2021. Sched. Order, ECF No. 108; Joint Prop.

Sched. Order, ECF No. 109. This response follows.

## ARGUMENT

### I.   Ayestas's Amended Petition Is Successive.

There is no question that Ayestas's case presents a number of procedural issues, not all of which this Court has straightforwardly addressed. The Director has argued that many of those complexities barred: amendment of his underlying petition under Rule 15, *see* ECF No. 59; a stay and abeyance of his federal proceedings, *see id.*; relief under Rule 59(e), *see* ECF No. 60; and relief under Rule 60(b), *see* ECF No. 88. The Director also outlined the procedural complexities when he asked the Court to reconsider allowing Ayestas to file an amended federal habeas petition long after final judgment has twice been issued. *See* ECF No. 98. In the interest of brevity and to not further belabor the issue, the Director incorporates by reference all arguments raised in those pleadings into this response. *See* Fed. R. Civ. P. 10(c).

The Director addresses here only the following point—*not once* in all the Court's orders addressing Ayestas's myriad attempts at post-judgment relief has this Court explicitly stated that it has reopened final judgment. Rather, in 2015, the Court agreed with the Director that Ayestas should not be granted post-judgment amendment, Rule 59(e) relief, or a stay. *See* ECF Nos. 63, 64. But seven years later, the Court did an about-face, apparently granting nearly

all the relief Ayestas has ever requested (save a stay of the proceedings and relief from the underlying judgment) in one fell swoop. *See* ECF Nos. 93, 96, 107. The end result is that Ayestas has been permitted to amend his federal petition thirteen years after he filed it and seven years after this Court issued final judgment for the *second* time.

It is unclear how the proceedings arrived at this particular posture. The Court's order granting Rule 60(b) relief was by its own terms limiting—it granted such relief only "[t]o the extent that Ayestas's [Rule 60(b)] motion [sought] relief from the denial of his motion to amend his Rule 59(e) Motion." ECF No. 93, at 8. As the Director has noted, this language was puzzling, as Ayestas *never filed* a "motion to amend his Rule 59(e) motion."[6] Moreover, the Court never denied Ayestas the ability to amend his Rule 59(e) motion; it denied his supplemental Rule 59(e) motion outright because it sought to add claims that exceeded the scope of the mandate and was successive. ECF No. 64, at 3. Importantly, nowhere in the Court's Rule 60(b) order did the Court say that it was reopening judgment; it simply ordered the parties to submit a scheduling order. *See* ECF No. 93, at 8.

---

[6]     Instead, Ayestas filed three separate motions related to the Siegler memo: 1) a motion to amend his *petition* under Rule 15; 2) a "supplemental" motion for relief from judgment under Rule 59(e); and 3) a motion for stay and abeyance under *Rhines*. *See* ECF Nos. 54, 55, 56.

The Court's order was interpreted by the parties in wildly divergent ways, precipitating the Director's motion to reconsider. ECF No. 98. But the Court's order denying the Director's motion to reconsider did not shed any more light on when and where final judgment had been reopened. Indeed, the Court disposed of the Director's many arguments for why Ayestas filing an amended petition at this juncture was inappropriate in a single line: "The [Rule 60(b)] order vacated the court's previous order denying Ayestas'[s] *motion to amend* and granted him leave to file an amended petition for a writ of habeas corpus" raising Siegler-memo claims. *See* ECF No. 107, at 2 (emphasis added).

But the Court's reference to a "motion to amend" is troubling for either of two reasons. Either: the Court is still referring to a motion "to amend the Rule 59(e) motion" when such a motion was never filed or denied. This means the Court could only be referencing its denial of Ayestas's "supplemental" 59(e) motion, even though reopening of that denial was not a remedy Ayestas asked for. *See generally* ECF No. 82. Regardless, the Court never then *granted* Rule 59(e) relief, a necessary prerequisite to reopening judgment and permitting amendment of the underlying petition. *See Fisher v. Kadant, Inc.*, 589 F.3d 505, 508 (1st Cir. 2009) ("If, however, a motion to amend is filed after the entry of judgment, the district court lacks authority to consider the motion under Rule 15(a) unless and until the judgment is set aside."); 6 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1489 (3d ed.) ("To hold

otherwise would enable the liberal amendment policy of Rule 15(a) to be employed in a way that is contrary to the philosophy favoring finality of judgments and the expeditious termination of litigation."). Because the Court did not grant Rule 59(e) relief and did not reopen final judgment, the Court lacks authority to even consider Ayestas's amended petition.

Or two: the Court is referring to Ayestas's Rule 15 motion to amend his *petition. See* ECF No. 54. But it is difficult to see how Ayestas's Rule 60(b) motion could've possibly served to reopen the denial of a post-judgment motion to amend when it was predicated on *Banister*,[7] an opinion with no application to motions under Rule 15. Indeed, Ayestas did not argue that *Banister* voided this Court's denial of his Rule 15 motion; he argued it voided the Court's characterization of his supplemental Rule 59(e) motion as successive. *See generally* ECF No. 82. In any event, because, as discussed above, a Court does not even have authority to consider a post-judgment Rule 15 motion, the granting of such a motion cannot reopen proceedings. 6 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1489 (3d ed.)

In either circumstance, the result is the same—judgment has never been reopened. And because judgment has never been reopened, Ayestas's amended petition is, on its face, a successive federal habeas petition that this Court lacks

---

[7]     *Banister v. Davis*, 140 S. Ct. 1698 (2020).

jurisdiction to consider. *See Gonzalez v. Crosby*, 545 U.S. 524, 531–32 (2005); *see also Phillips v. United States*, 668 F.3d 433, 435 (7th Cir. 2012) ("Nothing in the language of § 2244 or § 2255 suggests that the time-and-number limits are irrelevant as long as a prisoner keeps his initial request alive through motions, appeals, and petitions. . . . Final judgment marks a terminal point."). Ayestas has—as he's had since 2015 when this Court first pointed it out, *see* ECF No. 64, at 3—an avenue for properly raising his new claims: he may seek authorization from the Fifth Circuit to file a successive petition. 28 U.S.C. § 2244(b)(3). Because he has not, this Court cannot consider Ayestas's claims. His petition should thus be dismissed.

## II.   Ayestas's Claims Are Time-Barred.

"The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) establishes a [one]-year time limitation for a state prisoner to file a federal habeas corpus petition. That year runs from the latest of four specified dates." *Jimenez v. Quarterman*, 555 U.S. 113, 114 (2009) (citing 28 U.S.C. § 2244(d)(1)). Only two are applicable here: Ayestas must show he is timely under either the conviction finality or the factual predicate prongs. *See* §§ 2244(d)(1)(A), (D). He cannot, and he fails to demonstrate that he is entitled to equitable tolling. Thus, his claims must be dismissed as untimely.

### A.   Ayestas's amended petition is untimely because his limitations period expired on September 10, 2009.

Ayestas's conviction became final on February 2, 1999, when the time for seeking certiorari review on direct appeal expired. *See Roberts v. Cockrell*, 319 F.3d 690, 693–95 (5th Cir. 2003) (finality determined by expiration of time for filing further appeals); Sup. Ct. R. 13.1 (petition for writ of certiorari must be filed within 90 days after entry of state-court-of-last-resort judgment). Before the limitations period began to run in this case, however, Ayestas filed his initial state habeas application on December 9, 1998, 1.SHCR-01 at 2, which tolled the limitations period, § 2244(d)(2), until September 10, 2008, *id*. at cover. Thus, Ayestas had until September 10, 2009, to raise his instant claims.

Neither Ayestas's initial federal petition nor his subsequent state habeas application toll. *Duncan v. Walker*, 533 U.S. 167, 181 (2001) (federal habeas petition "is not an 'application for State post-conviction or other collateral review' within the meaning" of § 2244(d)(2)"); *Scott v. Johnson*, 227 F.3d 260, 263 (5th Cir. 2000) (state habeas application filed after expiration of limitations period does not toll). And Ayestas's claims do not relate back to that original petition because they differ in time and type from the claims raised therein. *Mayle v. Felix*, 545 U.S. 644, 650 (2005) ("An amended habeas petition . . . does not relate back (and thereby escape AEDPA's one-year time limit) when it asserts a new ground for relief supported by facts that differ in

15

both time and type from those the original pleading set forth."). Thus, Ayestas's amended petition, filed on September 28, 2021, was over twelve years too late.

**B.    Ayestas does not benefit from a later factual predicate date because both the CCA and the Fifth Circuit have already found him not diligent.**

Ayestas attempts to save the timeliness of his claims by arguing that his limitations period should run from December 22, 2014, the day he discovered the Siegler memo in Harris County's file. *See* Am. Pet. 19; § 2244(d)(1)(D). But to benefit from that later factual predicate date, Ayestas must establish that he could not have discovered the memo—prepared pre-trial in 1995 and eventually located in the State's file provided to Ayestas upon request—sooner. *See In re Jones*, 998 F.3d 187, 190 (5th Cir. 2021) ("Jones points to no factual predicate discovered in the last year that could not have been discovered earlier through the exercise of due diligence to support his intellectual disability claim."). Ayestas's argument on this is three-fold: 1) Harris County withheld it as work product; 2) the Director "conceded" that Harris County withheld it as work product; and 3) the law treats it as work product that should have been withheld. *See* Am. Pet. 19–21. But there are several problems with Ayestas's argument.

First, Harris County, who is not a party in this case,[8] has never said *anything* in these proceedings, and that they may have withheld the memo under work-product privilege in *other* cases, *see id.* at 20–21, doesn't prove that they did the same here. Ayestas has not once in the nearly seven years he has been litigating this issue offered any evidence that Harris County asserted work product privilege over the Siegler memo in this case, much less that they withheld it from trial or postconviction counsel on that basis. Indeed, there is one important difference between this case and any others in which they have withheld such memos as work product: The Siegler memo was, in fact, discoverable and contained within the available-upon-request State's file.

Second, whether the law *should* treat the capital summary memo as undisclosable work product has no bearing on whether Harris County *in fact* withheld the memo as such. And it certainly has no bearing on *when* the memo ended up in the file to be discovered by Ayestas in December 2014. In this, Ayestas cannot escape a fact that he has failed to account for in seven years:

---

[8]     Ayestas's continuous assertion that the Director has treated the Siegler memo as undisclosed work product is wrong. Am. Pet. 19. The Director has never conceded that the memo was *withheld* as work product. And in any event, Ayestas obfuscates a key point: the Director of TDCJ and Harris County are two distinct entities. *Fierro v. Johnson*, 197 F.3d 147, 155 (5th Cir. 1999) ("The attorneys for the Texas Department of [Criminal Justice] in a federal habeas case do not act as prosecutors of the crime investigated by the law enforcement officers."). The Director cannot represent on another agency's behalf how it maintains its files, or when it deems work product disclosable, absent an express representation from that agency. Here, the memo was *disclosed.*

He wholly fails to establish that the memo was *undiscoverable* at any point before December 22, 2014. *See* ECF No. 63, at 4 (holding Ayestas did "not allege that the document could not have been discovered previously through the exercise of due diligence" in that he specifically did "not allege that the prosecutor's file was previously unavailable to him, or that the document was omitted from the file when it was produced"); *Ayestas II*, 817 F.3d at 900 (finding Ayestas had "never suggest[ed] he sought to examine the prosecution's file prior to the December 22 search that uncovered the memorandum"). And he fails to explain why he waited until *after* this Court entered judgment to request to view Harris County's file, even though he was required to diligently pursue postconviction relief and even though final judgment imposes many jurisdictional and procedural barriers. That is, despite both this Court's and the Fifth Circuit's helpful attempts to offer practical ways he could establish diligence prior to December 2014, Ayestas has not once given an explanation. He instead suggests that the memo was in the file on December 22, 2014, and it was thus there that day and, by implication, on no day before that.

But the Fifth Circuit has already rejected Ayestas's tautology for what it is—"circular and without merit":

> Of course, had Ayestas known the memorandum was in the file he would have no doubt searched it, but the point of reasonable diligence is to ensure that such evidence is found when it is unclear where such evidence may lie. Ayestas's assumption does not serve

to excuse his duty to secure information in the possession of the prosecution.

*Ayestas II*, 817 F.3d at 901. Ayestas's reliance on the date he actually discovered the evidence is insufficient to show that it couldn't have been discovered sooner. *See In re Davila*, 888 F.3d 179, 186 (5th Cir. 2018) (rejecting argument that diligence in investigating potentially suppressed evidence "corresponds directly with the date of discovery"); *In re Masterson*, 638 F. App'x 320, 327 (5th Cir. 2016) (unpublished) ("Masterson offers nothing to explain why he now knows about Dr. Shrode's deficiencies but could not have discovered those problems by" the time he filed an amended petition); *In re Young*, 789 F.3d 518, 528 (5th Cir. 2015) ("[T]his means the date a petitioner is on notice of the facts which would support a claim, not the date on which the petitioner has in his possession evidence to support his claim."); *Johnson v. Dretke*, 442 F.3d 901, 906–08 (5th Cir. 2006); *Owens v. Boyd*, 235 F.3d 356, 359 (7th Cir. 2000) ("[T]he time commences when the factual predicate 'could have been discovered through the exercise of due diligence,' not when it was actually discovered by a given prisoner," or "when the prisoner recognizes [the] legal significance [of important facts]."); *In re Boshears*, 110 F.3d 1538, 1540 (11th Cir. 1997) ("An application that merely alleges that the applicant did not actually know the facts underlying his or her claim does not pass this [diligence] test.").

Third, this Court is bound by the Fifth Circuit's determination that Ayestas "did not exercise due diligence in attempting to discover the memorandum earlier."[9] *Ayestas II*, 817 F.3d at 901. "[A]n issue of fact or law decided on appeal may not be reexamined either by the district court on remand or by the appellate court on subsequent appeal." *Woodfox v. Cain*, 772 F.3d 358, 370 (5th Cir. 2014) (quoting *United States v. Lee*, 358 F.3d 315, 320 (5th Cir. 2004)); *cf. Briggs v. Pa. R.R. Co.*, 334 U.S. 304, 306 (1948) ("In its earliest days this Court consistently held that an inferior court has no power or authority to deviate from the mandate issued by an appellate court."). Diligence is a factual issue relevant to both entitlement to a stay or timeliness. This Court cannot look past that factual determination, especially where, as here, Ayestas has still offered no new evidence or law justifying departure from the Fifth Circuit's decision. *See Goodwin v. Johnson*, 224 F.3d 450, 457–58 (5th Cir. 2000) (a request to revisit a prior decision should be declined, unless: 1)

---

[9]     Ayestas suggests that the Fifth Circuit "[went] out of [its] way to note the post-discovery diligence of his federal habeas counsel" when it issued its revised opinion on rehearing. *See* Am. Pet. 23. He is wrong. The Fifth Circuit was merely responding to Ayestas's misunderstanding of its original opinion as having held that "because federal habeas counsel did not locate the Siegler Memo sooner, it was insufficiently diligent under" Section 5. *Ayestas III*, 826 F.3d at 215. The Fifth Circuit clarified: "We were not, though, referring to the diligence of federal habeas counsel in locating the memo. It was the diligence of Ayestas's trial counsel that we were describing. Our analysis is consistent with *Rhines*." *Id.* The Court did not "disclaim any criticism of post-conviction counsel's diligence," Am. Pet. 23; it made no determination one way or the other about federal habeas counsel's diligence. Ayestas's reading of the Fifth Circuit's opinion may reflect *his* opinion, but it is not the *Fifth Circuit*'s opinion.

the evidence on a subsequent trial was substantially different, 2) there is intervening, contrary controlling authority; or 3) the decision was clearly erroneous and would work manifest injustice).

Fourth, the Court must similarly give § 2254(e)(1) deference to the CCA's implicit factual determination that Ayestas wasn't diligent. Indeed, the Fifth Circuit has done so in precisely these circumstances. In *Ford v. Davis*, the Fifth Circuit held that, where the CCA had dismissed Ford's state habeas application as an abuse of the writ, the CCA had "necessarily found that Ford knew or could have reasonably known about the [factual basis of his claims] before filing his first petitions." 910 F.3d 232, 235 (5th Cir. 2018). "That implicit factual finding is subject to [§ 2254(e)(1)'s] presumption of correctness," requiring rejection of Ford's factual predicate argument. *Id*. at 235–36. The Fifth Circuit found insufficient Ford's "bare assertion" that he learned of the factual basis of his claims by reading trial counsel's affidavits "[b]ecause the state court would have considered Ford's habeas petitions had it believed his testimony," but instead, the CCA's "failure to grant relief [is] tantamount to an express finding against [his] credibility." *Id*. (quoting *Marshall v. Lonberger*, 459 U.S. 422, 433 (1983)). "Such a credibility determination made on the basis of conflicting evidence [is] entitled to a strong presumption of correctness and [is] virtually unreviewable by the federal courts." *Id*. at 235–36 (cleaned up).

21

Here, the CCA necessarily found that Ayestas was not diligent in raising the Siegler-memo claims. *Ex parte Ayestas*, 2020 WL 7234770, at *1. This implicit factual determination is entitled to § 2254(e)(1)'s presumption of correctness. Importantly, the CCA rejected Ayestas's bald assertions that the work product doctrine prevented him from finding the memo sooner. *See* SHCR-02 at 32–39 (arguing Siegler memo was unascertainable because it was privileged work product and that he was diligent). This is tantamount to an express, negative credibility finding that is virtually unreviewable by this federal court and that Ayestas has failed to rebut. *See Ford*, 910 F.3d at 235–36. In sum, Ayestas wholly fails to establish that he was diligent in discovering the factual basis of his claims, especially in light of the Fifth Circuit's explicit determination and the CCA's implicit determination that he was not. As such, § 2244(d)(1)(D) does not apply, and Ayestas's amended petition is time-barred.

## C. Even if a later factual predicate date applied, Ayestas's amended petition is still untimely.

Even if Ayestas's limitations period began to run from December 22, 2014, Ayestas would have had one-year from that date, or until December 22, 2015, to raise his Siegler-memo claims in federal court. Ayestas did not file his amended petition until September 28, 2021, and he gets no tolling for his initial federal petition or his subsequent state habeas application. *See* Argument II.A, *supra*. Thus, Ayestas's claims were raised almost six years too late.

Ayestas concedes that, if the amended petition does not "relate back" to January 9, 2015—the date he first sought leave to amend his federal petition with the Siegler-memo claims—then his one-year limitations period expired during federal habeas litigation. Am. Pet. 19. Thus, he argues, his supposed diligence in this case should allow the Court to relate his amended petition back to January 9, 2015, which would make him timely. Am. Pet. 19.

But the limitations clock only stops upon the filing of a petition seeking merits adjudication of a claim, not anything else less than that. *See Woodford v. Garceau*, 538 U.S. 202, 208 (2003) ("[A] [federal] habeas suit begins with the filing of an application for habeas corpus relief—the equivalent of a complaint in an ordinary civil case."); *Hardaway v. Davis*, 684 F. App'x 444, 448 (5th Cir. 2017) (unpublished) (concluding that a motion for extension of time filed within the limitations period is insufficient to meet the limitations deadline); *Fierro v. Cockrell*, 294 F.3d 674, 680–81 (5th Cir. 2002) (*Fierro II*) (holding that motion for authorization seeking permission to raise a successive federal petition "does not satisfy the one-year statute of limitations under the AEDPA" because such motion "is merely a preliminary motion that does not itself initiate proceedings"). And his instant claims do not relate back to his *original* petition because they differ in time and type from the claims raised therein. *See* Argument II.A, *supra*. Thus, his amended petition is untimely.

23

### D.     Ayestas is not entitled to equitable tolling.

A petitioner can demonstrate entitlement to equitable tolling by showing "'(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way' and prevented timely filing." *Holland v. Florida*, 560 U.S. 631, 649 (2010) (quoting *Pace v. DiGuglielmo*, 544 U.S. 408, 418 (2005)). Equitable tolling is, as Ayestas recognizes, a fact- and case-specific inquiry. *Jackson v. Davis*, 933 F.3d 408, 410 (5th Cir. 2019); *Fisher v. Johnson*, 174 F.3d 710, 713 (5th Cir. 1999). But it is available "only in rare and exceptional circumstances." *Jackson*, 933 F.3d at 410 (quoting *Hardy v. Quarterman*, 577 F.3d 596, 598 (5th Cir. 2009) (per curiam)). It principally applies where the petitioner is "actively misled by the defendant about the cause of action or is prevented in some extraordinary way from asserting his rights." *Flores v. Quarterman*, 467 F.3d 484, 487 (5th Cir. 2006) (quoting *Coleman v. Johnson*, 184 F.3d 398, 402 (5th Cir. 1999)). In other words, "[a] petitioner's failure to satisfy the statute of limitations must result from external factors beyond his control; delays of the petitioner's own making do not qualify." *Jackson*, 933 F.3d at 410 (quoting *Hardy*, 577 F.3d at 598). That's because "[e]quity is not intended for those who sleep on their rights." *Hardy*, 577 F.3d at 598 (cleaned up). And importantly, it is Ayestas's burden to establish that he is entitled to equitable tolling. *See Pace*, 544 U.S. at 418.

Here, Ayestas argues he is entitled to equitable tolling because he has diligently pursued his rights. Am. Pet. 21–23. He also believes two extraordinary circumstances prevented him from filing: 1) the "mistaken application of federal law that *Banister* corrected," and 2) the Director's alleged misrepresentation to the courts about the availability of the Siegler memo, which he thinks "negatively affect[ed] their willingness" to review his claims. *Id.* at 23–24. Ayestas finally argues that he is entitled to equitable tolling under *McQuiggin v. Perkins*, 569 U.S. 383 (2013). *Id.* at 24–25. But Ayestas's case does not present the necessary "rare and exceptional circumstances" to merit any tolling. *Ott v. Johnson*, 192 F.3d 510, 513 (5th Cir. 1999).

### 1.   Ayestas was not diligent.

Ayestas has failed to diligently pursue relief. Initially, the Fifth Circuit and CCA have already found that Ayestas was not diligent in discovering his claims in the first place. *See* Argument II.B, *supra*. Because he was not diligent in attempting to discover his claims, he does not benefit from either a later factual predicate date or equitable tolling for the time during which the claim was undiscovered by him. *Hardy*, 577 F.3d at 598 ("[E]quity is not intended for those who sleep on their rights."). Thus, his amended petition remains untimely because it was filed over a decade too late.

But even after Ayestas discovered the Siegler memo, Ayestas was not diligent. In the over 6 years since he learned of the memo's existence, he spent

well over a year—i.e., longer than the limitations period—*not* actively litigating the claim. That is, 18 days elapsed between the discovery of the memo and his first attempt to raise the issue in federal court. *See* ECF No. 54 (filed January 9, 2015). He filed no state or federal litigation for the 377 days between when the Fifth Circuit rightly ignored his procedurally improper Siegler-memo argument on remand from the Supreme Court[10] and when he ultimately filed a subsequent *state* habeas application in the CCA. *Compare Ayestas IV*, 933 F.3d at 384 (decision rendered July 31, 2019), *with* Pet. Writ Cert. 16–34, *Ayestas*, 140 S. Ct. at 1107 (petition filed October 29, 2019, raising no issues related to the Siegler memo), *and* SHCR-02 at 2 (subsequent state habeas application filed August 11, 2020). And he waited another 9 days after the CCA's denial of reconsideration to finally seek further relief in federal court. *Compare* Am. Pet. 9 (CCA denied suggestion for reconsideration January 27, 2021), *with* ECF No. 82 (Rule 60(b) motion filed February 8, 2021).

During that time—in particular the time after the Fifth Circuit declined to pass upon Ayestas's procedurally-improper attempt to litigate the claim— Ayestas could've: 1) sought authorization directly from the Fifth Circuit to file

---

[10]    The Director has previously argued, and continues to argue, that Ayestas should not get credit for litigating his claims in procedurally improper manners. *See* ECF No. 88, at 23–26. Regardless, assuming *arguendo* that his attempt to reraise the claim in the Fifth Circuit on remand from the Supreme Court is evidence of his diligence, he was still not diligent.

what had been deemed by this Court as a successive petition; or 2) filed an amended petition in this Court, which could have been transferred to the Fifth Circuit for consideration and, if authorized, would have related back to the time it was filed. *See In re Wilson*, 442 F.3d 872, 874 n.3 (5th Cir. 2006) (if the district court had transferred a successive petition to the Fifth Circuit, "the application would have been timely, as the date of filing for limitations purposes would have related back to the date of the initial filing in the district court" (citing 28 U.S.C. § 1631)). Indeed, Ayestas knew by April 1, 2015, at the latest, that this Court considered his claims to be successive, *see* ECF No. 64, and yet he never actually sought leave to file a successive petition.

Ayestas will likely hide behind *Banister* to excuse his lack of diligence during that time. But *Banister* does not apply to his case for the reasons the Director thoroughly outlined in his opposition to Ayestas's Rule 60(b) motion, namely: 1) Ayestas's "supplemental" Rule 59(e) motion was an untimely, impermissible amendment and was thus a Rule 60(b) motion to which *Banister* doesn't apply, ECF No. 88, at 10–13, 19–20; 2) *Banister* is inapplicable where the Court determined that Ayestas's supplemental Rule 59(e) motion was successive because it fell outside the scope of the Fifth Circuit's mandate, *id.* at 14–15; and 3) *Banister* doesn't apply to Rule 59(e) motions seeking to raise entirely new claims, *id.* at 16–17. Moreover, even if *Banister* did apply, Ayestas still waited more than eight months to actually litigate the issue which he

believes *Banister* corrected. *Compare Banister*, 140 S. Ct. at 1698 (decided June

1, 2020), *with* ECF No. 82 (Rule 60(b) motion filed February 8, 2021).

In previously rejecting the Director's argument that Ayestas was not

diligent after *Banister*, the Court held that the Director's suggestion that

Ayestas should have returned immediately to federal court to litigate a

decision on federal rules of procedure was just "one option." ECF No. 93. But

the *federal* statute of limitations is inherently concerned with a petitioner's

diligence in asserting his rights in *federal* court. To be sure, the filing of

"protective" federal petitions is encouraged in similar circumstances. *See Pace*,

544 U.S. at 417 ("A prisoner seeking state postconviction relief might avoid

th[e] predicament [of relying on a improperly filed state remedy], however, by

filing a 'protective' petition in federal court and asking the federal court to stay

and abey the federal habeas proceedings until state remedies are exhausted.");

*see also Palacios v. Stephens*, 723 F.3d 600, 608 (5th Cir. 2013) (holding while

there is no bright line rule that "failure to file a protective petition alone

prevents a prisoner from receiving equitable tolling," the petitioner's failure to

do so "weighs against, but is not dispositive of, the reasonable diligence

inquiry"). If Ayestas believed that *Banister* affected this Court's decision, then

it was to this Court he should have returned.

And while the Court is correct that, had Ayestas filed a Rule 60(b) motion

without first exhausting his claims, the Director might have raised an

exhaustion defense, *see* ECF No. 93, such fails to account for the more than three months that elapsed between the time federal habeas proceedings finally concluded and when *Banister*—a case wholly unrelated to exhaustion of state court remedies but which prompted Ayestas to seek state-court exhaustion—was decided. *See Ayestas*, 140 S. Ct. at 1107 (certiorari denied February 24, 2020). Simply put, Ayestas sat on his claims until he saw an avenue in federal court, and when that avenue became available, he went back to state court instead. This is not sufficient to establish his diligence.

Federal courts being asked to grant equitable relief from the strict limitations period imposed by AEDPA "must be mindful of the framework Congress established in § 2244(d)." *Felder v. Johnson*, 204 F.3d 168, 172 (5th Cir. 2000). This Court should, therefore, be wary about extending equitable tolling beyond the circumstances specifically enumerated in the statute, or risk frustrating the manifest intent of Congress. *Fierro II*, 294 F.3d at 684 (stating that although application of time-bar "may appear formalistic—particularly in a death penalty case"—federal courts must be mindful "that Congress has imposed a strict one-year limitations period for the filing of all habeas petitions under the AEDPA, subject only to the narrowest of exceptions"); *Cantu-Tzin v. Johnson*, 162 F.3d 295, 299 (5th Cir. 1998) (stating that "when Congress has stepped in to balance the competing interests [of equities in capital cases], as it did in AEDPA, courts should be loath to evade that balance"). "[S]tatutes of

limitations[] necessarily operate harshly and arbitrarily with respect to individuals who fall just on the other side of them, but if the concept of a filing deadline is to have any content, the deadline must be enforced." *United States v. Locke*, 471 U.S. 84, 101 (1985). Given that Ayestas failed to diligently discover the memo at any time prior to December 22, 2014, and that he failed to diligently assert his rights in federal court in the years after he did finally discover it, Ayestas should not be entitled to equitable tolling.

### 2. Ayestas fails to demonstrate extraordinary circumstances.

Ayestas's attempts to show extraordinary circumstances fare no better. Indeed, the change in law enacted by *Banister*, even assuming its application to Ayestas's case, is hardly extraordinary. *Cf. Gonzalez v. Crosby*, 545 U.S. 524, 537 (2005) ("It is hardly extraordinary that subsequently, after petitioner's case was no longer pending, this Court arrived at a different interpretation."). Moreover, even if a change in law could constitute extraordinary circumstances, it must have actually *prevented* him from filing a federal habeas petition. *Holland*, 560 U.S. at 649; *Lott v. Mueller*, 683 F.3d 1230, 1237 (9th Cir. 2012) (noting the "general rule" that equitable tolling is available only where the prisoner can show extraordinary circumstances were the *cause* of an untimely filing); *Harper v. Ercole*, 648 F.3d 132, 137 (2d Cir. 2011) (a party must show not only that he experienced extraordinary circumstances, but that

"those circumstances caused him to miss the original filing deadline."); *San Martin v. McNeil*, 633 F.3d 1257, 1267 (11th Cir. 2011) (petitioner must demonstrate causal connection between the alleged extraordinary circumstances and the late filing of the petition); *Felder*, 204 F.3d at 171–72 (finding because Felder filed his petition prior to obtaining a copy of AEDPA, his unawareness of the law arguably has not prevented him in some extraordinary way from asserting his rights).

But as argued above, *see* Argument II.D.1, *supra*, nothing *external* to Ayestas prevented him from actually filing a petition—Ayestas could've filed a successive petition in this Court and sought authorization upon its transfer. That he might not have *met* the successiveness-bar is not external to him. And nothing but his own actions actually prevented him from seeking federal relief in federal court after *Banister* was decided—he chose *not* to exhaust his claims after federal habeas litigation concluded and then he chose *to* exhaust them before returning to federal court to attack the Court's unrelated procedural ruling. *Cf. Jones v. Lumpkin*, 22 F.4th 486, 492 (5th Cir. 2022) ("Jones's plight is entirely self-inflicted and stems from his failure to comply with basic state procedural rules—about which he had notice."). This nexus requirement is fatal to Ayestas's argument. "In short, [Ayestas] cannot show the extraordinary circumstances necessary for equitable tolling because his failure to timely file the instant petition is the result of his own procedural mistakes." *Id*.

31

Ayestas's argument that the Director supposedly "misled" the federal courts as to the availability of the Siegler memo is similarly unavailing. First, the Director never misled the courts, and no court has so found. *See* ECF No. 88, at 21–23. Second, the Director's arguments did not "negatively affect[ the courts'] willingness to exercise their discretion in favor of merits review." Am. Pet. 24. Neither this Court nor the Fifth Circuit ever held that the Siegler memo—drafted in 1995—was in fact available prior to Ayestas's discovery of it in 2015; rather, both courts' holdings were predicated on Ayestas's *failure* to establish his diligence in seeking it prior to December 2014. *See Ayestas II*, 817 F.3d at 901. That is, neither court found that the work product doctrine necessarily meant that the memo was not "available." *Cf. In re Bexar Cty. Criminal Dist. Attorney's Office*, 224 S.W.3d 182, 187 (Tex. 2007) (explaining that State "producing the prosecution file unquestionably waived [work-product] protection of the documents" disclosed). In essence, it was not the Director's arguments but Ayestas's failures that "negatively affect[ed]" the courts' willingness to hear the merits of his claims. Because Ayestas again fails to establish a nexus between the alleged extraordinary circumstance and his failure to timely file a petition, he is not entitled to equitable relief.

**E.    Ayestas has not demonstrated he is actually innocent of capital murder.**

Ayestas finally argues that he should be entitled to equitable tolling under the miscarriage-of-justice exception to the statute of limitations. Am. Pet. 24–25. He specifically argues that he can meet *McQuiggin* because a refusal to remedy the "noxious taint of unlawful discrimination" he asserts in the Siegler memo claims "would be a serious miscarriage of justice." *Id.* at 25. But Ayestas entirely misunderstands *McQuiggin*.

*McQuiggin* held that tenable claims of actual innocence serve as a gateway through which a petitioner may raise untimely claims. 569 U.S. at 386. But "tenable actual-innocence gateway pleas are rare: '[A] petitioner does not meet the threshold requirement unless he persuades the district court that, in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt.'" *Id.* (quoting *Schlup v. Delo*, 513 U.S. 298, 329 (1995)). Newly discovered evidence of a petitioner's "[a]ctual innocence" refers to factual innocence, not legal insufficiency. *Bousley v. United States*, 523 U.S. 614, 623–624 (1998). Ultimately, "[t]he miscarriage of justice exception . . . applies to a severely confined category" of otherwise untimely claims. *McQuiggin*. 569 U.S. at 394–95.

Ayestas's case does not fall within that confined category. Ayestas does not even argue that he is actually innocent of capital murder, much less that

he has any new evidence that would establish that it is more likely than not that no reasonable juror could have convicted him of such. Because Ayestas has offered no evidence to prove his actual innocence, he fails to present a "tenable actual-innocence gateway plea." *Id.* at 386. His petition should be dismissed as time-barred.

## III.   Ayestas's Claims Are Procedurally Barred.

"A federal habeas court will not review a claim rejected by a state court 'if the decision of [the state] court rests on a state law ground that is independent of the federal question and adequate to support the judgment.'" *Beard v. Kindler*, 558 U.S. 53, 55 (2009) (quoting *Coleman v. Thompson*, 501 U.S. 722, 729 (1991)). Federal review is precluded "whether the state law ground is substantive or procedural." *Coleman*, 501 U.S. at 729. When an inmate fails to properly raise a claim in state court, he "has deprived the state courts of an opportunity to address those claims in the first instance." *Id.* at 732. Accordingly, preventing review of claims decided on state law grounds "ensures that the States' interest in correcting their own mistakes is respected in all federal habeas cases." *Id.*

Here, Ayestas presented his Siegler memo claims in his subsequent application, but the CCA dismissed it as abusive without reaching the merits. *Ex parte Ayestas*, 2020 WL 7234770, at *1. The abuse-of-the-writ bar is adequate, *see Hughes v. Quarterman*, 530 F.3d 336, 342 (5th Cir. 2008) ("This

34

court has held that, since 1994, the Texas abuse of the writ doctrine has been consistently applied as a procedural bar."), and independent of federal law, *see Balentine v. Thaler*, 626 F.3d 842, 854–57 (5th Cir. 2010) (holding that a "silent" dismissal of a mitigation-ineffectiveness claim pursuant to the abuse-of-the-writ statute was independent of federal law). A procedural state law ground thus prevents federal merits adjudication.

Ayestas admits his claims are barred but argues he can overcome the default because he can establish cause and prejudice or a fundamental miscarriage of justice. *See* Am. Pet. 25–27; *Coleman*, 501 U.S. at 749–50. A petitioner can invoke the miscarriage-of-justice exception only if he can show that he is factually, as opposed to legally, innocent of the crime or of the death penalty. *Sawyer v. Whitley*, 505 U.S. 333, 339–40 (1992). Actual innocence of the death penalty looks to eligibility for a sentence of death, not the jury's discretion in imposing such punishment. *Sawyer*, 505 U.S. at 346–47. Ayestas fails to demonstrate either procedural-default exception.

## A.   Ayestas does not prove a miscarriage of justice.

Addressing the second exception first, Ayestas does not prove a miscarriage of justice—actual innocence. Am. Pet. 27.[11] Ayestas thinks he can

---

[11]    Ayestas makes no argument that he is actually innocent of the death penalty. But even if he did, such an argument would fail—he meets no categorical exemption to a death sentence, i.e., he was over eighteen when he strangled Ms. Paneque to death, and he makes no claim that he is intellectually disabled.

show a miscarriage of justice for the same reasons as above, i.e., that his claim is about discrimination and the Director supposedly misled the courts. *Id.*; *see* Argument II.E, *supra*. But he again entirely misunderstands this exception.

A petitioner may overcome a procedural default in a "rare" and "extraordinary case" by demonstrating actual innocence. *Schlup*, 513 U.S. at 321. Like the standard under *McQuiggin*, this requires a petitioner to prove "that it is more likely than not that no reasonable juror would have convicted him in light of the new evidence." *Id.* at 327. This standard cannot be met by "merely . . . showing that a reasonable doubt exists in light of the new evidence, but rather that no reasonable juror would have found the defendant guilty." *Id.* at 329. Here, Ayestas is not contesting that he strangled Ms. Paneque in the course of a robbery or burglary. Nor is he proffering any new evidence to establish that he is factually innocent of such. Thus, the miscarriage of justice exception is wholly inapplicable to his case.

### B.   Ayestas does not prove cause and prejudice.

A petitioner seeking to excuse his default can typically prove cause where "something *external* to the petitioner, something that cannot fairly be attributed to him . . . 'impeded [his] efforts to comply with the State's procedural rule.'" *Coleman*, 501 U.S. at 753 (quoting *Murray v. Carrier*, 477 U.S. 478, 488 (1986)). Failure to raise a claim in an initial state habeas corpus application may not be excused for cause unless the claim was not "reasonably

36

available" at the time of the prior petition. *Fearance v. Scott*, 56 F.3d 633, 636 (5th Cir. 1995). And even if a petitioner can demonstrate cause, he must also prove "actual prejudice." Thus, a petitioner "must establish 'not merely' that the errors at his trial created a *possibility* of prejudice, but that they worked to his *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *Moore v. Quarterman*, 534 F.3d 454, 463 (5th Cir. 2008) (quoting *United States v. Frady*, 456 U.S. 152, 170 (1982)).

### 1. Ayestas fails to establish cause.

Ayestas argues he can establish cause because Harris County withheld the Siegler memo. *See* Am. Pet. 26. But Ayestas has never proven that. *See* Argument II.B, *supra*. Indeed, the only evidence in this case suggests the opposite—the memo was in the State's file that was provided to him when he first requested to view it. And that the Fifth Circuit and the CCA have already determined that Ayestas was not diligent in discovering the Siegler memo— explicit and implicit findings to which this Court must defer, *see id*.; § 2254(e)(1)—means that his failure to raise the claim was not due to an objective external factor to the defense; it was his own doing. *See Murray*, 477 U.S. at 488; *Woodard v. Thaler*, 702 F.Supp.2d 738, 752 (S.D. Tex. 2010) ("Cause requires a petitioner to show that something external, and not attributable to him, prevented compliance with a state procedural rule or thwarted his ability to exhaust his claims. [Petitioner] confuses his ability to

37

develop his claims with his opportunity to raise them."). Thus, Ayestas fails to demonstrate cause.

### 2. Ayestas fails to demonstrate actual prejudice too.

Even if Ayestas could show cause, he fails to show actual prejudice. Ayestas argues his underlying claims allege structural errors that infected the entire trial and make it sufficiently likely that, absent a violation, Harris County would not have capitally prosecuted or sought death against him. Am. Pet. 26–27. But it is not enough that an error "created a *possibility* of prejudice"; Ayestas must show "that they worked to his *actual* and substantial disadvantage, infecting the entire trial with error of constitutional dimensions." *Frady*, 456 U.S. at 170. Indeed, Ayestas's Equal Protection-based claims[12] are analogous to fair-cross-section claims, where what might be required to show prejudice of a properly preserved claim is not the same as what must be shown to demonstrate "actual prejudice":

> We shall assume for purposes of argument that Williams might somehow establish cause . . . . He has not, however, demonstrated the "actual prejudice" that would permit us to reach the merits of his successive *Taylor* [*v. Louisiana*, 419 U.S. 522 (1975)] claim. Such prejudice is of course presumed where the issue has been preserved; defendants need only prove that members of the community have been unconstitutionally excluded from jury service to obtain a reversal of their convictions. *See Batson v. Kentucky*, 476 U.S. 79, 99–101; *Vasquez v. Hillery*, 474 U.S. 254,

---

[12]   Ayestas raises a concomitant Eighth Amendment challenge based on the Siegler memo, but as argued below, such a claim does not truly sound in the Eighth Amendment. *See* Argument IV.C, *infra*. Ayestas just repackages his Equal Protection claim under a constitutional provision he believes lowers his burden of proof.

> 261–62 (1986). On the other hand, where, as here, the constitutional claim is not properly before the court as a result of writ abuse or procedural default, petitioners must identify how the alleged violation harmed their cause. *See, e.g.*, *Huffman v. Wainwright* 651 F.2d 347, 349–50 (5th Cir. 1981) (jury venire); *Evans v. Maggio*, 557 F.2d 430, 433–434 (5th Cir. 1977) (grand jury); *Godfrey v. Kemp*, 836 F.2d 1557, 1569–70 (11th Cir.) (jury venire); *Smith v. Kemp*, 715 F.2d 1459, 1470–72 (11th Cir.) (jury venire). These two lines of cases are not in tension: "The presumption of prejudice which supports the existence of the right is not inconsistent with a holding that *actual prejudice* must be shown in order to obtain relief from a statutorily provided waiver for failure to assert it in a timely manner." *Davis v. United States*, 411 U.S. 233, 245 (1973); *Godfrey*, 836 F.2d at 1570 n.12.

*See Williams v. Whitley*, 994 F.2d 226, 232 (5th Cir. 1993) (cleaned up) (emphasis added). In other words, because fair-cross-section claims are not predicated on the idea that *every* criminal trial, or even any particular trial, is automatically unfair, the petitioner in *Williams* had to demonstrate "how the exclusion of women from the jury venire affected his trial." *Id*. at 233. The Fifth Circuit found Williams had not "attempted to show that this error rendered the proceeding unfair," particularly where the Fifth Circuit did not "believe, given the very strong evidence supporting his conviction on charges of aggravated rape, that such a finding is warranted." *Id*.

The same applies to Ayestas. Ayestas has not even alleged, much less shown, how Harris County's supposed charging decisions had any effect *at all* at his trial, especially where, as here, it was the grand jury who ultimately indicted him for capital murder, and it was the jury who convicted him of

capital murder and sentenced him to death. *See* CR 2–4, 272–73. In fact, Ms. Siegler was not even the prosecutor at his trial. *See* CR 3 (prosecutor Williams Hawkins presented Ayestas's case to grand jury),[13] 272 (Bill Hawkins as attorney for the State); 18 RR 2 (attorneys Bill Hawkins and Don Smyth for the State). And the evidence of both his guilt and death worthiness was overwhelming. *See Ayestas*, No. 72,928, slip op. 2–9; ECF No. 51, at 12 (noting that, "in light of the extremely brutal nature of Ayestas's crime and Ayestas's history of criminal violence," Ayestas was "highly unlikely" to show prejudice on his IATC claims). Any suggestion that Harris County's charging decision somehow affected his actual trial is nothing but an unsubstantiated, and unlikely, possibility. Ayestas did not suffer "such actual prejudice that reversal of his conviction [25] years later could be justified." *Frady*, 456 U.S. at 172.

And to the extent that Ayestas believes that Harris County's *pre*-trial decision would have changed, such an argument is purely speculative. *See Moore*, 534 F.3d at 464 (holding that petitioner's allegation that had he known about a witness, he might've been able to locate a corroborating witness, was "far too speculative to satisfy the 'actual prejudice standard'"). Indeed, as argued further below, such a claim is belied by evidence showing that Harris

---

[13]     It appears that Siegler initially presented Ayestas's indictment to the grand jury on September 22, 1995. *See* Ex. A (Clerk's Record in *Meza v. Texas*, No. 01-97-1345-CR), at 7. But Ayestas was re-indicted by a different grand jury on June 2, 1997, and it was Hawkins that presented Ayestas's case to the grand jury then. CR at 3.

County's decision had nothing to do with Ayesta's alienage, race, or national origin, and everything to do with Ayestas being the killer, unlike his two similarly situated co-defendants. *See* Argument IV.B, *infra.* "In sum, [Ayestas] has fallen far short of meeting his burden of showing that he has suffered the degree of actual prejudice necessary to overcome society's justified interests in the finality of criminal judgments." *Frady*, 456 U.S. at 175. His claims must be dismissed as procedurally barred.

## IV. Alternatively, Ayestas's Claims Are Without Merit.

Even assuming Ayestas could surmount the numerous procedural obstacles standing in his way, Ayestas would not be entitled to relief on his claims. Ayestas first alleges that Harris County charged him with capital murder and sought a death sentence against him on the basis of his alienage—and, by proxy, his race and national origin—in violation of the Equal Protection Clause of the Fourteenth Amendment. Am. Pet. 10–16. Ayestas secondly alleges that Harris County's consideration of his alienage, race, or national origin in its charging decisions constitutes cruel and unusual punishment under the Eighth Amendment. *Id.* at 16–18. But Ayestas's claims are barred by nonretroactivity principles and nevertheless without merit.

### A. Relevant facts

On December 22, 2014, Ayestas's counsel located the Siegler memo in Harris County's file. The Siegler memo was prepared by Siegler on September

19, 1995. *See* ECF No. 82-1, at 2. It lists Ayestas's two co-defendants—Federico Zaldivar AKA Rolando Gutierrez and Roberto Meza—and describes the facts of the capital murder that the three men had committed. *See id*. at 2. The Siegler memo then lists both aggravating and mitigating circumstances relevant to the capital murder. *Id*. at 4. Two potential aggravating circumstances are typed: a) the victim was a helpless sixty-seven-year-old woman killed in her home, and b) Ayestas was "not a citizen." *Id*. A handwritten line is drawn through, i.e., crossing-out, the latter aggravating circumstance. *Id*. One mitigating circumstance was also typed: Ayestas had only one prior conviction for misdemeanor theft. *Id*.

The memo was apparently reviewed by four different people at Harris County: 1) Siegler, then-Court Chief; 2) Casey O'Brien, then-Division Chief; 3) Keno Henderson, then-Bureau Chief; and 4) John B. Holmes, then-District Attorney. *Id*. All four recommended indicting Ayestas with capital murder. *Id*. However, Holmes had the final call on the decision of whether to seek death against a particular defendant. *See* Allan Turner, *Former DA Ran Powerful Death-Penalty Machine*, Houston Chronicle (July 25, 2007), https://www.chron.com/news/houston-texas/article/Former-DA-ran-powerful-death-penalty-mach ine-1833545.php. Here, a handwritten note presumably written and initialed by Holmes states the following: "OK to plead non-killers for agg[ravated] robb[ery] life, deadly weapon, see[k] death on killer Ayestas. 2 pleading

[defendants]'s to testify." ECF No. 82-1, at 4. It's unclear when Holmes handwrote that, or when the citizenship aggravating circumstance was struck through, but a notation at the end of the memo says, "done 6-5-97," eight days before voir dire began in Ayestas's case. *Compare id.*, *with* 1 RR 8. As noted above, Siegler was not the attorney who prosecuted Ayestas's case. *See* Argument III.B.2, *supra* (citing CR 3, 272; 18 RR 2).

Whatever uncertainty there may be about when the citizenship-related aggravating circumstance was crossed out, it ultimately shows that Ayestas's citizenship was not a factor in the charging decision. Nonetheless, Siegler's appraisal of Ayestas's citizenship status was accurate. In fact, Ayestas was more than "not a citizen"; he was undocumented and thus in the United States illegally. Alexa Ura, *Twelve Texas Death Row Inmates Were Undocumented*, The Texas Tribune (Feb. 21, 2016, 6:00 AM) ("*Twelve Death Row Inmates*"), https://www.texastribune.org/2016/02/21/twelve-texas-death-row-inmates-we re-undocumented/. The same was true for his two co-defendants: Meza admitted during his sentencing hearing that he was in the United States on an "illegal" basis. Ex. B (Reporter's Record in *Meza v. Texas*, No. 01-97-1345-

CR), at 17.[14] And Gutierrez[15] was permitted by an immigration judge to voluntarily remove himself from the United States in September 1989, only six years before the three men committed the instant capital murder. Ex. D (*In the Matter of Gutierrez*, File No. A29195878), at 2. Gutierrez was subsequently deported and had not obtained citizenship or lawful residency by the time of the capital murder. *See* Ex. E (February 11, 1998 Sworn Statement by Roland Gutierrez), at 3.

The three men not only shared an unlawful immigration status but also shared ethnicity and national origin as well. Ayestas is a Hispanic male originally from Honduras. *See Ayestas II*, 817 F.3d at 896 ("Ayestas's home country of Honduras"); *see also Twelve Death Row Inmates* (Ayestas is "a Honduran national"); *Inmate Information Details*, Tex. Dep't Crim. Justice (last visited Feb. 21, 2022), https://inmate.tdcj.texas.gov/InmateSearch/view Detail.action?sid=05468834 (showing race as "H" for Hispanic). Co-defendant Meza is also a Hispanic male born in Honduras. *See* Ex. A, at 24 (Meza's motion for probation indicating his race as "Hispanic"); Ex. B, at 17 (Meza testifying he was born in Honduras). And Gutierrez is similarly Hispanic, born in

---

[14]   For ease of reference, all of the Director's exhibits have been Bates-stamped, and all citations will refer to the Bates-stamped page numbers.

[15]   Gutierrez was initially charged under the name Federico or Frederico Zaldivar. *See* Ex. C (Gutierrez indictment and judgment), at 2, 4.

Honduras, and a Honduran national. Ex. D, at 3 (stating Gutierrez was a native and citizen of Honduras); *Inmate Information Details*, Tex. Dep't Crim. Justice (last visited Feb. 21, 2022), https://inmate.tdcj.texas.gov/InmateSearch /viewDetail.action?sid=05468864 (showing race as "H" for Hispanic).

Yet despite identical backgrounds, the three co-defendants faced different outcomes. Indeed, while all three co-defendants were initially charged with capital murder,[16] *see* Ex. A, at 7, only Ayestas was convicted and sentenced to death. In Meza's case, the *State* moved to reduce the capital murder charge to aggravated robbery, to which Meza entered an open plea on July 30, 1997, a few weeks after Ayestas was convicted and sentenced to death. *See* Ex. A, at 16, 23, 28. Meza was sentenced to 75 years' imprisonment by the judge. *Id*. at 28. Similarly, the *State* moved to reduce Gutierrez's capital murder charge to aggravated robbery as well, in exchange for life in prison, to which Gutierrez was sentenced on December 2, 1997. Ex. C, at 4.

These outcomes are consistent with then-District Attorney Holmes's handwritten note on the Siegler memo that Ayestas, the killer, should receive the death penalty, but the two co-defendant non-killers could be pled out to

---

[16]     As previously indicated, it appears Siegler initially presented all three co-defendants' cases to the grand jury. *See* Ex. A, at 7. However, like in Ayestas's case, prosecutor Hawkins began representing the State by the time Meza decided to plead guilty, and Hawkins also represented the State at Meza's punishment hearing. *See id*. at 17, 23, 28; Ex. B, at 3. Prosecutor Hawkins also represented the State during Gutierrez's guilty plea proceeding. *See* Ex. C, at 4.

aggravated robbery. *See* ECF No. 82-1, at 4. Indeed, at Meza's sentencing hearing, the State affirmed its theory that Ayestas "is the individual that killed Ms. Paneque," though Meza "was involved in some fashion." *See* Ex. B, at 8. The record does not reflect that either Meza or Gutierrez testified at Ayestas's trial. *See generally* 1 RR.

### B. Ayestas's Equal Protection claim is *Teague*[17] barred and entirely without merit.

"In our criminal justice system, the Government retains 'broad discretion' as to whom to prosecute." *Wayte v. United States*, 470 U.S. 598, 607 (1985). Indeed, "[s]o long as the prosecutor has probable cause to believe that the accused committed an offense defined by a statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his discretion." *Id.* (quoting *Bordenkircher v. Hayes*, 434 U.S. 357, 364 (1978)). Thus, "the conscious exercise of some selectivity in enforcement is not in itself a federal constitutional violation." *Oyler v. Boles*, 368 U.S. 448, 456 (1962). That's because "[i]mplementation of these laws necessarily requires discretionary judgment," a discretion which is "essential to the criminal justice process." *McCleskey v. Kemp*, 481 U.S. 279, 297 (1987).

That discretion, though, is not unfettered; it is still subject to some constitutional constraints. *Wayte*, 470 U.S. at 608. Namely, "the decision to

---

[17]    *Teague v. Lane*, 489 U.S. 288 (1989) (plurality opinion).

prosecute may not be 'deliberately based upon an unjustifiable standard such as race, religion, or other arbitrary classification,' including the exercise of protected statutory and constitutional rights.'" *Id.* (quoting *Bordenkircher*, 434 U.S. at 364); *see also Oyler*, 368 U.S. at 456. It is therefore "appropriate to judge selective prosecution claims according to ordinary equal protection standards." *Wayte*, 470 U.S. at 608. Thus, to make a prima facie showing that Harris County engaged in unconstitutional selective prosecution, Ayestas must show *both* that Harris County's policy "had a discriminatory effect *and* that it was motivated by a discriminatory purpose." *Id.*; *see also United States v. Armstrong*, 517 U.S. 456, 465 (1996).

This means that Ayestas must first show ". . . that [he] w[as] singled out for prosecution while others similarly situated who committed the same crime were *not* prosecuted." *Jackson v. City of Hearne, Tex.*, 959 F.3d 194, 201 (5th Cir. 2021) (quoting *United States v. Sparks*, 2 F.3d 574, 580 (5th Cir. 1993)) (emphasis added); *Armstrong*, 517 U.S. at 465 ("To establish a discriminatory effect in a race case, the claimant must show that similarly situated individuals of a different race were not prosecuted."). Second, he "must show that the government's discriminatory selection of [him] for prosecution was invidious or done in bad faith—i.e., that the government selected its course of prosecution *because of*, rather than *in spite of*, its adverse effect upon an identifiable group." *Jackson*, 959 F.3d at 201 (quoting *Sparks*, 2 F.3d at 580);

47

*see also Wayte*, 470 U.S. at 610 ("[D]iscriminatory purpose' . . . implies more than . . . intent as awareness of consequences. It implies that the decisionmaker . . . selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group.") (internal citations omitted).

This is a "rigorous standard" that places a high burden on a claimant alleging a selective prosecution claim. *Armstrong*, 517 U.S. at 468 ("The justifications for a rigorous standard for the elements of a selective-prosecution claim thus require a correspondingly rigorous standard for discovery in aid of such a claim."); *McCleskey*, 481 U.S. at 292 ("[A] defendant who alleges an equal protection violation has the burden of proving 'the existence of purposeful discrimination.'"). "Because discretion is essential to the criminal justice process, we would demand exceptionally clear proof before we would infer that the discretion has been abused." *McCleskey*, 481 U.S. at 297. Thus, a presumption of regularity applies to prosecutorial decisions such that, "in the absence of clear evidence to the contrary, courts presume that [prosecutors] have properly discharged their official duties." *Armstrong*, 517 U.S. at 464.

Here, Ayestas alleges that the Equal Protection Clause was violated because Harris County considered his alienage in deciding to capitally prosecute and seek a death sentence against him. Am. Pet. 10–15. Ayestas also argues that, given the demography of noncitizens in Texas and given Siegler's

alleged history of prosecutorial misconduct, it is likely that Ayestas was also discriminated against on the basis of his race and national origin. *Id.* at 10, 15–16. But his former claim is barred by *Teague* and both claims fail because Ayestas wholly fails to meet his burden to show that Harris County's charging decisions had either discriminatory effect or were made with discriminatory purpose. Ayestas's amended petition should be denied.

> **1.    Ayestas's Equal Protection claim is *Teague* barred because it is based on his status as an unlawful alien.**

As a preliminary matter, Ayestas devotes a substantial portion of his amended petition reciting Equal Protection case law. *See, e.g.*, Am. Pet. 11–13 (discussing "Equal Protection Constraints on Racial and National Origin Discrimination," as well as on "Alienage Discrimination"). He then, without really establishing a connection between the two areas of law, applies "Equal Protection Constraints to [Prosecutorial] Charging Decisions." *Id.* at 13–14. In doing so, Ayestas argues several times over that, like classifications based on race or national origin, classifications based on alienage are suspect and thus subject to strict scrutiny under Equal Protection principles. *See* Am. Pet. 10 (arguing alienage classifications are suspect), 11 (same), 12 (same), 13 (same). He uses this daisy-chain of illogic to argue that, because the Equal Protection Clause reviews classifications based on alienage under the strict-scrutiny

rubric, a prosecutor's charging decisions are similarly analyzed under the Equal Protection's strict-scrutiny rubric.

Ayestas is correct on one minor, but ultimately irrelevant, link in that chain—"It has long been settled . . . that the term 'person' in th[e] context [of the Equal Protection Clause] encompasses *lawfully admitted* resident aliens as well as citizens of the United States and entitles both citizens and aliens to the equal protection of the laws of the State in which they reside." *Graham v. Richardson*, 403 U.S. 365, 371 (1971) (emphasis added) (citing *Takahashi v. Fish & Game Comm'n*, 334 U.S. 410, 420 (1948); and *Truax v. Raich*, 239 U.S. 33, 39 (1915); *Yick v. Hopkins*, 118 U.S. 356, 369 (1866)); *see also Ambach v. Norwick*, 441 U.S. 68, 69 (1979) (describing question presented as whether under Equal Protection, a state "may refuse to employ as elementary and secondary school teachers aliens who are *eligible for United States citizenship* but who refuse to seek naturalization" (emphasis added)); *Mathews v. Diaz*, 426 U.S. 67, 69 (1976) (noting that each appellee was a "resident alien who was lawfully admitted" to the United States); *Sugarman v. Dowell*, 412 U.S. 634, 636, 639 (1973) (analyzing whether plaintiffs—four "federally registered aliens"—were prohibited employment in competitive classified civil service due to their alienage in violation of the Equal Protection Clause).[18]

---

[18]    Ayestas also cites three other cases he believes establish that alienage is a suspect class under the Equal Protection Clause. *See* Am. Pet. 10, 12, 14 (citing *Toll*

But, as discussed above, Ayestas is not lawfully in this country, a fact which he, conveniently, never discusses. This fact presents a problem for Ayestas in two ways. First, the Supreme Court has never held that *unlawful* alienage is a suspect class subject to strict scrutiny review. *LeClerc v. Webb*, 419 F.3d 405, 416 (5th Cir. 2005) ("The Court has never applied strict scrutiny review to a state law affecting any other alienage classification, *e.g.*, illegal aliens, the children of illegal aliens, or nonimmigrant aliens."). To the contrary:

> We reject the claim that "illegal aliens" are a "suspect class." No case in which we have attempted to define a suspect class has addressed the status of persons unlawfully in our country. Unlike most of the classifications that we have recognized as suspect, entry into this class, by virtue of entry into this country, is the product of voluntary action. Indeed, entry into the class is itself a crime.[19] In addition, it could hardly be suggested that undocumented status is a "constitutional irrelevancy."

---

*v. Moreno*, 458 U.S. 1 (1982); *Trimble v. Gordon*, 430 U.S. 762 (1977); and *Wong v. United States*, 163 U.S. 228 (1896)). In *Toll*, the Court expressly did not "consider whether the [University of Maryland's] policy violates the Due Process or Equal Protection Clauses," instead disposing of the claim on Supremacy Clause grounds. 458 U.S. at 8–9. The *Trimble* language to which Ayestas cites is from a dissenting opinion, *see* Am. Pet. 10 (citing *Trimble*, 430 U.S. at 780 (Rehnquist, J., dissenting)), and in any event is dicta given that the rule at issue in that case was an Illinois rule allowing illegitimate children to inherit only from their mothers, *see Trimble*, 430 U.S. at 763. And in *Wong*, the issue was whether Chinese citizens could be sentenced to hard labor for unlawful entry into the United States without notice and a trial under the Fifth and Sixth Amendments. 163 U.S. at 235.

19    The fact that illegal entry into the United States is a *crime* makes it likely that Siegler's reference to Ayestas's citizenship status as an aggravating factor was essentially shorthand for his *illegal* immigrant status. Indeed, the commission of an offense is appropriately considered as an aggravating factor during the punishment phase of a capital sentencing proceeding. *See Ex parte Broxton*, 888 S.W.2d 23, 28 (Tex. Crim. App. 1994) ("Extraneous offenses, both adjudicated and unadjudicated, are frequently considered in sentencing. The sentencer needs to have as much

*Plyler v. Doe*, 457 U.S. 202, 219 n.9 (1982) (internal citations omitted); *cf.* *Mathews*, 426 U.S. at 78 ("The fact that all persons, aliens and citizens alike, are protected by the Due Process Clause does not lead to the further conclusion that all aliens are entitled to enjoy all the advantages of citizenship or, indeed, to the conclusion that all aliens must be placed in a single homogeneous legal classification.").

Thus, Ayestas's claim that he is a member of a suspect class turns in part on an extension, and overruling, of clear Supreme Court precedent. Given that Ayestas's conviction has long been final, such a new rule of constitutional law is barred by nonretroactivity principles. *See Edwards v. Vannoy*, 141 S. Ct. 1547, 1560 (2021) ("New procedural rules do not apply retroactively on federal collateral review. The watershed exception [of *Teague*] is moribund. It must 'be regarded as retaining no vitality.'"); *see also Teague*, 489 U.S. at 310 (holding that, unless a new constitutional rule falls within one of the enumerated exceptions, the new rule "will not be applicable to cases which have become final before the new rule[ is] announced").[20]

---

information about the individual defendant as possible in order to make the appropriate sentencing decision.").

[20]     Though *Teague*'s substantive rule "exception" still survives, Ayestas's proposed new rule is not substantive: it does not "alter 'the range of conduct or the class of persons that the law punishes.'" *Edwards*, 141 S. Ct. at 1562 (quoting *Schriro v. Summerlin*, 542 U.S. 348, 353 (2004)).

What's more, however, is the second problem: Ayestas hasn't pointed to any law that says selective prosecution claims—claims that may not be "pure" Equal Protection claims, though they are judged by "ordinary equal protection standards," *see Wayte*, 470 U.S. at 608—apply to non-suspect classes. Indeed, a charging decision may not be "deliberately based upon an unjustifiable standard such as race, religion, or other arbitrary classification" or based on the exercise of protected statutory and constitutional rights.[21] *Id*. But under Equal Protection standards, race and religion are suspect classes. *See*, *e.g.*, *Johnson v. California*, 543 U.S. 499, 505 (2005) (applying strict scrutiny to California Department of Corrections' policy segregating inmates based on race); *Larson v. Valente*, 456 U.S. 228, 246 (1982) ("[W]hen we are presented with a state law granting a denominational preference, our precedents demand that we treat the law as suspect and that we apply strict scrutiny in adjudging its constitutionality."). Unlawful alienage is not.

And if unlawful alienage is not a suspect class, then it is unclear how Ayestas's selective-prosecution claim is to be analyzed. Indeed, some courts appear to have interpreted the above language as meaning that the selective-

---

[21]     *Wayte* is an example of a case applying the latter. In *Wayte*, the petitioner argued that he was selectively prosecuted for exercising his First Amendment right when he chose to report himself for not registering for Selective Service. 470 U.S. at 600–01. Ayestas is not arguing that he has been capitally prosecuted for exercising a constitutional right.

prosecution test has limited application. *See*, *e.g.*, *United States v. White*, 928 F.3d 734, 742–43 (8th Cir. 2019) ("We have interpreted this standard as requiring a selective prosecution claimant to show '. . . that the government's action is thus singling him out was based on an impermissible motive such as race, religion, or the exercise of constitutional rights.'" (quoting *United States v. Parham*, 16 F.3d 844, 846 (8th Cir. 1994)). This lack of clarity means Ayestas is asking for a new rule of procedural law. *See Chaidez v. United States*, 568 U.S. 342, 347 (2013) ("[A] case announces a new rule,' *Teague* explained, 'when it breaks new ground or imposes a new obligation' on the government." (quoting *Teague*, 489 U.S. at 301)). "To put it differently, a case announces a new rule if the result was not *dictated* by precedent existing at the time the defendant's conviction became final." *Teague*, 489 U.S. at 301. "And a holding is not so dictated, [the Court] later stated, unless it would have been 'apparent to all reasonable jurists.'" *Chaidez*, 568 U.S. at 347 (quoting *Lambrix v. Singletary*, 520 U.S. 518, 527–28 (1997)). As discussed above, new rules are barred by nonretroactivity principles. *Edwards*, 141 S. Ct. at 1560. Thus, because Ayestas seeks creation of a new procedural rule under the Equal Protection Clause, he cannot garner the relief he seeks.

**2.  Even assuming illegal alienage is subject to the same selective-prosecution test as suspect classes, Ayestas fails to show discriminatory effect.**

Ayestas entirely fails to show that he was singled out for prosecution while others similarly situated who committed the same crime were not. *See Jackson*, 959 F.3d at 201; *Armstrong*, 517 U.S. at 465. Indeed, under ordinary Equal Protection principles, a defendant fails to establish a cognizable Equal Protection claim if he does not sufficiently show that two or more classes of people were treated differently. *See Hines v. Quillivan*, 982 F.3d 266, 272 (5th Cir. 2020) ("To state a claim for equal protection, the plaintiff must prove that similarly situated individuals were treated differently." (internal quotations omitted)); *Mahone v. Addicks Util. Dist. of Harris Cnty.*, 836 F.2d 921, 932 (5th Cir. 1988) ("The equal protection clause essentially requires that all persons similarly situated be treated alike."). "Being similarly situated is key." *Hines*, 982 F.3d at 272. Thus, "if the challenged government action does not appear to classify or distinguish between two or more relevant persons or groups, then the action does not deny equal protection of the laws." *Id.*; *Samaad v. City of Dallas*, 940 F.2d 925, 941 (5th Cir. 1991) ("Because the plaintiffs failed to allege the existence of a similarly situated non-minority neighborhood (i.e., one near a location suitable for an automobile race), their complaint does not allege an equal protection violation."), *abrogated on other grounds by Stop the Beach Renourishment, Inc. v. Fla. Dep't of Env't Prot.*, 560 U.S. 702, 728 (2010).

Ayestas "must specifically allege the actual existence of a similarly situated group of persons." *Samaad*, 940 F.2d at 941 n.31.

As applied to Ayestas's selective-prosecution claim, then, Ayestas must prove that there are similarly situated individuals who were *not* prosecuted. *Armstrong*, 517 US at 465. In Ayestas's case, he believes that Harris County singled him out for a capital prosecution because of his alienage.[22] But the idea that this single factor was the basis for Harris County's supposed discrimination is belied by the fact that Harris County *moved to reduce* the charges of his two co-defendants—who were *also* illegal aliens—and did not seek death against them. *See* Argument IV.A, *supra*. That is, if Ayestas was singled out for a capital prosecution and death sentence because he was an unlawful alien, he entirely fails to explain how or why his two unlawful-alien codefendants were not also singled out for a capital prosecution and death sentence when they "committed the same crime."[23] *See Jackson*, 959 F.3d at 201; *Armstrong*, 517 U.S. at 465.

More important, even assuming that Ayestas *was* singled out and even assuming that his illegal alien status is a protected group for Equal Protection

---

[22]    Ayestas's claim of discrimination based on race and national origin is dealt with separately. *See* Argument IV.B.4, *infra*.

[23]    As discussed further below, this is likely because Ayestas *wasn't* singled out on the basis of his alienage, but rather because he was the triggerman in a brutal capital murder. *See* Argument IV.B.3, *infra*.

purposes, Ayestas has failed to point to a single other person who was similarly situated to him but *not* prosecuted. Indeed, because Ayestas has never done the work to meet his burden under the selective-prosecution test, it is not even clear what Ayestas believes his "class" is comprised of, a necessary requirement to establishing whether other similarly situated people might exist. *See Wayte*, 470 U.S. at 608 n.10 ("Wayte has not established the first element as actually defined by *Castaneda*[ *v. Partida*, 430 U.S. 482 (1977)]: whether the individual is a member of an 'identifiable group' that is 'a recognizable, distinct class, *singled out for different treatment under the laws, as written or as applied.*'").

But if Ayestas is a member of any class, it is that of illegal aliens, who commit a death-eligible offense (a fact which he does not and cannot contest), who have a "helpless 67 year old" victim, and who were the "triggerman." To meet his burden, then, Ayestas would need to identify similarly situated United States citizens, or lawful residents, who were *not* capitally prosecuted and sentenced to death. *Armstrong*, 517 U.S. at 470–71. This he has failed to do. If Ayestas's claim of "selective prosecution were well founded, it should not have been an insuperable task to prove that persons of other [citizenship statuses] were being treated differently than [Ayestas]." *Id.* at 470. This "required threshold—a credible showing of different treatment of similarly situated persons—" is applicable even for petitioners attempting to

demonstrate entitlement to discovery because it "adequately balances the Government's interest in vigorous prosecution and the defendant's interest in avoiding selective prosecution." *Id.* Ayestas entirely fails to meet the high burden placed on petitioners attempting to overcome the significant deference afforded to discretionary prosecution decisions, and his claim must be denied.[24]

### 3. Ayestas also fails to show any discriminatory purpose related to his citizenship status.

Ayestas wholly fails to prove that Harris County actually selectively prosecuted him on the basis of his alienage. Indeed, Ayestas must prove that Harris County decided to prosecute him *because of*, not *in spite of*, his citizenship status. But assuming *arguendo* that his *unlawful* alien status is entitled to the same protections as typical suspect classes, Ayestas cannot do so. First, the offending statement in the Siegler memo was clearly marked through and crossed out. Thus, on the face of the memo itself, there is no proof that *anybody*, including Siegler herself, in any way relied on Ayestas's citizenship status in deciding to capitally prosecute and seek a death sentence against him. And Ayestas's attempts to create doubt regarding the timing and significance of the mark, as well as his attempts to cast aspersions on Siegler's

---

[24]     For this reason, any requests by Ayestas for discovery must also be denied. *Armstrong*, 517 U.S. at 469–71 (rejecting lower court's holding that "a defendant may establish a colorable basis for discriminatory effect without evidence that the Government has failed to prosecute others who are similarly situated to the defendant").

character, *see* Am. Pet. 2–5, only serve to highlight his failure to meet the high burden of proof he must meet in selective-prosecution claims. It may not be clear at what point in the process Ayestas's citizenship was removed from consideration, but it is clear that it was. Thus, Ayestas's argument that the Siegler memo is direct evidence that prosecutors "have acted on racial motives" is mere conjecture. *See id*. at 14–15.

Second, even if it could be said that Siegler relied on the memo, it cannot be said that had any effect on the *ultimate* decision to prosecute. Siegler was only one of four people who recommended a capital-murder charge against Ayestas, the last of which was the elected District Attorney himself. Importantly, then-District Attorney Holmes was the final call on whether to capitally prosecute someone. *See* Argument IV.A, *supra*. And in Ayestas's case, Holmes explicitly handwrote the reasons for his charge against Ayestas: Ayestas was the killer, or "triggerman," of the three co-defendants.

Indeed, even by the time Siegler prepared the memo, Harris County was already aware that Ayestas's fingerprints had been found on "a roll of tape," and Ms. Paneque had been "strangled to death with duct tape around her throat." ECF No. 82-1, at 2–3. Further, Holmes's notation that the two "non-killers," Meza and Gutierrez, could be pled out to aggravated robbery while death was sought against Ayestas turned out factually to be true—Meza and Gutierrez both pleaded guilty to aggravated robbery upon *the State's* motion to

59

reduce the capital murder charges against them. Ex. A, at 16, 23, 28; Ex. C, at 4. Notably, the State's theory that Ayestas was the killer was consistent both with the evidence presented at Ayestas's trial, *see* 20 RR 308 ("[T]he type of noise that [Ayestas], as he wants to do, does not want to leave a witness and he goes in there and he kills her. . . . And for some three to six minutes he sets about taking her life."), *and* with the State's theory as explained at Meza's sentencing hearing, *see* Argument IV.A, *supra*.

This evidence supports the *only* explicit reason for seeking death against Ayestas listed on the Siegler memo by then-District Attorney Holmes. Thus, Ayestas, at best, shows that Harris County capitally prosecuted him *in spite of* his citizenship status. He does not show that they did so *because of* it. This is insufficient for meeting the high burden necessary to overcome the presumption that the prosecutors properly discharged their duties. His claim should be denied. *See Wayte*, 470 U.S. at 610.

### 4. Ayestas's race-and national origin-discrimination by proxy argument entirely fails to state an Equal Protection claim.

Ayestas's race- and national origin-by-proxy claim fails as a matter of proof for several reasons. First, race and national origin are distinct concepts from unlawful alienage, and *nothing* on the face of the Siegler refers to the former two classifications. *See generally* ECF No. 82-1. Indeed, it should go without saying that unlawful aliens can be of many races and national origins.

Second, Ayestas's two co-defendants committed the same crime, were all of the same ethnicity, and were all from the same country. *See* Argument IV.A, *supra*. Yet they were not all capitally prosecuted and sentenced to death. *Id*. Thus, there is no proof that Harris County discriminated against Ayestas based on his race or national origin. In fact, Harris County moved to reduce the two co-defendants' capital murder charges to aggravated robbery. *Id*. There would be no reason to do so if it was motivated to discriminate against Meza and Gutierrez because of their race and national origin.

Third, his attempt to provide proof that rebuts "the presumption of regularity" afforded to prosecutorial decisions by pointing to Siegler's "well-established history of violating *Brady*, breaching her duties of candor, and misrepresenting [Harris County] policy," *see* Am. Pet. 15, is inadmissible. Indeed, these arguments are an impermissible attempt by Ayestas to suggest that, because Siegler has committed allegedly bad acts in other instances,[25]

---

[25]     The cases Ayestas cites to establish Siegler's purported "record of misconduct" have limited, if any, value. While a federal district court recently granted relief on claims related to Siegler, that case is currently on appeal before the Fifth Circuit and is therefore not final. *See Prible v. Davis*, No. H-09-CV-1896, 2020 WL 2563544, at *35 (S.D. Tex. May 20, 2020); Notice of Oral Argument, *Prible v. Lumpkin*, No. 20-70010 (5th Cir. Aug. 20, 2021). Further, Ayestas cites to the state trial court's findings of facts and conclusions of law in the *Temple* case, but the trial court is not the final arbiter of habeas cases in Texas. And in the CCA, only four judges found that Temple was entitled to *Brady* relief. *See Ex parte Temple*, No. WR-78,545-02, 2016 WL 6903758, at *1, *3 (Tex. Crim. App. Nov. 23, 2016) (Judges Richardson, Meyers, Johnson, and Alcala writing for majority and granting relief on *Brady* claim). The fifth judge of an eight-person court (Judge Newell did not participate, *id*. at *4) concurred only in judgment, holding that he "would not grant relief on the basis of

she somehow has a propensity to act discriminatorily on the basis of race in *this* case. This is inadmissible character evidence that cannot be used to prove his selective-prosecution claim. Fed. R. Evid. 404(a) ("Evidence of a person's character or character trait is not admissible to prove that on a particular occasion the person acted in accordance with the character or trait.").

Fourth, Ayestas's reliance on the findings and conclusions about Siegler in other cases is inadmissible for two other reasons: they are hearsay and unfairly prejudicial. Fed. R. Evid. 801(c), 903. Indeed, many of the circuit courts that have considered the issue have held that judicial fact-findings and opinions in other cases are not admissible evidence in another case. *See United States v. Sine*, 483 F.3d 1021, 1031 (9th Cir. 2007) (government's use of factual findings contained in another judge's order during cross examination "unfairly prejudiced Sine" and "impermissibly placed hearsay evidence before the jury"); *Herrick v. Garvey*, 298 F.3d 1184, 1191 (10th Cir. 2002) (holding that evidence of a district court opinion was hearsay); *Int'l Land Acquisitions, Inc. v. Fausto*, 39 F. App'x 751, 756 (3rd Cir. 2002) (same); *U.S. Steel, LLC, v. Tieco, Inc.*, 261 F.3d 1275, 1287 (11th Cir. 2001) (factual findings made by district court in separate case are hearsay that cannot be judicially noticed or admitted and

---

[Temple]'s *Brady* claims" and instead would grant relief on ineffective-assistance-of-counsel claims. *Id*. at *4 (Yeary, J., concurring). Thus, *Ex parte Temple* is a plurality opinion in which no majority found that *Brady* had been violated.

were unduly prejudicial); *CPC Int'l, Inc. v. Northbrook Excess & Surplus Ins. Co.*, 144 F.3d 35, 45 (1st Cir. 1998) (upholding district court's exclusion of other courts' findings on Rule 403 grounds); *Nipper v. Snipes*, 7 F.3d 415, 417 (4th Cir. 1993) (judicial fact-findings entered in state court in different case were hearsay); *cf. Taylor v. Charter Med. Corp.*, 162 F.3d 827, (5th Cir. 1998) (court cannot take judicial notice of another court's determination of mixed question of fact and law because it is not an "adjudicative fact" or beyond "reasonable dispute" as required by Federal Rule of Evidence 201).

Finally, Ayestas's bald assertion that "[a]lmost all foreign nationals that Texas prosecutes are Latino and from Latin America" is entirely insufficient to support the leap he makes from what the Siegler memo says on its face to a race- or national origin-discrimination-by-proxy argument. *See* Am. Pet. 15 n.3 (citing *Less Than 5 Percent of Texas Prison Inmates are Undocumented*, The Texas      Tribune      (Feb.      19,      2016)      ("*Less      than      5      Percent*"), https://www.texastribune.org/2016/02/19/ice-recordsreveal-makeup-undocum ented-prison-popu/). Certainly, as the article notes, it is unsurprising that there's a higher number of Mexican prisoners "given [Mexico]'s proximity to the United States." *Less Than 5 Percent*. And interestingly, the same article points out that while undocumented immigrants make up 6.3% of Texas's population, they make up only 4.6% of prisoners with standing immigration

detainers.[26] *Id.* This suggests, contrary to Ayestas's insinuations otherwise, that Texas *under*-prosecutes undocumented immigrants. In any event, Ayestas's attempt to rely on faulty, incomplete statistics to prove up why Siegler likely discriminated based on race and national origin is just like the type of statistical evidence rejected in *McCleskey*. 481 U.S. at 297 (holding statistical study by expert was insufficient to support inference that any decisionmakers in petitioner's case acted with discriminatory purpose). In short, nothing but Ayestas's conjecture and inadmissible evidence supports finding that race or national origin were even remotely considered by Harris County in its charging decisions.

But Ayestas's race- and national-origin-by-proxy claim also fails for the same reasons his alienage claim does: he makes absolutely no effort to point to any similarly situated defendants who were *not* prosecuted. *See* Argument IV.B.2, *supra*. This is as fatal to the merits of his claim as it is to any requests for discovery he might seek for this fishing expedition. *See Armstrong*, 517 U.S. at 464. Ayestas's selective-prosecution claim must therefore be denied.

---

[26]     This qualification, i.e., undocumented immigrants who U.S. Immigration and Customs Enforcement have placed detainers on, makes the relevance of this article extremely limited. Indeed, it's a self-selective statistic because it presumes that ICE was made aware of a specific inmate's status and thought it worth placing a detainer on such inmate. Moreover, the article says nothing about the makeup of prisoners who *Harris County*, as opposed to Texas as a whole, prosecuted.

### C. Ayestas's Eighth Amendment claim is *Teague* barred and without merit.

Ayestas finally claims that the Eighth Amendment's prohibition against cruel and unusual punishment somehow has application to Harris County's charging decisions. Am. Pet. 16–18. Ayestas does so because he believes that his burden of proof under the Eighth Amendment is lower than his burden of proof under the Equal Protection Clause. *See id.* at 17 ("The [Director] may maintain that Mr. Ayestas has not established discriminatory purpose and that his Equal Protection claim therefore fails, but such a contention, even if meritorious . . . cannot defeat Mr. Ayestas's Eighth amendment claim."). He cherry-picks language from several cases he believes stand for the proposition that Harris County's charging-decision consideration of his citizenship status is a violation of the Eighth Amendment's proscription against arbitrariness in capital sentencing proceedings. *Id.* at 16–18 (citing *Brown v. Sanders*, 546 U.S. 212, 216 (2006); *McCleskey*, 481 U.S. at 279; *Turner v. Murray*, 476 U.S. 28 (1986); *Godfrey v. Georgia*, 446 U.S. 420 (1980); and *Furman v. Georgia*, 408 U.S. 238 (1972) (Douglas, J., concurring)).

But Ayestas's cases do not say what he thinks they say. First, one of his cases doesn't discuss the Eighth Amendment at all, instead analyzing the Sixth Amendment right to an impartial jury in a capital case. *See Turner*, 476 U.S. at 36 ("By refusing to question prospective jurors on racial prejudice, the trial

65

judge failed to adequately protect petitioner's constitutional right to an impartial jury [under the Sixth Amendment].")). Second, the cases that *do* address the Eighth Amendment hold that a *trier of fact* in a capital case cannot rely on arbitrary or unconstitutional standards when deciding whether to impose a death sentence at trial. *See, e.g.*, *Brown*, 546 U.S. at 216 (holding that "[a]n invalidated sentencing factor . . . will render [a death] sentence unconstitutional by reason of its adding an improper element to the aggravation scale in the weighing process *unless* one of the other sentencing factors enables the sentencers to give aggravating weight to the same facts and circumstances"); *McCleskey*, 481 U.S. at 308 (holding that because McCleskey's sentence "was imposed under Georgia sentencing procedures that focus discretion 'on the particularized nature of the crime and the particularized characteristics of the individual defendant'" his sentence was not "wantonly and freakishly" imposed and was thus not disproportionate "within any recognized meaning under the Eighth Amendment"); *Godfrey*, 446 U.S. at. 423, 429 ("standardless and unchanneled imposition of death sentences in the uncontrolled discretion of a basically uninstructed jury" violated Eighth Amendment).

These cases' holdings are consistent with the Supreme Court's Eighth Amendment jurisprudence, which has historically "centered on the *procedures* by which a death sentence is *imposed*." *McCleskey*, 481 U.S. at 304 (emphasis

added). But Ayestas's claim has nothing to do with the procedures by which the jury imposed the death sentence in his case. Rather, his claim is centered on the aggravating factors considered by Harris County in deciding how to *charge* him. Indeed, Ayestas makes no allegation that the jury considered any impermissible factor when it decided to find Ayestas eligible for the death penalty by convicting him of capital murder and when it subsequently decided that Ayestas should be sentenced to death.

Thus, as in *McCleskey*, Ayestas "cannot argue successfully that his sentence is 'disproportionate to the crime in the traditional sense.'" *Id*. at 305 (quoting *Pulley v. Harris*, 465 U.S. 37 (1984)). Ayestas "does not deny that he committed a murder in the course of a [] robbery, a crime for which th[e] Court has determined that the death penalty may be imposed." *Id*. And "where the statutory procedures adequately channel the sentencer's discretion," as they did here, a "proportionality review is not constitutionally required." *Id*. at 306. In light of the fact that Ayestas was the killer and was charged on that basis, Ayestas cannot establish that his sentence was arbitrary or "disproportionate within any recognized meaning under the Eighth Amendment." *Id*. at 308; *cf. United States v. Ryan*, 874 F.2d 1052, 1055 (5th Cir. 1989) (rejecting Equal Protection claim because "court has complete discretion to consider the relative degrees of responsibility of co-defendants in imposing restitution obligations").

What is left, then, is Ayestas's wish that the Eighth Amendment should apply to a prosecutor's charging decisions. But he cites no case that establishes the required nexus between the Court's concern about reliable and particularized sentencing decisions and a prosecutor's far-earlier-in-time charging decision. In other words, Ayestas asks this Court to extend the Eighth Amendment to charging decisions, but such an extension would be barred by *Teague*. *See* Argument IV.B.1, *supra*; *see also Teague*, 489 U.S. at 301 (a rule is new "if the result was not *dictated* by precedent existing at the time the defendant's conviction became final"). Ayestas's Eighth Amendment claim is thus barred by nonretroactivity principles and without merit. His petition should be denied.

## CONCLUSION

For the foregoing reasons, the Director respectfully requests that the Court deny Ayestas's petition and deny him a certificate of appealability.

Respectfully submitted,

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

JOSH RENO
Deputy Attorney General
for Criminal Justice

                                        EDWARD L. MARSHALL
                                        Chief, Criminal Appeals Division

                                        s/ Gwendolyn S. Vindell
                                        GWENDOLYN S. VINDELL*
                                        Assistant Attorney General
*Lead Counsel                           State Bar No. 24088591
                                        Southern ID No. 2202376

                                        P.O. Box 12548, Capitol Station
                                        Austin, Texas 78711-2548
                                        (512) 936-1600
                                        (512) 320-8132 (Fax)
                                        E-mail: gwendolyn.vindell2@oag.texas.gov

                                        ATTORNEYS FOR RESPONDENT

## CERTIFICATE OF SERVICE

I do hereby certify that a true and correct copy of the foregoing pleading was served by placing same in the United States Mail, postage prepaid, on the 16th day of March, 2022, addressed to:

Sheri L. Johnson
Cornell University
School of Law
240 Myron Taylor Hall
Ithaca, NY 14853-4901

Lee Benjamin Kovarsky
Phillips Black, Inc.
727 East Dean Keeton Street
Jon 6.222
Austin, TX 78705

                                        s/ Gwendolyn S. Vindell
                                        GWENDOLYN S. VINDELL
                                        Assistant Attorney General