**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| CARLOS MANUEL AYESTAS, a/k/a<br>Dennis Humberto Zelaya Corea<br><br>Petitioner,<br><br>v.<br><br>BOBBY LUMPKIN, Director, Texas<br>Department of Criminal Justice,<br>Correctional Institutions Division<br><br>Respondent. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | <br><br><br><br>USDC No. 4:09-cv-2999<br><br><br>Capital Case |

## REPLY IN SUPPORT OF MOTION FOR DISCOVERY

There is good cause for discovery because there is a "reason to believe" that Mr. Ayestas may be entitled to relief "if the facts are fully developed." *Bracy v. Gramley*, 520 U.S. 899, 908–09 (1997). The discovery sought is material to the Eighth and Fourteenth Amendment claims in the Amended Petition, and a court could not conclude *on the pleadings* that such evidence will be excluded. In fact, the existing record makes clear that Court-ordered discovery is neither futile nor a fishing expedition. Additionally, the law governing habeas discovery orders does not, as the Director seems to suggest, require a claimant to prove, on the pleadings, that no procedural defense bars relief.

## I. *TWYFORD* AND *RAMIREZ* DO NOT CUT AGAINST DISCOVERY HERE.

The Director cites *Shoop v. Twyford*, 142 S. Ct. 2037 (2022) and *Shinn v. Ramirez*, 142 S. Ct. 1718 (2022) as though they are atmospherically inconsistent with any order granting Mr. Ayestas's requests. *Twyford*, however, establishes that discovery should be barred only when it has no realistic chance of yielding admissible evidence. *Ramirez*, in pertinent part, bars claimants

1

from using evidence on procedural issues to prove the merits unless that evidence escapes 28 U.S.C. § 2254(e)(2). Neither case blocks discovery here.

**A.**      **The _Twyford_ Claimant Made No Meaningful Attempt To Link Requested Discovery To Claims Or To Explain How Evidence Might Be Admitted.**

Per the Director, _Twyford_ supports a general principle that fact development must proceed in view of downstream limitations on evidence. Resp't Opp'n to Ayestas's Mot. for Disc. 5, ECF No. 129 ("Opp'n to Disc."). While a court must "take into account these restrictions," the discovery sought here is nothing like the orphaned fact development order in _Twyford_. _Id_ at 4. (quoting _Twyford_). The claimant in _Twyford_ sought an order requiring the state to transport him for mental health testing, but he "never explained how the results of the neurological testing could be admissible in his habeas proceeding, and it is hard to see how they could be." _Id._ at 2046. _See also id._ ("[H]e did not identify the particular defaulted claims he hopes to resurrect, nor did he explain how the testing would matter to his ability to do so."). Lacking credible arguments linking the transport order to the underlying claim, _Twyford_ held that fact development would be "needless" and that claimants should not be entitled "to fish for unusable evidence, in the hope that it might undermine his conviction in some way." _Id._ at 2045–46.

In this case, however, the discovery motion expressly sets forth the link between the requested discovery and potential relief. Pet'r's. Mot. for Disc. 5–9, ECF No. 126. As set forth in the Motion, the facts to be developed go directly to the question of whether the Harris County District Attorney's Office ("HCDA") discriminated on the basis of alienage, race, or national origin—which are the grounds for relief appearing in the Amended Petition. The material in the Motion relates to the HCDA's treatment of Mr. Ayestas's case, and to important evidence about treatment of comparators. _Twyford_ is a common-sense limit on fishing expeditions and futile fact development, not on the type of discovery sought here.

**B.** **_Ramirez_ Held That Evidence Introduced In A Procedural-Issue Hearing Must Satisfy § 2254(e)(2) Before Being Considered On The Merits, And Mr. Ayestas Does Not Claim Otherwise.**

Second, the Director repeatedly cites *Ramirez*,[1] a case about holding evidentiary hearings, as an atmospheric rule constraining discovery. But *Ramirez* does not stand for the Director's more granular propositions: that a court must always decide questions of evidence admissibility *on the pleadings* before ordering any discovery on either the merits or procedural issues. *Ramirez* explained that a claimant could not introduce substantive evidence on an underlying claim during a procedural-issue hearing and then subsequently introduce that same evidence *on the merits* without complying with the strictures of § 2254(e)(2). The Court held: "[W]hen a federal habeas court convenes an evidentiary hearing for any purpose, or otherwise admits or reviews new evidence for any purpose, it may not consider *that evidence on the merits* of a negligent prisoner's defaulted claim unless the exceptions in § 2254(e)(2) are satisfied." *Ramirez*, 142 S. Ct. at 1738 (emphasis added).

Unlike *Ramirez*, Mr. Ayestas is not trying to sneak around § 2254(e)(2) by introducing merits evidence at a hearing over a procedural issue. Mr. Ayestas concedes, as he must, that this Court will not be able to take evidence on the merits unless he complies with the restriction in § 2254(e)(2). Mr. Ayestas's argument is, primarily, that he did not "fail to develop" the Siegler Memorandum claims within the preambular text. *See* Mr. Ayestas's Reply in Supp. of Am. Pet. and Opp'n to Mot. for Summ. J. 1–3, 26–31, 34–37, 40–42, 47–51, ECF No. 124 ("Reply"); *see also id.* at 47–49 (explaining why Mr. Ayestas did not "fail to develop" factual predicate for

---

[1] This Reply uses the short for *Ramirez* instead of *Martinez Ramirez* so as to avoid confusion with *Martinez v. Ryan*, 566 U.S. 1 (2012), and because that is the short form that Mr. Ayestas used to refer to the case in other briefing.

§ 2254(e)(2) purposes); *id.* at 49–51 (explaining how Mr. Ayestas can satisfy subsectional requirements for introducing new evidence even if the Court found that he "failed to develop").

II.     <u>**DISCOVERY ON THE MERITS ISSUES IS NOT PREMATURE.**</u>

The Director's primary tactic is familiar: he bootstraps his discovery opposition to procedural defenses while claiming to win on the pleadings. *See* Opp'n to Disc. at 5 (procedural default, limitations, and § 2254(e)(2)). Mr. Ayestas fulsomely addressed the Director's claimed procedural defenses in prior pleadings. *See* Reply at 23–29 (limitations); *id.* at 40–46 (procedural default); *id.* at 46–52 (§ 2254(e)(2)).

The Director also repeats the argument that preclusion-adjacent doctrines bar fact development on the question of diligence. Opp'n to Disc. at 5–6. (These include law-of-the case arguments about decisions of this Court and the Fifth Circuit.) As Mr. Ayestas previously explained, (1) those prior decisions do not trigger law of the case; (2) even if they did, Mr. Ayestas satisfies multiple exceptions; and (3) this Court has already held that Mr. Ayestas has escaped any law-of-the-case limitations. *See* Reply at 31–33 (addressing both the Texas Court of Criminal Appeals ("TCCA") and Fifth Circuit decisions). And it bears repeating that, to the extent that any presumption attaches to any prior inference on diligence, nothing bars discovery to develop the facts necessary to overcome it.

Finally, the Director's argument that this Court would abuse its discretion by ordering any merits-based discovery prior to issuing a fact-bound decision on diligence is preposterous. The Director has not cited one case which stands for this proposition—when procedural defenses turn on a fact-intensive question of diligence, those defenses do not block discovery unless the Director is entitled to judgment as a matter of law on diligence in the pleadings posture.

### III. <u>DISCOVERY ON THE DILIGENCE ISSUES IS NOT PREMATURE.</u>

The Director, citing *Ramirez*, also argues that Mr. Ayestas should not be permitted discovery into any procedural issues unless the Court determines (again on the pleadings) that § 2254(e)(2) would eventually permit consideration of merits evidence. Opp'n to Disc. at 7–8. However, as explained above, *Ramirez* concerned whether evidence presented during a procedural hearing could *automatically* be considered on the merits without the claimant having to satisfy § 2254(e)(2). Nothing about that opinion has any bearing on whether Mr. Ayestas is entitled to discovery when he is not seeking to circumvent § 2254(e)(2).

The Director's § 2254(e)(2) argument also makes little logical sense. When § 2254(e)(2) bars new evidence on claims for which a claimant "failed to develop" factual predicates, it is imposing a diligence requirement. *Ramirez*, 142 S. Ct. at 1735 ("the opening clause of § 2254(e)(2) codifies [a judicially created] threshold standard of diligence"). For that reason, when the Director argues that there can be no discovery into procedural defenses unless diligence is established, he is arguing that there can be no discovery into diligence unless the movant proves diligence on the pleadings. But the law isn't that question begging.[2] This Court can easily rule *in favor of* Mr. Ayestas on the pleadings,[3] but it certainly cannot rule *against* him in that posture; and if it cannot rule against him in that posture, then the pleaded defenses don't block discovery.

Moreover, this Court has already rejected the Director's arguments. As grounds for reopening the judgment, and for escaping the mandate rule and law of the case, Mr. Ayestas

---

[2] If the Director means only to say that there needs to be a sufficient possibility of satisfying § 2254(e)(2) after discovery is complete, such a standard is easily satisfied with the material in the record.

[3] The Director continues to make the bizarre argument that Mr. Ayestas has not steadfastly maintained his diligence. Mr. Ayestas documented his history of alleging diligence in the Response to Motion to Strike. Resp. to Mot. to Strike 3–6, ECF No. 127.

pointed to: (1) the Director's concession that it had in fact treated the Siegler Memorandum as work product, (2) an intervening change in law (*Banister v Davis*, 140 S. Ct. 1698 (2020)), and (3) the taint of rank discrimination as a miscarriage of justice. Mot. For Relief from J. Pursuant to Rule 60(b)(6) 10–20, ECF No. 82; *see also* Reply In Supp. of Mot. for Relief From J. Pursuant to Rule 60(b)(6) 11–12, ECF No. 92 (offering additional argument on the mandate rule). This Court ultimately determined that *Banister* was an "intervening change in law" which established that its prior opinion "was incorrect," and that a failure to permit further litigation would risk "injustice" and "undermin[e] public confidence in the judicial process." Memorandum Opinion and Order Granting Relief from J. Pursuant to Rule 60(b)(6) 5, 7–8, ECF No. 93.[4] It also held that, because "newly discovered evidence are an exception to the mandate rule[,]" that rule is "not a bar to Ayestas's current Rule 60(b) motion." *Id.* at 6. These findings resolve the law-of-the-case question, because the law-of-the-case exceptions are the same as the exceptions that Mr. Ayestas proved when he escaped the mandate rule and reopened the case under Rule 60(b). *See United States v. Matthews*, 312 F.3d 652, 657 (5th Cir. 2002) (mandate rule is "a specific application of the general doctrine of law of the case"); Mot. For Relief from J. Pursuant to Rule 60(b)(6) 8 n.5, ECF No. 82 (explaining that showing sufficient to satisfy Rule 60(b) is sufficient to satisfy mandate rule).[5]

The Director supports his law-of-the-case position, itself foreclosed by law of the case, with several off-point decisions not applicable to the facts here. The Director cites to *Akinyemi v. Napolitano*, 347 F. App'x 604, 607 (2d Cir. 2009) (unpublished and cited in Opp'n to Disc. at 10),

---

[4] The Court has not yet formally ruled on whether the Director misrepresented the availability of the Siegler Memorandum in the earlier phases of the litigation.

[5] The exceptions to the mandate rule and law of the case are the same: (1) new facts, (2) new law, and (3) clear error or manifest injustice. *See Webb v. Davis*, 940 F.3d 892, 897 (5th Cir. 2019) (exceptions for mandate rule); *Matthews*, 312 F.3d at 657 (exceptions for law of case); *see also id.* ("The mandate rule, however, has the same exceptions as does the general doctrine of law of the case[.]").

where the claimant sought to reopen an issue based only on new evidence but "offered no proof that this evidence was not available earlier and gave the court no other reason to deviate from its prior ruling." *Id*. The Director also cites to *Bishop v. Smith*, 760 F.3d 1070, 1087 (7th Cir. 2014) (cited in Opp'n to Disc. at 9) where the claimant sought to reopen a settled issue on the basis of her own affidavit which had not been presented to the court when she had an earlier chance to do so. *Id*. at 1086–88. Lastly, the Director cites to *Vidimos, Inc., v. Wysong Laser Co., Inc*., 179 F.3d 1063, 1065–66 (7th Cir. 1999) (cited in Opp'n to Disc. at 10–11) where the petition was "based not on intervening authority, new (and heretofore undiscoverable) evidence, or other changed circumstances that justify waiver of the doctrine." *Id*. Mr. Ayestas's grounds for escaping law of the case, by contrast, are not based on evidence available during the prior adjudication (as in *Smith* and *Akinyemi*) and do not disguise a garden-variety motion for reconsideration (as in *Vidmos*).

Next, and without citing to any case that supports the proposition, the Director demands that Mr. Ayestas overcome a presumption that attaches to an implied determination of non-diligence made by the TCCA prior to the taking of any discovery—and insists that Mr. Ayestas may only overcome that presumption using evidence in the state record. *See* Opp'n to Disc. at 11–13. It is true that evidence *on the underlying claim* will have to satisfy § 2254(e)(2) or escape § 2254(d), and the Director's cases are about such evidence—they are not referring to evidence *on the procedural question of diligence.* Evidence about the diligence necessary to resolve procedural defenses is not addressed by the provisions or precedent the Director cites. Moreover, none of the cited cases suggest that non-merits evidence on federal procedural defenses need to be exhausted in state courts in the same way that evidence on the merits must.

## IV. THERE IS GOOD CAUSE.

### A. The Court Could Not Conclude On The Basis Of The Pleadings That The Procedural Bars Do Not Preclude A Good Cause Showing

The Director's procedural defenses do not preclude Mr. Ayestas's good cause on the pleadings. The Director argues that Mr. Ayestas cannot show good cause for discovery because his "claims suffer from a number of procedural issues that preclude federal habeas relief." Opp'n to Disc. at 15. Mr. Ayestas refuted each of the Director's arguments at length in prior pleadings and does not repeat them in full here. *See* First Am. Pet., 25–27, ECF No. 101; Reply at 40–45. In addition to those previously-made arguments, this Court could not conclude that the Director's pleadings preclude discovery for two additional reasons. First, the Director cannot show that he will prevail on his procedural defenses *after* all the discoverable evidence is acquired. Indeed, discovery could reveal important information about the Siegler Memorandum, as well as HCDA's policies and practices, that prove Mr. Ayestas's entitlement to relief. Second, discovery is necessary to resolve the very procedural defenses the Director claims are dispositive. For example, inquiry into the availability of the Siegler Memorandum before its inadvertent disclosure in December 2014 would clarify whether the Director's diligence-related defenses have merit.

The Director's procedural defenses do not preclude discovery because they do not prevent this Court from reaching the merits of Mr. Ayestas's claims. The good cause standard for discovery in habeas cases is meant to give a petitioner who raises specific allegations a chance to develop facts that will show his entitlement to relief. *See Bracy*, 520 U.S. at 908–09. "The 'good cause' that authorizes discovery under Rule 6(a) requires a showing 'that the petitioner may, *if the facts are fully developed*, be able to demonstrate that he is . . .entitled to [habeas] relief.'" *Rucker v. Norris*, 563 F.3d 766, 771 (8th Cir. 2009) (quoting *Bracy*, 520 U.S. at 909) (emphasis added).

The Director recites familiar procedural arguments as bars to discovery on some of those same procedural arguments. *See* Opp'n to Disc. at 19 (arguing Mr. Ayestas's petition is successive, untimely, or barred by an adequate and independent state procedural ground). The answers remain the same. *See* Reply at 29–33 (Mr. Ayestas's petition is not successive and this court has therefore reopened the final judgment); Order Granting Relief from J. Pursuant to Rule 60(b)(6) 5 ("Ayestas's current rule 60(b) Motion. . . is not a successive petition."); Reply at 33–36 (The claims are timely because Mr. Ayestas diligently pursued relief both before and since the discovery of the Siegler Memorandum.); Reply at 44–49 (Mr. Ayestas is entitled to equitable tolling because he has diligently pursued habeas relief despite extraordinary circumstances that prevented his timely filing of an amended petition, and because denying merits review of Mr. Ayestas's claims would sanction a miscarriage of justice); Reply at 50–56 (Mr. Ayestas's procedural default is excused under the cause-and-prejudice and miscarriage-of-justice gateways); Reply at 52–55 (There is prejudice from the default on two separate grounds). As explained below, the parties' dispute over Mr. Ayestas's diligence in seeking the Siegler Memorandum reinforces the need for discovery.

Discovery is necessary to resolve the Director's procedural defenses themselves, including whether to have an evidentiary hearing at all. *See* Advisory Committee Notes to Rules Governing § 2254 Cases, Rule 6(a) ("Discovery may, in appropriate cases, aid in developing facts necessary to decide whether to order an evidentiary hearing or to grant the writ following an evidentiary hearing."). The Director argues that Mr. Ayestas's claims are untimely because "he was not diligent in seeking the factual predicate of his claims," namely, the Siegler Memorandum. Opp'n to Disc. at 15. Mr. Ayestas has explained why this is wrong. *See* Reply at 33–44. The HCDA withheld the Siegler Memorandum as privileged attorney work product, a fact which the Director admitted to the Supreme Court. *Id.*; Br. in Opp'n at 18 n.10, *Ayestas v. Davis*, 138 S. Ct. 1080

(2018) (No. 16-6795). But since his admission, the Director has repeatedly contradicted himself, insisting that Mr. Ayestas has not "offered any evidence that Harris County asserted work product privilege over the Siegler memo in this case. . . ." Resp't. Ans. and Mot. for Summ. J. at 17, ECF. No. 115; *see* Resp't. Mot. to Strike at 5, ECF No. 125 ("[Mr. Ayestas] still offers no evidence suggesting Harris County specifically withheld the Siegler memo as work product"). The parties' dispute over whether Mr. Ayestas was diligent in seeking the Siegler Memorandum illustrates the need for inquiry into the facts surrounding the document's creation and availability. This Court should give Mr. Ayestas the opportunity to seek the evidence the Director insists upon—evidence that is directly relevant to the Director's procedural defenses.

### B. Retroactivity Does Not Bar a Good Cause Showing.

The Director renews his retroactivity arguments, this time in service of an assertion that nonretroactivity precludes Mr. Ayestas from making the "prima facie showing of the merits of his claims" required to establish good cause for discovery. Opp'n to Disc. at 17. For starters, the rule of nonretroactivity is a limit on remedies, not a question of merit. Nonetheless, as set forth in greater detail in Mr. Ayestas's Reply, retroactivity principles do not bar relief and therefore do not bar a good cause showing.

Respondent's Answer contends that *Teague v. Lane*, 489 U.S. 288 (1989), precludes relief on Mr. Ayestas's Equal Protection and Eighth Amendment claims. But, as explained in Mr. Ayestas's reply, that contention cannot be squared with Supreme Court precedent defining what constitutes a "new rule." Reply at 3–5 (Equal Protection); *id.* at 15–18 (Eighth Amendment). With respect to "a rule of general application, a rule designed for the specific purpose of evaluating myriad factual contexts, it will be the infrequent case that yields a result so novel that it forges a new rule, one not dictated by precedent." *Chaidez v. United States*, 568 U.S. 342, 348 (2013)

(internal citations, quotation marks, and alterations omitted). None of the Director's pleadings have addressed this precedent; he has neither explained why the Eighth and Fourteenth Amendment rules at stake here are not general rules nor why those rules "yield a result so novel it forges a new rule, one not dictated by precedent." *Id*.

With respect to the Eighth Amendment claims, the Director offers nothing beyond what appeared in his Answer, which contended that the case law does not single out *prosecutors* as institutional actors specifically forbidden from reliance on arbitrary or impermissible factors. Resp. Ans. and Mot. for Summ. J. at 68. The Answer did not cite a single case which limited the Eighth Amendment rule to "triers of fact," or even a case using that term. Reply at 17. Furthermore, the language that the Court does use cuts against such a granular limitation. *See, e.g.*, *McCleskey v. Kemp*, 481 U.S. 279, 304–05 (1987) ("Although our constitutional inquiry has centered on the procedures by which a death sentence is imposed, we have not stopped at the face of a statute, but have probed the application of statutes to particular cases."); *California v. Ramos*, 463 U.S. 992, 999 (1983) ("In ensuring that the death penalty is not meted out arbitrarily or capriciously, the Court's principal concern has been more with the *procedure* by which the State imposes the death sentence than with the substantive factors the State lays before the jury as a basis for imposing death . . . .") (emphasis in original and cited in Reply at 17). Thus, the relevant question under the applicable precedent is not *who* creates the risk of arbitrary and invidious discrimination, but the *substantiality of that risk*. The Eighth Amendment rule against the risk of arbitrary and invidious imposition of the death penalty is general, and the rule applied here is not "new" simply because it specifies the institutional source of that risk.

With respect to Mr. Ayestas's Equal Protection claims, the Director adds to his *Teague*-bar argument that Mr. Ayestas's Reply "cites unrelated case law to argue that, contrary to clearly

established selective-prosecution Supreme Court law, he does not have to prove discriminatory impact with reference to a similarly situated person who was not capitally prosecuted." Opp'n to Disc. at 17. This characterization is both confusing and wrong.

Of course an equal protection violation requires both intent and effect, but intent and effect are both alleged here. When a state actor (here, a prosecutor) takes action she would not have taken but for the defendant's race, and when that action adversely affects the defendant, it violates the Equal Protection Clause. The but-for cause of the action establishes discriminatory purpose, and the harm done to the defendant creates the discriminatory effects. True, the proof of both intent and effect are, in some cases, established by the existence of an otherwise identical comparator outside the suspect class who received more favorable treatment. Proving discriminatory effect, however, does not *require* a showing of favorable comparator treatment. *See* Reply at 8. There is both ample Supreme Court case law supporting that proposition (summarized below) and obviously intolerable implications for the converse proposition.

The Director asserts that Mr. Ayestas is "meld[ing] together disparate areas of case law to prove that his burden is lesser," Opp'n to Disc. at 18, but the Director is mistaken in two respects: (1) the cases regarding proof of effects are not from "disparate areas"; and (2) Mr. Ayestas is not urging a "lesser" burden with respect to proving effect. All of the cases Mr. Ayestas cited—*Miller-El v. Dretke*, 545 U.S. 231, 247 n.6 (2005) ("*Miller-El II*")*, Buck v. Davis*, 137 S. Ct. 759 (2017), and *Saldaño v. Texas*, 530 U.S. 1212 (2012)—are race discrimination cases and all arose in the criminal justice context. *Miller-El II* unmistakably rejected an identical-comparator requirement: "A *per se* rule that a defendant cannot win a[n equal protection] claim unless there is an exactly identical [comparator] would leave *Batson* inoperable; potential jurors are not products of a set of cookie cutters." 545 U.S. at 247 n.6. In fact, no Supreme Court *Batson* case suggests that any form

of comparative juror analysis is a *necessary* element of a winning *Batson* claim. If it were, then a prosecutor could announce his intent to strike all Black jurors, strike them all, and then triumphantly announce that no white juror was identical to any of the struck Black jurors. All that is required to establish a *Batson* violation is discriminatory purpose and discriminatory effect: the statement of his intent, which proves discriminatory motive, and the strike itself, which establishes the discriminatory effect.

Taken together, *Buck* and *Saldaño* also reject an identical-comparator rule for a prosecutor's use of racially biased expert testimony. At issue in both cases was expert testimony that a defendant is more likely to be a future danger because he is Latino or Black. In neither case did the State of Texas (as litigant) or the Supreme Court (as adjudicant) ever suggest that the constitutional claims should fail because an identically situated white defendant had not been sentenced to death. Indeed, in *Saldaño*, where the State had sponsored the testimony, it conceded error. *Saldaño* contains no identical-comparator requirement because it disclosed different proof of discriminatory effect: the presence of a facially discriminatory argument for death followed by a death sentence.[6] That is not *lesser* proof, but *a different form of* proof—and that same form of proof is also present here.

Finally, proof that Director's rule is wrong is reflected in its unworkability. As the Reply

_____

[6] The Director insists in a footnote that "Ayestas's citation to *Saldaño* means nothing" because "the only thing the Supreme Court did in its four-sentence order was grant the petition for writ of certiorari and remand the case to the CCA in light of the *confession of error* by the Solicitor General of Texas." 530 U.S. at 1212 (emphasis added and internal quotation marks omitted). This begs the question of why the State conceded error. It also ignores the Supreme Court's later characterization of *Saldaño*, which makes plain that the there was an Equal Protection violation without an identical comparator. *Buck* described the violation in *Saldaño* thusly: "The State's response to Saldaño's petition for certiorari succinctly expressed the injustice Saldaño had suffered[.] '*[T]he infusion of race as a factor for the jury to weigh in making its determination violated his constitutional right* to be sentenced without regard to the color of his skin.'" 137 S. Ct. at 778 (emphasis added).

notes, if an equal protection claim could survive summary judgment *only* when some identically situated comparator was not capitally prosecuted, then courts would be unable to address even extreme forms of racist behavior. Reply at 10. On the Director's rendering of equal protection law, a prosecutor could openly target defendants on the basis of race unless there existed a white defendant with identical characteristics.

Thus, Mr. Ayestas's Equal Protection claim falls within a general but very well-established rule: purposefully taking an action that harms an individual because of his or her race or alienage violates the Equal Protection Clause of the Fourteenth Amendment. That general rule prohibits invidious classification that enhances the punishment for a criminal offense: "When the law lays an unequal hand on those who have committed intrinsically the same quality of offense and sterilizes one and not the other, it has made as an invidious a discrimination as if it had selected a particular race or nationality for oppressive treatment." *McLaughlin v. Florida*, 379 U.S. 184, 194 (1964) (citing *Yick Wo v. Hopkins*, 118 U.S. 356 (1886)). *United States v. Armstrong,* 517 U.S. 456 (1996), reflects an even more particular application of the rule: "A selective-prosecution claim is not a defense on the merits to the criminal charge itself, *but an independent assertion that the prosecutor has brought the charge for reasons forbidden by the Constitution.*" *Id.* at 464 (emphasis added). The principle that prosecutors cannot discriminate on the basis of protected characteristics is not "new" just because it is a specific application of a general rule.

## C.     There Is Good Cause For Discovery Into The Equal Protection Claim.

The Director cites *Armstrong* both to argue that Mr. Ayestas's claim fails on the merits and to assert that Mr. Ayestas is not entitled to discovery. But the Director's reliance on *Armstrong* is misplaced on both counts. In *Armstrong*, the Supreme Court held that "[i]n order to dispel the presumption that a prosecutor has not violated equal protection, a criminal defendant must present

clear evidence to the contrary." *Id*. at 465 (internal quotation marks omitted). Here, however, Mr. Ayestas has presented extraordinarily clear evidence "to the contrary": the Siegler Memorandum, which articulates reliance on a constitutionally impermissible factor.

As discussed above with respect to *Teague*, an Equal Protection claim requires both proof of discriminatory purpose and proof of discriminatory effect. Mr. Ayestas has alleged and provided evidence of both. The Siegler Memorandum is strong evidence of discriminatory purpose with respect to alienage and also evidences discrimination on the basis of race and national origin. The HCDA sought and obtained death against Mr. Ayestas, and did so after consideration of the Siegler Memorandum. This is the only evidence of discriminatory effect needed at this stage of the proceedings. That the Director might dispute facts does not make the claims unworthy of discovery. For example, the Director's allegation that the strikethrough moots any prior discrimination does not preclude factfinding on the question.

The Director observes that the *Armstrong* defendants "moved for pre-trial discovery or for dismissal of the indictment because they believed they were selected for prosecution because they are black." Opp'n to Disc. at 22 (internal quotation marks omitted). Sure, but the *Armstrong* defendants presented no direct evidence of discriminatory purpose. *Armstrong* details a "background presumption" of regularity for charging decisions. 517 U.S. at 464. Where nothing upsets that background presumption, *Armstrong* also sets forth "the showing necessary for a defendant to be entitled to discovery on a claim that the prosecuting attorney singled him out for prosecution on the basis of his race." *Id.* at 458.

Unlike *Armstrong*, there is concrete and direct evidence of discrimination forming the basis for the discovery request here. The balance between the Government's interest in "vigorous prosecution" and the defendant's interest in avoiding selective prosecution changes in the presence

of clear evidence of discrimination, such as the Siegler Memorandum. *Armstrong* acknowledges as much: "We reserve the question whether a defendant must satisfy the similarly situated requirement in a case involving direct admissions by prosecutors of discriminatory purpose." *Id.* at 469 n.3 (internal quotation marks and alterations omitted). This is just such a case. Kelly Siegler, by her own written admission, deemed Mr. Ayestas's alienage a reason to seek death against him.

Mr. Ayestas is aware of only two cases where such admissions were present, and both eschewed the emphasis on direct comparators that *Armstrong* requires in cases lacking smoking-gun evidence. One such case is *United States v. Al Jibori*, 90 F.3d 22 (2d Cir. 1996). In *Al Jibori*, the Second Circuit, while noting that "the Supreme Court in *Armstrong* reserved the question whether a defendant must satisfy the similarly situated requirement" in circumstances involving "direct admissions by prosecutors of discriminatory purpose," held that such "admissions should sometimes justify further inquiry." 90 F.3d at 25. In *Pyke v. Cuomo*, 258 F.3d 107 (2d Cir. 2001), the Second Circuit elaborated on *Al Jibari*, expressly rejecting an identical-comparator rule for discovery in cases with smoking-gun evidence:

> [A] plaintiff who. . .alleges an express racial classification, or alleges that a facially neutral law or policy has been applied in an intentionally discriminatory race-based manner, or that a facially neutral statute or policy with an adverse effect was motivated by discriminatory animus, is not obligated to show a better treated, similarly situated group of individuals of a different race in order to establish a claim of denial of equal protection."

*Id.* at 108–10.

The invidious discrimination alleged here is not indirectly established on the basis of comparators, but is instead declared on the face of the Siegler Memorandum. The Second Circuit has the law right, and correctly reads *Armstrong* to exempt the discovery motion here from an identical comparator requirement. Instead, this Court must balance the State's interest in this case as against the defendant's. Here, the evidence of discriminatory purpose is strong, as is the

evidence of effect. The Siegler Memorandum openly declares alienage as a basis for capital prosecution, and Mr. Ayestas was thereafter prosecuted capitally and sentenced to death. Moreover, here, unlike in *Armstrong*, identification of similarly situated comparators lies in the hands of the State, for Mr. Ayestas cannot predict what factors the State might rely on to deem a comparator not "similarly situated"—given the multiplicity of factors that the decision to seek death might.[7] On the other side of the ledger is only the State's illegitimate interest in concealing misconduct and its interest in avoiding the administrative burden of discovery. Finally, *Armstrong* arose in a pretrial posture, and presents issues about the state's ability to make discretionary judgments that are not present in a post-conviction posture. Weighing these factors, Mr. Ayestas has established good cause for discovery into his Equal Protection claims.

---

[7] The Court's reasoning in *Armstrong* suggests that the difficulty of establishing a comparator, like the absence of direct evidence of invidious intent, is also material in determining when discovery is permissible. *Immediately* before stating that the appropriate balance between the "Government's interest in vigorous prosecution and the defendant's interest in avoiding selective prosecution" requires "a credible showing of different treatment of similarly situated persons," the Court noted that "*if the claim of selective prosecution were well founded, it should not have been an insuperable task to prove that persons of other races were being treated differently than respondents,*" *id.* at 470 (emphasis added). In doing so, it cited the possibility of investigating whether similarly situated persons of other races were prosecuted by the state, were known to federal law enforcement officers, and yet were not prosecuted in federal court. *See also, United States v. Tuitt,* 68 F. Supp. 2d 4, 10–14 (D. Mass. 1999) ("In urging the Supreme Court to reverse the Ninth Circuit Court of Appeals, the Solicitor General argued in his reply brief that the defendants had failed to avail themselves of California state court records which were open to inspection and could provide supporting data.") (citing *United States v. Armstrong,* 1996 WL 67650, at *16–17 (U.S. Reply. Brief 1996)). In capital prosecutions by a state, however, it would be an "insuperable task" to demonstrate different treatment of similarly situated persons, both because there is not a quickly available comparator group of defendants prosecuted by another sovereign, and because a capital defendant cannot predict what the state will deem "similarly situated," given the much wider range of factors that may enter into a particular office's decision to seek death.

**D.**    <u>There Is Good Cause For Discovery Into The Eighth Amendment Claim.</u>

The Director does not directly address whether there is good cause for discovery based upon Mr. Ayestas's Eighth Amendment claim. Instead, in a single sentence slipped in before he addresses at length the inappropriateness of discovery on the Equal Protection claim, he simply repeats the contention of his Answer: "[Petitioner's] Eighth Amendment claim is without merit because he makes no allegation that the trier-of-fact considered any impermissible factors when it convicted him of capital murder and sentenced him to death, and he hence cannot establish that his sentence was arbitrary or disproportionate. " Opp'n to Disc. at 18. He then cites his Answer at 65–67, but neither the throw-away sentence nor the pages he cites in his Answer provide a basis for denying discovery on this claim. Indeed, citing to the Answer for an Eighth Amendment argument would be difficult, because the Answer contains exactly four words on the merits issue. *See* Reply at 19 (underscoring the Director's failure to plead material responsive to merits on the Eighth Amendment claim).

The lack of any "allegation that the trier-of-fact considered any impermissible factors," Opp'n to Disc. at 18, does not doom Mr. Ayestas's Eighth Amendment claim because—as explained above—an Eighth Amendment claim does not require that a "trier of fact" relied on such factors. The Eighth Amendment bars capital sentences when the "circumstances under which they were imposed created an unacceptable risk that the death penalty [may have been] meted out arbitrarily or capriciously or through whim. . . or mistake." *Turner v. Murray*, 476 U.S. 28, 35–36 (1986) (citations omitted, alterations in original). *McCleskey v. Kemp* explicitly adopts the *Turner* formulation in evaluating an Eighth Amendment claim: The question "is at what point that risk becomes constitutionally unacceptable[.]" *McCleskey*, 481 U.S. at 308–09 (citing *Turner*, 476 U.S. at 36 n.8). Nothing in the articulation of this rule—literally, nothing anywhere—suggests the limit

that the Director wishes to impose: "that the trier-of-fact considered any impermissible factors."

The Director ignores the Reply's observation that the Answer failed to cite *any* Eighth Amendment Supreme Court case that even uses the "trier of fact" term, let alone one that imposes Eighth Amendment constraints to triers of fact. The question under the Eighth Amendment is not *who* has created a substantial risk of arbitrary or invidious imposition of the death penalty, but whether the *procedures employed* created such a risk. Because the Siegler Memorandum explicitly relies upon Mr. Ayestas's alienage as a reason for seeking death against him, even alone it establishes a substantial risk that alienage influenced the death sentence, and it creates good cause for discovery into the question of whether there was a substantial risk that race and/or national origin also influenced the charging decision.

The Director's briefing on discovery is fatally incomplete because he makes no argument directly addressing the discovery standard applicable to Eighth Amendment claims. And whatever limits *Armstrong* places upon discovery related to an Equal Protection claim, those limits have no bearing on discovery orders that permit factual development of the Eighth Amendment allegations. Because the ultimate burden in an Eighth Amendment claim is only to establish a substantial *risk* of arbitrary or invidious imposition, there would be no basis for conditioning discovery on a preliminary showing of discriminatory effect.

## V. THE REQUESTED DISCOVERY IS NOT FORECLOSED ON THE GROUND THAT IT IS A "FISHING EXPEDITION."

The Director asserts that Mr. Ayestas's discovery motion is a "fishing expedition." But the only case cited by the Director on this score, *Murphy v. Johnson*, 205 F.3d 809 (5th Cir. 2000), demonstrates the stark difference between a "fishing expedition" and the discovery sought by Mr. Ayestas. In *Murphy*, the Fifth Circuit held that the claimant had failed to demonstrate good cause "by virtue of his having failed to demonstrate the existence or concealment of [the impermissible

conduct] or that proof of such [impermissible conduct] would be material to the outcome." 205 F.3d at 814. Mr. Ayestas, by contrast, has identified the existence and concealment of a document that facially demonstrates that prosecutors charged capital murder based at least in part on his alienage. Unlike *Murphy*, where the petitioner's "conclusory allegation . . . [wa]s based purely on speculation," *id.*, Mr. Ayestas's discovery motion links the Siegler Memorandum and its rank discrimination to the charging decision. In fact, courts frequently find good cause, rather than "fishing expeditions," where petitioners have identified evidence supporting their claims. *See, e.g.*, *Reed v. Quarterman*, 504 F.3d 465, 474 (5th Cir. 2007) (finding good cause and granting discovery where petitioner "had produced medical evidence that suggests that the substance of McLean's testimony of [petitioner's] confession was false"); *Momennia v. Estrada*, No. 3-03-0525, 2003 WL 21318323, at *1 (N.D. Tex. May 21, 2003) (finding good cause for discovery where the claimant produced affidavits supporting his allegations regarding his FBI cooperation as an informant).

Mr. Ayestas is not fishing for some ground for relief. He wants to develop facts about a memorandum stating that a prosecutor sought death because Mr. Ayestas is a noncitizen, and he has already clearly alleged constitutional error under the Eighth and Fourteenth Amendments. This is precisely the basis for good cause as explained in *Bracy*, "where specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is . . . entitled to relief." 520 U.S. at 908–09. The discovery requests will develop the facts regarding the consideration of alienage in the charging decision, and therefore Mr. Ayestas's entitlement to relief. The Director complains that Mr. Ayestas requests "disciplinary files and other personnel files for every person who signed the memo." Opp'n to Disc. at 26. Any discriminatory intent of those four signatories undoubtedly would bolster Mr. Ayestas's claim for relief; the Director does not argue otherwise. Their disciplinary and personnel files are the least

burdensome and most efficient method for assessing whether they had any history of discriminatory animus.

## VI.  THE DIRECTOR'S STATUS AS CUSTODIAN DOES NOT PRECLUDE DISCOVERY FROM THE HCDA.

The Director also argues that the documents listed in Mr. Ayestas's discovery motion are not in the Director's possession and therefore that Mr. Ayestas's request must be denied. Opp'n to Disc. at 13–14. That is wrong. Mr. Ayestas moved under Rule 6 of the Rules Governing Section 2254 for the Court to authorize him to conduct discovery. Pet. Mot. for Disc. As described in Rule 6, "a judge may, for good cause, authorize a party to conduct discovery under the Federal Rules of Civil Procedure." Meaning, Mr. Ayestas seeks authorization from the Court to conduct discovery which would include, among other tools, serving third-party subpoenas under Federal Rule of Civil Procedure 45. *See* ECF No. 126-1 (Proposed Order stating: "Petitioner seeks to subpoena documents…). As the Director acknowledged, many of the documents that Mr. Ayestas seeks are in the possession of third parties, such as the Harris County District Attorney's Office. *See* Opp'n to Disc. at 13. The Director is the respondent on this discovery motion because it "act[s] in response to a petitioner's charge of unlawful detention." *Fierro v. Johnson*, 197 F.3d 147, 156 (5th Cir. 1999) (cited in Opp'n to Disc. at 13). But this does not mean that all of the discovery Mr. Ayestas seeks is from the Director.

Even if Mr. Ayestas's discovery requests were only aimed at the Director (and they are not), Mr. Ayestas could not know what information is in the Director's custody without first serving a discovery request on the Director and receiving a response—that is the point of discovery. The Director is the office that made the representation to the Supreme Court that the Siegler Memorandum was privileged, BIO at 18 n.10, *Ayestas v. Davis*, 138 S. Ct. 1080 (2018)

(No. 16-6795), and so it is certainly plausible that the Director would have in his possession some of the items listed in Mr. Ayestas's discovery request in order to have made that privilege assertion.

## CONCLUSION

For the foregoing reasons, Mr. Ayestas respectfully requests that this Court grant his motion seeking discovery related to the claims presented in his Amended Petition and in the Director's response thereto.

Dated:  October 21, 2022

Sheri Lynn Johnson
*\* motion to appear pro hac vice forthcoming*
Cornell Law School
240 Myron Taylor Hall
Ithaca, NY 14853
(607) 255-6478
slj8@cornell.edu

Respectfully submitted,

/s/ Lee B. Kovarsky
Lee B. Kovarsky
Phillips Black, Inc.
727 East Dean Keeton Street
Jon 5.231
Austin, TX 78705
(434) 466-8257
l.kovarsky@phillipsblack.org


Attorneys for Petitioner

## CERTIFICATE OF SERVICE

I hereby certify that on the 21st day of October 2022, I electronically filed the above and foregoing document using the CM/ECF system, which automatically sends notice and a copy of the filing to all counsel of record.

*/s/ Lee Kovarsky*