# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| CARLOS MANUEL AYESTAS, | § | |
| | § | |
| Petitioner, | § | |
| | § | |
| v. | § | Civil Action No. 4:09-cv-2999 |
| | § | |
| BOBBY LUMPKIN, Director, Texas | § | |
| Department of Criminal Justice, Correctional | § | |
| Institutions Division, | § | (Death Penalty Case) |
| | § | |
| Respondent. | § | |
| | § | |
| | § | |

**PETITIONER'S MOTION TO COMPEL PRODUCTION OF VICTIM DEMOGRAPHIC INFORMATION OR, IN THE ALTERNATIVE, MOTION FOR DISCOVERY UNDER HABEAS RULE 6**

# TABLE OF CONTENTS

**Page**

I.     BACKGROUND ON DISCOVERY ...............................................................................2

    A.     Background on Discovery Proceedings.............................................................2

    B.     Ayestas's Requests for Victim Demographic Information...................................3

II.    MOTION TO COMPEL..............................................................................................5

    A.     Legal Standard...............................................................................................5

    B.     Argument.......................................................................................................6

        1.     Victim Demographic Information Is Clearly Relevant .............................7

        2.     There Is No Burden Associated With Producing the Victim
              Demographic Information ........................................................................10

        3.     The Director's Arguments That Ayestas Did Not Request Victim
              Demographic Information in Discovery Are Incorrect and
              Obstructive...............................................................................................10

              a.     Ayestas's Discovery Requests Were Encompassed by the
                    Rule 6 Order ................................................................................11

              b.     Ayestas's Discovery Requests Were Encompassed by His
                    August 7 Requests .......................................................................12

III.   MOTION FOR DISCOVERY......................................................................................13

    A.     In Habeas Litigation, Federal Courts Are to Authorize Discovery Upon a
        Showing of Good Cause ...............................................................................14

    B.     There Is Good Cause for Authorization of Ayestas's Limited Additional
        Discovery Requests ......................................................................................15

IV.    CONCLUSION .........................................................................................................16

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bracy v. Gramley,*
  520 U.S. 899 (1997) ........................................................................................15

*Burns v. Thiokol Chem. Corp.,*
  483 F.2d 300 (5th Cir. 1973) ...............................................................................8

*Carr v. State Farm Mut. Auto. Ins. Co.,*
  312 F.R.D. 459 (N.D. Tex. 2015) ...................................................................6, 12

*Clark v. Johnson,*
  202 F.3d 760 (5th Cir. 2000) ...........................................................................15

*Crosswhite v. Lexington Ins. Co.,*
  321 F. App'x 365 (5th Cir. 2009) .........................................................................5

*Foster v. Boise-Cascade, Inc.,*
  1975 WL 11888 (S.D. Tex. May 29, 1975) .............................................................8

*Harris v. Nelson,*
  394 U.S. 286 (1969) ........................................................................................15

*Kyles v. Whitley,*
  514 U.S. 419 (1995) ....................................................................................6, 15

*McCleskey v. Kemp,*
  481 U.S. 279 (1987) .....................................................................................7, 8

*McLeod, Alexander, Powel & Apffel, P.C. v. Quarles,*
  894 F.2d 1482 (5th Cir. 1990) .............................................................................6

*O'Bryant v. Walgreen Co.,*
  802 F. App'x 826 (5th Cir. 2020) .........................................................................6

*Payne v. Bell,*
  89 F. Supp. 2d 967 (W.D. Tenn. 2000) ..................................................................6

*Rogers v. Lodge,*
  458 U.S. 613 (1982) ..........................................................................................7

*United States v. Armstrong,*
  517 U.S. 456 (1996) ..........................................................................................7

*United States v. Webster,*
  162 F.3d 308 (5th Cir. 1998) ...............................................................................8

*Village of Arlington Heights v. Metropolitan Housing Development Corp.,*
  429 U.S. 252 (1977) ..........................................................................................7

- ii -

## TABLE OF AUTHORITIES

**Page(s)**

*Washington v. Davis*,
  426 U.S. 229 (1976) ....................................................................................7

**Statutes**

Tex. Code Crim. Proc. Ann. art. 42.09, § 8 ...............................................4

**Other Authorities**

*David Baldus et al., Racial Discrimination and the Death Penalty in the Post-Furman Era: An Empirical and Legal Overview, with Recent Findings from Philadelphia*, 83 Cornell Law Rev. 1638 (1998)....................................................................................9

Jeffrey A. Fagan & Amanda Geller, Police, Race, and the Production of Capital Homicides, 23 Berkeley J. Crim. L. 261 (2018)..............................................................9

U.S. Gen. Accounting Office, Gao-Ggd-90-57, Death Sentencing: Research Indicates Pattern Of Racial Disparities 5 (Feb. 26, 1990)..................................8

**Rules**

Fed. R. Civ. P. 37(a)(3)(B) .....................................................................5, 6

The Director has refused to produce certain demographic information about victims of crimes that the Harris County District Attorney's Office ("HCDA") charged as murder or capital murder between 1979 and 2008 (the "covered period"). This victim data would substantially assist Petitioner Carlos Ayestas's efforts to capture the effect, on HCDA's charging decisions, of defendant race, ethnicity, alienage, national origin, and immigration status. Ayestas hereby moves to compel this discovery from the Director and, if necessary, requests that the Court issue an order under Habeas Rule 6 facilitating that result.

The Director has acknowledged that this information is maintained and accessible on an electronic database—presumably the same database that stored the prisoner-defendant data that this Court ordered the Director to produce on February 8, 2024. *See* ECF Nos. 172, 182. The Director has nevertheless objected to victim data production. First, he says that the information was not encompassed by Ayestas's August 7, 2023 discovery requests. Second, he says that he can avoid the subsequent discovery request because it was "untimely." Third, he says that, in any event, the discovery is beyond the scope of this Court's Habeas Rule 6 Order, ECF. No. 131.

This Court should order the Director to disclose the requested victim demographic information notwithstanding his objections. The information is encompassed within both this Court's original Rule 6 Order and Ayestas's first discovery request. Even if this Court were to conclude that the victim demographic information was not encompassed by Ayestas's first discovery request, Ayestas's second request was not "untimely." And if this Court were to determine that responsive material were not due under its first Rule 6 Order and the requests made thereunder, Ayestas respectfully requests that the Court issue a new discovery order that explicitly covers the information. One way or the other, the Court should order production because the victim data is an important piece of the statistical puzzle and because it is easy for the Director to produce.

## I.       BACKGROUND ON DISCOVERY

Given the Court's familiarity with the extensive factual and procedural history of this litigation, Ayestas recites only the most relevant background for the instant motion.[1]

### A.       Background on Discovery Proceedings

On August 31, 2022, Ayestas moved for discovery under Rule 6(b) of the Rules Governing Section 2254 Cases in the United States District Courts (the "Habeas Rules"). In his Rule 6 motion, Ayestas stated that he intended to seek information from the Director, the HCDA, and (potentially) other third parties. Specifically, Ayestas announced his intent to seek information regarding Harris County defendants who were charged with murder or capital murder during the covered period. In his discovery motion, Ayestas explained that he sought the data necessary to explore whether the HCDA had engaged in discriminatory charging practices. *See* ECF No. 126 at 6 (stating that the requested discovery "will allow [Ayestas] to ascertain the HCDA's treatment of pertinent comparators"). Ayestas sought discovery that would permit a statistical analysis of the HCDA's charging decisions and potentially relevant biases, as well as the identification of specific individuals who received different treatment than Ayestas on account of their race, ethnicity, national origin, alienage, or immigration status. The Director opposed Ayestas's Rule 6 motion.

The Court found good cause for Ayestas's request and granted the motion.  ECF No. 131. After the Director unsuccessfully petitioned the Fifth Circuit for a writ of mandamus challenging discovery, Ayestas served discovery requests upon both the HCDA and the Director on August 7, 2023.  Among other things, Ayestas requested production of capital charging memoranda for Harris County defendants that were or could have been charged with capital murder during the covered

---

[1] The parties' prior filings have repeatedly discussed this lengthy factual and procedural history, including at ECF No. 165 at 4-7 (procedural history of discovery) and ECF No. 101 at 2-9 (factual history of Ayestas's conviction as well as the procedural history of this litigation).

2

period, as well as case files for defendants having select race, ethnicity, national origin, alienage, and immigration status. Ayestas believed that the changing memoranda and case files would include the type of victim demographic information sought here.

The Director again objected to these requests, reiterating the already-rejected arguments on relevance and procedural bars that he raised in opposition to Ayestas's motion for discovery. This Court overruled the Director's objections. *See* ECF Nos. 148, 150. The Director then produced data covering only a fraction of the covered period, and made clear that he would not produce the rest—even though he represented that there was no burden. Ayestas then moved to compel production of the defendant data from the covered period, provided that it was easily accessible on the Director's mainframe database. ECF No. 165. (This is the same database that appears to contain the victim data at issue here.) The Court granted Ayestas's motion and ordered the Director to produce that data, holding that the Director "ha[d] waived any objection to Petitioner's requested production based on the burden of production." ECF No. 172 at 2.

On March 12, 2024, the Director finally produced the requested materials. On April 12, Ayestas filed a sealed motion for authorization of services under 18 U.S.C. § 3599(f), which the Court granted on April 15. ECF Nos. 183-85. Working with the § 3599(f) service providers (experts), Ayestas confirmed that the victim demographic information contested here would the broadest, most accurate statistical analysis.

## B.    Ayestas's Requests for Victim Demographic Information

In October 2023, the HCDA produced three spreadsheets providing information regarding defendants who had been charged with capital murder and murder. A few months later, in March 2024, Ayestas received the Director's court-ordered production of defendant-related data stored on TDCJ's mainframe computer.

Ayestas had specifically raised the need for victim demographic information with the

Director in October 2023. At that time, the Director indicated that he would not produce victim demographic information because he did not believe that information was covered by Ayestas's initial discovery requests. While Ayestas disagreed with the Director, Ayestas nevertheless advised that he was willing to serve new requests to settle this matter. Accordingly, on November 14, 2023, Ayestas served two interrogatories on the Director that specifically asked for victim demographic information, seeking the "murder victim's (or victims') name, age, sex, and any other information concerning the victim that was included in the Pen Packet for the defendant(s)."[2] (Attached as Exhibit A).  On November 28, 2023, the Director sent counsel for Ayestas a letter that addressed other discovery issues—in particular, the Director's subsequently-overruled objections to producing defendant information beyond 1995-2000—and stated that the Director "will not presently address the victim information" request.  (Attached as Exhibit B).

Because the parties were also litigating the Director's refusal to defendant information beyond the 1995-2000 window, *see* ECF No. 165, Ayestas agreed to temporarily suspend the dispute concerning victim information to determine whether such information could be procured from either the HCDA or the Harris County District Clerk's Office ("HCDCO"). After the HCDCO indicated that it did not possess victim information outside of names and ages, Ayestas refocused his efforts on obtaining this information from the HCDA and the Director. On May 22, the HCDA informed Ayestas that its electronic system would likely be unable to produce such data.  On May 31, upon Ayestas's request for an update, the HCDA informed Ayestas that it could not provide a timeframe for producing the data, if it could even procure the data at all. Ayestas followed up again

---

[2] *See* TEX. CODE CRIM. PROC. ANN. art. 42.09, § 8 (requiring a county that transfers a defendant to TDCJ to provide, among other things, a "copy of the judgment"; a "written report that states the nature and the seriousness of each offense"; a "copy of the victim impact statement"; "if requested, information regarding the criminal history of the defendant"; a "copy of the indictment or information"; and a "copy of a presentence or postsentence report").

on July 5 and 8 regarding the status of the HCDA's response. In so doing, Ayestas requested a response by July 15. The HCDA did not respond by that deadline, and it has not responded since its last communication on May 31, 2024.

Ayestas renewed his earlier request to the Director for the victim demographic information included in the "Pen Packet" as described in Article 42.09, Section 8 of the Texas Code of Criminal Procedure. On July 3, the Director replied seeking additional clarifying information and noted that, if the Director decided to produce this information, the production might take some time. The Director did not confirm or deny whether he could produce this information. On July 18, Ayestas followed up on his request to ascertain the Director's position and, on July 26, the Director invited Ayestas to meet-and-confer regarding his request. On July 31, the parties met-and-conferred and the Director indicated that, while he did not possess information containing victim addresses or zip codes, he did possess gender and race information for a majority of the victims. While the Director did not suggest that the information was burdensome to produce and acknowledged that this data was stored electronically in a manner similar to the mainframe data that the Director had already been ordered to produce,  the Director argued that this victim demographic information did not fall within the scope of the discovery previously sought by and granted to Ayestas. The Director indicated that he would not produce this information without an order from the Court requiring him to do so.

## II.     MOTION TO COMPEL

### A.     Legal Standard

A party seeking discovery may move to compel when another party has failed to answer interrogatories or to produce documents. Fed. R. Civ. P. 37(a)(3)(B); *see also Crosswhite v. Lexington Ins. Co.*, 321 F. App'x 365, 368 (5th Cir. 2009) ("A party may move to compel production of materials that are within the scope of discovery and have been requested but not

received."). Parties, moreover, may not hinder discovery through partial compliance. Under Fed. R. Civ. P. 37(a)(4), "an evasive or incomplete disclosure, answer, or response must be treated as a failure to disclose, answer, or respond." Generally, "more liberal discovery is appropriate in capital cases where the stakes for petitioner are so high." *Payne v. Bell*, 89 F. Supp. 2d 967, 971 (W.D. Tenn. 2000); *cf. Kyles v. Whitley*, 514 U.S. 419, 422 (1995) ("duty to search for constitutional error with painstaking care is never more exacting that it is in a capital case.").

The party filing the motion to compel bears the initial burden of showing that the information requested is permissible discovery. *See Carr v. State Farm Mut. Auto. Ins. Co.*, 312 F.R.D. 459, 469 (N.D. Tex. 2015). If the movant has met their burden, the burden then shifts to the respondent to show "specifically how ... each interrogatory is not relevant or how each question is overly broad, burdensome or oppressive." *O'Bryant v. Walgreen Co.*, 802 F. App'x 826, 833 (5th Cir. 2020) (*per curiam*) (quoting *McLeod, Alexander, Powel & Apffel, P.C. v. Quarles*, 894 F.2d 1482, 1485 (5th Cir. 1990)); *see also* Section IV of Magistrate Judge Christina A. Bryan's Court Procedures ("Counsel for a party resisting discovery of electronic data shall be prepared to discuss, or have in attendance (in person or by telephone) a person prepared to discuss, the specific burdens or difficulties involved in the searching for and/or production of the requested electronic data."); ECF No. 147 (requiring the Director to provide specific evidence regarding the man-hours and procedures that would be required to comply); ECF No. 172 at 2 (holding that the Director "has waived any objection to Petitioner's requested production based on the burden of production" and ordering the Director to produce mainframe data).

## B.    Argument

This victim demographic information is relevant and the burden of producing it is negligible, so an order compelling production is warranted. The data that Ayestas seeks is narrowly tailored to the information that the Director possesses and can easily produce; Ayestas does not

seek information that the Director says he does not possess (namely, victim address and zip code), and he only seeks information that is maintained electronically. The Director must produce this data unless he can demonstrate that doing so is overly burdensome. But the Director can do neither. The Director has not—and seemingly cannot—explain any material burden associated with producing this victim demographic data. Nor has the Director suggested that this information is irrelevant. Indeed, *McCleskey v. Kemp*, 481 U.S. 279 (1987), and its progeny clearly establish that victim demographic information is a vital datapoint for statistical analyses of criminal punishment bias.

### 1.       Victim Demographic Information Is Clearly Relevant

Analyzing victim characteristics is widely recognized as a best practice in performing statistical analyses of charging discrimination against defendants. The importance of statistical inference is reflected in broader equal protection principles about the probative value of patterns and practices. In *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, for example, the Supreme Court acknowledged that "discriminatory purpose" can be demonstrated by a "clear *pattern*, unexplainable on grounds other than" discrimination. 429 U.S. 252, 266 (1977) (emphasis added). That is because resolving a discrimination claim requires "a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Id.*; *see also Rogers v. Lodge*, 458 U.S. 613, 618 (1982) (citing *Arlington Heights* and underscoring that discrimination is often inferred by differential application of facially neutral standards); *Washington v. Davis*, 426 U.S. 229, 242 (1976) (cited by *Arlington Heights* and explaining same). Indeed, statistical analysis of comparator data is frequently the primary evidence of prosecutorial discrimination. *See*, *e.g.*, *United States v. Armstrong*, 517 U.S. 456, 465 (1996) (emphasizing the importance of evidence in selective prosecution cases that "*similarly situated* individuals of a different race were not prosecuted") (emphasis added).

There is black-letter Fifth Circuit law that data about comparators is probative of individual discrimination: "Even though a suit seeks only individual relief for an individual instance of discrimination, and is not a 'pattern or practice' suit by the government or a class action, the past history of *both* Black and White employees is surely relevant information." *Burns v. Thiokol Chem. Corp.*, 483 F.2d 300, 306 (5th Cir. 1973); *see also United States v. Webster*, 162 F.3d 308, 334 (5th Cir. 1998) (noting, in a selective prosecution case, that a court may "find[] a constitutional violation (or *prima facie* finding thereof) in very limited circumstances if the data presents a 'stark' enough picture"). "[P]ast history as revealed by statistical or other empirical evidence is relevant to a [discrimination claim], even if only individual relief is sought," and "despite the problem of compiling, assimilating and synthesizing voluminous employment records into cogent, responsive answers to interrogatories, [respondents] should not be permitted to avoid responding to such interrogatories because they invoke this burden." *Foster v. Boise-Cascade, Inc.*, 1975 WL 11888, at *3 (S.D. Tex. May 29, 1975).

In terms of statistical evidence of charging discrimination, prosecutors can discriminate by reference to the race of defendant, but also by race of the victim. The leading Supreme Court case on charging discrimination, *McCleskey*, expressly recognizes this race-of-victim effect. *See McClesky*, 481 U.S. at 292, 293-94, 295 n.15. (analyzing sufficiency of race effect); *id.* at 287, 292 (recognizing race-of-victim effect in Georgia cases).[3] The race-of-victim effect has proven robust across studies and specifications for decades.[4] Holding other things constant, a defendant who

---

[3] Ayestas is not making a race-of-victim claim; he is merely invoking *McCleskey* because it recognizing that race-of-victim effects have, for at least 37 years, been part of mainstream understanding about capital charging decisions.

[4] The effect was particularly pronounced in the time period that this case implicates. *See* U.S. GEN. ACCOUNTING OFFICE, GAO-GGD-90-57, DEATH SENTENCING: RESEARCH INDICATES PATTERN OF RACIAL DISPARITIES 5 (Feb. 26, 1990), http://www.gao.gov/assets/220/212180.pdf (determining that over 80% of empirical work on question disclosed race-of-victim effect); *David Baldus et al.,*

harms a white victim is more likely to be charged and punished harshly than a defendant who harms a nonwhite victim.

Obtaining victim demographic information in this case is important for two reasons. First, analysis of statistical discrimination against nonwhite defendants is best undertaken by disentangling the race-of-defendant effect from the race-of-victim effect. If nonwhite defendants kill only nonwhite victims and if the race-of-victim effect is larger than the race-of-defendant effect, then failing to disentangle the two effects will produce a misleading result. In aggregate, nonwhite defendants will appear less likely to receive harsher charges—even though the only reason for that is that they harmed nonwhite victims. The best analysis of a race-of-defendant effect will hold victim race constant.

Second, Ayestas needs to be able to understand HCDA charging practices by reference to victim vulnerability. That's because, in addition to Ayestas's alienage, the Siegler Memorandum specifically invoked victim vulnerability as the *other* reason for seeking the death penalty. The best comparators allowing Ayestas to determine whether the HCDA systematically discriminated against defendants with Ayestas's profile are cases where the victims are also vulnerable. Ayestas can only analyze those cases if he knows certain attributes of the victims—including age and gender.

Ayestas does not seek superfluous information about victims. What he seeks is in line with best statistical practice since *McCleskey*. It allows him to provide the Court and other parties with the best information about the effect of defendant characteristics on charging decisions.

_____

*Racial Discrimination and the Death Penalty in the Post-Furman Era: An Empirical and Legal Overview, with Recent Findings from Philadelphia*, 83 CORNELL LAW REV. 1638, 1661 (1998) (finding race-of-victim effect in ninety percent of studies); *see also* Jeffrey A. Fagan & Amanda Geller, Police, Race, and the Production of Capital Homicides, 23 BERKELEY J. CRIM. L. 261, 273-75 (2018) (surveying more recent empirical work on race-of-victim effect).

### 2. There Is No Burden Associated With Producing the Victim Demographic Information

Ayestas seeks only information that the Director has represented is both in his possession and stored electronically on a database. This represents a considerable narrowing not only of Ayestas's original request—which sought all case files and charging memoranda from the relevant crimes—but also the already-tailored ask for victim demographic information that would have been contained in those charging memoranda and case files. The Director has explained to Ayestas that TDCJ employees usually (but not always) record a victim's age, race, and/or gender into a mainframe database when a defendant is entered into TDCJ's system. Ayestas seeks only the race, age, and gender information stored on this database.

In response, the Director has not articulated *any* burden associated with producing this information. There is a simple explanation for this: the burden is negligible. As with the mainframe data regarding murder and capital murder defendants that the Director refused to produce until ordered to do so by this Court, this data can presumably be easily queried, collected, and produced to Ayestas without any significant burden. Thus, like the mainframe data, the Director has waived any objection "based on the burden of production," ECF No. 172, at 2, due to this plain refusal to justify that burden.

### 3. The Director's Arguments That Ayestas Did Not Request Victim Demographic Information in Discovery Are Incorrect and Obstructive

The Director has instead resorted to the argument that Ayestas's discovery requests were not encompassed by the Rule 6 Order; that even if they were encompassed by that Order, they were not encompassed by Ayestas's August 7, 2023 requests, which did not include this victim demographic information; and that, if they were not encompassed by those requests, they are untimely. The Director is incorrect.

### a.  Ayestas's Discovery Requests Were Encompassed by the Rule 6 Order

From the inception of discovery in this litigation, Ayestas has sought victim demographic information that he reasonably believed would have been part of the charging memoranda, because that information was included in the charging memorandum in Ayestas's own case.  His August 7, 2023 discovery requests, which the Rule 6 Order authorized Ayestas to propound, reflect this. *See* ECF No. 126 at 3 (requesting "charging memoranda for any and all Harris County defendants that were or could have been charged with capital murder").



Similarly, the homicide case files involving noncitizen and Hispanic/Latino/a defendants would have included victim demographic information for a substantial portion of the defendants charged during the covered period. Case files would capture even more victim demographic information than a charging memorandum; while charging memoranda would typically be limited to a narrow set of information that is highly relevant to the charging decision, the case files would include a litany of other information regarding the defendant, the crime, and the victim. Ayestas requested the case files and charging memoranda in part because they would provide this critical victim demographic information, and he has subsequently narrowed his request because the Director and the HCDA represented that producing case files and charging memoranda would be more burdensome.[5] This is a natural part of discovery. Parties "may begin discovery without a full

---

[5] Ayestas has not abandoned his request for case files and charging memoranda. He is working with the parties to further tailor the scope of his requests concerning this information.

appreciation of the facts that bear on proportionality." *Carr v. State Farm Mut. Automobile Ins. Co.*, 312 F.R.D. 459, 467 (N.D. Tex. 2015). As discovery proceeds and those facts become clearer, parties confer regarding a more agreeable scope of production.

But here, rather than work cooperatively with Ayestas's efforts to get the relevant information through the most efficient means, the Director insists that Ayestas restart the entire discovery process, including asking for permission to serve discovery under the Habeas Rules. In an attempt to address the Director's objections without Court intervention, Ayestas served additional interrogatories in November 2023 that asked for the victim demographic information at issue here. Ayestas served these requests in an effort to find a middle ground to get the same information he had already requested, as this second round of requests simply enumerated specific information that was covered by his initial round of requests. But the Director again refused to engage, taking the position that Ayestas needed to ask the Court for permission to serve any additional requests.

b.     **Ayestas's Discovery Requests Were Encompassed by His August 7 Requests**

The Director insists that he need not respond because the November 2023 discovery requests were "untimely." The Director's timeliness objection mischaracterizes Ayestas's attempt to narrow a prior request so as to reduce the Director's burden. As discussed *infra*, Ayestas's August 7 requests sought HCDA's charging memoranda and case files for select defendants, which he believed would include victim demographic information. As discovery progressed, however, Ayestas learned through the meet-and-confer process that the victim demographic information he needed would not be contained within those materials. For example, Ayestas learned that HCDA prepares charging memoranda only for defendants actually *charged* with capital murder, as opposed to all defendants *eligible* for a capital murder charge. As a result, charging memoranda

that might contain victim demographic information would not exist for defendants who were charged with non-capital murder. Given this narrower universe of charging memoranda, as well as representations by the HCDA and the Director that they were either unwilling or unable to produce charging memoranda, Ayestas put forth a narrower request that the HCDA or the Director produce the victim demographic information that Ayestas had previously believed would be covered by his request for charging memoranda (as well as the request for case files, at least for Hispanic and noncitizen defendants).

Simply put, Ayestas's November 2023 request for victim demographic information narrowed his August 7 requests. That narrowing reflected the Director's and HCDA's representations about the information they possess, as well as information produced by third parties. The Director has nonetheless refused to produce any victim demographic information, and, on July 31, 2024, the Director informed Ayestas that he would not produce it without a Court order. In short, the Director now attempts to use Ayestas's efforts to minimize the Director's burden as a shield to avoid minimally burdensome production.

The Director's insistence that Ayestas move anew for discovery under Habeas Rule 6 and then serve new discovery requests needlessly delays Ayestas's prosecution of his habeas claim. Briefing his opposition to this motion to compel (much less an additional motion for discovery) will undoubtedly require more time and effort from the Director than just producing the information Ayestas seeks. But given the importance of this information, as well as the clear justification for its production, Ayestas moves the Court to compel the Director to produce all electronically stored information regarding the age, gender, and race for victims of crimes charged as murder or capital murder in Harris County during the covered period.

## III.   MOTION FOR DISCOVERY

In the event the Court construes Ayestas's request as untimely or not authorized by the Rule

6 Order, and it determines that Ayestas must serve new discovery requests specifically covering the victim demographic information, Ayestas respectfully requests that the Court issue a new discovery order under Habeas Rule 6. The Rule 6 Order should authorize Ayestas to serve discovery requests targeting this limited, easily produced information. Specifically, Ayestas would again serve the two interrogatories that he previously served on the Director on November 14, 2023:

1. For any and all Harris County Inmates between 1979 and 2008 who were convicted of murder, as defined by the Texas Penal Code title 5, chapter 19, section 19.02(b)(1) or the equivalent statute in effect at the time when the defendant was convicted, please identify the defendant's name; the defendant's alienage, date of birth, place of birth, race, sex, and SPN; case disposition, offense report number, case number, and filing date of the prosecution of the charged murder; and the murder victim's (or victims') name, age, sex, and any other information concerning the victim that was included in the Pen Packet for the defendant(s).

2. For any and all Harris County Inmates between 1979 and 2008 who were convicted of capital murder, as defined by the Texas Penal Code title 5, chapter 19, section 19.03 or the equivalent statute in effect at the time when the defendant was convicted, please identify the defendant's name; the defendant's alienage, date of birth, place of birth, race, sex, and SPN; case disposition, offense report number, case number, and filing date of the prosecution of the charged murder; and the murder victim's (or victims') name, age, sex, and any other information concerning the victim that was included in the Pen Packet for the defendant(s).

Exhibit A.   For each request, the Director would need only produce the victim demographic information residing in his mainframe database.

### A.      In Habeas Litigation, Federal Courts Are to Authorize Discovery Upon a Showing of Good Cause

In habeas proceedings, "a judge may, *for good cause*, authorize a party to conduct discovery under the Federal Rules of Civil Procedure." Habeas Rule 6(a) (emphasis added). Good cause exists "where specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is ... entitled to relief[.]" *Bracy*

14

*v. Gramley*, 520 U.S. 899, 908-09 (1997) (internal quotation marks and citations omitted). In those situations, "it is the duty of the court[s] to provide the necessary facilities and procedures for an adequate inquiry." *Id.* It is especially important that claimants be permitted to make a complete factual record in capital cases, as habeas proceedings are designed to identify and rectify wrongful verdicts before an irreversible penalty is actually imposed. *See Harris v. Nelson*, 394 U.S. 286, 291 (1969) ("habeas corpus is 'the great and efficacious writ, in all manner of illegal confinement.'"); *Kyles*, 514 U.S. at 422 ("duty to search for constitutional error with painstaking care is never more exacting than it is in a capital case."). The Fifth Circuit has held that the critical factor for authorizing discovery in habeas litigation is the existence of a "specifically alleged factual dispute." *Clark v. Johnson*, 202 F.3d 760, 767 (5th Cir. 2000).

### B.   There Is Good Cause for Authorization of Ayestas's Limited Additional Discovery Requests

Here, the Court has already found that "Ayestas has shown good cause for discovery," as "Ayestas has presented evidence raising questions as to whether the decision to seek the death penalty against him was based on constitutionally impermissible factors." ECF No. 131, at 16. The same predicates for that finding remain. Ayestas continues to pursue the same theory that the decision to charge him with capital murder was based, at least in part, on unconstitutional considerations such as his alienage and/or ethnicity.

In order to pursue his theory that the charging decision invoked impermissible factors, Ayestas should have the demographic information relating to the victims of potential comparators. As described *supra*, information about *victim* attributes allows analysis to better pinpoint the effects of *defendant* attributes. Without the victim demographic information, Ayestas would miss a critical parameter for both identifying and discounting potential comparators.

## IV.     CONCLUSION

Due to the Director's refusal to provide Ayestas with important victim demographic information, Ayestas respectfully requests that the Court order the Director to quickly produce all electronically stored information regarding the age, gender, and race for victims of crimes charged as murder or capital murder in Harris County during the covered period. In the alternative, if the Court sustains the Director's objection that victim demographic information is not covered by Ayestas's previous discovery requests, Ayestas respectfully requests that the Court issue a new Rule 6 Order that covers the limited discovery described in this Motion.


Dated: October 30, 2024                              Respectfully submitted,

                                                     */s/ Lee B. Kovarsky*
                                                     Lee B. Kovarsky
                                                     Phillips Black, Inc.
                                                     727 East Dean Keeton street
                                                     Jon 5.231
                                                     Austin, TX 78705
                                                     (434) 466-8257
                                                     l.kovarsky@phillipsblack.org

                                                     Sheri Lynn Johnson
                                                     Cornell Law School
                                                     240 Myron Taylor Hall
                                                     Ithaca, NY 14853
                                                     (607) 255-6478
                                                     slj8@cornell.edu

                                                     ATTORNEYS FOR PETITIONER

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on the 30th day of October 2024, I electronically filed the above and foregoing document using the CM/ECF system, which automatically sends notice and a copy of the filing to all counsel of record.

*/s/ Lee Kovarsky*